**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| | § | |
| JASON EMORY McKEMIE, | § | CASE NO. 26-30161-mvl7 |
| | § | |
| Debtor. | § | |

**MOTION OF GWENDOLYN LAURA ULIJASZ FOR (I) ANNULMENT OF THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(d) TO THE EXTENT THE STAY APPLIED TO THE JUNE 26, 2026 FINAL DECREE OF DIVORCE, (II) A DETERMINATION, FOR PURPOSES OF § 362, THAT THE STAY DID NOT APPLY TO THE DECREE'S DISSOLUTION PROVISIONS OR TO PROPERTY THAT WAS NOT PROPERTY OF THE ESTATE, AND (III) ALTERNATIVELY, MODIFICATION OF THE STAY TO PERMIT THE STATE COURT TO COMPLETE THE DIVISION OF PROPERTY; AND APPLICATION FOR ORDER SHORTENING TIME AND EXPEDITED HEARING**

**PURSUANT TO LOCAL BANKRUPTCY RULE 4001-1(b), A RESPONSE IS REQUIRED TO THIS MOTION, OR THE ALLEGATIONS IN THE MOTION MAY BE DEEMED ADMITTED, AND AN ORDER GRANTING THE RELIEF SOUGHT MAY BE ENTERED BY DEFAULT.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 1100 COMMERCE STREET, ROOM 1254, DALLAS, TEXAS 75242 BEFORE CLOSE OF BUSINESS ON SEPTEMBER 25, 2026, WHICH IS AT LEAST 14 DAYS FROM THE DATE OF SERVICE HEREOF. A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY AND ANY TRUSTEE OR EXAMINER APPOINTED IN THE CASE. ANY RESPONSE SHALL INCLUDE A DETAILED AND COMPREHENSIVE STATEMENT AS TO HOW THE MOVANT CAN BE "ADEQUATELY PROTECTED" IF THE STAY IS TO BE CONTINUED.**

Gwendolyn Laura Ulijasz ("Movant"), the former spouse of the Debtor, Jason Emory McKemie, files this motion and respectfully shows:

## I. RELIEF REQUESTED AND WHY IT IS URGENT

1. On June 26, 2026, the 301st Judicial District Court of Dallas County, Texas (the "State Court") signed a Final Decree of Divorce (the "Decree") in Cause No. DF-24-18010, dissolving the marriage of Movant and the Debtor, restoring Movant's name, confirming Movant's separate property, and dividing the parties' community property. The Debtor, who had answered and appeared, did not attend the June 11, 2026 trial. The Debtor has since moved the State Court for a new trial and for "vacatur of the Decree in its entirety," arguing that the Decree is void because it was signed while this case was pending and no party had sought relief from the stay. On September 3, 2026, the State Court overruled every other ground of the motion and took the stay question under advisement; its plenary power over the Decree expires on October 9, 2026. Tex. R. Civ. P. 329b(c), (e).

2. Movant asks this Court to resolve the question that belongs to it. The Debtor has told this Court that whether the Decree's division "is given any effect as to property of this estate" is "a question reserved to this Court — not the state court," and that validation is available "only through retroactive annulment of the stay under § 362(d) — a form of relief committed exclusively to this Court." ECF 96 ¶ 29. Movant takes him at his word and asks for an order:

(a) annulling the automatic stay under 11 U.S.C. § 362(d), effective as of June 26, 2026 (or, if the Court deems it necessary, as of June 11, 2026), to the extent the stay applied to the trial of the divorce and to the entry of the Decree, so that the Decree is given effect as of the date it was signed, without prejudice to the Trustee's rights in property of the estate as reserved by Decree § 8.G;

(b) determining, solely for purposes of § 362 and this contested matter, that the stay did not apply to the Decree's dissolution of the marriage, its findings concerning the existence and date of the marriage, or the restoration of Movant's name, 11 U.S.C. § 362(b)(2)(A)(iv), and that the property confirmed to Movant in Section 8.C of the Decree, and the property awarded to her in Section 8.A, items W-1 through W-6, was not under the Debtor's management and control as of January 12, 2026 and did not become property of the estate under 11 U.S.C. § 541(a)(2)(A), so that, except to the extent (if any) that such property was liable for an allowable claim against the Debtor under § 541(a)(2)(B), it was not property of the estate when the Decree was signed, the annulment requested in paragraph 2(a) applying to any such extent; and

(c) in the alternative, modifying the stay to permit the State Court to complete or redo the division of any property that this Court determines to be property of the estate, subject to the rights of the Chapter 7 Trustee.

3. Movant does not ask this Court to adjudicate title to any asset or to enter a declaratory judgment of the kind described in Federal Rule of Bankruptcy Procedure 7001. The determination requested in paragraph 2(b) is the determination this Court routinely makes in deciding whether the stay applies to an act and whether relief from it should be granted. *See In re Trammell*, 399 B.R. 177 (Bankr. N.D. Tex. 2007) (Houser, J.) (deciding, on a motion for relief from stay, that a vehicle titled to the non-filing spouse was not property of the estate). A request that the Court determine that the stay was not in effect as to an act and that the act "was not invalid" is properly brought by motion under Rule 4001(a)(1), not by adversary proceeding; such a request "does not fall within the bounds of Rule 7001." *Barner v. Saxon Mortg. Servs., Inc. (In re Barner)*, 597 F.3d 651, 654 (5th Cir. 2010) (per curiam) (holding also that any error in proceeding by motion was

harmless where the parties had a full hearing on the merits). Movant recognizes that the determination requested in paragraph 2(b) asks more of the Court than *Barner* did, because it concerns the management of identified assets under § 541(a)(2)(A) rather than the operation of a prior order, and that if the Debtor disputes the material facts, Rule 9014(d) requires testimony to be taken as in an adversary proceeding. The annulment requested in paragraph 2(a) does not depend on the determination requested in paragraph 2(b); if the Court prefers to grant annulment under Part V without making that determination, Movant asks that it do so.

4. Movant applies for an order shortening time and requests an expedited hearing before October 9, 2026, for the reasons stated in Part VI and in the accompanying declaration, and is submitting the Court's expedited-motion form (BTXN146) and notifying the courtroom deputy at mvl_settings@txnb.uscourts.gov upon filing, in accordance with the Court's published procedures. N.D. Tex. L.B.R. 4001-1(e)(3), 9007-1.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (G). Venue is proper under 28 U.S.C. § 1409. The relief requested is authorized by 11 U.S.C. §§ 105(a) and 362(d), Federal Rule of Bankruptcy Procedure 4001(a), and N.D. Tex. L.B.R. 4001-1. Movant is a party in interest: she is the Debtor's former spouse; the Debtor scheduled her as a creditor holding a disputed claim of $250,000 (ECF 29, Schedule E/F, item 4.3); and he has asked this Court, in his Rule 2004 motion (ECF 97), for subpoenas to eight institutions for her compensation, banking, brokerage, and retirement records on the theory that her property is property of this estate.

## III. BACKGROUND

6. Movant and the Debtor married on June 22, 2024. Movant filed for divorce in December 2024. The Debtor filed this Chapter 7 case, pro se, on January 12, 2026 (ECF 1, 7). Areya Holder

Aurzada is the Chapter 7 Trustee. The case was dismissed on February 5, 2026 (ECF 24) and reinstated on February 18, 2026 (ECF 32). The meeting of creditors was held and concluded on March 3, 2026. The Debtor moved to defer his own discharge (ECF 40, 49); InTouch Credit Union has filed a complaint objecting to his discharge under § 727 (ECF 62; Adv. No. 26-03034-mvl), with docket call set for October 6, 2026; and as of September 5, 2026 no discharge has been entered.

7. On February 18, 2026, the Debtor filed in the State Court a "Notice of Bankruptcy Automatic Stay" requesting that no further proceedings occur in the divorce absent relief from the stay. He did not follow that notice with any request to this Court. He knew how to ask: he moved to vacate the dismissal and reimpose the stay in February (ECF 27, 32) and obtained emergency reinstatement of the stay as to his residence in April (ECF 54, 57), both in connection with his eviction. But the docket, reviewed through September 5, 2026, reflects no motion by the Debtor to enforce the stay against the divorce proceeding or for a determination that the stay applied to it. He continued to litigate in the State Court, sought nine continuances of the trial setting, and in his filings here invoked the State Court's orders as protection: "Debtor was under the protection of an active divorce-court restraining order," and the property at the residence "remained subject to the divorce court's restraining order and property-preservation authority." ECF 71 at 1. By his own account, "no party has ever asked the Bankruptcy Court to annul the stay to validate" the Decree. Debtor's Aug. 31, 2026 State Court filing ¶ 48-1.

8. After eighteen months of litigation and a trial setting of which the Debtor had notice, the State Court tried the case on June 11, 2026 without him and signed the Decree on June 26, 2026, day 165 of this case. The Decree (Exhibit 1):

(a) finds the parties married on June 22, 2024, finds that no informal marriage preceded that date, and dissolves the marriage (§§ 5, 6);

(b) restores Movant's name (§ 10);

(c) confirms as Movant's separate property, on clear and convincing evidence of pre-marital inception of title, her AIG 401(k), her Ameriprise Traditional and Roth IRAs, and her Advantigen Biosciences membership units (§ 8.C);

(d) awards Movant the community property held in her name or possession: her UBS Accenture VEIP/ESPP account, her Accenture restricted stock units, her Chase checking account, her Accenture HSA, her BMW subject to its debt, her personal effects, and other community assets in her name, possession, or control (§ 8.A, W-1 through W-6, W-9), together with two items in the Debtor's possession or control, domain names incorporating Movant's name (W-7) and the personal items specified in W-8;

(e) awards the Debtor every account in his own name, his vehicle subject to its lien, his effects, and other community assets in his name, possession, or control (§ 8.B);

(f) allocates debts between the spouses (§§ 8.D through 8.F); and

(g) provides that "[n]othing in this Decree modifies the rights of the Chapter 7 trustee in In re McKemie, N.D. Tex. No. 26-30161-MVL-7" (§ 8.G).

9. The Debtor's motion for new trial in the State Court was filed July 27, 2026. His stated purpose in seeking vacatur "in its entirety" is "so that the community estate resumes accruing and can be reconstituted." Aug. 31 Filing ¶ 48a. In this Court, by contrast, he has written that "Section 362(b)(2)(A)(iv)'s dissolution exception is textually limited: the dissolution proceeding could proceed, but not 'the division of property that is property of the estate,'" that stay violations in this Circuit "are voidable" and "can be validated only through retroactive annulment of the stay under

§ 362(d) — a form of relief committed exclusively to this Court," and that whether the division "is given any effect as to property of this estate is therefore a question reserved to this Court — not the state court — under 28 U.S.C. § 1334(e)(1), and it remains unresolved." ECF 96 ¶ 29. Movant agrees that this Court is the forum for that question and brings it here. On September 3, 2026, the State Court overruled the motion on all grounds except the automatic stay, which it took under advisement with briefing to close September 11, 2026. The State Court's plenary power to grant a new trial or modify the Decree ends October 9, 2026.

## IV. THE STAY DID NOT APPLY TO THE DISSOLUTION, AND THE PROPERTY CONFIRMED AND AWARDED TO MOVANT WAS NOT PROPERTY OF THE ESTATE

### A. The dissolution, the findings on the marriage, and the name change

10. The stay does not apply to "the commencement or continuation of a civil action or proceeding . . . for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate." 11 U.S.C. § 362(b)(2)(A)(iv). Texas courts apply the exception as written: a decree signed during the stay is void as to the division of estate property but valid as to the dissolution. *Adeleye v. Driscal*, 544 S.W.3d 467, 473–74, 485–86 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (dissolution "unaffected by the bankruptcy stay"; decree affirmed "to the extent that it recognizes and dissolves that marriage"); *Eguia v. Eguia*, 367 S.W.3d 455, 459–60 (Tex. App.—Corpus Christi–Edinburg 2012, no pet.) (judgment "void to the extent it attempted to rule on matters relating to property that is part of the bankruptcy estate"). The dissolution, the findings on the marriage, and the name change were never stayed, and Movant asks the Court to say so, to end the Debtor's effort to have the marriage reinstated in the State Court.

**B. The property confirmed and awarded to Movant was not property of the estate**

11. "Property interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979). Community property enters the estate only as § 541(a)(2) provides: interests of the debtor and the debtor's spouse in community property "as of the commencement of the case" that is "(A) under the sole, equal, or joint management and control of the debtor; or (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable." Separate property of the non-debtor spouse does not enter the estate under § 541(a)(2) at all. *In re Robertson*, 203 F.3d 855, 859 (5th Cir. 2000).

12. Movant's separate property (Decree § 8.C). The AIG 401(k), the Ameriprise IRAs, and the Advantigen units were owned by Movant before the marriage and traced to pre-marital sources by clear and convincing evidence. Tex. Fam. Code §§ 3.001(1), 3.003(b). The Decree confirmed them as Movant's separate property, and the separate property of the non-debtor spouse is not property of the estate. Tex. Fam. Code § 3.202(a) (separate property "not subject to liabilities of the other spouse unless both spouses are liable by other rules of law"); *Robertson*, 203 F.3d at 859. Ulijasz Decl. ¶¶ 5–7. Form 1's "VOYA" entry is Movant's Cognizant 401(k): it is the only Voya account the record shows, and the Debtor's own February 24, 2025 inventory lists it as "Voya - Cognizant 401(k) Retirement Savings Plan" (Ulijasz Decl. Ex. 4, line 24). It is therefore the same money: that plan was rolled into the Ameriprise IRAs in November 2024 and held a zero balance by December 31, 2024. Ulijasz Decl. ¶ 6. Payroll contributions from Movant's earnings continued to reach that plan for a short time after the marriage and before the rollover (the statements show $1,545.00 on June 28, 2024 and $1,545.00 on July 15, 2024). *Id.* To the extent the Cognizant rollover therefore included marital earnings, Movant relies in the alternative on her sole

management of those earnings under Tex. Fam. Code § 3.102(a)(1), which places them outside § 541(a)(2)(A), subject to the § 541(a)(2)(B) analysis in ¶ 14 below.

13. Movant's sole-management community property (Decree § 8.A, W-1 through W-6). Section 541(a)(2) speaks "as of the commencement of the case," January 12, 2026. Each of these items was held in Movant's name or possession on that date, and the financial items derive from her Accenture compensation. Under Texas law each spouse has "the sole management, control, and disposition of the community property that the spouse would have owned if single, including: (1) personal earnings; . . . and (4) the increase and mutations of, and the revenue from, all property subject to the spouse's sole management, control, and disposition," Tex. Fam. Code § 3.102(a). Section 3.104(a) adds a presumption of sole management for property "held in that spouse's name"; Movant does not rest on it, because Texas courts have declined to apply the presumption in disputes between the spouses themselves, *Trammell*, 399 B.R. 177 (slip op. at 8 n.8) (citing *Wohlenberg v. Wohlenberg*, 485 S.W.2d 342 (Tex. Civ. App.—El Paso 1972)), although *Trammell* applied it where, as here, the question concerns the estate's rights rather than a dispute between spouses. The evidence answers the question without the presumption, item by item: W-1, the UBS account, holds shares bought through Accenture's employee equity purchase program by payroll deduction from Movant's salary; W-2 is the restricted stock Accenture granted her as compensation; W-3 is the Chase account ending x9259, in her name alone, into which her salary is paid; W-4 is the health savings account maintained through her Accenture employment, held in her name with an opening balance of $8,197.44 on January 1, 2026, Ulijasz Decl. Ex. 6; W-5 is the BMW, titled in her name alone since June 21, 2023, a year before the marriage, Ulijasz Decl. Ex. 7, and paid for from her earnings, so that whether it is her separate property by inception of title or, as the Decree's placement of it in § 8.A treats it, community property under her sole

management, it was never under the Debtor's management; and W-6 consists of personal effects she brought into the marriage or bought with her earnings. Ulijasz Decl. ¶¶ 8–11. [On February 28, 2026, six weeks after the petition, Movant traded the vehicle in to a dealer, which paid the InTouch loan, then $54,500, from the trade-in, for a replacement financed in her name alone; the determination sought concerns the vehicle's status on the petition date, and the replacement, acquired after the commencement of the case, is outside § 541(a)(2), which speaks "as of the commencement of the case." Ulijasz Decl. ¶ 11 & Ex. 7-B.] [Counsel: this bracket stands or falls with the trade-in sentence in declaration ¶ 11, and both wait on the answer to the W-5 question in the cover note (fifteenth pass).] Item W-9 is a residual category ("[a]ny and all other community assets in Wife's name, possession, or control not otherwise awarded"); Movant does not ask for a finding as to unidentified property and includes W-9 in the annulment request instead. Each account has been in her name alone and administered by her alone, *id.*; the State Court so found, Decree § 8 (RSU findings under Tex. Fam. Code § 3.007; "Wife serviced and paid down the community debt from her separate income"); the Debtor's own inventory lists these items as hers, Ulijasz Decl. Ex. 4; and the Debtor's own sworn schedules describe the same assets as property over which "control remain[s] exclusively with spouse," ECF 29, Schedule A/B, line 27, and list his "[c]ommunity property interest in marital funds and assets currently held and controlled by spouse" not as property in his hands but as a claim against a third party, *id.* line 33; Form 1 carries both entries forward. ECF 91 (Assets 21, 23). This Court has held that such property is not "under the sole, equal, or joint management and control of the debtor" and does not enter the estate under § 541(a)(2)(A), even where the debtor scheduled it. *Trammell*, 399 B.R. 177 (vehicle titled in non-debtor husband's name, scheduled by debtor as community property, held not property of the estate); *In re Martin*, No. 08-46189-DML (Bankr. N.D. Tex. July 2, 2009) (non-debtor spouse's

tax refund attributable to his earnings "not property of Mrs. Martin's estate"); *see Ragan v. Comm'r*, 135 F.3d 329 (5th Cir. 1998). Ulijasz Decl. ¶¶ 8–11. Section 3.102(b) of the Family Code does not alter the analysis. It converts to joint management community property under one spouse's sole management that "is mixed or combined with" community property under the other spouse's sole management, Tex. Fam. Code § 3.102(b); *In re Kim*, 405 B.R. 179, 189 (Bankr. N.D. Tex. 2009); *Martin*, slip op. at 4; the conversion is triggered by combining the two spouses' sole-management property with each other, it reaches "the mixed or combined community property" and not the spouse's other assets, and a spouse's use of her own earnings to pay household expenses is a use of her property, not a mixing of the other spouse's property into it. The 2024 statements for Movant's Chase account ending x3898, the predecessor of x9259, show no deposit from any account of the Debtor's; the deposits are her payroll, the proceeds of loans in her own name, and other credits none of which the statements identify as coming from him, and the one credit from an account to which the Debtor had access is a single $3,400 online transfer on November 12, 2024 from the joint Chase x6893 account, which had received a cash deposit in that amount the same day. Ulijasz Decl. ¶ 10. That cash was the price of a ring Movant bought in 2009, which the Debtor sold on her behalf that day and deposited with his own debit card; the parties' text messages of November 12, 2024 record the sale and his deposit "in the joint account," and the money went to her account the same day. *Id.* & Ex. 12. So the one credit that passed through an account the Debtor could reach was Movant's own money, the proceeds of property she owned before the marriage, Tex. Fam. Code § 3.001(1), and not his. During the marriage Movant funded the joint account by transfers from her own accounts, and she states that to her knowledge the Debtor never deposited money of his own into it or into her accounts. *Id.* ¶ 10. The statements alone do not say whose cash that was, and Movant does not rest on them alone: had the cash been the Debtor's, the

commingled balance would have become joint-management property at that time, because under § 3.102(b) "the commingled property is considered to be jointly managed property, absent a written agreement to the contrary." *United States v. Loftis*, 607 F.3d 173, 178–79 (5th Cir. 2010). What the statements show in any event is that the funds held in the account were depleted before the petition. The x3898 balance was transferred into x9259 on January 13, 2025; by October 14, 2025 the payments posted to x9259 since September 26, 2025, including a $13,000 payment on Movant's own Chase Visa card, exceeded the beginning balance and the deposits to that date by $121.84, so that the account was overdrawn that day; every deposit after that date was Movant's Accenture payroll or another payment from Accenture, a $200 cash deposit made with her debit card (which identifies the depositor, not the source of the cash), or a January 5, 2026 wire from her own UBS account; and the balance on January 12, 2026, after that day's payments, was $18,502.40. Ulijasz Decl. ¶ 10 & Exs. 9–11. The overdraft establishes that the funds then held in the account were depleted; it does not by itself exclude earlier withdrawals having been placed in another asset or later redeposited, and the character of the petition-date balance depends on the sources of the credits that followed. Movant claims no more than that. No one has identified an asset into which any earlier funds can be traced, and no later credit came from any source but hers. The accounts in which the spouses' funds did meet were the two joint household checking accounts addressed in ¶ 16.

14. Nor does that property enter the estate under § 541(a)(2)(B). "Unless both spouses are personally liable as provided by this subchapter, the community property subject to a spouse's sole management, control, and disposition is not subject to: (1) any liabilities that the other spouse incurred before marriage; or (2) any nontortious liabilities that the other spouse incurs during marriage." Tex. Fam. Code § 3.202(b). A spouse is personally liable for the other's acts "only if"

the other acted as her agent or incurred a debt for necessaries. *Id.* § 3.201(a), (c); *Trammell*, 399 B.R. 177 (distinguishing "community liability for a debt and personal liability for a debt"). The InTouch Credit Union vehicle loan was signed by the Debtor alone on June 30, 2022, two years before the marriage. ECF 46 ¶ 1. The one obligation on which both parties' names appeared, the residential lease at 5609 La Foy Boulevard, was the subject of a Mutual Release and Private Settlement Agreement dated July 22, 2025, under which the landlord released "any and all claims, demands, causes of action, obligations, damages, and liabilities of any nature whatsoever . . . arising directly or indirectly from the Premises and the Lease" and agreed to nonsuit its eviction suit as to Movant with prejudice, in exchange for her surrender of possession and of the security deposit, terms with which Movant has complied. The landlord filed the notice of nonsuit on July 23, 2025, reciting that Movant "has previously surrendered possession," and the justice court dismissed the suit as to her, with prejudice, on July 24, 2025. Ulijasz Decl. ¶ 12 & Exs. 2, 2-A. Movant's sworn inventory in the divorce lists Movant as the only cardholder or authorized user on each of her credit accounts and as the person liable on her personal loans, naming no one else on any of them, and the Debtor's own inventory lists his credit cards, auto loan, and personal loans as his alone; neither identifies a debt on which both spouses are liable, and Movant states from her own knowledge that the Debtor has never been a borrower, co-signer, or guarantor on any of her accounts. Ulijasz Decl. ¶ 12 & Exs. 3–4. The Debtor was an authorized user on Movant's American Express account for some months in 2023, before the marriage, and on her Chase card from about June to December 2024, when Movant removed him. *Id.* An authorized user's charging privilege is not a promise to pay the issuer; the obligor on each account is Movant under her cardholder agreement, and neither issuer is scheduled as a creditor in this case or has filed a claim in it. ECF 29 at 12–14. The three debts that Section 8.F of the Decree divides equally between the spouses,

the SoFi loan, the Chase credit card, and the Citibank account (JD-1 through JD-3), are accounts in Movant's name: the inventories identify them as hers, and Movant declares that the Debtor has never been a borrower or co-signer on any of them and has not been an authorized user on the Chase card since 2024. *Id.* Section 8.F's description of them as "community debts" and its equal allocation divide liabilities between the spouses as part of the just-and-right division; they do not make the Debtor personally liable to those creditors, whose claims are claims against Movant rather than "allowable claim[s] against the debtor," and none of the three creditors is scheduled in this case or has filed a claim in it. Ulijasz Decl. ¶ 12 & Exs. 3–4; ECF 29 at 12–14. [Confirm the identity of the Chase account referred to in Section 8.F before filing; see the cover note.] Two categories of claim can reach a non-debtor spouse's sole-management community property notwithstanding § 3.202(b): a tortious liability either spouse incurred during the marriage, to which "[a]ll community property is subject," Tex. Fam. Code § 3.202(d), and a federal tax claim against the debtor, which the United States may collect from the debtor's one-half interest in that property because the state-law exemption "is ineffective against the federal government." *Medaris v. United States*, 884 F.2d 832 (5th Cir. 1989); *see In re Whitus*, 240 B.R. 705, 708–10 (Bankr. W.D. Tex. 1999) (applying that rule under § 541(a)(2)(B)). No claim of either kind has been identified. The Debtor's Schedule E/F lists no priority or tax claim, and none of its four nonpriority unsecured claims (the landlord, scheduled as incurred by "Debtor 1 only"; a student-loan servicer; John McKemie; and Movant herself) is identified as tortious. ECF 29 at 12–14. The claims register contains a single claim, InTouch Credit Union's. The 2021 federal tax lien identified in these records, a notice for tax year 2014 that the Debtor produced in the divorce, was released by a Certificate of Release of Federal Tax Lien recorded in Pinellas County, Florida on February 19, 2025, certifying that the taxes "and all statutory additions" had been satisfied. Ulijasz Decl. ¶ 17

& Ex. 5. To the extent the Trustee identifies a specific allowable claim against the Debtor for which Movant's sole-management community property is liable, § 541(a)(2)(B) reaches that property only "to the extent that such interest is so liable," and Movant asks that any such determination be made here, on evidence of the claim, rather than by treating her accounts as estate property wholesale.

15. The Trustee's Form 1 (ECF 91) confirms that no determination has been made. The Debtor's petition values (Column 2) total $850,595: $820,000 attributed to assets he lists as Movant's (a Voya account, the VEIP program, Accenture stock, the Advantigen units, and two Ameriprise accounts), a $1,395 entry labeled "Ameriprise Roth-J," and $29,200 of his own household goods and prepaid rent; the Trustee's own "Estimated Net Value" for each entry attributed to Movant (Column 3) is "Unknown"; the Trustee's valued assets total $29,200 and consist of the Debtor's household goods and prepaid rent, each marked fully administered; and the "Gross Value of Remaining Assets" is $0.00, a total that, like the others, excludes the entries marked "Unknown." Asset 21 records that the "Debtor asserts a community property interest in all marital assets and funds aquired or retained by non-filing spouse," and Asset 23 describes that asserted interest as "valuation unknown, subject to divorce proceedings." The Debtor has told this Court the same thing: Form 1 "identifies for estate administration the Debtor's asserted community-property interests," and his motion "does not treat Form 1 itself as a final adjudication of title, characterization, or value." ECF 97 ¶¶ 1, 8. The scheduling of an asset is not a determination that it is property of the estate. *Trammell*, 399 B.R. 177. Movant asks the Court to make that determination now, with the Trustee before it. The State Court found on the evidence that the UBS account held approximately $44,599.52 and that the Ameriprise accounts, totaling

$449,000.53, are Movant's separate property traced to pre-marital sources. Decree §§ 8.A (W-1), 8.C (S-2, S-3).

16. The Decree's award to the Debtor of the property in his own name (§ 8.B) did not diminish the estate. That property was the Debtor's separate property (his schedules describe the firearms, for example, as owned for over a decade and "all separate") or his sole-management community property, and as such was property of the estate under § 541(a)(1) or § 541(a)(2)(A) both before and after the Decree, and the Decree expressly preserved the Trustee's rights. Decree § 8.G; *see* 11 U.S.C. § 541(a)(5)(B) (property the debtor "acquires or becomes entitled to acquire within 180 days after" the petition "as a result of . . . an interlocutory or final divorce decree" is property of the estate). Movant does not contend that this provision fell outside the stay because it did the estate no harm; she asks that the stay be annulled as to it under Part V, and the absence of any prejudice to the estate or its creditors supports that relief. Movant does not ask this Court to disturb the Trustee's administration of any of it. The provisions of the Decree that arguably reach community property under the Debtor's sole or joint management are items W-7 (domain names registered by the Debtor, although his sworn Schedule A/B answers "No" to internet domain names, ECF 29 at 7, line 26), W-8 to the extent any item specified there is community rather than Movant's separate property, and the award to Movant of the two household checking accounts held in both names, Chase x6893 and USAA x9941, which held $315.75 and $20.00 at the last statements in evidence. Ulijasz Decl. ¶ 10. Movant acknowledges that those directions are not enforceable against the estate and cannot be given effect as a division of estate property unless this Court annuls the stay as to them; if the property leaves the estate undivided, its division is a matter for the State Court under Chapter 9, Subchapter C of the Texas Family Code. Movant includes those items in the annulment request in Part V and in the alternative requests below.

## V. ALTERNATIVELY, THE COURT SHOULD ANNUL THE STAY AS TO THE DECREE

17. Section 362(d) authorizes relief "such as by terminating, annulling, modifying, or conditioning such stay." "The power to annul authorizes retroactive relief even unto the date of the filing of the petition." *Sikes v. Global Marine, Inc.*, 881 F.2d 176, 178 (5th Cir. 1989); *Jones v. Garcia (In re Jones)*, 63 F.3d 411 (5th Cir. 1995) (affirming retroactive relief validating a post-petition foreclosure sale); *Bustamante v. Cueva (In re Cueva)*, 371 F.3d 232, 236–38 (5th Cir. 2004) (the authority to annul is broad); *Chapman v. Bituminous Ins. Co. (In re Coho Res., Inc.)*, 345 F.3d 338, 344 (5th Cir. 2003) (stay violations "are subject to discretionary cure"). The Fifth Circuit has not prescribed a mandatory list of annulment factors; the statutory grounds of § 362(d)(1) and (d)(2) control, and the equitable considerations discussed below inform "cause." *In re Okorie*, No. 24-60377, 2025 WL 603890 (5th Cir. Feb. 25, 2025) (per curiam) (unpublished) (affirming annulment under both § 362(d)(1) and (d)(2)). Texas courts, which treat acts in violation of the stay as void, recognize that annulment by this Court supplies the validity the act lacked when taken. *York v. State*, 373 S.W.3d 32, 39–40 (Tex. 2012) ("No one doubts that the bankruptcy court can retroactively grant relief from the stay."). Section 362(g) allocates the burdens on a motion for relief from the stay: the movant bears the burden on the debtor's equity in property, and "the party opposing such relief has the burden of proof on all other issues." 11 U.S.C. § 362(g). Movant recognizes that a party who asks for retroactive relief must establish cause for it, and she undertakes that showing below.

18. Courts in this District ask, first, "whether if relief from the stay had been sought before the action in violation of the stay was taken," the relief would have been granted, and then weigh, among other considerations, whether the creditor had knowledge of the bankruptcy, whether the

debtor acted in bad faith, whether there was equity in the property and whether it was necessary to a reorganization, whether denying retroactive relief would cause unnecessary expense, and whether the movant has detrimentally changed position in reliance on the act. *In re Fennell*, No. 17-20095-RLJ-13, 2017 WL 7050633, at *2–3 (Bankr. N.D. Tex. Nov. 13, 2017); *In re Vasquez*, No. 09-47043-DML-13 (Bankr. N.D. Tex. Mar. 3, 2010) (applying the *Thornburg* factors and denying annulment where relief would not have been granted had it been sought in time); *Thornburg v. Lynch (In re Thornburg)*, 277 B.R. 719, 731 n.18 (Bankr. E.D. Tex. 2002); *In re Guevara*, No. 16-31741 (Bankr. S.D. Tex. Aug. 31, 2018) (granting retroactive annulment). Annulment is extraordinary relief, and Movant does not pretend otherwise. Those considerations nonetheless favor it here.

(a) Movant knew of this case, and she does not ask the Court to excuse her on the ground of ignorance. She proceeded on the understanding, for the reasons set out in Part IV, that § 362(b)(2)(A)(iv) permitted the dissolution to proceed and that the property confirmed and awarded to her was not property of the estate under § 541(a)(2); the Decree's § 8.G reservation of the Trustee's rights reflects that understanding, and Movant asks the Court to decide whether it was right. She did not seek to divide, and the Decree did not purport to reach, anything of the Debtor's beyond what the estate already held. Knowledge of the bankruptcy is a consideration, not a bar. The Fifth Circuit affirmed annulment in *Okorie* for a creditor that foreclosed with knowledge of the case after the debtor's counsel had agreed that no stay was in effect, where the debtor, with advance notice of the sale, did nothing to stop it. *Okorie*, 2025 WL 603890. Movant does not claim that parallel in full. The Debtor did not agree that the stay was inapplicable; he filed a notice of it in the State Court on February 18, 2026 (¶ 7), and his continued participation in the divorce is not the

same thing as agreement. The rest of the pattern is present. With that notice on file, the Debtor never asked this Court to enforce the stay against the divorce or to determine its scope, though he twice invoked this Court's authority over the stay for his own protection in the same months (ECF 27, 32, 54, 57); he went on litigating the case he had said the stay forbade; the Trustee, whose July 24, 2026 Form 1 records the Debtor's assertion of an interest in marital assets held by the non-filing spouse, has taken no action on it (¶ 15); and the dissolution itself was within the express exception. Movant also acknowledges *In re Okedokun*, 593 B.R. 469 (Bankr. S.D. Tex. 2018), *aff'd sub nom. Elbar Invs., Inc. v. Prins (In re Okedokun)*, 968 F.3d 378 (5th Cir. 2020), in which the bankruptcy court stated that annulment is available only to innocent parties without knowledge of the bankruptcy filing. That statement was made in weighing the stay violations of a foreclosure speculator, which bid on property of the debtor at a sale held hours after the petition and completed the purchase after learning of the case, against its own claims for equitable recovery of the purchase money; the Fifth Circuit affirmed the findings of three violations, two of them willful, and did not address annulment under § 362(d). The standard applied in this District treats knowledge as one factor among several (¶ 18), and the Fifth Circuit has affirmed annulment for a creditor with knowledge. Movant does not contend that good faith alone excuses a violation of the stay. She contends that cause exists on this record because the proceeding was one the Code largely excepted, the property it reached was, on the showing in Part IV, not the estate's, the estate lost nothing, the party who now invokes the stay used the State Court's process for eighteen months and then did not appear, and relief would have been granted had it been sought in time, as (b) and (c) below explain. Movant is also aware that this Court has held that acts taken in violation of the stay "are invalid, whether

or not a creditor acts with knowledge of the stay," and that a creditor that learns its actions violated the stay has an affirmative duty to restore the status quo. *Rojas v. Gomez (In re Rojas)*, Adv. No. 23-03026-MVL, slip op. at 15, 17, 25 (Bankr. N.D. Tex. June 5, 2024) (quoting *Cueva*, 371 F.3d at 236). Movant is likewise aware of *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298 (5th Cir. 2005), which held that a creditor that foreclosed, with knowledge of the case, on land titled to the non-debtor spouse as her separate property violated the stay because the debtor's asserted community interest made the land "arguable property," and that "[w]here seized property is arguable property, it is no answer for the creditor to defend the foreclosure by claiming that the property was not properly covered by the stay," *id.* at 302–04, and of this Court's statement in *Rojas* that *Chesnut* "laid out the reasoning why the automatic stay protects even arguable property of the estate" and "ultimately concluded that post facto relief from the automatic stay is inadequate." *Rojas*, slip op. at 17 (quoting *Chesnut*, 422 F.3d at 304). Movant does not contend that the State Court's findings, or a determination by this Court now, establish that no stay protection existed on June 26, 2026 if the property was arguable property on that date. Her position is, first, that whether the Debtor's assertion made her property arguable property on June 26, 2026 is a question for this Court, which *Chesnut* itself bounded: "[n]ot every bankruptcy petition, with an attendant claim of a right in property, will transform what is obviously not property of the estate into arguable property," 422 F.3d at 306. The record on that question is that the Debtor's own schedules describe the property as under Movant's exclusive control and list his interest as a claim against a third party (¶ 13), that Form 1 values every entry attributed to her "Unknown," and that he has conceded that Form 1 is not an adjudication of title, characterization, or value (¶ 15). Movant asks the Court to

decide the question on that record rather than to assume the answer either way. Second, to whatever extent the property was arguable property, she asks this Court, the forum *Chesnut* identifies, to decide the question now, on evidence, and to annul the stay to that extent. Third, this motion is Movant's request for the relief *Rojas* recognized a court may grant: "[u]nder certain conditions, when a party pursues retroactive annulment or modification of the automatic stay, a court may grant relief," and the foreclosure there was held void where "no party requested retroactive relief from the stay, and no relief was granted." Slip op. at 15. The request cures nothing by itself, and Movant does not suggest that it does; only the Court's order can. She does not assume the question away. She asks the Court to decide it, on a record, in the forum the Debtor himself says is the right one, and she seeks annulment only to the extent the Court determines that the stay applied.

(b) The Debtor filed a notice of the stay in the State Court on February 18, 2026, but never asked this Court to enforce the stay against the divorce or to determine its scope; he litigated the divorce for eighteen months, invoked the State Court's orders for his own protection in this Court (ECF 71), sought nine continuances of trial, and did not appear for trial. He scheduled Movant as a creditor holding a disputed $250,000 claim (ECF 29, Schedule E/F, item 4.3) but did not place her on the mailing matrix, so she received no notice from this Court of the case, the meeting of creditors, or any deadline; what she knew of the case she learned from his February 18, 2026 filing in the State Court. Ulijasz Decl. ¶ 4. He had held exclusive possession of the La Foy residence under the State Court's temporary orders since January 7, 2025, and in May 2025 he wrote to Movant that she was "not permitted at the property under any circumstances" and that he would "contact law enforcement immediately" if she were seen near it. *Id.* & Ex. 2-C. [Counsel: confirm against the certified

matrix and Schedule E/F; add the La Foy service fact if Gwen identifies the document.] He now invokes the stay to undo a judgment he chose not to defend, and for the stated purpose of keeping the marriage alive so that "the community estate resumes accruing" from Movant's post-divorce earnings. Aug. 31 Filing ¶ 48a. That is a use of the stay as a sword against the non-debtor spouse, not as a shield for the estate.

(c) Movant submits that relief would have been granted had it been sought before June 11, 2026, and under *Vasquez* and *Fennell* that is the central question. The dissolution required no relief at all. As to property, bankruptcy courts routinely permit divorce courts to divide marital property, subject to the trustee's interests, because domestic relations are a matter of state law and state courts. *See, e.g., In re Chunn*, 106 F.3d 1239 (5th Cir. 1997); *In re Voisine*, No. 19-20005 (Bankr. D. Me. May 28, 2021) (granting relief for the divorce to proceed, with any property determination effective upon further relief); *Eguia*, 367 S.W.3d at 458 n.8 (bankruptcy court entered an "Order Modifying Automatic Stay to Allow Prosecution of Divorce Proceeding and Appeal"). The Fifth Circuit has affirmed an order of a bankruptcy court in this District that annulled the stay as to a Texas divorce proceeding "retroactive to the entry of a final divorce decree" signed three years earlier, on the non-debtor spouse's motion, observing that bankruptcy courts have "broad discretion to fashion relief from the automatic stay, including retroactive annulment if warranted," that "bankruptcy courts owe state courts deference in domestic matters," and that "any alleged defect in the state court order was cured when the stay was lifted." *Barnes v. Barnes (In re Barnes)*, 279 F. App'x 318, 319 & n.1 (5th Cir. 2008) (per curiam) (unpublished; not precedent except as provided in 5th Cir. R. 47.5.4); *see Okorie*, 2025 WL 603890 (citing *Barnes*, 279 F. App'x at 319, for the retroactive reach of the annulment power). Movant

cites *Barnes* for no more than that the relief she requests has been granted in this posture and affirmed. This is a Chapter 7 case, so no reorganization is at stake. Had Movant asked this Court before June 11, 2026 to determine whether the stay reached the property in her name and, to whatever extent it did, to permit the State Court to divide it subject to the Trustee's rights, Movant submits that the request would have been granted: the dissolution required no relief; the property she asked the State Court to confirm and award to her was, on the showing in Part IV, outside the estate, and if any of it was arguable property within *Chesnut*, a determination to that effect or a modification permitting the division would have been the ordinary course; and the only property the Decree awarded the Debtor was property the estate already held, in which the Decree preserved the Trustee's rights (§ 8.G). The Trustee has not valued any of the property Movant received or asserted an interest in it (ECF 91), and no creditor has claimed prejudice from the Decree. Movant does not contend that the Form 1 totals establish the absence of equity in any particular asset; those totals exclude the entries the Trustee marked "Unknown."

(d) Denying annulment could require further property proceedings and expense in the State Court, on property that Movant contends is not the estate's, while Movant has already acted on the Decree: on the day it was signed she removed the Debtor from her employer-sponsored health coverage, which ended June 30, 2026, cancelled his card on her health savings account, and changed the beneficiary designations on her accounts. Ulijasz Decl. ¶¶ 13–15.

19. Movant therefore asks, in the alternative, that the stay be annulled as to the Decree, effective June 26, 2026, without prejudice to the Trustee's rights in property of the estate as reserved by Decree § 8.G.

## VI. FURTHER ALTERNATIVE RELIEF, AND THE REQUEST FOR AN EXPEDITED HEARING

20. If the Court determines that any provision of the Decree divided property of the estate and declines to annul the stay as to that provision, Movant asks that the stay be modified for cause under § 362(d)(1) to permit the State Court to complete or redo the division of that property, on the condition that any such division is subject to the Trustee's rights and to this Court's determination of the estate's interest. Domestic-relations matters are peculiarly within the province of the state courts, *Chunn*, 106 F.3d 1239, and the State Court retains continuing, exclusive jurisdiction to divide any community property left undivided by the Decree. Tex. Fam. Code §§ 9.201(c), 9.203(a). The Debtor has himself told this Court that "the dissolution proceeding could proceed." ECF 96 ¶ 29. At a minimum, this Court should say so.

21. Expedited hearing. The State Court's plenary power over the Decree expires October 9, 2026. If this Court determines before then that the stay did not apply, or annuls it, the State Court can deny the Debtor's motion with that determination in hand; the Supreme Court of Texas has observed that the prospect of a bankruptcy court validating "a judgment already set aside by a state court" "seems unlikely as long as the parties in state court could seek relief from the bankruptcy court before the state court's decision." *York*, 373 S.W.3d at 42 n.64. If no ruling issues by then, the State Court will be left to decide, without the benefit of this Court's view and within a deadline it cannot extend, whether to set aside a judgment that this Court may later validate. Movant has conferred, or attempted to confer, with the Trustee and the Debtor as stated in the certificate of conference below. Movant is separately filing her objection to the Debtor's Rule 2004 motion (ECF 97) within the 21-day response period stated in that motion, which the Debtor moved to shorten (ECF 98) but which, as of September 5, 2026, no order has shortened, and asks that the

two matters be heard together. The affidavit required by L.B.R. 4001-1(e)(3) for an expedited setting is filed with this motion as the Declaration of Gwendolyn Laura Ulijasz.

## VII. PRAYER

Movant respectfully asks the Court to shorten time, set this motion for expedited hearing, and, after hearing, to enter an order (1) annulling the stay, to the extent it applied, as to the June 11, 2026 trial and the June 26, 2026 Decree, effective as of June 11, 2026; (2) determining, for purposes of § 362, that the stay did not apply to Sections 5, 6, and 10 of the Decree, and that the property confirmed and awarded to Movant in Sections 8.C and 8.A (W-1 through W-6) was not under the Debtor's management and control as of January 12, 2026 and did not become property of the estate under § 541(a)(2)(A), so that, except to the extent (if any) that such property was liable for an allowable claim against the Debtor under § 541(a)(2)(B), as to which the annulment in item (1) applies, it was not property of the estate when the Decree was signed; (3) in the alternative, modifying the stay to permit the State Court to divide any property the Court determines to be property of the estate, subject to the Trustee's rights; and (4) granting such other relief as is just.

Respectfully submitted

*/s/ Richard G. Dafoe*
Richard G. Dafoe. Local Counsel
State Bar No. 05309500

**WADDELL SERAFINO GEARY RECHNER JENEVEIN, P.C.**
1717 Main Street, Suite 2500
Dallas, Texas 75201
Telephone: (214) 979-7400
Telecopier: (214) 979-7402
Rdafoe@wslawpc.com

*Local Counsel for Gwendolyn Larua Ulijasz*

Jonathan D. Steele,
Application for Admission Pro Hac Vice
Pending

**Beermann LLP**
161 N. Clark Street, Suite 3000
Chicago, Illinois 60601
: (312) 621-9700
Jsteele@beermannlaw.com

*Lead Counsel for Gwendolyn Larua Ulijasz*

**CERTIFICATE OF SERVICE**

I certify that on September 11, 2026, a true and correct copy of this Objection was served through the Court's CM/ECF system on all parties registered to receive electronic notice in this case, and by first-class United States mail and email on: Jason Emory McKemie, Debtor, pro se, 539 W. Commerce St., #2010, Dallas, Texas 75208, jmckemie@mckemie.net; Areya Holder Aurzada, Chapter 7 Trustee, Law Office of Areya Holder, PC, PO Box 2105, Addison, Texas 75001-2105, areya@holderlawpc.com; the Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75202; and Loriann A. Martinez, Quilling, Selander, Lownds, Winslett & Moser, P.C., counsel for InTouch Credit Union, lmartinez@qslwm.com.

*/s/Richard G. Dafoe*
Richard G. Dafoe

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| | § | |
| JASON EMORY McKEMIE, | § | CASE NO. 26-30161-mvl7 |
| | § | |
| Debtor. | § | |

**DECLARATION OF GWENDOLYN LAURA ULIJASZ**

I, Gwendolyn Laura Ulijasz, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct:

1. I am over eighteen years of age and competent to make this declaration. I reside in San Antonio, Texas. I have personal knowledge of the facts stated here.

2. I married Jason Emory McKemie in a ceremony on June 22, 2024. We separated in December 2024, when I filed for divorce in Dallas County, Texas, Cause No. DF-24-18010; the case was filed in the 254th Judicial District Court and was later transferred, and it is now pending in the 301st Judicial District Court. The Final Decree of Divorce was signed June 26, 2026. A true copy is attached as Exhibit 1.

3. I have been employed by Accenture since October 2024. Before that I was employed by Cognizant Technology Solutions. My compensation consists of salary, bonus, and equity awards (restricted stock units) granted to me by my employer in my name.

4. Mr. McKemie filed this bankruptcy case on January 12, 2026. I did not file with him and am not a debtor in this case. I learned of the case from the notice he filed in the divorce court on February 18, 2026, which the state court's e-filing system sent to my email address. I have never received any notice of the case, of the meeting of creditors, or of any deadline from the bankruptcy court or from Mr. McKemie by mail, although his schedules list me as a creditor. Under the divorce court's temporary orders of January 7, 2025, Mr. McKemie was awarded exclusive use and



Document Ref: QRFS5-6RCT7-8DW7Q-3CYYA

possession of the residence at 5609 La Foy Boulevard, Dallas, Texas, I have not lived at that address since December 13, 2024, and apart from the four hours the court allowed me on January 8, 2025 to pick up personal items, I have not had access to it or received mail there since. On May 21, 2025, Mr. McKemie wrote to me that I was "not permitted at the property under any circumstances" and that "[i]f you are seen on or near this property, including the street or surrounding area, I will contact law enforcement immediately. There will be no discussion, no warnings, and no exceptions." A true copy of that email is attached as Exhibit 2-C.

5. The AIG 401(k) plan identified in Section 8.C of the Decree was established and funded by me before June 22, 2024 through my prior employment. It has been in my name alone since it was opened. The only additions to the account during the marriage shown on the plan statements were repayments of a loan I had taken from the plan in 2019, before the marriage; no new contributions were made to the plan during the marriage.

6. The Ameriprise Traditional IRA ending in 7988 and the Ameriprise Roth IRA ending in 6811 identified in Section 8.C were funded by rollovers and transfers from accounts I owned before the marriage: my E*TRADE accounts, transferred in January 2024, and my Cognizant 401(k), which was administered first by Empower and then by Voya and was rolled over to Ameriprise in November 2024 in two direct rollovers of $49,891.72 (traditional IRA ending 7988) and $42,075.52 (Roth IRA ending 6811); the Voya account then held a zero balance. They have been in my name alone since they were opened. Payroll contributions to the Cognizant plan continued for a short time after our June 22, 2024 marriage: the plan statements show contributions of $1,545.00 on June 28, 2024 and $1,545.00 on July 15, 2024 (each consisting of my Roth salary deferral and a company match), after which the plan was transferred to Voya and no further contributions appear on the statements before the November 2024 rollover.



Document Ref: QRFS5-6RCT7-8DW7Q-3CYYA

7. The Advantigen Biosciences LLC membership units identified in Section 8.C were acquired by me before the marriage and have been held in my name alone since.

8. The UBS brokerage account ending in x5313 identified as item W-1 holds shares purchased through Accenture's employee equity purchase program by payroll deductions from my salary. It was established in connection with my enrollment in that program, whose first purchase period began February 5, 2025; it held shares valued at $37,449.67 on May 30, 2025 and $44,599.52 on June 30, 2025, and it is in my name alone. Mr. McKemie has never been a named account holder on, or an authorized signer for, that account.

9. The Accenture restricted stock units identified as item W-2 were granted to me by Accenture as part of my compensation and are held in my name. Mr. McKemie has never held any of them.

10. The Chase checking account ending in x9259 identified as item W-3 is in my name alone and has been funded by my salary; it replaced my prior Chase account ending x3898 in January 2025, when I opened it after unauthorized transactions on the x3898 account and transferred the balance of that account into it, and it has received my Accenture payroll since that month. Mr. McKemie has never been a named account holder on, or an authorized signer for, either account. To my knowledge he never deposited his earnings or any other money of his into either account, and I never accepted money from him into them. The deposits I can identify on the statements are my payroll, the proceeds of loans in my own name (SoFi, American Express, and LightStream), transfers from my own accounts, and refunds. The statements also show a small number of cash and check deposits. Two of them, $5,103 on January 14, 2025 and $5,000 on January 29, 2025, each followed my withdrawal of the same amount from the account a few days earlier; as best I recall, I withdrew my own funds and redeposited them while I was changing



Document Ref: QRFS5-6RCT7-8DW7Q-3CYYA

accounts. I do not recall the source of a $500 deposit on February 3, 2025. I used the accounts to pay my expenses and to send money to Mr. McKemie and to our joint household account. During our marriage, our joint Chase household account, ending x6893, was funded by transfers from my own accounts; it paid our household expenses and some of Mr. McKemie's expenses, and to my knowledge he never deposited any money of his own into it. The one transfer into the x3898 account from the joint account, $3,400 on November 12, 2024, followed a $3,400 cash deposit into the joint account the same day. That cash was the price of an emerald and diamond ring that I bought in Colombia in 2009, long before I met Mr. McKemie. In the fall of 2024 he offered to list rings of mine for sale, and on November 12, 2024 he met the buyer, received the cash, and deposited it into the joint account at a Chase ATM with his own debit card ending 4112; it was transferred to my account the same day. Our text messages of September 10 and November 12, 2024 about the sale are attached as Exhibit 12. The Accenture HSA identified as item W-4 is a health savings account in my name, administered by Inspira Financial and funded through my employment; its opening balance on January 1, 2026 was $8,197.44. A true copy of the January 2026 statement is attached as Exhibit 6, and Mr. McKemie's own inventory lists the account as mine (Exhibit 4, line 31). The clothing, jewelry, electronics, household furnishings, and other personal effects in my possession (item W-6) were either owned by me before the marriage or purchased with my earnings during it.

11. The 2023 BMW identified as item W-5 was titled in my name alone. I purchased it in 2023, before I met Mr. McKemie; the Texas certificate of title in my name issued on June 21, 2023, and the original lien in favor of BMW Bank of North America was released on January 6, 2024. A true copy of the title is attached as Exhibit 7. From December 29, 2023 the vehicle was financed through InTouch Credit Union under a loan in my name alone, which paid off the BMW

Financial Services loan I had taken when I bought the car; the loan agreement names me as the only borrower and called for 74 monthly payments of $1,161.70 beginning February 12, 2024. A true copy of the loan agreement, with account numbers redacted, is attached as Exhibit 7-A. Mr. McKemie was never a borrower or co-signer on that loan and was never on the title, and I made every payment on it from my earnings. On January 12, 2026 the vehicle was titled in my name and in my possession, subject only to InTouch's lien. [On February 28, 2026, I traded the vehicle in to BMW of San Antonio, which paid off the InTouch loan, then $54,500, from the trade-in; I have owed InTouch nothing since. The replacement vehicle is titled in my name alone and is financed in my name alone by BMW Financial Services under a contract dated February 28, 2026. True copies of the dealer's trade-in agreement and odometer statement are attached as Exhibit 7-B.] Each of the accounts described in paragraphs 8 through 10 was in my name on January 12, 2026, the date Mr. McKemie filed this case, and has remained so, and the personal effects described in paragraph 10 and the vehicle described in this paragraph were in my possession on that date.

12. I did not co-sign, guarantee, or otherwise agree to be liable for any of Mr. McKemie's credit cards, personal loans, or vehicle financing, including his InTouch Credit Union loan on the 2018 Jaguar F-Pace, which he signed in June 2022, nearly a year before we met. The one obligation on which both of our names appeared was the residential lease at 5609 La Foy Boulevard, Dallas, Texas, signed in 2024. On July 22, 2025, the landlord, Skweres Properties, LLC, and I signed a Mutual Release and Private Settlement Agreement under which the landlord released all claims against me arising from the lease and the premises and agreed to nonsuit its eviction suit as to me with prejudice, in exchange for my surrender of possession and of the security deposit. A true copy is attached as Exhibit 2. I surrendered possession before the agreement was signed. On July 23, 2025, the landlord filed a Notice of Nonsuit (With Prejudice) as to me in Cause No. JPC-25-06838-



Document Ref: QRFS5-6RCT7-8DW7Q-3CYYA

51 in the Justice Court, Precinct 5-1, Dallas County, stating that I had "previously surrendered possession," and the court signed an order on July 24, 2025 dismissing the suit as to me with prejudice. True copies of the notice and order are attached as Exhibit 2-A. My belongings remained in the house because Mr. McKemie would not let me retrieve them: his May 21, 2025 email (Exhibit 2-C), sent when I proposed to collect my things with my father, states that "[t]here will be no discussion, exchange, or release of your belongings until the ring is returned," referring to a ring he claimed. Under paragraph 5 of that agreement I was not to enter the premises until Mr. McKemie vacated and the landlord recovered possession, after which the landlord and I were to arrange a time for me to recover my property. On April 15, 2026, the landlord's principal, Travis Skweres, wrote to me that the landlord had a writ of possession, that Mr. McKemie would be moved out the next morning, and that I could come for my belongings once the constables and the landlord's crew were on site. A true copy of that email is attached as Exhibit 2-B. I went to the premises on April 16, 2026. Two movers from All My Sons Moving, booked for me by a friend and paid for by me, came to help me recover my belongings. When I arrived, the landlord's crew had been removing property from the house for about an hour and placing it on the front lawn and in the alley behind the house, both of which were open to the public; my movers arrived about half an hour after I did and loaded onto their truck the items I identified as mine: my clothing, family heirlooms, and things I had bought before I met Mr. McKemie. The only items I took from the premises were a handbag, two or three skirts, and a wooden carving I had owned since before I met Mr. McKemie, which I had put in the car I had come in. I left before Mr. McKemie returned that afternoon with an order extending his time to move out. I was later told that everything my movers had loaded was then taken off the truck at the house, and I have received none of it. The landlord has never asserted that I breached the agreement, and I have complied with every

obligation I undertook in it. My sworn Inventory and Appraisement filed in the divorce (Exhibit 3) lists me as the only cardholder or authorized user on each of my credit accounts and as the person liable on my personal loans, and Mr. McKemie's own inventory (Exhibit 4) lists his credit cards, auto loan, and personal loans as his alone, including his Chase Marriott Bonvoy Visa card ending 8046. Mr. McKemie has never been a borrower, co-signer, or guarantor on any of my credit accounts or loans. He was an authorized user on my American Express account from about August 2023 to about December 2023, before our marriage, and on my Chase credit card from shortly before our wedding in June 2024 until December 2024, when I removed him; he has not been allowed access to any of my accounts since. The three debts that Section 8.F of the Decree divides equally between us, the SoFi loan, the Chase credit card, and the Citibank account, are accounts in my name alone; Mr. McKemie has never been a borrower or co-signer on any of them, and he has not been an authorized user on the Chase card since 2024.

13. In reliance on the Decree, on June 26, 2026, the day it was signed, I submitted through Accenture's Benefits Center the enrollment change removing Mr. McKemie from my employer-sponsored health coverage; Accenture confirmed that his coverage as my spouse ended June 30, 2026. I cancelled the card he held on my health savings account, and I changed the beneficiary designations on my accounts to remove him. A true copy of the Benefits Center receipt is attached as Exhibit 8.

14. During the marriage and after we separated, I paid community debt from my earnings, including a payment of $25,513 on the SoFi loan on December 11, 2024, a payment of $85,522 to the Internal Revenue Service on January 2, 2026 for federal income tax, and a payment of $17,163.30 on the LightStream loan on January 23, 2026, which reduced its principal balance to zero. Since the Decree was signed, I have continued to pay from my own earnings the debts it

allocated to me, including my American Express account, and I have continued to make the payments on the Chase and Citibank accounts that Section 8.F divides between us; in August 2026 I paid the remaining balance of the SoFi loan, about $6,000, in full. [Mr. McKemie has paid nothing toward the half of those three balances that Section 8.F assigned to him.]

15. A new trial of the divorce would require me to retry an eighteen-month case at my own expense, including the retention of a forensic accountant to re-trace my separate property, and would reopen questions the State Court has already decided on evidence Mr. McKemie chose not to contest.

16. An expedited hearing is necessary because the State Court's plenary power over the Decree expires on October 9, 2026, and that court has stated that it will rule on Mr. McKemie's motion within its plenary power. A ruling from this Court before that date will allow the State Court to decide the motion with this Court's determination in hand.

17. In the divorce, Mr. McKemie produced a Notice of Federal Tax Lien recorded against him in Pinellas County, Florida on September 20, 2021 (Instrument No. 2021307423) for federal income tax for the year 2014. Attached as Exhibit 5 is a copy of the Certificate of Release of Federal Tax Lien recorded in the official records of Pinellas County on February 19, 2025 (Instrument No. 2025048930, Book 23067, Page 62), which references that notice by serial number and recording information and certifies that the taxes and all statutory additions were satisfied.

Executed on 2026-09-10.

Gwendolyn Laura Ulijasz



Document Ref: QRFS5-6RCT7-8DW7Q-3CYYA

# CERTIFICATE *of* SIGNATURE

REF. NUMBER
QRFS5-6RCT7-8DW7Q-3CYYA

DOCUMENT COMPLETED BY ALL PARTIES ON
10 SEP 2026 17:20:35
UTC

| SIGNER | TIMESTAMP | SIGNATURE |
|---|---|---|
| EMAIL<br>GWENULIJASZ@PROTON.ME | SENT<br>10 SEP 2026 17:10:32<br>VIEWED<br>10 SEP 2026 17:20:19<br>SIGNED<br>10 SEP 2026 17:20:35 | <br>IP ADDRESS<br>65.212.192.225<br>LOCATION<br>SAN ANTONIO, UNITED STATES |

**RECIPIENT VERIFICATION**

EMAIL VERIFIED
10 SEP 2026 17:20:19

| | |
|---|---|
| NO. DF-24-18010 | IN THE DISTRICT COURT |
| IN THE MATTER OF<br>THE MARRIAGE OF | 301ST JUDICIAL DISTRICT |
| GWENDOLYN ULIJASZ-MCKEMIE<br>AND<br>JASON MCKEMIE | DALLAS COUNTY, TEXAS |

# FINAL DECREE OF DIVORCE

On **June 11, 2026**, the Court heard this cause.

**1. Appearances**

Petitioner, **GWENDOLYN ULIJASZ-McKEMIE** ("Wife"), appeared in person and through her attorneys of record, **Jonathan D. Steele** and **Rebecca Lee Armstrong**, announced ready for trial, and proved up her case on **Petitioner's First Amended Petition for Divorce filed June 23, 2025**, which is the live pleading and supersedes all prior petitions, including the December 2024 original pleading.

Respondent, JASON EMORY McKEMIE ("Husband"), previously appeared and answered pro se. The Court finds this case was a contested case for notice purposes. Husband received timely and sufficient notice of the final trial setting in compliance with Texas Rule of Civil Procedure 245 and due process, including notice served at his email of record. Husband failed to appear for trial. The Court proceeded by post-answer default, received testimony and admitted exhibits, and finds that the relief granted below is supported by the pleadings and the evidence.

**2. Record**

A record of the testimony and evidence was duly made by the official court reporter for the 301st Judicial District Court, Dallas County, Texas.

EXHIBIT
1

**3. Jurisdiction and Domicile**

The Court finds that the pleadings of Petitioner are in due form and contain all the allegations, information, and prerequisites required by law. The Court, after receiving evidence, finds that it has jurisdiction of this cause and of all the parties and that at least sixty (60) days have elapsed since the date the suit was filed.

The Court further finds that, at the time this suit was filed, Petitioner and Respondent had been a domiciliary of Texas for the preceding six-month period and Respondent was a resident of **Dallas County**, Texas, for the preceding ninety-day period.

**4. Jury**

A jury was waived, and all questions of fact and of law were submitted to the Court.

**5. Findings on the Marriage**

The Court finds that the parties were married on **June 22, 2024**.

The Court further finds that **no informal (common-law) marriage existed between the parties before the ceremonial marriage of June 22, 2024**, and that the community estate commenced June 22, 2024, and continues to entry of this Final Decree pursuant to Tex. Fam. Code § 3.003(a).

**6. Divorce**

**IT IS ORDERED AND DECREED** that **GWENDOLYN ULIJASZ-McKEMIE**, Petitioner, and **JASON EMORY McKEMIE**, Respondent, are divorced and that the marriage between them is dissolved on the ground of insupportability, pursuant to Tex. Fam. Code § 6.001. The Court enters **no finding of fault** against either party.

**7. Children of the Marriage**

The Court finds that **no children were born or adopted of the marriage of the parties and that none is expected.**

**8. Division of the Marital Estate**

The Court finds that the parties have **entered into no agreement incident to divorce**, that Respondent has wholly made default, and that the division set forth below is therefore **ordered by the Court** as a just and right division of the parties' marital estate, having due regard for the rights of each party.

The Court further finds that the division of the community estate as set forth herein is just and right under the circumstances, including the short duration of the marriage, the disparity in earning capacity, the conduct of the parties, the debt-heavy and net-negative character of the community estate, and the fact that Wife serviced and paid down the community debt from her separate income.

The Court finds that the Accenture RSUs/restricted stock awarded below consist of Wife's separate-property component, calculated under Texas Family Code § 3.007(d)–(e), and any community-property component subject to division. The Court confirms Wife's separate-property component to Wife and awards Wife one hundred percent (100%) of any community-property component as part of the just-and-right division. The Court does not include Wife's separate-property component in the divisible community estate.

Except as expressly provided in this Decree or in a beneficiary designation executed after the date this Decree is signed, each party is divested of and shall have no right, title, claim, or beneficiary interest in any retirement account, IRA, brokerage account, HSA, employee-benefit plan, life-insurance policy, stock plan, deferred-compensation plan, or financial account awarded or confirmed to the other party.

**A. Community Property Awarded to Wife**

**IT IS ORDERED AND DECREED** that Wife, **GWENDOLYN ULIJASZ-McKEMIE**, is awarded the following as her sole and separate property, and Husband is divested of all right, title, interest, and claim in and to that property:

W-1. The UBS Accenture VEIP/ESPP brokerage account ending in **x5313**, with an approximate value of **$44,599.52**, together with all funds, securities, and accruals therein.

W-2. All Accenture Restricted Stock Units (RSUs), vested and unvested, granted to or held in the name of Wife, including the unvested shares, together with all rights to vesting, dividends, and proceeds thereof.

W-3. The Chase Checking account ending in **x9259** together with all funds on deposit therein.

W-4. The Accenture HSA account, together with all funds on deposit therein.

W-5. The BMW automobile, together with all keys, title documents, and equipment, subject to the indebtedness thereon as allocated below.

W-6. All clothing, jewelry, electronics, household furnishings, and other personal effects in Wife's possession or control.

W-7. Any and all Internet domain names registered to, held by, or otherwise in the possession or control of Husband that consist of, contain, or incorporate the name "Gwendolyn," "Gwen," or "Ulijasz," or any part, abbreviation, or variation thereof, together with all associated registrations, renewal rights, account credentials, and transfer authorization codes. Husband shall take all steps reasonably necessary to transfer each such domain name to Wife or her designee, including initiating and approving all registrar transfers and furnishing all required authorization codes, within thirty (30) days after the date this Decree is signed. Husband is enjoined from registering, renewing, transferring to a third party, monetizing, redirecting, publishing through, or otherwise using any domain name, social-media handle, email account, or online identifier using Wife's name or a confusingly similar variation.

W-8. Wife's guitar, baptism cross, and sobriety coins/medallions, including any such items in Husband's possession or control. Husband shall cause all such items in his possession or control to be appropriately and securely packed and shipped to Wife, at his expense, via FedEx with tracking, addressed to **11703 Huebner Road, Suite 106, PMB 499, San Antonio, Texas 78230**, within thirty (30) days after the date this Decree is signed. If Husband contends that any such item is no longer in his possession or control, Husband shall, within seven days after this Decree is signed, serve on Wife's counsel a sworn declaration identifying the item, its last known location, the date and manner of loss/transfer/disposition, and all persons known to have information regarding the item.

W-9. Any and all other community assets in Wife's name, possession, or control not otherwise awarded herein.

**B. Community Property Awarded to Husband**

**IT IS ORDERED AND DECREED** that Husband, **JASON EMORY McKEMIE**, is awarded the following as his sole and separate property, and Wife is divested of all right, title, interest, and claim in and to that property:

H-1. Any and all bank, retirement, or investment accounts in his own name.

H-2. The 2018 Jaguar F-Pace automobile, together with all keys, title documents, and equipment, subject to any indebtedness thereon as allocated below.

H-3. All clothing, jewelry, electronics, household furnishings, and other personal effects in Husband's possession or control.

H-4. Any and all other community assets in Husband's name, possession, or control not otherwise awarded herein.

**C. Confirmation of Wife's Separate Property**

The Court finds **by clear and convincing evidence**, and **CONFIRMS** as the sole and separate property of Wife, **GWENDOLYN ULIJASZ-McKEMIE**, the following property, which Wife traced to pre-marital sources, and each of which is **SET ASIDE** to Wife as her sole and separate property:

S-1. The **AIG 401(k) Plan**, valued at **$121,271.77** at the date of marriage and traced gap-free to its current value.

S-2. The **Ameriprise Traditional IRA** account ending in **7988**, traced to pre-marital E*TRADE and the pre-marital Cognizant 401(k).

S-3. The **Ameriprise Roth IRA** account ending in **6811**, traced to pre-marital E*TRADE Roth IRA and the pre-marital Cognizant 401(k) rollover. The combined Ameriprise corpus of **$449,000.53**, as reflected on the refreshed May 31, 2025 statements adopted by the Court, traces in full to pre-marital sources in Wife's name.

S-4. The **Advantigen Biosciences LLC** membership units, confirmed as Wife's pre-marital separate property by clear and convincing evidence of inception of title. The Court makes **no finding as to the current value** of these units, the record containing no current valuation; **the membership units themselves**, whatever their value, are set aside to Wife as her separate property.

S-5. Any and all other property shown by clear and convincing evidence to be Wife's separate estate, having been owned or claimed by her before the marriage, or acquired during the marriage by gift, devise, or descent.

The Court finds that the refreshed (May 31, 2025) statement values recited above are the values the Court adopts; any prior working or posture figure for Wife's separate estate is superseded by these findings.

**D. Debts to be Paid by Husband**

**IT IS ORDERED AND DECREED** that Husband, **JASON EMORY McKEMIE**, shall pay, as a part of the division of the estate of the parties, and shall indemnify and hold Wife and her property harmless from any failure to so discharge, the following debts and obligations:

HD-1. All credit-card, charge, and consumer-credit accounts titled in Husband's name or incurred by Husband, **excluding the debts identified in Section 8.F below except for Husband's one-half share of those debts**.

HD-2. Any indebtedness secured by the 2018 Jaguar F-Pace automobile awarded to Husband in Section 8.B, if any such indebtedness exists.

HD-3. Any and all other debts, charges, liabilities, and obligations incurred solely by Husband from and after the date of marriage, except as expressly provided otherwise herein.

**E. Debts to be Paid by Wife**

**IT IS ORDERED AND DECREED** that Wife, **GWENDOLYN ULIJASZ-McKEMIE**, shall pay, as a part of the division of the estate of the parties, and shall indemnify and hold Husband and his property harmless from any failure to so discharge, the following debts and obligations:

WD-1. The American Express account ending in **x7006**.

WD-2. The indebtedness secured by the BMW awarded to her above.

WD-3. Any and all other debts, charges, liabilities, and obligations incurred solely by Wife from and after the date of marriage, except as expressly provided otherwise herein.

**F. Debts Divided Equally Between the Parties**

**IT IS ORDERED AND DECREED** that, notwithstanding any other provision of this Decree, the following community debts shall be divided equally between the parties, with each party ordered to pay fifty percent (50%) of the outstanding balance of each such debt, together with the interest, fees, and charges attributable to that party's one-half share, within 30 days of entry of this Judgment, and each party shall indemnify and hold the other party and his or her property harmless from any failure to pay his or her one-half share:

JD-1. The SoFi loan, with an approximate outstanding balance of **$10,000**.

JD-2. The Chase credit card account, with an approximate outstanding balance of **$50,000**.

JD-3. The Citibank account, with an approximate outstanding balance of **$15,000**.

**G. Mutual Indemnification**

**IT IS ORDERED AND DECREED** that each party shall indemnify and hold the other party and his or her property harmless from any failure to discharge any debt, charge, liability, or obligation assigned to that party under this Decree. If either party fails to discharge a debt assigned to him or her and the other party is required to pay any portion thereof, the defaulting party shall reimburse the paying party for all sums so paid, together with reasonable attorney's fees, costs, and post-judgment interest. Nothing in this Decree modifies the rights of the Chapter 7 trustee in *In re McKemie*, N.D. Tex. No. 26-30161-MVL-7.

**9. Attorney's Fees**

**IT IS ORDERED AND DECREED** that each party shall be responsible for his or her own attorney's fees and costs incurred in this proceeding.

**10. Change of Name**

**The Court finds that Petitioner specifically requested this name change and that GWENDOLYN LAURA ULIJASZ is a name previously used by Petitioner. IT IS ORDERED AND DECREED** that the name of Petitioner, **GWENDOLYN ULIJASZ-McKEMIE**, is changed to **GWENDOLYN LAURA ULIJASZ**.

**11. Court-Ordered Documents; Execution of Instruments; Turnover**

**IT IS ORDERED AND DECREED** that each party shall, at the request of the other party or the other party's counsel, execute, acknowledge, and deliver any deed, title, assignment, release, qualified domestic relations order (QDRO), or other instrument, and shall perform any act, reasonably necessary to effectuate and carry out the terms of this Decree, including the division and transfer of the retirement, brokerage, and financial accounts awarded herein.

**IT IS FURTHER ORDERED AND DECREED** that each party shall surrender and turn over to the other party, within **thirty (30) days** after the date this Decree is signed, all property awarded to the other party under this Decree that is in his or her possession or subject to his or her control, together with all keys, titles, statements, and documents of ownership.

If a party fails to comply within the time specified, the Court may, on motion, appoint the District Clerk or a constable to execute any necessary instrument on that party's behalf, and such execution shall be valid as if executed by the party.

**12. Discharge from Duty to Preserve Discovery**

**IT IS ORDERED AND DECREED** that the parties are discharged from the requirement of keeping and storing the documents produced in this case in accordance with Rule 191.4(d) of the Texas Rules of Civil Procedure.

Notwithstanding any discharge from Texas Rule of Civil Procedure 191.4(d), each party shall preserve all documents, financial records, account statements, transfer records, domain-registration records, communications, shipment records, exhibits, and other materials reasonably necessary to enforce this Decree, respond to any appeal, restricted appeal, motion for new trial, bankruptcy trustee request, creditor claim, tax filing, or enforcement proceeding.

**13. Costs**

**IT IS ORDERED AND DECREED** that costs of court are taxed against the party who incurred them.

**14. Denial of Respondent's Counterpetition and Affirmative Relief**

**IT IS ORDERED AND DECREED** that Respondent, **JASON EMORY McKEMIE,** having failed to appear, prosecute, or proceed at trial, all relief requested in Respondent's Original Counterpetition for Divorce, his First Amended Counterpetition for Divorce, and any other pleading or request for affirmative relief filed by Respondent is in all respects **DENIED.**

**15. Finality**

This judgment finally disposes of all claims and all parties, is appealable, and is a final judgment. **All relief requested in this case and not expressly granted in this Decree is DENIED.**

**SIGNED** this 26 day of June, 2026.

________________________________

**JUDGE PRESIDING**

**APPROVED AND ENTRY REQUESTED:**

/s/

**Jonathan D. Steele**
Beermann LLP
*(admitted pro hac vice)*

# MUTUAL RELEASE AND PRIVATE SETTLEMENT AGREEMENT

WHEREAS, SKWERES PROPERTIES, LLC, as landlord (the "Landlord"), and GWENDOLYN ULIJASZ-MCKEMIE (the "Tenant" and sometimes "Gwen"; together with the Landlord, the "Parties") entered into a certain Residential Lease (the "Lease") for the property located at 5609 La Foy Blvd, Dallas, Texas 75209 (the "Premises"), the Lease having also JASON MCKEMIE as co-tenant ("Jason"); and

WHEREAS, the Tenant and Jason are currently parties to an eviction suit, Cause No. JPC26-06838-51 (the "Lawsuit"); and

WHEREAS, Landlord and Tenant desire to nonsuit the Lawsuit as to then Tenant only.

NOW, THEREFORE, the Parties agree as follows:

1. **Mutual Release**: For the consideration stated below and other good and valuable consideration, and contingent on the complete adherence to all terms of this Agreement, the Parties, acting for themselves do hereby fully release, acquit, and forever discharge any and all claims, demands, causes of action, obligations, damages, and liabilities of any nature whatsoever, arising in the past or in the future, whether or not now known, suspected, or claimed, of whatever kind or character that the Parties, as individuals, may have or assert, against each other, arising directly or indirectly from the Premises and the Lease and the performance or nonperformance thereof. This agreement inures to the benefit of, and is binding upon, the Parties, their agents, attorneys, heirs, beneficiaries, spouses, partners, transferees, devisees, and assignees, now or in the future, whether known or unknown.

2. **Termination of Leasehold Interest.** Gwen surrenders any right to possession she may possess under the Lease and waives any claim that she retains any interest, leasehold or otherwise, in the Premises.



EXHIBIT
2

3. **Security Deposit Waiver.** Gwen surrenders any interest she may have in that certain security deposit held under the Lease. Consequently, Landlord shall have no obligation to refund any amount from the security deposit to Gwen, nor provide any itemization of deductions or otherwise notify Gwen of any charges from the security deposit.

4. **Nonsuit.** Upon execution of this Agreement by the Parties, the Parties shall sign, and the Landlord shall file, an Agreed Motion to Nonsuit (the "Motion"). The Motion shall dismiss the current Lawsuit only as it pertains to Gwen (continuing against Jason) with prejudice. Landlord shall simultaneously file an accompanying Order. Gwen agrees and affirms that such dismissal with prejudice is intended solely to resolve disputes between her and the Landlord concerning the Lease and the Premises.

5. **Gwen's Property; Release of Liability.** The Parties acknowledge that personal property belonging to Gwen remains within the Premises. The Parties further acknowledge that, given the ongoing divorce between Gwen and Jason and the pending Lawsuit, it would be impractical to arrange a window of time for Gwen to recover her property from the Premises until after Jason fully vacates and surrenders the Premises. Gwen agrees that she shall not enter nor make any claim to enter the Premises until Jason fully vacates and surrenders possession of the Premises, whereby possession is recovered by Landlord (whether at the conclusion of the current Lawsuit in the Justice of the Peace or upon the conclusion of any appeal, as may be initiated by either Landlord or Jason) OR unless Gwen is provided the ability to enter the Premises by the judge in her divorce proceeding.

   a. After the Landlord recovers full possession of the Premises, Landlord and Gwen shall arrange a time for her to access the Premises and recover her property within seven (7) days of notice to Gwen that she may enter and remove her property. The Landlord reserves the right to charge a modest storage fee per diem (based on local market rates for storage centers) if Gwen is provided notice of the ability to access the Premises and recover her property but the property is not fully removed within the seven (7) day timeline. The Parties may agree to modify this timeline in writing.

Docusign Envelope ID: C4E69281-F502-4A92-B779-883FD8691EFF

**b.** Gwen releases Landlord from any and all claims related to her property, including but not limited to, claims of damaged or broken items, claims of lost or missing items, or claims of conversion or theft. The Parties agree that Landlord is not a bailee, this it not a bailiff/bailee relationship, and Landlord has no obligation to safeguard or otherwise account for Gwen's property, given the contested nature of possession of the Premises and the ongoing Lawsuit with Jason.

6. **Confidentiality.** The Parties agree that the terms of this Agreement are confidential and not to be publicly disclosed to any other parties unless required to do so by law.

7. **Representations.** The Parties represent that (i) in entering into this Agreement they have relied wholly upon their judgement, belief, and knowledge of their respective circumstances and that this Agreement is executed and made without any reliance upon any statement or representation of the other party or their respective representatives; (ii) this Agreement has not been used to sell or lease goods or services; (iii) the Parties have had a meaningful opportunity to negotiate the terms of this Agreement before signing; and (iv) the Parties had the opportunity to consult with an attorney of their choice with respect to this Agreement.

8. **Effectiveness:** This Agreement shall be effective upon the date of the last to sign below.

9. **Counterparts:** This document may be signed electronically by the Parties, and any electronic counterpart shall count as an original Agreement and be fully enforceable. The Parties agree that their electronic signatures to this Agreement are legally binding.

EXECUTED to be effective as of the date of the last to sign below.

| **Landlord:** | **Tenant:** |
|---|---|
| **SKWERES PROPERTIES, LLC** | Signed by: |
| By: [signature] | [signature] 76AAE3FE25C7444... 7/22/2025 |
| Printed Name: Skweres Properties LLC | Gwendolyn Ulijasz-McKemie |
| 07 / 22 / 2025 | |

**From:** Ulijasz, Gwen
**To:** Sara A. Boucher; Jonathan Steele
**Subject:** Fw: [External] Set Out
**Date:** Thursday, September 10, 2026 7:28:52 PM

**Warning: Unusual sender** <gwendolyn.ulijasz@accenture.com>
You don't usually receive emails from this address. Make sure you trust this sender before taking any actions.

Gwen Ulijasz
Managing Director, Client Account Lead
210.278.6377

**From:** Travis Skweres <travis@10xapps.com>
**Sent:** Wednesday, April 15, 2026 11:07 AM
**To:** Ulijasz, Gwen <gwendolyn.ulijasz@accenture.com>; Jacqueline Skweres <jacquelineskweres@gmail.com>
**Subject:** [External] Set Out

**WARNING:** External email. Be vigilant with links, attachments, and requests.

Gwen,

We have the writ of possession and will be moving Jason out tomorrow morning at 9:30am.

Once the constables ensure he has left and the property is safe, movers will place any furniture he hasn't already removed by the side of the road.

I'm sending this to you in case you wanted to grab anything - but please:

1. Do not notify him or give any advanced indication to avoid a conflict
2. Do not arrive at the property until at least 10 a.m. and confirm that the constables and our team are on site before approaching

Hopefully this nightmare will be over soon. Thanks.

Travis
713-492-9218

This message is for the designated recipient only and may contain privileged, proprietary, or otherwise confidential information. If yo

EXHIBIT
2b

have received it in error, please notify the sender immediately and delete the original. Any other use of the e-mail by you is prohibited. Where allowed by local law, electronic communications with Accenture and its affiliates, including e-mail and instant messaging (including content), may be scanned by our systems for the purposes of information security, AI-powered support capabilities, and assessment of internal compliance with Accenture policy. Your privacy is important to us. Accenture uses your personal data only in compliance with data protection laws. For further information on how Accenture processes your personal data, please see our privacy statement at https://www.accenture.com/us-en/privacy-policy.

www.accenture.com

FILED
7/23/2025 12:15 PM
Dallas County
Justice of the Peace Pct 5-1
By: Victoria Lopez

CAUSE NO.JPC-25-06838-51

| | | |
|---|---|---|
| SKWERES PROPERTIES, LLC, | § | IN THE JUSTICE COURT |
| | § | |
| | § | |
| VS. | § | PRECINCT 5-1 |
| | § | |
| MCKEMIE, JASON, & | § | |
| ULIJASZ, GWENDOLYN L | § | DALLAS COUNTY, TEXAS |

**NOTICE OF NONSUIT (WITH PREJUDICE)**
**AS TO GWENDOLYN L ULIJASZ ONLY**

Now comes SKWERES PROPERTIES, LLC (the "Plaintiff"), and files this Notice of Nonsuit with Prejudice as to Gwendolyn L Ulijasz Only (the "Notice") and presents the following:

1. Plaintiff and Defendant Gwendolyn L Ulijasz ("Gwen") have privately agreed to settle this matter. Gwen has previously surrendered possession of the subject leased property and there is no longer any contest between Plaintiff and Gwen about her rights to possession of the leased property.

2. In exchange for the various promises and consideration made by each of Plaintiff and Gwen, Plaintiff agrees to file this Notice of Nonsuit with Prejudice as to Gwendolyn Ulihasz Only.

3. For avoidance of doubt, Plaintiff shall continue this Eviction Suit / Suit for Possession against Defendant Jason McKemie ("Jason") and does not in any way intend to nonsuit or dismiss any claims against Jason. This Notice does not in any way affect the claims Plaintiff has against Jason as a tenant or the lease obligations, generally.

WHEREFORE, Plaintiff requests that the Court accept this Notice and sign an Order to dismiss this case with prejudice.

*Signature page follows.*



EXHIBIT
2-A

FILED
7/23/2025 12:15 PM
Dallas County
Justice of the Peace Pct 5-1
By: Victoria Lopez

Respectfully submitted,

SKWERES PROPERTIES, LLC

/s/ Skweres Propeties, LLC

Printed Name: Travis Skweres, Director

AGREED:

/s/ Gwendolyn L Ulijasz

Gwendolyn L Ulijasz

**Certificate of Service**

I certify that on this date a true copy of this Notice was sent to Jason McKemie through the Texas e-filing system using the email jmckemie@mckemie.net and by certified mail, return receipt requested to 5609 La Foy Blvd, Dallas, Texas 75209. Gwendolyn L Ulijasz has received and agreed, by her signature above, to this Motion.

SKWERES PROPERTIES, LLC

/s/ Skweres Propeties, LLC                Date: July 23, 2025

Printed Name: Travis Skweres, Director

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Ryan Zapalac on behalf of Ryan Zapalac
Bar No. 24106618
rzapalac@zapalaclawfirm.com
Envelope ID: 103467179
Filing Code Description: MOTION FOR NONSUIT
Filing Description: *EFILE
Status as of 7/24/2025 8:06 AM CST

Associated Case Party: JASON MCKEMIE

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason McKemie | | jmckemie@mckemie.net | 7/23/2025 12:15:01 PM | SENT |

FILED
7/23/2025 12:15 PM
Dallas County
Justice of the Peace Pct 5-1
By: Victoria Lopez

CAUSE NO. JPC-25-06838-51

| | | |
|---|---|---|
| SKWERES PROPERTIES, LLC, | § | IN THE JUSTICE COURT |
| | § | |
| | § | |
| VS. | § | PRECINCT 5-1 |
| | § | |
| MCKEMIE, JASON, & | § | |
| ULIJASZ, GWENDOLYN L | § | DALLAS COUNTY, TEXAS |

**ORDER GRANTING**
**NONSUIT (WITH PREJUDICE)**
**AS TO GWENDOLYN L ULIJASZ ONLY**

On this date the Court received the Plaintiff's Notice for Nonsuit (With Prejudice) as to Gwendolyn Ulijasz Only and ORDERS the following:

- This case shall be dismissed as to Defendant GWENDOLYN L ULIJASZ only, with prejudice.
- This case shall continue between Plaintiff and Defendant JASON MCKEMIE.

JUDGE PRESIDING

SIGNED ON 7/24/2025

[redacted]

---

[redacted]

[redacted]

---------- Forwarded message ---------
From: **Jason McKemie** <jmckemie@mckemie.net>
Date: Sun, May 25, 2025 at 12:45 PM
Subject: Re: Notice of Property Access Restriction and Conditional Pickup Terms
To: Gwen Ulijasz <gulijasz@gmail.com>, Gwen Laura Ulijasz McKemie <gwendolyn.ulijasz@accenture.com>
CC: Jason Mckemie <jason.mckemie@atintegration.com>

Gwen,

Just a quick follow-up—this is the third reminder after my emails on **May 12th** and **May 18th** regarding the **public storage unit**. As mentioned before, **I won't be continuing the lease past this month.**

You have the option to either take over the unit or remove your items before **May 31st**. I spoke with Public Storage, and while they don't allow a direct account transfer, there is a workable option: you can go online to reserve a unit, and they can assign you the current one once it's available in the system.

Please hold off on doing anything just yet. I will advise on best next steps.

I will be going in on **Tuesday** afternoon to speak with the manager directly to help streamline this so you don't have to physically go in. Once your new account is active, they'll provide a new lock. I'll use that to secure the unit and then **mail you the keys**—at the time the old account is paid current.

As for the outstanding amount:

- You previously paid **$350** toward shipment of your items. I'll apply that to the **$420** owed for back rent on the unit.
- That leaves a remaining balance of **$70** to bring things current.

I also covered **$66 in packing materials**, but don't worry about reimbursing that right now. I'd prefer to keep shipping costs separate until a date, time, and address for shipment are confirmed.

I'm covering the coordination and doing my best to simplify this process at no cost. But if this turns into a debate, an attempt to redirect the issue, or a delay in payment, or you attempt to modify temporary order rulings over email, I just don't have the time or energy to keep chasing such things, and I will have to simply disengage. If things aren't resolved easily by **May 31st**, I'll remove my lock, and Public Storage will treat the unit and contents as **abandoned** under their policies.

Also, please advise **when you intend to return my grandmother's wedding ring**, as previously committed. **This remains an unresolved issue and should be addressed directly.**

Finally, this is the **fourth reminder** to update your status on eFileTexas.gov—either by declaring pro se or having your attorney appear. You're also still out of compliance on the required **HSA account information** under both the standing and temporary orders.

Let's please keep this simple and handle it directly. We don't need to overcomplicate things.

Jason

---

**From:** Jason McKemie <jmckemie@mckemie.net>
**Date:** Wednesday, May 21, 2025 at 2:51 PM
**To:** Gwen Ulijasz <gulijasz@gmail.com>, Gwen Laura Ulijasz McKemie <gwendolyn.ulijasz@accenture.com>

EXHIBIT
2c

**Cc:** Thaddeus Ulijasz <trulijasz@gmail.com>, Jason Emory McKemie <jason.mckemie@atintegration.com>
**Subject:** Notice of Property Access Restriction and Conditional Pickup Terms

**Gwen & Ted:**

**Gwen,**

I have done my best to honor the boundaries surrounding your family, even when it meant withholding truth I believed deserved to be known. However, at this moment, I choose to ensure that **my words are conveyed in a manner of my own choosing—not as a recreation, retelling, or distortion.** I am not seeking conflict, nor am I attempting to intrude. I am simply choosing clarity over silence, and ownership over misrepresentation.

I understand that you would like to come gather your remaining belongings with your father. However, to be absolutely clear, **you are not permitted at the property under any circumstances**. Given the nature of the ongoing litigation and the history of prior incidents, your presence at or near the home constitutes a direct threat to my legal safety and mental well-being.

**This is not about retaliation—it is about protection.** If you are seen on or near this property, including the street or surrounding area, I will contact law enforcement immediately. There will be no discussion, no warnings, and no exceptions. **This boundary is final and will be enforced without hesitation.**

I am currently under physician's orders to remain in bed through the 25th due to a serious staph infection. Coordinating a pickup and boxing your belongings under these conditions is an immense task—especially given the circumstances. Nevertheless, I will do everything I can to have your items prepared by Sunday. **But to be clear, this ONLY happens if my grandmother's ring is returned at the same time.**

You have committed in writing and over a recorded call—emotionally and unequivocally—that you would never withhold that ring from my mother or my family. **No separate nor community funds were used in its purchase.** It was a **conditional gift from my family**, with the clear understanding that it would remain in our lineage if the marriage ended. **I am holding you to that promise.**

That ring is not a bargaining chip. It will not be weaponized, bartered, or reduced to leverage. **There will be no discussion, exchange, or release of your belongings until the ring is returned.** Whether that happens now or later, the choice is yours: you may honor your word or pursue retrieval of your property through the appropriate legal channels.

I hope this **one small piece** can be resolved with **civility and integrity**. That's all I'm asking.

**~J.**

---

**Ted,**

I missed you at Christmas. I was really looking forward to hitting the range again with you and I had an appropriate gift I was excited to deliver.

You've always had my respect. I realize my strong words and firm boundaries might create a discomforting confusion. That is not what I want for either you or for Chris. I only ask that you trust I'm doing what I must do—for my safety, and for my family.

If you'd like to come by the house to gather any of Gwen's belongings, I will do my best to have things boxed up in advance. That said, I have extremely limited bandwidth before the weekend. So, I will send out another update with progress closer to Sunday if the decision is to go that direction.

Best Regards Ted. I hope you and Chris are well.

**Regards,**

**Jason McKemie**
**214.868.4901**

---------- Forwarded message ----------
From: Jason McKemie <jmckemie@mckemie.net>
To: Gwen Ulijasz <gulijasz@gmail.com>
Cc: William Cook <wcook@sullivancook.com>, Ethan Scroggins <escroggins@sullivancook.com>, Chandler Alt <calt@sullivancook.com>, Gwen Laura Ulijasz McKemie <gwendolyn.ulijasz@accenture.com>
Bcc:
Date: Tue, 20 May 2025 16:30:04 -0500
Subject: Re: Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

**Gwen,**

**I am not going to keep playing these games Gwen.**

Let's be crystal clear—this is not a fairy tale, and there is no golden ticket being mailed to you, nor your attorney, for magical storage access. You should not be expecting some enchanted email invitation filled with fairy dust. You're an adult. Adults communicate. Adults take **accountability**.

You have never once asked for access to the unit at Public Storage. Not by email. Not by text. Not through counsel. So, playing the **victim** now—claiming you were "denied access"—is absurd and flat-out false.

Had you made a single request, I would have told you exactly what your portion of the past-due storage fees was and granted access immediately after payment was made current. **That's how adulthood works.** That's how responsibility works.

To state it plainly:

- You were never denied access.
- You never *requested* access.
- You never paid a dime toward your share of the storage fees.

You currently owe **$420.00**, covering your half of the total $840.00 from January through May 2025. That unit was retained specifically for the preservation of marital assets per the Court's Standing and Temporary Orders—which is a shared expense that are well aware of.

---

**Storage Cost Summary (Dec 16, 2024 – May 31, 2025):**

- Total duration: 166 days
- Months billed: 5 months
- Total storage cost: $840.00
- Your share: **$420.00**

---

The access code will be provided once your account is current. The physical key can be made available at the front desk once payment is received. You're not "barred" from entry—**you're just behind on your bills and making excuses for it.**

If you want access, do what any rational adult would do:

**State the day you'd like access, and pay your share of the cost.** Until then, stop pretending there was some mythical email you missed. **The only thing you're missing is accountability—*and that's something I can't ship you in a box.***

**Payment is past due.** If non-payment is continued, I will file a formal motion seeking enforcement, reimbursement, and sanctions for knowingly misrepresenting access and reusing to pay.

Enough with the games.

**Jason McKemie**
(214) 868-4901
jmckemie@mckemie.net

---

**From:** Gwen Ulijasz <gulijasz@gmail.com>
**Date:** Tuesday, May 20, 2025 at 3:09 PM
**To:** Jason McKemie <jmckemie@mckemie.net>
**Subject:** Re: Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

Will does not have the email where you or your attorney indicated I could get my things from storage. Can you please forward that - no one has any record.

On Tue, May 20, 2025 at 1:02 PM Jason McKemie <jmckemie@mckemie.net> wrote:

> You've got some nerve Gwen.
>
> There was a time we had an armed lunatic trying to kill you. From September 2023 to June 2024, I spent every night from 11 PM to 2 to 4 AM in the morning, scraping your data off the Internet. Purging your information from data brokers. Creating false trails, putting your footprints in random cities with one singular purpose, to keep you safe until you could take my name. To do anything and everything to

protect you every single night, so I could protect us & what we had.

I sacrificed my sleep. I sacrificed my productivity. I sacrificed my profession. Every goddamn night I would kiss you at 11 PM, and you would thank me when I went into that room to start scraping your data off the Internet. When I would start researching programs to protect you, signing you up for the Texas address confidentiality program. You watched me, exhausted, drained. I hired security details for you. I coordinated coverage for your court proceedings.

And you bring that fucking charade into our marital home!?! You accuse me of being an abuser!?! Me complicating things? Are you fucking delusional?

And it was all bullshit!?!

It was goddamn bullshit!?!

How could you watch me do that every night? How could you ask that of me?

It's true what they say about your kind. You have no awareness of others. You are "self" consumed. You are self will run riot. You certainly have no sympathy. And God knows you don't have empathy.

How dare you speak to me about making things complicated. How dare you?

A fraudulent protective order with allegations of abuse and stalking. 19 false police reports filed in multiple jurisdictions. Abandoning me directly after a spinal surgery after an attempted character assassination, well canceling payment on unnecessary medical device after an invasive spinal surgery and leaving me with less than $300 so that I had to sell plasma for medication while you go to New York to buy a $3000 gown and fuck strangers masquerading like it's a work function. and I make things complicated?

You clearly have no idea of the mountain of evidence I have. But you're gonna find out real soon.

And before you deny, all this, just remember, I've got all the receipts. It's time to start telling the truth to people Gwen. And anyone in your family you expect to come to this house, you better start telling the truth to. So you might as well start with your dad. Because there's no way in hell, he's coming here until he knows what really happened. They're all gonna find out anyway, so you might as well start telling them now.

And before you speak to me again with hateful rhetoric or a wicked disregard, keep in mind that you're currently being monitored by the San Antonio mental health division of the police department. They've been actively investigating you and they've come to me twice asking me to testify. Initially, I gave them some information. The next time they came around, I told them I couldn't help them and if they were gonna reach out again, they needed to do so with a warrant. I have saved your job twice Gwen. You better start being a little appreciative. Because I'm not feeling like doing that anymore.

What you suggesting is impossible. However, I will think about logistically how I can get your stuff somewhere, but you're not coming in this house. The fact you would think that is possible shows how detached you really are from reality.

I DO NOT TRUST YOU!

You are dangerous.

Stay away from me.

You complicated this.

Jesus. You really are unbelievable.

You've had five months Gwen.

Five months to talk to a sponsor.

Five months to take accountability.

Five months to try to make things right.

Five months to BEG for forgiveness You don't deserve.

Five months to still have a normal boring, quiet, private divorce.

But driven by contrived ego and predacious greed, you've chosen not to. Even worse, you drug your sister into this mess. You really are a black hole.

And now, it's too late

J

Get Outlook for iOS

---

**From:** Gwen Ulijasz <gulijasz@gmail.com>
**Sent:** Tuesday, May 20, 2025 10:34:50 AM
**To:** Jason McKemie <jmckemie@mckemie.net>
**Subject:** Re: Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

This is the email address the court has on record.

I would make a trip to empty the storage and at the same time take my items from the La Foy house this weekend Saturday or Sunday. My Dad would be with me. You can pick one day or the other. I'll be taking everything that pre dates our marriage. We both know what is yours and what is mine. We dont need to overcomplicate things.

On Sun, May 18, 2025 at 10:05 PM Jason McKemie <jmckemie@mckemie.net> wrote:

> FYI – responses included below
>
> ---
>
> **From:** Jason Emory McKemie <jason.mckemie@atintegration.com>
> **Date:** Sunday, May 18, 2025 at 10:01 PM
> **To:** Gwen Ulijasz <gulijasz@gmail.com>
> **Cc:** Gwen Laura Ulijasz McKemie <gwendolyn.ulijasz@accenture.com>, Jason McKemie <jmckemie@mckemie.net>
> **Subject:** Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims
>
> Gwen,
>
> As there is currently no attorney of record filed on your behalf and no formal pro se designation submitted to the Court, please clarify how you intend to receive legal service going forward. Continued direct communication in the absence of such clarification may be deemed procedurally improper under the Texas Rules of Civil Procedure and could expose you to further sanctions.
>
> ---
>
> **1. Employment Commentary and Health Status**
>
> You currently have no knowledge of my employment status or income. Your unsolicited commentary is unappreciated, inappropriate, and constitutes yet another example of the ongoing mental and psychological attacks that have characterized your conduct throughout these proceedings.

If you must pry: I was released yesterday following an extended stay in the hospital and am currently fighting a serious health battle from which I am still attempting to recover—partially brought on by your obstruction of access to medication and healthcare services. These facts are documented and will be addressed accordingly in court.

---

**2. Health Insurance and HSA Access**

There was never any agreement—express or implied—that you would be reimbursed for the use of HSA funds. During the time in question, I was engaged in startup efforts with your full knowledge and support. You were explicitly aware that no income would be generated for up to, and potentially beyond, one year. You acknowledged this in writing as late as December and encouraged those efforts—even over more immediate W-2 opportunities. This is documented.

Access to the HSA account functioned exactly as it did throughout the marriage. If you intended to change that arrangement post-separation, you should have addressed it in the Temporary Orders we co-authored and signed. You did not.

**I must remind you again that you are in violation of both the Standing Orders and Temporary Orders issued by the 254th Judicial District Court by continuing to obstruct access to marital healthcare benefits and attempting to retroactively rewrite the terms without judicial approval.**

---

**3. HSA Receipts and Documentation**

To date, the only disputed HSA receipt you have mentioned was approximately $300, and you failed to substantiate it with documentation. Your new claim involving 12 missing receipts is entirely unverified. Please provide a formal statement from the HSA administrator listing each disputed transaction, including:

- Date of service
- Provider name
- Procedure performed
- Patient name
- Amount billed

Once I receive this documentation, I will investigate. Until then, your claims remain unsubstantiated.

---

**4. Storage Unit Access**

Your former attorney was explicitly notified that you could access the storage unit at any time. The key would be left on-site by me with reasonable prior notice. You have never requested such access. Any assertion that your belongings were withheld is demonstrably false.

---

**5. Mailing of Items and Storage Costs**

You never confirmed a delivery address for the proposed shipment on Monday, May 5th, nor did you reply to confirm you would be available to receive it. Mailing personal property without a verified address is not legally or logistically reasonable.

During the marriage, you funded the joint account—therefore, you were responsible for those payments at the time. Since separation, I have solely funded the account, and you have contributed nothing. The Public Storage charge has continued to be paid from that account. You are responsible for the current balance, and my offer to accept half is generous. If you prefer to dispute this in court, I will gladly do so and seek full reimbursement supported by documentation.

---

**6. Unsupported Accusations**

Accusations made without full and complete documentation will be disregarded. If any such claims are weaponized in court without evidentiary support, I will pursue legal action, including motions for sanctions, evidentiary exclusion, and bad-faith litigation conduct.

---

**7. Regarding Service and Email Communications**

You recently stated that I should not email your work address. However, until a formal declaration of pro se status or attorney representation is filed with the Court—and a legally recognized method of service is designated—I am required to notify you through all channels reasonably available. I cannot omit email addresses when there is no record on file indicating how legal service should be conducted.

---

**8. Demand for Service Instructions**

You are hereby formally requested to provide written clarification within 24 hours as to how you intend to receive legal service. This includes identifying either (1) your counsel of record, or (2) filing a pro se appearance and designating an email address and/or mailing address for legal service. If no response is received by the deadline, I will proceed with motions to compel and request that all direct communications from you be barred until formal notice procedures are followed.

---

**P.S.** Turning off delivery and read receipts at a time when you have no attorney of record and have not declared pro se status is a transparent act of procedural obstruction—and potentially unlawful, depending on its intent to evade legal service. This will be documented and presented to the Court if necessary.

Additionally, let this serve as final notice that you are to stay out of my personal life and my professional affairs. Any further intrusion, interference, or reputational sabotage will be treated as retaliatory harassment and litigated accordingly.

Respectfully,

**Jason McKemie**
jmckemie@mckemie.net

---------- Forwarded message ----------
From: Jason McKemie <jmckemie@mckemie.net>
To: Gwen Ulijasz <gulijasz@gmail.com>, "gwendolyn.ulijasz@accenture.com" <gwendolyn.ulijasz@accenture.com>
Cc:
Bcc:
Date: Tue, 20 May 2025 13:54:51 -0500
Subject: Re: Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

Gwen,

This will serve as formal notice that youmust formally declare your status as either pro se or attorney of record through the Texas eFile system. Email alone does not constitute legal notice or authorize service under the Texas Rules of Civil Procedure. Until this is done, you are not in compliance and I have no official channel through which to serve you. Please correct this immediately.

In addition, I am requesting the full credentials for the HSA card, including card number, expiration date, CVV, and billing ZIP code. This access is required under both the Standing and Temporary Orders currently in effect, and your continued refusal to provide it constitutes a violation of those orders.

Lastly, I am asking you and I strongly suggest making a good faith deposit to the joint account for your share of the Public Storage unit costs immediately. There are motions going in this week, and refusing to contribute to a clearly documented, shared marital expense is not going to reflect well on you. Making that one payment, and not having to be forced by the courts to present the HSA credentials, may be the only things that presents you as even being marginally reasonable in light of your broader conduct.

Please confirm receipt and take immediate action on all points.

Best regards,

Jason McKemie

(214) 868-4901

jmckemie@mckemie.net

Get Outlook for iOS

---

**From:** Gwen Ulijasz <gulijasz@gmail.com>
**Sent:** Tuesday, May 20, 2025 10:34:50 AM
**To:** Jason McKemie <jmckemie@mckemie.net>
**Subject:** Re: Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

This is the email address the court has on record.

I would make a trip to empty the storage and at the same time take my items from the La Foy house this weekend Saturday or Sunday. My Dad would be with me. You can pick one day or the other. I'll be taking everything that pre dates our marriage. We both know what is yours and what is mine. We dont need to overcomplicate things.

On Sun, May 18, 2025 at 10:05 PM Jason McKemie <jmckemie@mckemie.net> wrote:

FYI – responses included below

---

**From:** Jason Emory McKemie <jason.mckemie@atintegration.com>
**Date:** Sunday, May 18, 2025 at 10:01 PM
**To:** Gwen Ulijasz <gulijasz@gmail.com>
**Cc:** Gwen Laura Ulijasz McKemie <gwendolyn.ulijasz@accenture.com>, Jason McKemie <jmckemie@mckemie.net>
**Subject:** Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

Gwen,

As there is currently no attorney of record filed on your behalf and no formal pro se designation submitted to the Court, please clarify how you intend to receive legal service going forward. Continued direct communication in the absence of such clarification may be deemed procedurally improper under the Texas Rules of Civil Procedure and could expose you to further sanctions.

---

**1. Employment Commentary and Health Status**

You currently have no knowledge of my employment status or income. Your unsolicited commentary is unappreciated, inappropriate, and constitutes yet another example of the ongoing mental and psychological attacks that have characterized your conduct throughout these proceedings.

If you must pry: I was released yesterday following an extended stay in the hospital and am currently fighting a serious health battle from which I am still attempting to recover—partially brought on by your obstruction of access to medication and healthcare services. These facts are documented and will be addressed accordingly in court.

---

**2. Health Insurance and HSA Access**

There was never any agreement—express or implied—that you would be reimbursed for the use of HSA funds. During the time in question, I was engaged in startup efforts with your full knowledge and support. You were explicitly aware that no income would be generated for up to, and potentially beyond, one year. You acknowledged this in writing as late as December and encouraged those efforts—even over more immediate W-2 opportunities. This is documented.

Access to the HSA account functioned exactly as it did throughout the marriage. If you intended to change that arrangement post-separation, you should have addressed it in the Temporary Orders we co-authored and signed. You did not.

**I must remind you again that you are in violation of both the Standing Orders and Temporary Orders issued by the 254th Judicial District Court by continuing to obstruct access to marital healthcare benefits and attempting to retroactively rewrite the terms without judicial approval.**

---

**3. HSA Receipts and Documentation**

To date, the only disputed HSA receipt you have mentioned was approximately $300, and you failed to substantiate it with documentation. Your new claim involving 12 missing receipts is entirely unverified. Please provide a formal statement from the HSA administrator listing each disputed transaction, including:

- Date of service
- Provider name
- Procedure performed
- Patient name
- Amount billed

Once I receive this documentation, I will investigate. Until then, your claims remain unsubstantiated.

---

**4. Storage Unit Access**

Your former attorney was explicitly notified that you could access the storage unit at any time. The key would be left on-site by me with reasonable prior notice. You have never requested such access. Any assertion that your belongings were withheld is demonstrably false.

---

**5. Mailing of Items and Storage Costs**

You never confirmed a delivery address for the proposed shipment on Monday, May 5th, nor did you reply to confirm you would be available to receive it. Mailing personal property without a verified address is not legally or logistically reasonable.

During the marriage, you funded the joint account—therefore, you were responsible for those payments at the time. Since separation, I have solely funded the account, and you have contributed nothing. The Public Storage charge has continued to be paid from that account. You are responsible for the current balance, and my offer to accept half is generous. If you prefer to dispute this in court, I will gladly do so and seek full reimbursement supported by documentation.

---

**6. Unsupported Accusations**

Accusations made without full and complete documentation will be disregarded. If any such claims are weaponized in court without evidentiary support, I will pursue legal action, including motions for sanctions, evidentiary exclusion, and bad-faith litigation conduct.

---

**7. Regarding Service and Email Communications**

You recently stated that I should not email your work address. However, until a formal declaration of pro se status or attorney representation is filed with the Court—and a legally recognized method of service is designated—I am required to notify you through all channels reasonably available. I cannot omit email addresses when there is no record on file indicating how legal service should be conducted.

---

**8. Demand for Service Instructions**

You are hereby formally requested to provide written clarification within 24 hours as to how you intend to receive legal service. This includes identifying either (1) your counsel of record, or (2) filing a pro se appearance and designating an email address and/or mailing address for legal service. If no response is received by the deadline, I will proceed with motions to compel and request that all direct communications from you be barred until formal notice procedures are followed.

---

**P.S.** Turning off delivery and read receipts at a time when you have no attorney of record and have not declared pro se status is a transparent act of procedural obstruction—and potentially unlawful, depending on its intent to evade legal service. This will be documented and presented to the Court if necessary.

Additionally, let this serve as final notice that you are to stay out of my personal life and my professional affairs. Any further intrusion, interference, or reputational sabotage will be treated as retaliatory harassment and litigated accordingly.

Respectfully,

**Jason McKemie**
jmckemie@mckemie.net

---------- Forwarded message ----------
From: <jason.mckemie@atintegration.com>
To: <gwen.mckemie@accenture.com>, Gwen Laura Ulijasz McKemie <gulijasz@gmail.com>
Cc:
Bcc:
Date: Mon, 12 May 2025 01:39:57 -0500
Subject: Public storage / transfer of lease

Gwen — per my text message, not trying to start a discussion, just giving notice re: the shared storage unit. I've paid for the last 6 months (Dec–May) at $168/mo = $1,008. Your half is $504. Please deposit that to the joint account by **noon tomorrow (Mon 5/12)**. If not received, I'll request sanctions and reimbursement through the Court tomorrow afternoon.

Also, I'll be clearing my items out by **May 31** and won't be continuing the lease for future months. So let me know if you're planning on getting your stuff out of there and if so, I'll drop the keys off at the public storage facility so they'll be there waiting for you. Otherwise, I'll plan on transferring you the billing at the end of the month. Payment is due on the first.

Don't forget noon, Monday.

— Jason




Best Regards,

Jason McKemie
Advanced Technology Integration
(214) 868-4901 *Mobile

---------- Forwarded message ----------
From: Jason Mckemie <jason.mckemie@atintegration.com>
To: Gwen Ulijasz <gulijasz@gmail.com>
Cc: Gwen Laura Ulijasz McKemie <gwendolyn.ulijasz@accenture.com>, Jason McKemie <jmckemie@mckemie.net>
Bcc:
Date: Sun, 18 May 2025 22:01:41 -0500
Subject: Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

Gwen,

As there is currently no attorney of record filed on your behalf and no formal pro se designation submitted to the Court, please clarify how you intend to receive legal service going forward. Continued direct communication in the absence of such clarification may be deemed procedurally improper under the Texas Rules of Civil Procedure and could expose you to further sanctions.

---

### 1. Employment Commentary and Health Status

You currently have no knowledge of my employment status or income. Your unsolicited commentary is unappreciated, inappropriate, and constitutes yet another example of the ongoing mental and psychological attacks that have characterized your conduct throughout these proceedings.

If you must pry: I was released yesterday following an extended stay in the hospital and am currently fighting a serious health battle from which I am still attempting to recover—partially brought on by your obstruction of access to medication and healthcare services. These facts are documented and will be addressed accordingly in court.

---

### 2. Health Insurance and HSA Access

There was never any agreement—express or implied—that you would be reimbursed for the use of HSA funds. During the time in question, I was engaged in startup efforts with your full knowledge and support. You were explicitly aware that no income would be generated for up to, and potentially beyond, one year. You acknowledged this in writing as late as December and encouraged those efforts—even over more immediate W-2 opportunities. This is documented.

Access to the HSA account functioned exactly as it did throughout the marriage. If you intended to change that arrangement post-separation, you should have addressed it in the Temporary Orders we co-authored and signed. You did not.

**I must remind you again that you are in violation of both the Standing Orders and Temporary Orders issued by the 254th Judicial District Court by continuing to obstruct access to marital healthcare benefits and attempting to retroactively rewrite the terms without judicial approval.**

---

### 3. HSA Receipts and Documentation

To date, the only disputed HSA receipt you have mentioned was approximately $300, and you failed to substantiate it with documentation. Your new claim involving 12 missing receipts is entirely unverified. Please provide a formal statement from the HSA administrator listing each disputed transaction, including:

- Date of service
- Provider name
- Procedure performed
- Patient name
- Amount billed

Once I receive this documentation, I will investigate. Until then, your claims remain unsubstantiated.

---

### 4. Storage Unit Access

Your former attorney was explicitly notified that you could access the storage unit at any time. The key would be left on-site by me with reasonable prior notice. You have never requested such access. Any assertion that your belongings were withheld is demonstrably false.

---

### 5. Mailing of Items and Storage Costs

You never confirmed a delivery address for the proposed shipment on Monday, May 5th, nor did you reply to confirm you would be available to receive it. Mailing personal property without a verified address is not legally or logistically reasonable.

During the marriage, you funded the joint account—therefore, you were responsible for those payments at the time. Since separation, I have solely funded the account, and you have contributed nothing. The Public Storage charge has continued to be paid from that account. You are responsible for the current balance, and my offer to accept half is generous. If you prefer to dispute this in court, I will gladly do so and seek full reimbursement supported by documentation.

---

**6. Unsupported Accusations**

Accusations made without full and complete documentation will be disregarded. If any such claims are weaponized in court without evidentiary support, I will pursue legal action, including motions for sanctions, evidentiary exclusion, and bad-faith litigation conduct.

---

**7. Regarding Service and Email Communications**

You recently stated that I should not email your work address. However, until a formal declaration of pro se status or attorney representation is filed with the Court—and a legally recognized method of service is designated—I am required to notify you through all channels reasonably available. I cannot omit email addresses when there is no record on file indicating how legal service should be conducted.

---

**8. Demand for Service Instructions**

You are hereby formally requested to provide written clarification within 24 hours as to how you intend to receive legal service. This includes identifying either (1) your counsel of record, or (2) filing a pro se appearance and designating an email address and/or mailing address for legal service. If no response is received by the deadline, I will proceed with motions to compel and request that all direct communications from you be barred until formal notice procedures are followed.

---

Respectfully,

**Jason McKemie**
jmckemie@mckemie.net

**P.S.** Turning off delivery and read receipts at a time when you have no attorney of record and have not declared pro se status is a transparent act of procedural obstruction—and potentially unlawful, depending on its intent to evade legal service. This will be documented and presented to the Court if necessary.

Additionally, let this serve as final notice that you are to stay out of my personal life and my professional affairs. Any further intrusion, interference, or reputational sabotage will be treated as retaliatory harassment and litigated accordingly.

---------- Forwarded message ----------
From: Jason Mckemie <jason.mckemie@atintegration.com>
To: Gwen Ulijasz <gulijasz@gmail.com>
Cc: Gwen Laura Ulijasz McKemie <gwendolyn.ulijasz@accenture.com>, Jason McKemie <jmckemie@mckemie.net>, "9174711979@vtext.com" <9174711979@vtext.com>
Bcc:
Date: Sun, 18 May 2025 22:53:42 -0500
Subject: [UPDATED] Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

Gwen,

**In lieu of additional correspondence, updated sections indicated in red.**

---

As there is currently no attorney of record filed on your behalf and no formal pro se designation submitted to the Court, please clarify how you intend to receive legal service going forward. Continued direct communication in the absence of such clarification may be deemed procedurally improper under the Texas Rules of Civil Procedure and could expose you to further sanctions.

---

1. **Employment Commentary and Health Status**

You currently have no knowledge of my employment status or income. Your unsolicited commentary is unappreciated, inappropriate, and constitutes yet another example of the ongoing mental and psychological attacks that have characterized your conduct throughout these proceedings.

If you must pry: I was released yesterday following an extended stay in the hospital and am currently fighting a serious health battle from which I am still attempting to recover—partially brought on by your obstruction of access to medication and healthcare services. These facts are documented and will be addressed accordingly in court.

---

## 2. Health Insurance and HSA Access

There was never any agreement—express or implied—that you would be reimbursed for the use of HSA funds. During the time in question, I was engaged in startup efforts with your full knowledge and support. You were explicitly aware that no income would be generated for up to, and potentially beyond, one year. You acknowledged this in writing as late as December and encouraged those efforts—even over more immediate W-2 opportunities. This is documented.

Access to the HSA account functioned exactly as it did throughout the marriage. If you intended to change that arrangement post-separation, you should have addressed it in the Temporary Orders we co-authored and signed. You did not.

**I must remind you again that you are in violation of both the Standing Orders and Temporary Orders issued by the 254th Judicial District Court by continuing to obstruct access to marital healthcare benefits and attempting to retroactively rewrite the terms without judicial approval.**

---

## 3. HSA Receipts and Documentation

To date, the only disputed HSA receipt you have mentioned was approximately $300, and you failed to substantiate it with documentation. Your new claim involving 12 missing receipts is entirely unverified. Please provide a formal statement from the HSA administrator listing each disputed transaction, including:

- Patient name
- Date of service
- Provider name
- Procedure performed
- Amount billed

Once I receive this documentation, I will investigate. Until then, your claims remain unsubstantiated.

---

## 4. Storage Unit Access

Your former attorney was explicitly notified that you could access the storage unit at any time. The key would be left on-site by me with reasonable prior notice. You have never requested such access. Any assertion that your belongings were withheld is demonstrably false.

---

## 5. Mailing of Items and Storage Costs

You never confirmed a delivery address for the proposed shipment on Monday, May 5th, nor did you reply to confirm you would be available to receive it. Mailing personal property without a verified address is not legally or logistically reasonable.

During the marriage, you funded the joint account—therefore, you were responsible for payments made at that time. Since separation, I have solely funded the account, and you have contributed nothing. The Public Storage charge has continued to be paid from that account. You are responsible for the current balance, and my offer to accept half is generous. If you prefer to dispute this in court, I will gladly do so and seek full reimbursement supported by documentation.

---

## 6. Unsupported Accusations

Accusations made without full and complete documentation will be disregarded. If any such claims are weaponized in court without evidentiary support, I will pursue legal action, including motions for sanctions, evidentiary exclusion, and bad-faith litigation conduct.

---

## 7. Regarding Service and Email Communications

You recently stated that I should not email your work address. However, until a formal declaration of pro se status or attorney representation is filed with the Court—and a legally recognized method of service is designated—I am required to notify you through all channels reasonably available. I cannot omit email addresses when there is no record on file indicating how legal service should be conducted.

---

## 8. Demand for Service Instructions

You are hereby formally requested to provide written clarification within 24 hours as to how you intend to receive legal service. This includes identifying either (1) your counsel of record, or (2) filing a pro se appearance and designating an email address and/or mailing address for legal service. If no response is received by the deadline, I will proceed with motions to compel and request that all direct communications from you be barred until formal notice procedures are followed.

---

## 9. Preservation of Record and Pending Discovery Service

**For the sake of clarity and judicial efficiency, I will be compiling all emails and correspondence into a single, time-stamped record so that the full scope of communications may be reviewed in their entirety during any future legal proceedings.** This includes all claims, accusations, reimbursement demands, text messages, letters and commentary—both past and ongoing.

I also reiterate that I am awaiting clarification on service instructions so I may properly serve formal discovery documentation. This cannot be delayed further due to your failure to comply with basic procedural requirements. The 24-hour window to respond remains in effect.

---

**10. Financial Contributions, HSA Noncompliance, and Final Deadline**

**I do see a deposit in the amount of $350 from a Chase account ending in 9259, which appears to have been made without any accompanying notice or context.** I was never informed of this deposit—neither by you, nor your former attorney, nor by the financial institution. This transaction will be included in the discovery documentation being produced this week.

**Going forward, if you intend to make any deposits into the joint account, you are required to notify me in writing in advance.** I recommend doing so via email with return receipt for your own records. Deposits made without documentation or coordination may not be recognized in the context of reimbursement claims or financial negotiations.

**Additionally, at no time did I receive any written confirmation—either directly or through counsel—that you agreed to cover any portion of shipping costs.** Your current claim is unsupported by the record and will be treated accordingly. This matter is being formally noted and preserved.

**As for your refusal to provide Health Savings Account (HSA) access, your position remains a direct violation of both the Standing Orders and the Temporary Orders issued by the 254th Judicial District Court. If you intended to modify the scope of healthcare access, coverage obligations, or account control, such terms were required to be stated clearly in your version of the Temporary Orders.**

**We co-authored and executed those Temporary Orders together.** You made no such proposal at that time. You cannot now retroactively alter or limit my access to the HSA. **Your continued refusal is not only improper—it is unlawful. You remain in violation, and this issue will be brought before the Court.**

**Likewise, your failure to contribute your portion of the Public Storage balance—despite relying on it to store community property—remains unresolved.** I have reasonably offered to accept half of the balance, though your financial obligation is in fact greater.

This is your final notice:

**You have until 10:45 PM CST on Monday, May 19, 2025 to bring yourself into compliance. After that time, I will move for sanctions, enforcement, and protective relief.**

---

P.S. Turning off delivery and read receipts at a time when you have no attorney of record and have not declared pro se status is a transparent act of procedural obstruction—and potentially unlawful, depending on its intent to evade legal service. This will be documented and presented to the Court if necessary.

Additionally, let this serve as final notice that you are to stay out of my personal life and my professional affairs. Any further intrusion, interference, or reputational sabotage will be treated as retaliatory harassment and litigated accordingly.

---

Have an Awesome Week,

Jason McKemie
jmckemie@mckemie.net

---

**From:** Gwen Ulijasz <gulijasz@gmail.com>
**Date:** Sunday, May 18, 2025 at 9:03 PM
**To:** Jason McKemie <jmckemie@mckemie.net>
**Subject:** Re: Deadline Today - 5pm / Formal Demand for Immediate Compliance with Healthcare Access Orders (Standing & Temporary)

I don't even read this stuff. You really need to get a job.

Thank you,

Gwen Ulijasz

On May 8, 2025, at 11:37 AM, Jason McKemie <jmckemie@mckemie.net> wrote:

**GWEN,**

**Violations of Standing and Temporary Orders**

**Deadline for Full Compliance: Today, Thursday, May 8th, by 5:00 PM CST**

**IT IS NOT BY CHOICE NOR DESIRE THAT I AM EMAILING YOU! YOU'RE ACTIONS OF SEPARATING FROM COUNCIL HAVE LEFT ME NO CHOICE!**

**This is not an invitation for discussion, rebuttal, or clarification.**

I am not seeking dialogue. I am not requesting negotiation.

The only response warranted—and the only one that will be acknowledged—is full delivery of the requested HSA access details and a confirmed time**before 6:00 PM CST today** during which you will receive a verification code via text and immediately relay it back to me for activation.

This is the only correspondence you're gonna receive from me about this.

---

Pursuant to the Standing Orders and Temporary Orders of the 254th Judicial District Court, **no party may interfere with access to employer-provided healthcare benefits as structured throughout the marriage.**This includes—but is not limited to—the Health Savings Account (HSA) used during the marriage.

Despite multiple formal requests since late December, you have continued to obstruct access. Your conduct forms part of a growing pattern of medical and healthcare-related interference, including the following:

---

**1. Falsely Reporting a Legitimate Medical Charge as Fraud**

A medical device critical to my spinal recovery—prescribed by my physician and purchased from Mission Medical Chairs—was reversed due to your false claim of fraud. This occurred **after I notified you directly via phone and text** of the charge's legitimacy.

**As a result, the order was canceled just days after I was discharged from an invasive spinal surgery, which 11 days prior had me hospitalized for 6 days, including being paralyzed for 36 hours from the waist down.**

You berated me for the injury, as captured on home security recordings and via text, telling others it was the result of "not caring for myself," "carrying luggage up stairs in Costa Rica," "refusing (non-existent) support", or "drinking no water and nothing but Diet Coke." These remarks were both cruel, intend to inflict maximum emotional harm, and factually wrong. When the medical findings proved your narrative conclusively false, you double downed with dismissive cruel sarcasm, while attempting to reframe

psychological abuse and victim blaming as some sort of apology stating "that was wrong of me" and *"I guess we'll never know what really caused it."*

The device in question was medically necessary. Your actions knowingly obstructed prescribed care, delayed healing, and prolonged my pain.

---

**2. Acknowledged Harm on a Recorded Call—Then Did Nothing**

On a recorded call, you acknowledged the harm, in a seemingly heartfelt and tearful moment, "I never would have done that… I know how much pain you've been in". Continuing on "the reason I'm getting a bit ticky-tacky is because I didn't see that charge… I want you to have that chair—you need that chair."

This call took place 36 hours after you instructed your legal team to rush in pursuit of a fraudulent protective order, and less than 1.5 business days before I was served. Not to mention stating via text that same day, as well as on that recorded call, that "you did not have an attorney" and would not be able to even "start looking for one till the following Tuesday or Wednesday" (the 17-18th).

On that call you claimed you could not reinstate my retainer, which you also fraudulently reported as fraud. Stating, financially we were unable to do so—while simultaneously forwarding screenshots of your old Chase account to feign financial hardship, after having transferred funds to a redacted new account--and stating "sorry, I'm just stuck between a rock and hard place." You reiterated the "unfairness" of me having access to counsel, and it wouldn't be fair unless we both got attorney's on the same day, which you said would be the following Tuesday or Wednesday. I was served Wed the 18th.

At the time, I had not retained divorce counsel. I had engaged legal support specifically for protection against the potential of a **false protective order** being filed for by you, which you certainly did; as I predicted, and feared.

On that call, you also asked about an unrelated eBay charge made the same day—which was one of the many gifts picked out, personalized, and purchased by me for your family members. This one for your sister-in-law—of which you miraculously reinstated this charge without issue. But the money transfer for 3mo living expenses, the replacement credit card you stated you cancelled in error, and the medical chair purchase, which occurred prior, all remain uncorrected to this day, despite your verbal assurance that you would fix it.

You additionally reported a legal retainer charge as "fraud," deliberately severing my existing access to counsel. This deprived me of legal representation at a critical time and further supports a pattern of tactical obstruction, medical neglect, and potentially constitutes wire fraud.

---

**3. Ongoing Denial of Access to Prescription Medications**

I currently have no access to prescriptions necessary for congestive heart failure and post-operative care. I have missed multiple cardiology and mental health appointments that would have been reimbursable through the HSA.

As of today, I have gone **more than 75 days** without access to medically essential treatment as well as have been prohibited from continuing with my therapy for C-PTSD. My therapist and psychiatrist have been providing my treatment pro bono thus far with an expectation to recollect once access to HSA funds was restored. They can no longer do this, and I need that card to get current on my last 4 sessions. This is not a misunderstanding—this is deliberate, ongoing interference with healthcare during a period of medical recovery and vulnerability.

---

**Required Information – Due by 5:00 PM CST Today**

To comply with standing and temporary orders and avoid immediate escalation, you must provide:

- HSA card number
- CVV security code
- Expiration date
- Billing ZIP code

Additionally, you must confirm a **two-minute window prior to 6:00 PM today** during which you will receive a verification code via text and immediately relay it back to me.

---

**Clarification on the Billing ZIP Code**

Any claim that providing the billing ZIP code poses a security threat is meritless:

- I personally enrolled you in the **Texas Address Confidentiality Program**, which provides a designated surrogate ZIP specifically for public use.
- That ZIP routes to a **commercial mailbox**, not a residential address.
- You have publicly listed your **Kings Forest Drive** address on financial and legal documents.
- As you have been made aware, **SAPD Detectives Carnivally and Vidal, as well as two other detectives,** have documented that I have not been within 250 miles of you at any of the times relevant to any of your multitude of claims.

Any claim of endangerment is contradicted by your own disclosures and law enforcement findings. Refusal to provide the ZIP will be logged as intentional obstruction.

---

**Legal Exposure for Continued Noncompliance**

If you do not fully comply by **5:00 PM CST today**, this issue will be formally presented to the Court as evidence of:

- Violation of Standing and Temporary Orders
- Intentional obstruction of medically prescribed care
- Potential benefit fraud and malicious interference
- Grounds for sanctions and emergency relief

---

**Final Notice**

This is your final opportunity to comply. I am not seeking discussion, excuses, or emotional appeals—only what the Court requires and what I lawfully need to protect my health.

**Deadline: Today, Thursday, May 8th, by 5:00 PM CST.**

The false narrative is over Gwen. Act accordingly. You're only going to make this worse on yourself.

Jason McKemie

jmckemie@mckemie.net

---------- Forwarded message ----------
From: Gwen Ulijasz <gulijasz@gmail.com>
To: Jason McKemie <jmckemie@mckemie.net>
Cc:
Bcc:
Date: Sun, 18 May 2025 20:48:04 -0500
Subject: Re: Deadline Today - 5pm / Formal Demand for Immediate Compliance with Healthcare Access Orders (Standing & Temporary)
I don't even read this stuff. You really need to get a job.

Thank you,
Gwen Ulijasz

On May 8, 2025, at 11:37 AM, Jason McKemie <jmckemie@mckemie.net> wrote:

**GWEN,**

**Violations of Standing and Temporary Orders**

**Deadline for Full Compliance: Today, Thursday, May 8th, by 5:00 PM CST**

**IT IS NOT BY CHOICE NOR DESIRE THAT I AM EMAILING YOU! YOU'RE ACTIONS OF SEPARATING FROM COUNCIL HAVE LEFT ME NO CHOICE!**

**This is not an invitation for discussion, rebuttal, or clarification.**

I am not seeking dialogue. I am not requesting negotiation.

The only response warranted—and the only one that will be acknowledged—is full delivery of the requested HSA access details and a confirmed time**before 6:00 PM CST today** during which you will receive a verification code via text and immediately relay it back to me for activation.

This is the only correspondence you're gonna receive from me about this.

---

Pursuant to the Standing Orders and Temporary Orders of the 254th Judicial District Court, **no party may interfere with access to employer-provided healthcare benefits as structured throughout the marriage.**This includes—but is not limited to—the Health Savings Account (HSA) used during the marriage.
Despite multiple formal requests since late December, you have continued to obstruct access. Your conduct forms part of a growing pattern of medical and healthcare-related interference, including the following:

---

**1. Falsely Reporting a Legitimate Medical Charge as Fraud**

A medical device critical to my spinal recovery—prescribed by my physician and purchased from Mission Medical Chairs —was reversed due to your false claim of fraud. This occurred **after I notified you directly via phone and text** of the charge's legitimacy.

**As a result, the order was canceled just days after I was discharged from an invasive spinal surgery, which 11 days prior had me hospitalized for 6 days, including being paralyzed for 36 hours from the waist down.**

You berated me for the injury, as captured on home security recordings and via text, telling others it was the result of "not caring for myself," "carrying luggage up stairs in Costa Rica," "refusing (non-existent) support", or "drinking no water and nothing but Diet Coke." These remarks were both cruel, intend to inflict maximum emotional harm, and factually wrong. When the medical findings proved your narrative conclusively false, you double downed with dismissive cruel sarcasm, while attempting to reframe psychological abuse and victim blaming as some sort of apology stating "that was wrong of me" and *"I guess we'll never know what really caused it."*

The device in question was medically necessary. Your actions knowingly obstructed prescribed care, delayed healing, and prolonged my pain.

---

**2. Acknowledged Harm on a Recorded Call—Then Did Nothing**

On a recorded call, you acknowledged the harm, in a seemingly heartfelt and tearful moment, "I never would have done that... I know how much pain you've been in". Continuing on "the reason I'm getting a bit ticky-tacky is because I didn't see that charge... I want you to have that chair—you need that chair."

This call took place 36 hours after you instructed your legal team to rush in pursuit of a fraudulent protective order, and less than 1.5 business days before I was served. Not to mention stating via text that same day, as well as on that recorded call, that "you did not have an attorney" and would not be able to even "start looking for one till the following Tuesday or Wednesday" (the 17-18th).

On that call you claimed you could not reinstate my retainer, which you also fraudulently reported as fraud. Stating, financially we were unable to do so—while simultaneously forwarding screenshots of your old Chase account to feign financial hardship, after having transferred funds to a redacted new account--and stating "sorry, I'm just stuck between a rock and hard place." You reiterated the "unfairness" of me having access to counsel, and it wouldn't be fair unless we both got attorney's on the same day, which you said would be the following Tuesday or Wednesday. I was served Wed the 18th.

At the time, I had not retained divorce counsel. I had engaged legal support specifically for protection against the potential of a **false protective order** being filed for by you, which you certainly did; as I predicted, and feared.

On that call, you also asked about an unrelated eBay charge made the same day—which was one of the many gifts picked out, personalized, and purchased by me for your family members. This one for your sister-in-law—of which you miraculously reinstated this charge without issue. But the money transfer for 3mo living expenses, the replacement credit card you stated you cancelled in error, and the medical chair purchase, which occurred prior, all remain uncorrected to this day, despite your verbal assurance that you would fix it.

You additionally reported a legal retainer charge as "fraud," deliberately severing my existing access to counsel. This deprived me of legal representation at a critical time and further supports a pattern of tactical obstruction, medical neglect, and potentially constitutes wire fraud.

---

**3. Ongoing Denial of Access to Prescription Medications**

I currently have no access to prescriptions necessary for congestive heart failure and post-operative care. I have missed multiple cardiology and mental health appointments that would have been reimbursable through the HSA.

As of today, I have gone **more than 75 days** without access to medically essential treatment as well as have been prohibited from continuing with my therapy for C-PTSD. My therapist and psychiatrist have been providing my treatment pro bono thus far with an expectation to recollect once access to HSA funds was restored. They can no longer do this, and I need that card to get current on my last 4 sessions. This is not a misunderstanding—this is deliberate, ongoing interference with healthcare during a period of medical recovery and vulnerability.

---

**Required Information – Due by 5:00 PM CST Today**

To comply with standing and temporary orders and avoid immediate escalation, you must provide:

- HSA card number
- CVV security code
- Expiration date
- Billing ZIP code

Additionally, you must confirm a **two-minute window prior to 6:00 PM today** during which you will receive a verification code via text and immediately relay it back to me.

---

**Clarification on the Billing ZIP Code**

Any claim that providing the billing ZIP code poses a security threat is meritless:

- I personally enrolled you in the **Texas Address Confidentiality Program**, which provides a designated surrogate ZIP specifically for public use.
- That ZIP routes to a **commercial mailbox**, not a residential address.
- You have publicly listed your **Kings Forest Drive** address on financial and legal documents.
- As you have been made aware, **SAPD Detectives Carnivally and Vidal, as well as two other detectives,** have documented that I have not been within 250 miles of you at any of the times relevant to any of your multitude of claims.

Any claim of endangerment is contradicted by your own disclosures and law enforcement findings. Refusal to provide the ZIP will be logged as intentional obstruction.

---

**Legal Exposure for Continued Noncompliance**

If you do not fully comply by **5:00 PM CST today**, this issue will be formally presented to the Court as evidence of:

- Violation of Standing and Temporary Orders
- Intentional obstruction of medically prescribed care
- Potential benefit fraud and malicious interference
- Grounds for sanctions and emergency relief

---

**Final Notice**

This is your final opportunity to comply. I am not seeking discussion, excuses, or emotional appeals—only what the Court requires and what I lawfully need to protect my health.

**Deadline: Today, Thursday, May 8th, by 5:00 PM CST.**

The false narrative is over Gwen. Act accordingly. You're only going to make this worse on yourself.

Jason McKemie
jmckemie@mckemie.net

---------- Forwarded message ----------
From: Gwen Ulijasz <gulijasz@gmail.com>
To: Jason Mckemie <jason.mckemie@atintegration.com>
Cc:

Bcc:
Date: Sun, 18 May 2025 20:45:07 -0500
Subject: Re: Public storage / transfer of lease
You can transfer the lease ownership now. Let me know when it's completed and the keys are mailed., with a tracking number provided , and I'll start payment. If I need to call the office let me know.

There's no basis for you to charge me for storage costs while I was not permitted access to my things. It's not defensible to hold someone's property hostage and then charge them for doing so.

On reimbursement to the marital estate:

You owe me $1198.16 for health insurance premiums I've paid on your behalf this year.
The HSA account has not been touched. It's a qualified investment account and community property. You drained the last one erroneously. I will be requesting reimbursement.
I'm requesting reimbursement for $1800 in taxes and penalties due for illegitimate receipts you gave me that do not match the ones your eye doctor provided to me directly. Additional 12 receipts were never provided.
Additionally I"ve paid $4709 this year for what is your portion of the Sofi loan. I've already paid my portion. It's a debt that was taken out during the marriage and its community property.
I'll also be seeking reimbursement for 1/2 of the $25k Amex loan I had to take out in my name and paid back.

I've transferred $350 weeks ago into joint checking and not received anything. This is a breach of the contract you made over email with my attorney.

You are not invited to email my work account.

Gwen

> On May 12, 2025, at 1:40 AM, Jason Mckemie <jason.mckemie@atintegration.com> wrote:
>
> Gwen — per my text message, not trying to start a discussion, just giving notice re: the shared storage unit. I've paid for the last 6 months (Dec–May) at $168/mo = $1,008. Your half is $504. Please deposit that to the joint account by **noon tomorrow (Mon 5/12)**. If not received, I'll request sanctions and reimbursement through the Court tomorrow afternoon.
>
> Also, I'll be clearing my items out by **May 31** and won't be continuing the lease for future months. So let me know if you're planning on getting your stuff out of there and if so, I'll drop the keys off at the public storage facility so they'll be there waiting for you. Otherwise, I'll plan on transferring you the billing at the end of the month. Payment is due on the first.
>
> Don't forget noon, Monday.
>
> — Jason
> <IMG_3710.jpeg>
>
> Best Regards,
>
> Jason McKemie
> Advanced Technology Integration
> (214) 868-4901 *Mobile

---------- Forwarded message ----------
From: Mail Delivery System <MAILER-DAEMON@dispatch1-us1.ppe-hosted.com>
To: <jason.mckemie@atintegration.com>
Cc:
Bcc:
Date: Mon, 19 May 2025 03:02:19 +0000
Subject: Successful Mail Delivery Report
This is the mail system at host https://urldefense.proofpoint.com/v2/url?u=http-3A__dispatch1-2Dus1.ppe-2Dhosted.com&d=DwICAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=uDX0lPlBB25EWh5vjtIL8K1PcnOL1CJwSEU9SzCGFYE&m=YwGVKDPdKaJL4nxwbr8HRoT8dmK_FbZfKBohp-3ZV0OqOqVZzPhSVLzQSciAi2Qy&s=EilEdXYzcR8przdyal1XE3itrdpur6QOjllqAhO-xWA&e=

Your message was successfully delivered to the destination(s)
listed below. If the message was delivered to mailbox you will
receive no further notifications. Otherwise you may still receive
notifications of mail delivery errors from other systems.

The mail system

<gulijasz@gmail.com>: delivery via
gmail-smtp-in.l.google.com[142.251.15.26]:25: 250 2.0.0 OK 1747623710

00721157ae682-70ca84cf44fsi57365197b3.241 - gsmtp

<jmckemie@mckemie.net>: delivery via mx01.ionos.com[74.208.5.21]:25: 250
Requested mail action okay, completed: id=1MjBZx-1uvf9X3xyv-00buWr

<gwendolyn.ulijasz@accenture.com>: delivery via
mx0b-001dcc01.pphosted.com[148.163.159.10]:25: 250 2.0.0 46pqh1xq4p-1
Message accepted for delivery

---------- Forwarded message ----------
From: Jason Mckemie <//urldefense.proofpoint.com/v2/url?u=http-3A__jason.mckemie-40atintegration.com&d=DwACAQ&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=uDX0lPlBB25EWh5vjtlL8K1PcnOL1CJwSEU9SzCGFYE&m=YwGVKDPdKaJL4nxwbr8HRoT8dmK_FbZfKBohp-3ZV0OqOqVZzPhSVLzQSciAi2Qy&s=N8SU0mxMvCMnTem26DW_O5JlEn9zX7qqqe9XPHVEKWc&e=>
To: Gwen Ulijasz <gulijasz@gmail.com>
Cc: Gwen Laura Ulijasz McKemie <gwendolyn.ulijasz@accenture.com>, Jason McKemie <jmckemie@mckemie.net>
Bcc:
Date: Sun, 18 May 2025 22:01:41 -0500
Subject: Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

---------- Forwarded message ----------
From: <postmaster@exchange2019.ionos.com>
To: <jmckemie@mckemie.net>
Cc:
Bcc:
Date: Sun, 18 May 2025 23:05:44 -0400
Subject: Relayed: Re: Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

**Delivery to these recipients or groups is complete, but no delivery notification was sent by the destination server:**

Gwen Ulijasz (gulijasz@gmail.com)

Gwen Laura Ulijasz McKemie (gwendolyn.ulijasz@accenture.com)

Subject: Re: Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

---------- Forwarded message ----------
From: Jason McKemie <jmckemie@mckemie.net>
To: Gwen Ulijasz <gulijasz@gmail.com>
Cc: Gwen Laura Ulijasz McKemie <gwendolyn.ulijasz@accenture.com>
Bcc:
Date: Sun, 18 May 2025 22:05:43 -0500
Subject: Re: Clarification Requested – Service of Legal Communications / Access & Reimbursement Claims

**CAUSE NO. DF-24-18010**

| | | |
|---|---|---|
| **IN THE MATTER OF THE MARRIAGE OF** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **GWENDOLYN ULIJASZ-MCKEMIE** | § | **254TH JUDICIAL DISTRICT** |
| **AND** | § | |
| **JASON MCKEMIE** | § | **DALLAS COUNTY, TEXAS** |

**SECOND AMENDED INVENTORY AND APPRAISEMENT OF GWENDOLYN ULIJASZ-MCKEMIE**

Gwendolyn Ulijasz-McKemie, Petitioner, submits this inventory and appraisement of all assets and liabilities, community and separate estates, as follows:

**Community Estate of the Parties**

1. **Real Property** (include any property purchased by contract for deed, such as Texas Veterans Land Board property, property purchased in recreational developments, and time-shares)

   1.1. None.

   No real property, but there is a $3,800 security deposit for Petitioner's residence.

2. **Mineral Interests** (include any property in which the parties own the mineral estate, separate and apart from the surface estate, such as oil and gas leases; also include royalty interests, working interests, and producing and nonproducing oil and gas wells)

   2.1. None.

3. **Other Real Property–Related Assets** (include any other assets and property rights related to real property, e.g., surface water rights, groundwater rights, crop share leases, hunting leases, wind power leases, solar power leases, timber rights, and so forth)

   3.1. None.

4. **Cash and Accounts with Financial Institutions** (include cash, traveler's checks, money orders, and accounts with commercial banks, savings banks, credit unions, and funds on deposit with attorneys and other third parties; exclude accounts with brokerage houses and all retirement accounts)

   4.1. Name of financial institution: Chase Bank

EXHIBIT 3

Account name: Gwendolyn Ulijasz & Jason McKemie

Account number: x6893

Type of account: Checking

Name(s) on withdrawal cards: Gwendolyn Ulijasz & Jason McKemie

Current account balance (as of 7/17/2025): <$428>

Source(s) of value/balance: Screenshot

4.2 Name of financial institution: Chase Bank

Account name: Gwendolyn Ulijasz

Account number: x9259 (was x3898)

Type of account: Checking

Name(s) on withdrawal cards: Gwendolyn Ulijasz

Current account balance (as of 7/17/2025): $8,203

Source(s) of value/balance: Screenshot

4.3 Name of financial institution: Chase Bank

Account name: GLU Distribution LLC

Account number: x8627

Type of account: Checking

Name(s) on withdrawal cards: GLU Distribution LLC

Current account balance (as of 6/30/2025): $212

Source(s) of value/balance: Statement

4.4 Name of financial institution: USAA

Account name: Gwendolyn Ulijasz and Jason McKemie

Account number: x9941

Type of account: Checking

Name(s) on withdrawal cards: Gwendolyn Ulijasz and Jason McKemie

Current account balance (as of 7/3/2025): $20

Source(s) of value/balance: Statement

4.5 Name of financial institution: Chase

Account number: x7496

Type of account: Checking

Name(s) on withdrawal cards: Gwendolyn Ulijasz

Current account balance (as of 7/17/2025): $82

Source(s) of value/balance: Screenshot

**5. Brokerage and Mutual Fund Accounts**

5.1. None.

**6. Publicly Traded Stocks, Bonds, and Other Securities**
(include securities not in a brokerage account, mutual fund, or retirement fund)

*6.A. Stocks*

6.A.1. None.

*6.B. Bonds*

6.B.1. None.

**7. Employee Stock Benefit Plans** (include all stock options (qualified and nonqualified), restricted stock awards (RSAs), restricted stock units (RSUs), and Employee Stock Purchase Plans)

*7.A. Stock Options* (include all stock options, whether exercisable, nonexercisable, vested, nonvested, transferable, or nontransferable, regardless of any restrictions on transfer, but if the stock was once an option and is currently owned without restrictions, list that stock under section 5.)

*7.B. Restricted Stock* (include all restricted stock awards and restricted stock units regardless of any restrictions on transfer, but if the stock was once restricted and is currently owned without restrictions, list that stock under section 5.)

7.B.1. Name of company: Accenture Leadership New Hire Equity;

Date of award/grant: 11/01/2024

Number of shares/units: 510

Vesting schedule: 11/01/2029

Current stock price: $282.44

Current net market value (as of 7/19/2025): $144,044

Value of community interest (as of 7/19/2025): $19,206

Source(s) of value: Statement

7.B.1. Name of company: Accenture Leadership Supplemental Equity

Date of award/grant: 11/01/2024

Number of shares/units: 292

Vesting schedule: 1/3 vest each October

Current stock price: $282.44

Current net market value (as of 7/19/2025): $82,473

Value of community interest (as of 7/19/2025): $18,359

Source(s) of value: Share price

7.B.1. Name of company: Accenture performance equity

Date of award/grant: October of each year

Number of shares/units: 0, 34%, or 68% of base earnings; 1/3 on anniversary date

Vesting schedule: TBD

Current stock price: $282.44

Current net market value (as of 7/19/2025): $0

Value of community interest (as of 7/19/2025): $0

7.C. Employee Stock Purchase Plan

7.C.1. Name of company: Accenture VEIP Voluntary stock purchase plan

Date of option/grant: 2/5/2025

Number of shares/units: 24

Vesting schedule: Only matched if shares purchased and held through year.

Current stock price: $282.44

Account Number: x5313

Current account value (as of 6/30/2025): $44,600

Value of community interest (as of 6/30/2025): $44,600

**8. Bonuses (gross of tax)**

8.1. Name of company: Accenture; Signing Bonus;

Spouse earning bonus: Gwendolyn Ulijasz

Date bonus expected to be paid: November 2025

Time period covered by bonus: Nov. 1, 2025 through Aug. 31, 2025

Anticipated amount of bonus: $150,000

Source(s) of value: Contract, signing bonus;

**9. Closely Held Business Interests** (include sole proprietorships, professional practices, corporations, partnerships, limited liability companies and partnerships, joint ventures, and other nonpublicly traded business entities)

9.1. None.

**10. Retirement Benefits**

*10.A. Defined Contribution Plans* (a plan that provides for an individual account for a participant and for benefits based solely on the amount contributed to the participant's account; IRC §§ 401(k), 403(b))

10.A.1. Exact name of plan: Accenture 401k

Name and address of plan administrator: Merrill Lynch

Employee spouse:

Employer: Accenture

Starting date of creditable service: 10/16/2024

Account name: Gwendolyn Ulijasz 401k

Account number: x5189

Account balance as of date of marriage: $0

Payee of survivor benefits: Jason McKemie

Designated beneficiary: Jason McKemie

Current account balance (as of 7/18/2025): $9,238

Balance of loan against plan: $0

Value of community interest in plan (as of 6/30/2025): $9,238

Source(s) of value: Screenshot

*10.B.* *Defined Benefit Plan* (any plan that is not a defined contribution plan and that usually involves payment of benefits according to a formula)

10.B.1. Jason McKemie AT&T Pension Plan

Information: Unknown to Gwen McKemie

*10.C.* *IRA/SEP*

10.C.1. Jason McKemie Ameriprise IRA

Value: Unknown

Last Known Value: $6,767 in 12/31/2024

*10.D.* *Military Benefits*

10.D.1. None.

*10.E.* *Nonqualified Plans (Not under ERISA)*

10.E.1. None.

*10.F.* *Government Benefits* (civil service, teacher, railroad, state, and local)

10.F.1. None.

11.1. None.

**12. Insurance and Annuities**

*12.A. Life Insurance*

12.A.1. Name of insurance company: The Hartford Insurance Group

Policy number: TBD

Name of insured: Gwendolyn Ulijasz

Name of owner: Gwendolyn Ulijasz

Type of insurance: ADD Supplemental Policy

Amount of premiums

Date of issue: 2023

Face amount: $25,000.000

Cash surrender value on date of marriage: $0, term policy

Current cash surrender value: $0, term policy

Designated beneficiary(ies): Jason McKemie

Balance of loan against policy: $0

Value of community interest: $0, term policy

Source(s) of value: Paystubs;

12.A.2. Name of insurance company: Accenture

Policy number:

Name of insured: Gwendolyn Ulijasz

Name of owner: Gwendolyn Ulijasz

Type of insurance: Term Life

Amount of premiums monthly: $109

Date of issue: 10/16/2024

Face amount: $1,500,000

Cash surrender value on date of marriage: 0

Current cash surrender value: 0

Designated beneficiary(ies): Jason McKemie

Balance of loan against policy: $0

Value of community interest: 0

Source(s) of value: screenshot;

*12.B. Annuities*

12.B.1. None.

*12.C. Health Savings Accounts*

12.C.1. Institution holding account: MetLife

Account number: x2457

Name of high-deductible health plan with which the HSA is coupled: Cognizant Aetna Healthplan

Value of assets in account (as of 6/30/2025): $14

12.C.2. Institution holding account: Accenture Inspira

Account number: Unknown

Account holder: Jason McKemie

Value of assets in account (as of 7/20/2025): Unknown

*12.D. Medical Savings Accounts*

12.D.1. Institution holding account: MetLife

Account number: TBD

Name of high-deductible health plan with which the MSA is coupled: Cognizant Aetna Healthplan

Value of assets in account (as of 7/11/2025): $0

13. **Motor Vehicles, Boats, Airplanes, Cycles, Etc.** (include mobile homes, trailers, and recreational vehicles, but do not include vehicles owned by a business entity)

13.1. Year: 2023

Make: BMW

Model: M340xi

Name on title: Gwendolyn Ulijasz

In possession of: Gwendolyn Ulijasz

Vehicle identification number: 3MW49FF07P8C9022

Name of creditor if loan against vehicle: InTouch Credit Union

Current balance (as of 7/11/2025): $61,000.00

Current fair market value (as of 7/11/2025): $50,000

Current net equity in vehicle: <$11,000.00>

**14. Money Owed to Me or My Spouse** (do not include any expected federal or state income tax refund or receivables connected with a business entity)

14.1. Name of debtor: Christopher Steven McNally

Debtor's relationship to you: Ex-Partner

Is debt evidenced in writing? Yes

Is debt secured? No. Cannot collect as debtor lives out of the country.

Current loan amount owed (as of 7/11/2025): $20,000 but practical value is $0.

Source(s) of value: Court order for Ex Partner's Violation of PO

**15. Household Furniture, Furnishings, and Fixtures**

**Remaining Personal Property to be retrieved from house and storage to be provided.**

15.1. In possession of Gwendolyn Ulijasz (attach separate sheet by room if necessary):

Description and value of each item in possession of Gwendolyn Ulijasz

Personal Attire/Shoes/handbags/ Other household items TBD

Source(s) of value: TBD

15.2 In possession of Jason McKemie (attach separate sheet by room if necessary):

Description and value of each item in possession of Jason McKemie:

Contents of Storage Unit TBD

Gwen's Remaining Personal property in home TBD

Source(s) of value:

**16. Electronics and Computers**

16.1. In possession of Gwendolyn Ulijasz (attach separate sheet if necessary):

Description and value of each item in possession of Gwendolyn Ulijasz:

Macbook/Dell Laptop/Bluetooth Speaker/Four Phones TBD

16.2. In possession of Jason McKemie (attach separate sheet if necessary):

Description and value of each item in possession of Jason McKemie: TBD

**17. Antiques, Artwork, and Collections** (include any works of art, such as paintings, tapestry, rugs, and coin or stamp collections)

17.1. In possession of Gwendolyn Ulijasz: no community.

17.2. In possession of Jason McKemie (attach separate sheet if necessary):

Description and value of each item in possession of Jason McKemie: TBD

Cheetah wooden Tanzania carving ($2k), Ballerina framed lithograph from Gwen's deceased grandmother , Folkart drum in Storage unit - $1000, painting of Indian boy Gwen purchased in Costa Rica ($1800), oriental rug in master ($4k), Moroccan tribal rugs (2). Remaining Items: TBD

**18. Miscellaneous Sporting Goods and Firearms**

18.1. In possession of Gwendolyn Ulijasz (attach separate sheet if necessary):

Description and value of each item in possession of Gwendolyn Ulijasz: Golf Clubs — TBD

18.2 In possession of Jason McKemie (attach separate sheet if necessary):

Description and value of each item in possession of Jason McKemie: Gwen Skis/SkiBoots/Firearms — TBD

**19. Jewelry and Other Personal Items**

19.1. No community.

19.2. In possession of Jason McKemie (attach separate sheet if necessary):

Description and value of each item in possession of Jason McKemie: — TBD

1 small circular diamond necklace

Source(s) of value:

**20. Livestock and Pets** (include cattle, horses, frozen semen or embryos, dogs, cats, and so forth)

20.1. In possession of Gwendolyn Ulijasz (attach separate sheet if necessary):

Description and value of each item in possession of Gwendolyn Ulijasz: Chihuahua Dog - Katie — $0

Source(s) of value:

20.2. In possession of Jason McKemie (attach separate sheet if necessary):

Description and value of each item in possession of Jason McKemie: None.

**21. Club Memberships**

21.1. Name of club: Sam's Club and Costco Club

Name membership held in: Gwendolyn Ulijasz and Jason McKemie

Account number: TBD

Current value (as of 7/19/2025): — $0

**22. Travel Award Benefits** (include frequent-flyer mileage accounts)

22.1. Name of airline: American Airlines

Account number and name on account: Gwendolyn Ulijasz

Current number of miles or points (as of 7/19/2025): Est. 38,000

**23. Other Assets**

*23.A* *Miscellaneous Assets* (include intellectual property (such as musical, literary, and artistic/creative works; discoveries and inventions; copyright, trademarks, patents, and so forth), licenses, crops, farm equipment, construction equipment, tools, leases, cemetery lots, gold or silver coins not part of a collection described elsewhere in this inventory, estimated tax payments, tax overpayments, loss carry-forward deductions, lottery tickets/winnings, stadium bonds, stadium seat licenses, seat options, season tickets, ranch brands, and business names)

23.A.1. In possession of Gwendolyn Ulijasz (attach separate sheet if necessary): None.

23.A.2. In possession of Jason McKemie (attach separate sheet if necessary): Unknown refund.

*23.B.* *Digital Assets* (identify assets—anything that exists in digital form, i.e., data in the form of binary digits, including such things as Bitcoin or other forms of cryptocurrency, email addresses, social network accounts, websites, domain names, digital media such as pictures, music, e-books, movies, and videos, blogs, reward points, digital storefronts, artwork, and data storage accounts)

23.B.1 In possession of Gwendolyn Ulijasz (attach separate sheet if necessary): None.

23.B.2. In possession of Jason McKemie (attach separate sheet if necessary):

Description and value of each item in possession of Jason McKemie:

- 2 hard drives containing contents of Gwen's previous mac and her laptop prior.
- iCloud account associated with Gwen's iPhone 13 (917-471-1979)

and old Macbook

- Warranty and ownership associated with Gwen's Apple ear buds
- Pictures of Family and other pictures on iPad.
- Email addresses in Gwen's name, held by various companies that may include Ionos and GoDaddy.com
- Domain names in Gwen's name; Including Gwen.Ulijasz.com at Ionos;
  - Bitcoin Unknown

*23.C.* *Virtual Assets* (identify assets—intangibles used in virtual worlds or MMORPGs (massively multiplayer online role playing games), virtual pets, avatars, accessories for characters, prizes, virtual real estate, and virtual currency)

23.C.1. In possession of Gwendolyn Ulijasz (attach separate sheet if necessary): None.

23.C.2. In possession of Jason McKemie (attach separate sheet if necessary): TBD

*23.D.* *Tax Assets* (tax refunds, estimated tax payments, carryovers, carryforwards, etc.)

23.D.1. Estimated tax payments: <$158,000>

Applicable income tax year: 2025

Amount of estimated payments made: $0

Estimated remaining tax liability: <$158,000>

**24. Safe-Deposit Boxes**

24.1. None.

**25. Storage Facilities**

25.1. Name and location: Public Storage

Unit number: 3131

Terms and length of lease: Under Gwen

Names of persons with access to contents: Jason McKemie

Items in storage unit: Unknown

Value(s) of items in storage unit: TBD

**26. Community Claims for Reimbursement**

26.1. Reimbursement claim against Gwendolyn Ulijasz's separate estate: None.

26.2. Reimbursement claim against Jason McKemie's separate estate:

Basis of claim:

Amount claimed (as of 7/11/2025): $0

Source(s) of value:

**27. Reconstitution of the Community Estate for Fraud on the Community**

27.1 Gwendolyn Ulijasz's claim for reconstitution of the community estate

Value: $50,000

Source(s) of value: Accumulation of debt put on Gwen's credit cards for electronics, porn, and spying equipment.

27.2 Jason McKemie's claim for reconstitution of the community estate

Value: $0

Source(s) of value:

**28. Contingent Assets** (e.g., lawsuits by either party against a third party)

28.1. None.

**Separate Estates of the Parties**

(generally defined as assets owned before marriage or assets acquired during marriage by gift or inheritance or as a result of personal injury; may include real property, mineral interests, cash and financial accounts, brokerage and mutual fund accounts, stocks, bonds, other securities, stock options, bonuses, closely held business interests, retirement benefits, deferred compensation benefits, insurance and annuities, vehicles, boats, airplanes, cycles, notes receivable, household furnishings, electronics, antiques, art, miscellaneous sporting goods and firearms, jewelry and other personal items, livestock, club memberships, travel awards, miscellaneous assets, digital assets, virtual assets, and contingent assets)

**29. Separate Assets of Gwendolyn Ulijasz**

29.A. Description of asset: Advantigen Biosciences, LLC shares

Date property acquired: June 22, 2022 ($20,000); March 19, 2023 ($30,000); October 13, 2023 ($50,000)

How acquired (e.g., by gift, by devise, by descent, or owned before marriage): Owned before marriage

Current face value (as of 7/19/2025): $98,889

*29.B. Defined Contribution Plans* (a plan that provides for an individual account for a participant and for benefits based solely on the amount contributed to the participant's account; IRC §§ 401(k), 403(b))

Exact name of plan: AIG 401k

Name and address of plan administrator: Alight

Employee spouse: Jason

Employer: AIG

Starting date of creditable service: 2015 through 2020

Account name: Gwendolyn Ulijasz 401k

Account balance as of date of marriage (as of 6/22/24): $121,272

Payee of survivor benefits: Jason

Designated beneficiary(ies): Jason 100%

Current Balance (as of 7/17/2025): $153,457

*29.C. IRA/SEP*

29. C.1. Name of financial institution: Ameriprise Financial

Account name: Gwendolyn Ulijasz Roth IRA

Account number: 6811 1 133

Payee of survivor benefits: Jason McKemie

Designated beneficiary(ies): Jason McKemie

Current account balance (as of 5/31/2025): $146,516

Value of community interest (as of 7/11/2025): $0

Source(s) of value: Statements

29.C.2. Name of financial institution: Ameriprise Financial

Account name: Gwendolyn Ulijasz Traditional IRA

Account number: 7988 2 133

Payee of survivor benefits: Jason McKemie

Designated beneficiary(ies): Jason McKemie

Current account balance (as of 5/31//2025): $287,771

Value of community interest (as of 7/11/2025): $0

Source(s) of value: Statements

*29.D Jewelry, Artwork, and Other Personal Items*

29.D.1.In possession of Gwendolyn Ulijasz (attach separate sheet if necessary):

Description and value of each item in possession of Gwendolyn Ulijasz: See separate sheet.

*29.E. Gwendolyn Ulijasz's separate reimbursement claim against community estate:*

Value: $50,000

**30. Liabilities of Gwendolyn Ulijasz's Separate Estate**

30.1. None.

**31. Separate Assets of Jason McKemie**

31.1 Unknown.

**32. Liabilities of Jason McKemie's Separate Estate**

32.1 Unknown.

**Sole and Joint Liabilities**

**33. Credit Cards and Charge Accounts**

33.1. Name of creditor: American Express

Account number: x7006 (was x6008)

Cardholder(s)/Authorized user(s): Gwendolyn Ulijasz

Person(s) liable on account:

Current balance (as of 6/25/2025): <$238>

Balance on date of marriage: <$0>

Source(s) of balance: Statement

33.2. Name of creditor: JP Morgan Chase Bank

Account number: x3444 (was x4005 and x7555)

Cardholder(s)/Authorized user(s): Gwendolyn Ulijasz

Person(s) liable on account:

Current balance (as of 7/17/2025): <$9,648>

Source(s) of balance: Screenshot

33.3. Name of creditor: CitiBank

Account number: x2295

Cardholder(s)/Authorized user(s): Gwendolyn Ulijasz

Current balance (as of 6/24/2025): <0>

Source(s) of balance: Statement

33.4. Name of creditor: Capital One

Account number: TBD

Cardholder(s)/Authorized user(s): Uknown

Person(s) liable on account: Unknown

Current balance (as of 7/19/2025): <TBD>

33.5. Name of creditor: Amazon Storecard (joint checking chase late June)

Account number: TBD

Cardholder(s)/Authorized user(s): Uknown

Person(s) liable on account: Unknown

Current balance (as of 7/19/2025): <TBD>

**34. Federal, State, and Local Tax Liability**

34.1. Description of liability (e.g., federal income tax/property taxes)

Tax year for which liability is due: 2025

Person(s) liable for tax: $2,200 tax due for Jason's HSA failure to submit receipts. Jason's Tax Lien for unfiled tax returns dating back to 2014. Large liability for 2025 taxes.

Amount owed (estimated): <$158,000>

**35. Attorney's Fees in This Case**

*35.A. Gwendolyn Ulijasz*

35.A.1. Amount owed by Gwendolyn Ulijasz: <$TBD>

*35.B. Jason McKemie*

35.B.1. Amount owed by Jason McKemie: <$Uknown>

**36. Contingent Liabilities**
(e.g., lawsuit against either party, guaranty either party may have signed)

**37. Other Liabilities Not Otherwise Listed in This Inventory**
(e.g., loans and margin accounts)

37.1. Name of creditor: SoFi

Account number: TBD

Person(s) liable: Gwendolyn Ulijasz

Is loan evidenced in writing? Yes

Current balance (as of 7/17/2025): <$22,533>

Security, if any: None.

Source(s) of balance: TBD

37.2. Name of creditor: Pam and Clint Woodman

Account number: None.

Person(s) liable: Gwendolyn Ulijasz

Is loan evidenced in writing? Yes

Current balance (as of 7/19/2025): <$30,000>

Security, if any: None.

Source(s) of balance: Note. For Attorney's Fees.

37.3. Name of creditor: Pam and Clint Woodman

Account number: None.

Person(s) liable: Gwendolyn Ulijasz

Is loan evidenced in writing? Yes

Current balance (as of 7/19/2025): <$30,000>

Security, if any: None.

Source(s) of balance: Note. For security to access house and for sweep of residence.

37.4. Name of creditor: Lightstream Personal Loan

Is loan evidenced in writing? Yes

Current balance (as of 7/17/2025): <$29,000>

Security, if any: None.

Source(s) of balance: Screenshot

**Declaration**

"My name is Gwendolyn Ulijasz. I am above the age of eighteen years, and I am fully competent to make this unsworn declaration. I declare under penalty of perjury that the facts stated in this document are true and correct. I have personal knowledge of the facts stated herein.

"To the best of my knowledge, this inventory and appraisement contains—

"1. a full and complete list of all properties that I claim belong to the community estate of me and my spouse, with the values thereof;

"2. a full and complete list of all properties in my possession or subject to my control that I claim or admit are my or my spouse's separate property and estate, with the values thereof; and

"3. a full and complete list of the debts that I claim are community indebtedness.

"There may be other assets and liabilities in the control of my spouse of which I am not aware as of this date, and the omission of those items from this inventory should not be construed as a waiver of my interest in them.

"Unless otherwise indicated, all values stated in this inventory and appraisement are my personal opinions and may change after additional information is obtained. I reserve the right to amend or correct this inventory and appraisement at a later date as additional information becomes available.

"I further expressly reserve the right to change the characterization of any of the property listed in this inventory and appraisement from community to separate, depending on facts developed through discovery or trial of this case.

"My name is Gwendolyn Ulijasz. My date of birth is May 27, 1978. My address is

12802 Kings Forest St.
San Antonio, TX 78230

"Further affiant sayeth not."

Executed in Dallas County, Texas on the 22nd day of July 2025.

[signature]

Gwendolyn Ulijasz, Declarant

**NO. DF-24-18010**

| | | |
|---|---|---|
| **IN THE MATTER OF** | § | **IN THE DISTRICT COURT** |
| **THE MARRIAGE OF** | § | |
| | § | |
| **GWENDOLYN ULIJASZ-MCKEMIE** | § | **254th JUDICIAL DISTRICT** |
| **AND** | § | |
| **JASON MCKEMIE** | § | **DALLAS COUNTY, TEXAS** |

## UNSWORN INVENTORY & APPRAISEMENT OF JASON MCKEMIE

### RESERVATIONS AND QUALIFICATIONS

Respondent, Jason McKemie, hereby reserves the right to amend and/or correct this inventory to insert any items inadvertently not mentioned or incorrectly valued as more information becomes available. All values stated in this inventory are estimates as of this time.

Respondent, Jason McKemie, files this inventory without waiving the right to challenge the accuracy of any and all inventories filed by Petitioner, Gwendolyn Ulijasz-McKemie. Respondent, Jason McKemie, further expressly reserves the right to change the classification of any of the property listed herein from community to separate dependent upon facts developed by discovery or trial of this case and in no instance shall this inventory be construed as an admission against interest or as judicial admission to characterization of such property as community or separate, and that such determination is a matter of law to be decided by the Court.

**Verification**

I, Jason McKemie state that, to the best of my knowledge and belief, this inventory and appraisement contains—

1. a full and complete list of all properties that I claim belong to the community estate of me and my spouse, with the values thereof;

2. a full and complete list of all properties in my possession or subject to my control that I claim or admit are my or my spouse's separate property and estate, with the values thereof; and



EXHIBIT
4

3. a full and complete list of the debts that I claim are community indebtedness.

Any omission from this inventory is not intentional but is done through mere inadvertence and not to mislead my spouse. There may be other assets and liabilities of which my spouse is aware, and the omission of those items from this inventory should not be construed as a waiver of my interest in them.

Jason McKemie (Feb 24, 2025 15:23 CST)

Jason McKemie

My name is Jason McKemie, my date of birth is April 8, 1976, and my address is 539 W. Commerce St., Suite 2010, Dallas, Texas 75208, United States. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Dallas County, Texas on February 24, 2025.

Jason McKemie (Feb 24, 2025 15:23 CST)

Jason, McKemie, Declarant

Jason McKemie

# 2025-02-24 Unsworn Inventory and Appraisement of Jason McKemie

Final Audit Report 2025-02-24

| | |
|---|---|
| Created: | 2025-02-24 |
| By: | Betty Villarreal (betty@webbfamilylaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA5zwcVPD4FQa4_us28lWxAsoGNRNwrAWP |

## "2025-02-24 Unsworn Inventory and Appraisement of Jason Mc Kemie" History

Document created by Betty Villarreal (betty@webbfamilylaw.com)
2025-02-24 - 8:56:41 PM GMT

Document emailed to Jason McKemie (jmckemie@mckemie.net) for signature
2025-02-24 - 8:57:36 PM GMT

Email viewed by Jason McKemie (jmckemie@mckemie.net)
2025-02-24 - 9:22:26 PM GMT

Document e-signed by Jason McKemie (jmckemie@mckemie.net)
Signature Date: 2025-02-24 - 9:23:31 PM GMT - Time Source: server

Agreement completed.
2025-02-24 - 9:23:31 PM GMT

In the Matter of the Marriage of Gwendolyn Ulijasz-McKemie and Jason McKemie
Cause No. DF-24-18010, 254th Judicial District Court, Dallas County

**Inventory and Appraisement of Jason McKemie**

| Line # | *Community Property* | Style/ Control | As of Date | Total Value | Source |
|---|---|---|---|---|---|
| | **Assets** | | | | |
| | **Bank Accounts** | | | | |
| 1 | (G) Chase Sapphire Checking *3898 | W | 10/25/24 | $14,504 | 10/25/2024 statement screenshot |
| 2 | (G) Chase Sapphire Checking *1695 | W | | Unknown | |
| 3 | Hospitech Solutions, LLC - Checking *1603 | H | 02/01/25 | $3,857 | statement ending 01/31/2025 |
| 4 | Gwen Checking *2372 | W | | Unknown | |
| 5 | Chase Money Market Savings *4219 | W | | Unknown | |
| 6 | USAA joint checking *9941 | H/W | 02/04/25 | $100 | statement ending 02/04/2025 |
| 7 | Chase Checking *9072 | H | 02/24/25 | $2,112 | current balance via Chase mobile app |
| 8 | Chase joint checking *6893 | H/W | 02/12/25 | $536 | current balance via Wells Fargo mobile app |
| 9 | Wells Fargo Bank Ameriprise *1293 | W | 10/08/24 | $60,000 | screenshot of wire transfer into account; current balance unknown - but this is what we know of |
| 10 | Checking *1695 | W | | unknown | |
| 11 | CapitalOne - Checking (Jason) *9520 | H | 01/31/25 | $0 | statement ending 01/31/2025 |
| 12 | CapitalOne - Savings (Jason) *9801 | H | 01/31/25 | $0 | statement ending 01/31/2025 |
| 13 | ***Total Bank Accounts*** | | | ***$81,109*** | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | **Retirement - AMERITRADE** | | | | |
| 17 | Ameriprise Roth IRA *1133 | W | 02/24/25 | $151,315 | current balance via Ameriprise mobile app |
| 18 | Ameriprise Roth IRA *8133 | H | 02/24/25 | $7,108 | current balance via Ameriprise mobile app |
| 19 | Traditional IRA *2133 | W | 02/24/25 | $297,208 | current balance via Ameriprise mobile app |
| 20 | ***Total Retirement - Ameritrade*** | | | ***$455,631*** | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | **Retirement - Other** | | | | |
| 24 | Voya - Cognizant 401(k) Retirement Savings Plan | W | Nov 18 2024 | $90,247 | screenshots of balance and text message |
| 25 | E*Trade *8274 | W | 2021 | Unknown | |
| 26 | E*Trade *5029 | W | 06/30/21 | $86,504 | 06/2021 statement |
| 27 | E*Trade *6977 | W | 05/31/21 | $76,139 | 05/31/2021 vesting schedule |
| 28 | E*Trade *6587 | W | 09/30/21 | $183,107 | 09/30/2021 statement |
| 29 | E*Trade *201 | W | 06/30/24 | $80,816 | 06/30/2021 statement |
| 30 | Cognizant Tecnology 401(k) Savings Plan | W | 08/30/24 | 0 | 08/30/2024 statement; $87,680.15 withdrawal between 7/1 and 8/30/2024 |
| 31 | Accenture H.S.A. (2025 - Health Savings Account) | W | | Unknown | |
| 32 | AIG Inc. Incentive 401(k) | W | 04/01/24 | $91,087 | April 2024 Ameriprise Financial Planning Docs - Page 6 |
| 33 | E*Trade Roth IRA | W | | Unknown | |
| 34 | Vanguard Roth IRA - Account | W | | Unknown | |
| 35 | E*Trade Traditional IRA | W | | Unknown | |
| 36 | Traditional IRA Account #7 | W | | Unknown | |
| 37 | Vanguard IRA Account - Gwen | W | | Unknown | |
| 38 | ***Total Retirement - Other*** | | | ***$607,900*** | |
| 39 | | | | | |
| 40 | | | | | |
| 41 | **Vehicles** | | | | |
| 42 | 2023 BMW M3 (approx. value) | W | | $68,710 | |
| 43 | (-) loan (ITCU: Act ending 3898) - paid in full | W | | $0 | |
| 44 | 2018 Jaguar F-Pace (approx. value) | H | | $15,000 | |



Printed 2/24/2025, 5:12 PM

In the Matter of the Marriage of Gwendolyn Ulijasz-McKemie and Jason McKemie
Cause No. DF-24-18010, 254th Judicial District Court, Dallas County

| Line # | *Community Property* | Style/ Control | As of Date | Total Value | Source |
|---|---|---|---|---|---|
| 45 | (-) loan (approx. payoff $19,999) | H | | ($20,000) | |
| 46 | ***Total Vehicles*** | | | ***$63,710*** | |
| 47 | | | | | |
| 48 | | | | | |
| 49 | **Liabilities** | | | | |
| 50 | (Jason) Capital One Quicksilver One CC *9962 | H | 02/24/25 | ($5,343) | Monarch Money screenshot |
| 51 | (Jason) USAA Rate Advantage Platinum Visa CC *5373 | H | 02/24/25 | ($3,921) | Monarch Money screenshot |
| 52 | (Jason) US Bank Platinum CC *4563 | H | 02/24/25 | ($4,192) | Monarch Money screenshot |
| 53 | (Jason) Chase Marriott Bonvoy Visa CC *8046 | H | 02/24/25 | ($6,272) | Monarch Money screenshot |
| 54 | (Jason) Amazon Prime Card | H | 02/24/25 | ($4,693.50) | Monarch Money screenshot |
| 55 | (Jason) Quicksilver One *9173 | H | 02/23/25 | ($1,637.53) | Monarch Money screenshot |
| 56 | (Jason) Citi Aadvantage Card | H | 02/24/25 | ($5,439.17) | Monarch Money screenshot |
| 57 | (Jason) Amazon Store Card | H | 02/24/25 | ($1,650.97) | Monarch Money screenshot |
| 58 | (Jason) PayPal Credit | H | 02/24/25 | ($2,424.52) | Monarch Money screenshot |
| 59 | (Jason) AUTO LOAN | H | 02/24/25 | ($19,599.00) | Monarch Money screenshot |
| 60 | (Jason) Oil Loan | H | 02/24/25 | ($35,000.00) | Monarch Money screenshot |
| 61 | (Gwen) American Express Personal (Loan) | H | 02/24/25 | Unknown | |
| 62 | (Jason) Hilton AMEX Credit Card *2004 | H | 02/24/25 | ($616.58) | Monarch Money screenshot |
| 63 | (Jason) Loan - American Express Personal Loan *1001 | H | 02/24/25 | ($3,422) | Monarch Money screenshot |
| 64 | (Gwen) American Express Platinum Card | W | 02/12/25 | Unknown | |
| 65 | (Gwen) Loan - SoFi | W | 02/12/25 | Unknown | |
| 66 | (Gwen) Wells Fargo credit card (maybe ending *3623) | W | 02/12/25 | Unknown | |
| 67 | (Gwen) CITI / Advantage Executive World Elite Mastercard | W | 02/12/25 | Unknown | |
| 68 | ***Total Other Items*** | | | ***($94,211)*** | |
| 69 | | | | | |
| 70 | | | | | |
| 71 | **Other Items** | | | | |
| 72 | Accenture Sign-On Bonus Payments | W | 11/01/24 | $300,000 | Accenture Compensation Summary |
| 73 | Roth 401k Contributions (Aug-Dec 2024) ($15,600/month paycheck deduction) | W | 12/31/24 | $78,000 | |
| 74 | Accenture VEIP Program + Bonus | W | 12/31/25 | $229,905 | Accenture Compensation Summary |
| 75 | Global Annual Bonus (31% of Annual Base Pay) | W | 12/31/25 | $120,900 | Accenture Compensation Summary |
| 76 | Leadership New Hire Equity (RSU's - Cliff Vests @ 5 Years) | W | 11/01/24 | $175,000 | Accenture Compensation Summary |
| 77 | Leadership Supplemental New Hire Equity (vests 1/3 over 3 years) | W | 11/01/24 | $100,000 | Accenture Compensation Summary |
| 78 | Leadership Performance Equity Stock (34% / Vests 1/3 over 3yrs) | W | 12/31/25 | $132,600 | Accenture Compensation Summary |
| 79 | Cognizant Expense Reimbursement (4 Payments) | W | 11/01/24 | $67,560 | |
| 80 | Cognizant - Settlement Payment (from separation agreement) | W | 11/01/24 | $140,441 | separation agreement (draft) |
| 81 | Advantigen Stock | H/W | | $130,000 | Advantigen agreements |
| 82 | Cognizant - Annual Bonus | W | 12/15/24 | $125,000 | |
| 83 | ***Total Other Items*** | | | ***$1,599,406*** | |
| 84 | | | | | |
| 85 | | | | | |
| 86 | **Other Items** | | **Style Control** | **Value** | |
| 87 | W's Personal property | | W | X | |
| 88 | H's Personal property | | H | X | |
| 89 | W's Attorney/Professional Fees in this Matter | | W | X | |
| 90 | H's Attorney/Professional Fees in this Matter | | H | X | |
| 91 | W's Memberships, frequent flyer miles, etc., if any | | W | X | |
| 92 | H's Memberships, frequent flyer miles, etc., if any | | H | X | |

In the Matter of the Marriage of Gwendolyn Ulijasz-McKemie and Jason McKemie
Cause No. DF-24-18010, 254th Judicial District Court, Dallas County

| Line # | ***Community Property*** | **Style/ Control** | **As of Date** | **Total Value** | **Source** |
|---|---|---|---|---|---|
| 93 | Federal Income Taxes | | | | |
| 94 | | | | | |
| 95 | | | | | |
| 96 | **CRYPTO/DIGITAL CURRENCY (Bitcoin, Ethereum, Litecoin, Etc.)** | | | | |
| 97 | (Jason) Digital Currency Balance - Paypal Crypto | | | $87.46 | |
| 98 | (Gwen) Digital Currancy Balance - CumRocket Crypto | | | $15,304.00 | screenshot |
| 99 | ***Total Crypto Currency*** | | | ***$15,391*** | |
| 100 | | | | | |
| 101 | | | | | |
| 102 | **P2P PAYMENT SERVICES** | | | | |
| 103 | (Gwen) GooglePay | W | | unknown | |
| 104 | (Gwen) PayPal | W | | unknown | |
| 105 | (Gwen) ApplePay | W | | unknown | |
| 106 | (Gwen) CashApp | W | | unknown | |
| 107 | (Gwen) Venmo | W | | unknown | |
| 108 | (Jason) GooglePay | H | | $0.00 | |
| 109 | (Jason) PayPal | H | | $5.88 | |
| 110 | (Jason) ApplePay | H | | $0.00 | |
| 111 | (Jason) CashApp | H | | $0.00 | |
| 112 | (Jason) Venmo | H | | $0.00 | |
| 113 | ***Total P2P Sevice Balances*** | | | ***$6*** | |

I#[illegible] BK: 23067 PG: [illegible] 2025 at [illegible] PM, RECORDING 1 PAGES $10.00 KEN BURKE, CLERK OF COURT AND COMPTROLLER PINELLAS COUNTY, FL BY DEPUTY CLERK: clk103505

--*--

**Form 668 (Z)**
(Rev. 10-2000)

5829

Department of the Treasury - Internal Revenue Service

# Certificate of Release of Federal Tax Lien

| Area: SMALL BUSINESS/SELF EMPLOYED AREA #3<br>Lien Unit Phone: (800) 913-6050 | Serial Number<br>438329921 | For Use by Recording Office |
|---|---|---|

I certify that the following-named taxpayer, under the requirements of section 6325 (a) of the Internal Revenue Code has satisfied the taxes listed below and all statutory additions. Therefore, the lien provided by Code section 6321 for these taxes and additions has been released. The proper officer in the office where the notice of internal revenue tax lien was filed on September 20 2021, is authorized to note the books to show the release of this lien for these taxes and additions.

Name of Taxpayer
JASON E MCKEMIE

Residence 4761 DOVER ST NE
ST PETERSBURG, FL 33703-4125

COURT RECORDING INFORMATION:

| Liber | Page | UCC No. | Serial No. |
|---|---|---|---|
| 21723 | 580 | n/a | 2021307423 |

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 1040 | 12/31/2014 | XXX-XX-7823 | 07/29/2019 | 08/28/2029 | 14539.46 |
| ******* | *********** | ************ | ********** | *********** | *************** |

Place of Filing
CLERK OF CIRCUIT COURT
PINELLAS COUNTY
CLEARWATER, FL 33756

Total $ 14539.46

This notice was prepared and signed at BALTIMORE, MD, on this,

the 05th day of February, 2025.

| Signature | Title<br>Operations Manager,<br>Centralized Lien Operation |
|---|---|

**(NOTE:** Certificate of officer authorized by law to take acknowledgments is not essential to the validity of Certificate of R[illegible] Federal Tax lien Rev. Rul. 71-466, 1971 - 2 C.B. 409)

**Part 1 - RECORDING OFFICE**

Form **668 (Z)** (Rev. 10-2000)
CAT. NO 60026[illegible]

**EXHIBIT 5**

**Statement Period:** 1/1/2026 - 1/31/2026

**Account Number:** [redacted]7544

inspira FINANCIAL

Inspira Financial
PO Box 2239
Omaha, NE 68103-2239

GWENDOLYN ULIJASZ
11703 HUEBNER ROAD
STE106 PMB499
SAN ANTONIO, TX 78230

**Health Savings Account Statement**

## Summary

| Account | Opening Balance | Closing Balance |
|---|---|---|
| **HSA Deposit Account** | $8,197.44 | $5,184.00 |
| **TOTAL BALANCES** | $8,197.44 | $5,184.00 |

## HSA Deposit Account Summary

| | This Period | Tax Year to Date |
|---|---|---|
| **Current Account Activity** | | |
| Opening Balance: | $8,197.44 | |
| Total Deposits: | $0.00 | $0.00 |
| Total Withdrawals: | [redacted] | [redacted] |
| Interest Earned: | $0.26 | $0.26 |
| Closing Balance: | $5,184.00 | |
| **Current Tax Year Contribution Summary** | | |
| Applied to Current Tax Year Limits: | $0.00 | $0.00 |
| Not Subject to Current Tax Year Limits: | $0.26 | $0.26 |
| **TOTAL CONTRIBUTIONS:** | $0.26 | $0.26 |
| **Previous Tax Year Contribution Summary** | | |
| Applied To Previous Tax Year Limits: | $0.00 | $0.00 |
| Not Subject to Previous Tax Year Limits: | $0.00 | $0.00 |
| **TOTAL CONTRIBUTIONS:** | $0.00 | $0.00 |

EXHIBIT 6

**Statement Period:** 1/1/2026 - 1/31/2026

**Account Number:** [redacted]7544

**HSA Deposit Account Transaction History**

| Date | Transaction Description | Deposit | Withdrawal | Ending Balance |
|---|---|---|---|---|
| Opening Balance on 1/1/2026 | | | | $8,197.44 |
| 01/09 | [redacted] | [redacted] | [redacted] | [redacted] |
| 01/26 | [redacted] | [redacted] | [redacted] | [redacted] |
| 01/29 | [redacted] | [redacted] | [redacted] | [redacted] |
| 01/29 | [redacted] | [redacted] | [redacted] | [redacted] |
| 01/31 | Interest payment from 1/1/2026 to 1/31/2026 | $0.26 | $0.00 | $5,184.00 |
| Closing Balance on 1/31/2026 | | | | $5,184.00 |

**This statement reflects activity that was posted to your account as of the last day of the statement month.**

**Interest is earned at a higher level as your balance grows. Rates shown are calculated per tier each day, stored, and then credited to your account monthly.**

| Account Balance | Interest Rate | Annual Percentage Yield (APY) |
|---|---|---|
| $0.00 - $2,000.00 | 0.01% | 0.00% - 0.01% |
| Over $2,000.01 | 0.05% | 0.01% - 0.05% |

# TEXAS CERTIFICATE OF TITLE

TEXAS DEPARTMENT OF MOTOR VEHICLES

DMV

171526577

| VEHICLE IDENTIFICATION NUMBER | YEAR MODEL | MAKE OF VEHICLE | BODY STYLE |
|---|---|---|---|
| 3MW49FF07P8C89022 | 2023 | BMW | 4D |

| TITLE/DOCUMENT NUMBER | DATE TITLE ISSUED |
|---|---|
| 05746845088121215 | 06/21/2023 |

| MODEL | MFG CAPACITY IN TONS | WEIGHT | LICENSE NUMBER |
|---|---|---|---|
| M34 | | 3849 | SZF0836 |

PREVIOUS OWNER
BILL JACOBS NAPERVILLE IL

ODOMETER READI[NG]
4526

OWNER
GWENDOLYN LAURA ULIJASZ
4223 TRAVIS STREET
DALLAS, TX 75205-0000

REMARK(S)
ACTUAL MILEAGE

SIGNATURE OF OWNER OR AGENT MUST BE IN INK

UNLESS OTHERWISE AUTHORIZED BY LAW IT IS A VIOLATION OF STATE LAW TO SIGN THE NAME OF ANOTHER PERSON ON A CERTIFICATE OF TITLE OR OTHERWISE GIVE FALSE INFORMATION ON A CERTIFICATE OF TITLE

DATE OF LIEN
/02/2023

1ST LIENHOLDER
BMW BANK OF NA
PO BOX 1910
COCKEYSVILLE, MD 21030

JAN 06 2024

1ST LIEN RELEASED ______ DATE

BY BMW Cank of North Ame

AUTHORIZED AGENT

DATE OF LIEN

2ND LIENHOLDER

2ND LIEN RELEASED ______ DATE

BY ______ AUTHORIZED AGENT

DATE OF LIEN

3RD LIENHOLDER

3RD LIEN RELEASED ______ DATE

BY ______ AUTHORIZED AGENT

[I]T IS HEREBY CERTIFIED THAT THE PERSON HEREIN NAMED IS THE OWNER [O]F THE VEHICLE DESCRIBED ABOVE WHICH IS SUBJECT TO THE ABOVE LIENS

[RI]GHTS OF SURVIVORSHIP AGREEMENT
THE MARRIED PERSONS WHOSE SIGNATURES APPEAR HEREIN HEREBY [AG]REE THAT THE OWNERSHIP OF THE VEHICLE DESCRIBED ON THIS [CE]RTIFICATE OF TITLE SHALL FROM THIS DAY FORWARD BE HELD JOINTLY [AN]D IN THE EVENT OF DEATH OF ANY OF THE PERSONS NAMED IN THE [AG]REEMENT THE OWNERSHIP OF THE VEHICLE SHALL VEST IN THE SURVIVOR(S)

SIGNATURE ______ DATE

SIGNATURE ______ DATE

SIGNATURE ______ DATE

[FOR]M 30-C REV 05/2016

DO NOT ACCEPT TITLE SHOWING ERASURE ALTERATION OR MUTILATION

EXHIBIT 7

DocuSign Envelope ID: B42FA48A-09D5-41C9-90B0-FC[illegible]

**InTouch CREDIT UNION**

P.O Box 250169
Plano, TX 75025-0169
Phone: 800-337-3328
Fax: 214-291-1310
www.itcu.org

# Loan and Security Agreements and Disclosure Statement

☐ Covered Borrower Under Military Lending Act

| ☒ FIXED RATE ☐ STEP RATE ☐ VARIABLE RATE | LOAN DATE | ACCOUNT NUMBER | LOAN NUMBER | MATURITY DATE |
|---|---|---|---|---|
| | 12/29/2023 | [redacted] | [redacted] | 4/12/2030 |

| BORROWER 1 (Name & Address) | BORROWER 2 (Name & Address) |
|---|---|
| GWENDOLYN LAURA ULIJASZ<br>4223 TRAVIS ST<br>DALLAS, TX 75205 | |

| BORROWER 3 (Name & Address) | BORROWER 4 (Name & Address) |
|---|---|
| | |

## TRUTH IN LENDING DISCLOSURE ('e' means an estimate)

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | Total Sale Price |
|---|---|---|---|---|
| The cost of Your credit as a yearly rate. | The dollar amount the credit will cost You. | The amount of credit provided to You or on Your behalf. | The amount You will have paid after You have made all payments as scheduled. | The total cost of Your purchase on credit is $87,127.47 which includes Your down payment of |
| 6.490% | $15,844.41 | $71,283.06 | $87,127.47 | $0.00 |

**Your Payment Schedule Will Be:**

| Number of Payments | Amount of Payments | Payment Frequency | When Payments Are Due | |
|---|---|---|---|---|
| 74 | $1,161.70 | MONTHLY | beginning | 2/12/2024 |
| 1 | $ 1,161.67 | | | 4/12/2030 |

**Prepayment:** If You pay off early You will not have to pay a penalty.

**Required Deposit:** The Annual Percentage Rate does not take into account Your required deposit, if any.

**Demand:**

☒ This obligation has a demand feature.

☐ All disclosures are based on an assumed maturity of one year.

**Property Insurance:** You may obtain property insurance from anyone You want that is acceptable to the Credit Union. If You get the insurance from the Credit Union You will pay $N/A

| Filing Fees | Non-Filing Insurance |
|---|---|
| $65.00 | $ |

**Late Charge:**

If Your payment is more than 15 days late, Your lender will charge a late fee of 5% of the monthly principal and interest payment with a minimum amount of $15.

**Security:** Collateral securing other loans with the Credit Union may also secure this Loan. You are giving a security interest in Your shares and dividends and, if any, Your deposits and interest in the Credit Union; and the Property described below:

| Collateral | Property/Model/Make | Year | I.D. Number | Type | Value | Key Number |
|---|---|---|---|---|---|---|
| BMW | 3 Series | 2023 | 3mw49ff07p8c89022 | Sedan 4D M3 | $60,625.00 | |
| | | | | | $ | |
| | | | | | $ | |

Other (Describe)

Pledge of Shares $ in Account No. $ in Account No.

**Variable Rate:**

**See Your contract documents for any additional information about nonpayment, default, and any required repayment in full before the scheduled date.**

EXHIBIT 7a

©TruStage Compliance Solutions 1999, 2000, 01, 02, 03, 04, 06, 08, 2016, 18, 2023

Credit Union InTouch Credit Union | Acct No. [redacted] | Loan No. [redacted]

## ITEMIZATION OF THE AMOUNT FINANCED ('e' means an estimate)

| Itemization of Amount Financed of | Amount Given to You Directly | Amount Paid on Your Account | Prepaid Finance Charge |
|---|---|---|---|
| $71,283.06 | $0.00 | $0.00 | $0.00 |

**Amounts Paid to Others on Your Behalf: (If an amount is marked with an asterisk (*) We will be retaining a portion of the amount.)**

| | | | |
|---|---|---|---|
| $70,510.06 | To BMW FIN SVC | * $65.00 | To DOCUMENT FEE |
| $33.00 | To TT&L | * $675.00 | To GAP |
| $ | To | $ | To |
| $ | To | $ | To |
| $ | To | $ | To |
| $ | To | $ | To |
| $ | To | $ | To |

## MILITARY LENDING ACT DISCLOSURES

Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: The costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account).

A "Covered Borrower" for purposes of this loan means a consumer who, at the time the consumer becomes obligated on this loan, is a covered member or a dependent of a covered member as defined by the Military Lending Act. A Covered Borrower does not mean a consumer who (though a Covered Borrower at the time he or she became obligated on this transaction) no longer is a covered member or a dependent of a covered member as defined by the Military Lending Act.

## LOAN AGREEMENT

In this Loan Agreement ("Agreement") all references to "Credit Union", "We", "Our" or "Us" mean the Credit Union whose name appears above and anyone to whom the Credit Union assigns or transfers this Agreement. All references to "You" or "Your" mean each person who signs, or otherwise authenticates, this Agreement as a borrower.

**1. PROMISE TO PAY** - You promise to pay $71,283.06 to the Credit Union plus interest on the unpaid balance until what You owe has been repaid.

For **fixed rate** loans, the interest rate is 6.490% per year.

For **step-rate** loans, the initial interest rate will be % until and then the interest rate will be % until the balance is repaid in full.

For **variable rate** loans, the initial interest rate is % per year and will vary as follows:

**Collection Costs:**

You agree to pay all costs of collecting the amount You owe under this Agreement, including court costs and reasonable attorney fees.

**2. PAYMENTS** - You promise to make payments of the amount and at the time shown in the Truth in Lending Disclosure. If this is a variable rate loan, the Promise to Pay section tells You whether, if the interest rate increases, You will have to make more payments, higher payments, or if the final payment will be a balloon payment. You may prepay any amount without penalty. If You prepay any part of what You owe, You are still required to make the regularly scheduled payments, unless We have agreed to a change in the payment schedule. Because this is a simple interest loan, if You do not make payments exactly as scheduled, Your final payment may be more or less than the amount of the final payment that is disclosed. If You elect voluntary payment protection, We will either include the premium or program fee(s) in Your payments or extend the term of Your loan. If the term is extended, You will be required to make additional payments of the scheduled amount, until what You owe has been paid. You promise to make all payments to the place We choose. If this loan refinances another loan You have with Us, the other loan will be canceled and refinanced as of the date of this loan. Unless otherwise required by law, payments will be applied to amounts owed in the manner We choose.

**3. LOAN PROCEEDS BY MAIL** - If the proceeds of this loan are mailed to You, interest on this loan begins on the date the loan proceeds are mailed to You.

**4. SECURITY FOR LOAN** - This Agreement is secured by all property described in the "Security" section of the Truth in Lending Disclosure. Property securing other loans You have with Us also secures this loan, unless the property is a dwelling or otherwise

prohibited by federal and/or state law. In addition to Your pledge of shares, We may also have what is known as a statutory lien on all individual and joint accounts You have with Us. A statutory lien means We have the right under federal and/or state law to claim an interest in Your accounts. Unless otherwise prohibited by federal and/or state law, We can enforce a statutory lien against Your shares and dividends and, if any, interest and deposits, in all individual and joint accounts You have with Us to satisfy any outstanding financial obligation that is due and payable to Us. We may exercise Our right to enforce this lien without further notice to You, to the extent permitted by law. ***For all borrowers:*** You pledge as security for this loan all shares and dividends and, if any, all deposits and interest in all joint and individual accounts You have with the Credit Union now and in the future. **The statutory lien and/or Your pledge will allow Us to apply the funds in Your account(s) to what You owe when You are in default.** If a dollar amount and account number are listed in the "Security" section of the Truth in Lending Disclosure, You may not withdraw the amount that has been specifically pledged to secure this loan until the Credit Union agrees to release all or part of the pledged amount. The statutory lien and Your pledge do not apply to any Individual Retirement Account or any other account that would lose special tax treatment under state or federal law if given as security.

**5. DEFAULT** - You will be in default under this Agreement if You do not make a payment of the amount required on or before the date it is due. You will be in default if You break any promise You made in connection with this loan or if anyone is in default under any security agreement made in connection with this Agreement. You will be in default if You die, file for bankruptcy, become insolvent (that is, unable to pay Your bills and loans as they become due), or if You made any false or misleading statements in Your loan application. You will also be in default if something happens that We believe may seriously affect Your ability to repay what You owe under this Agreement or if You are in default under any other loan agreement You have with Us.

**6. ACTIONS AFTER DEFAULT** - When You are in default, We may demand immediate payment of the entire unpaid balance under this Agreement. If We demand immediate payment, You will continue to pay interest at the rate provided for in this Agreement, until what You owe has been repaid. **We will also apply against what You owe any shares and/or deposits given as security under this Agreement.** We may also exercise any other rights given by law when You are in default. **Unless You are a Covered Borrower under the Military Lending Act, You waive any right You have to receive demand for payment, notice of intent to demand immediate payment and notice of demand for immediate payment.**

**7. EACH PERSON RESPONSIBLE** - Each person who signs, or otherwise authenticates, this Agreement will be individually and jointly responsible for paying the entire amount owed under this Agreement. This means We can enforce Our rights against any one of You individually or against all of You together.

**8. LATE CHARGE** - If You are late in making a payment, You promise to pay the late charge shown in the Truth in Lending Disclosure. If no late charge is shown, You will not be charged one.

**9. DELAY IN ENFORCING RIGHTS** - We can delay enforcing any of Our rights under this Agreement any number of times without losing the ability to exercise Our rights later. We can enforce this Agreement against Your heirs or legal representatives.

**10. CONTINUED EFFECTIVENESS** - If any part of this Agreement is determined by a court to be unenforceable, the rest will remain in effect.

**11. NOTICES** - Notices will be sent to You at the most recent address You have given Us in writing. Notice to any one of You will be notice to all.

**12. USE OF ACCOUNT** - You promise to use Your account only for consumer (personal, family or household) purposes, unless the Credit Union gives You written permission to use the account also for agricultural or commercial purposes, or to purchase real estate.

**13. NO ORAL AGREEMENTS -- THIS NOTE CONSTITUTES A "WRITTEN LOAN AGREEMENT" PURSUANT TO SECTION 26.02 OF THE TEXAS BUSINESS AND COMMERCE CODE, IF SUCH SECTION APPLIES. THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**14. The following is required by Vermont law: NOTICE TO COSIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.**

**15. NOTICE TO UTAH BORROWERS:** This written Agreement is the final expression of the Agreement between You and the Credit Union. This written Agreement may not be contradicted by evidence of any oral agreement.

**16. OTHER PROVISIONS -**

A default ANNUAL PERCENTAGE RATE up to the maximum allowed by law may be imposed if You are in default under this Agreement, including failure to provide Us with title to the collateral within 60 days of receiving the loan proceeds.

## SECURITY AGREEMENT

In this Security Agreement ("Agreement") all references to "Credit Union", "We", "Our" or "Us" mean the Credit Union whose name appears on this document and anyone to whom the Credit Union assigns or transfers this Agreement. All references to the "Loan" mean the loan described in the Loan Agreement that is part of this document. All references to "You" or "Your" mean any person who signs, or otherwise authenticates, this Agreement.

**1. THE SECURITY FOR THE LOAN** - You give Us what is known as a security interest in the Property described in the "Security" section of the Truth in Lending Disclosure that is part of this document ("the Property"). The security interest You give includes all accessions. Accessions are things which are attached to or installed in the Property now or in the future. The security interest also includes any replacements for the Property which You buy within 10 days of the Loan and any extensions, renewals or refinancings of the Loan. It also includes any money You receive from selling the Property or from insurance You have on the Property. If the value of the Property declines, You promise to give Us more property as security if asked to do so.

**2. WHAT THE SECURITY INTEREST COVERS/CROSS COLLATERAL PROVISIONS** - The security interest secures the Loan and any extensions, renewals or refinancings of the Loan. **Unless prohibited by applicable law, the security interest also secures any other loans, including any credit card loan, You have now or receive in the future from Us and any other**

**amounts You owe Us for any reason now or in the future, except any loan secured by Your principal dwelling.** If the Property is household goods as defined by the Federal Trade Commission Credit Practices Rule or Your principal dwelling, the Property will secure only this Loan and not other loans or amounts You owe Us.

**3. OWNERSHIP OF THE PROPERTY** - You promise that You own the Property or, if this Loan is to buy the Property, You promise You will use the Loan proceeds for that purpose. You promise that no one else has any interest in or claim against the Property that You have not already told Us about. You promise not to sell or lease the Property or to use it as security for a loan with another creditor until the Loan is repaid. You promise You will allow no other security interest or lien to attach to the Property either by Your actions or by operation of law.

**4. PROTECTING THE SECURITY INTEREST** - If Your state issues a title for the Property, You promise to have Our security interest shown on the title. We may have to file what is called a financing statement to protect Our security interest from the claims of others. You irrevocably authorize Us to execute (on Your behalf), if applicable, and file one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code (UCC) in a form satisfactory to Us. You promise to do whatever else We think is necessary to protect Our security interest in the Property. You also promise to pay all costs, including but not limited to any attorney fees, We incur in protecting Our security interest and rights in the Property, to the extent permitted by applicable law.

**5. USE OF PROPERTY** - Until the Loan has been paid off, You promise You will: (1) Use the Property carefully and keep it in good repair. (2) Obtain Our written permission before making major changes to the Property or changing the address where the Property is kept. (3) Inform Us in writing before changing Your address. (4) Allow Us to inspect the Property. (5) Promptly notify Us if the Property is damaged, stolen or abused. (6) Not use the Property for any unlawful purpose. (7) Not retitle the Property in another state without telling Us.

**6. PROPERTY INSURANCE, TAXES AND FEES** - You promise to pay all taxes and fees (like registration fees) due on the Property and to keep the Property insured against loss and damage. The amount and coverage of the property insurance must be acceptable to Us. You may provide the property insurance through a policy You already have, or through a policy You get and pay for. You promise to make the insurance policy payable to Us and to deliver the policy or proof of coverage to Us if asked to do so.

If You cancel Your insurance and get a refund, We have a right to the refund. If the Property is lost or damaged, We can use the insurance settlement to repair the Property or apply it towards what You owe. You authorize Us to endorse any draft or check which may be payable to You in order for Us to collect any refund or benefits due under Your insurance policy.

If You do not pay the taxes or fees on the Property when due or keep it insured, We may pay these obligations, but We are not required to do so. Any money We spend for taxes, fees or insurance will be added to the unpaid balance of the Loan and You will pay interest on those amounts at the same rate You agreed to pay on the Loan. We may receive payments in connection with the insurance from a company which provides the insurance. We may monitor Our loans for the purpose of determining whether You and other borrowers have complied with the insurance requirements of Our loan agreements or may engage others to do so. The insurance charge added to the Loan may include (1) the insurance company's payments to Us and (2) the cost of determining compliance with the insurance requirements. If We add amounts for taxes, fees or insurance to the unpaid balance of the Loan, We may increase Your payments to pay the amount added within the term of the insurance or term of the Loan.

**7. INSURANCE NOTICE** - If You do not purchase the required property insurance, the insurance We may purchase and charge You for will cover only Our interest in the Property. The premium for this insurance may be higher because the insurance company may have given Us the right to purchase insurance after uninsured collateral is lost or damaged. **The insurance will not be liability insurance and will not satisfy any state financial responsibility or no fault laws.**

**8. DEFAULT** - You will be in default if You break any promise You make or fail to perform any obligation You have under this Agreement. You will also be in default under this Agreement if the Loan is in default. You will be in default if any Property You have given Us as security is repossessed by someone else, seized under a forfeiture or similar law, or if anything else happens that significantly affects the value of the Property or Our security interest in it.

**9. WHAT HAPPENS IF YOU ARE IN DEFAULT** - When You are in default, We may demand immediate payment of the outstanding balance of the Loan without giving You advance notice and take possession of the Property. You agree the Credit Union has the right to take possession of the Property without judicial process if this can be done without breach of the peace. If We ask, You promise to deliver the Property at a time and place We choose. If the Property is a motor vehicle or boat, You agree that We may obtain a key or other device necessary to unlock and operate it, when You are in default. We will not be responsible for any other property not covered by this Agreement that You leave inside the Property or that is attached to the Property. We will try to return that property to You or make it available for You to claim.

After We have possession of the Property, We can sell it and apply the money to any amounts You owe Us. We will give You notice of any public disposition or the date after which a private disposition will be held. Our expenses for taking possession of and selling the Property will be deducted from the money received from the sale. Those costs may include the cost of storing the Property, preparing it for sale and attorney's fees to the extent permitted under state law or awarded under the Bankruptcy Code.

If You have agreed to pay the Loan, You must pay any amount that remains unpaid after the sale money has been applied to the unpaid balance of the Loan and to what You owe under this Agreement. You agree to pay interest on that amount at the same rate as the Loan until that amount has been paid.

**10. DELAY IN ENFORCING RIGHTS AND CHANGES IN THE LOAN** - We can delay enforcing any of Our rights under this Agreement any number of times without losing the ability to exercise Our rights later. We can enforce this Agreement against Your heirs or legal representatives. If We change the terms of the Loan, You agree that this Agreement will remain in effect.

**11. CONTINUED EFFECTIVENESS** - If any part of this Agreement is determined by a court to be unenforceable, the rest will remain in effect.

**12. NOTICE FOR ARIZONA OWNERS OF PROPERTY** - You must return a motor vehicle that is subject to a security interest within thirty days after You have received notice of default. Notice of default will be mailed to the address You gave Us and it is Your responsibility to notify Us if Your address changes. The maximum penalty for failure to return a motor vehicle that is subject to a security interest is suspension of the registration of, and any license plate assigned to, the motor vehicle.

DocuSign Envelope ID: B42FA48A-09D5-41C9-90B0-FC

Credit Union InTouch Credit Union Acct No. [redacted] Loan No. [redacted]

☐ ***The following notice applies ONLY when the box at left is marked.***

**13. NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**14. OTHER PROVISIONS -**

A default ANNUAL PERCENTAGE RATE up to the maximum allowed by law may be imposed if You are in default under this Agreement, including failure to provide Us with title to the collateral within 60 days of receiving the loan proceeds.

## SIGNATURES

By signing, or otherwise authenticating, as Borrower, You agree to the terms of the Loan Agreement. If Property is described in the "Security" section of the Truth in Lending Disclosure, You also agree to the terms of the Security Agreement. If You sign, or otherwise authenticate, as "Owner of Property" You agree only to the terms of the Security Agreement.

**CAUTION: IT IS IMPORTANT THAT YOU THOROUGHLY READ THE AGREEMENT (I.E., CONTRACT) BEFORE YOU SIGN IT.**

| Borrower 1 Signature | Date | Borrower 2 Signature | Date |
|---|---|---|---|
| X DocuSigned by: Gwen Ulijasz (Seal) | 12/29/2023 | X (Seal) | |
| GWENDOLYN LAURA ULIJASZ | | | |
| Signature X (Seal) | Date | Signature X (Seal) | Date |

☐ Borrower 3:
☐ Owner of Property ☐ Witness
☐ Other:

☐ Borrower 4:
☐ Owner of Property ☐ Witness
☐ Other:



NZF014-E

DEAL# 141168 P8C89022A CUST# 1424659

# PURCHASER'S AGREEMENT CONCERNING TRADE-IN

Purchaser is trading in the below-described vehicle to BMW OF SAN ANTONIO ("Dealer") in connection with Purchaser's purchase of a vehicle from Dealer.

Year: 2023 Make: BMW Model: 3 SERIES Mileage: 15491
License No.: N/A VIN: 3MW49FF07P8C89022
Lienholder: INTOUCH CREDIT UNION Pay-off Amount of Lien: 54,500.00

Purchaser hereby certifies that the above-listed pay-off amount is correct and represents the full pay-off of all liens on Purchaser's trade-in vehicle. If the actual pay-off is greater, Purchaser agrees to pay the difference in cash to Dealer within three days of being notified of the difference.

Purchaser hereby certifies that, except as stated below:

(a) the trade-in vehicle, including all components, accessories, and equipment, is in good operating condition;

(b) the mileage shown above is the true and correct actual mileage of the trade-in vehicle and that the trade-in vehicle's odometer has never been disconnected, set back, or replaced;

(c) the trade-in vehicle does not have any repaired or unrepaired body damage;

(d) the trade-in vehicle has not been rebuilt, reconditioned, or salvaged; the vehicle has not suffered Flood, hail or other substantial weather damage; and there is no indication of the foregoing or any other exception or condition noted on the vehicle's title;

(e) the emission control components and systems on the trade-in vehicle have not been tampered with, modified or disconnected;

(f) the air bags in the trade-in vehicle have not been deployed or disconnected; and

(g) the trade-in vehicle has not been altered in a manner that causes it to fail to conform to its manufacturer's specifications. This means, by way of example and not as a limitation, that the vehicle's wheels, tires, springs shock absorbers, and exhaust system conform to the manufacturer's original equipment specifications for the vehicle.

Unless and except as expressly noted in writing below, Dealer is expressly authorized to sell, trade, or otherwise liquidate the trade-in vehicle immediately upon receipt thereof and the limit of Dealer's liability on account of the trade-in vehicle shall be actual monies received by Dealer for the trade-in vehicle, whether or not Purchaser's purchase of a vehicle from Dealer is consummated.

Exceptions:____________________

All references herein to Purchaser shall be deemed to refer to both Purchaser and Co-Purchaser, if there is a co-purcahser involved in this transaction.

[signature]
Purchaser's Signature

N/A
Co-Purchaser's Signature

EXHIBIT 7b

CUST# 1424659

## ODOMETER DISCLOSURE STATEMENT

Federal law (and State law, if applicable) requires that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

I, GWENDOLYN LAURA ULIJASZ state that the odometer now
(TRANSFEROR'S NAME - PRINT)

reads 15491 (no tenths) miles and to the best of my knowledge that it reflects the actual mileage of the vehicle described below, unless one of the following statements is checked.

☐ (1) I hereby certify that to the best of my knowledge the odometer reading reflects the amount of mileage in excess of its mechanical limits.

☐ (2) I hereby certify that the odometer reading is **NOT** the actual mileage.
**WARNING – ODOMETER DISCREPANCY**

MAKE BMW

MODEL 3 SERIES BODY TYPE 4DR CAR

VEHICLE IDENTIFICATION NUMBER 3MW49FF07P8C89022

YEAR 2023

TRANSFEROR'S NAME ____________________
(PRINTED NAME)

TRANSFEROR'S ADDRESS 12802 KINGS FOREST STREET
(STREET)

SAN ANTONIO TX 78230
(CITY) (STATE) (ZIP CODE)

TRANSFEROR'S NAME [signature]
(SIGNATURE)

DATE OF STATEMENT 02/28/2026

TRANSFEREE'S NAME BMW OF SAN ANTONIO
(PRINTED NAME)

TRANSFEREE'S ADDRESS 15507 I-10 WEST
(STREET)

SAN ANTONIO TX 78249
(CITY) (STATE) (ZIP CODE)

TRANSFEREE'S NAME [signature]
(SIGNATURE)

Stock # P8C89022A

Deal # 141168

Dealership BMW OF SAN ANTONIO

# Benefit Summary

Benefit Summary Generated On 06/26/2026 At 05:31:28 CDT

## About You

### Your Information

| | |
|---|---|
| **Name** | Gwendolyn Laura Ulijasz |
| **Address** | 11703 Huebner Road<br>Ste106 PMB499<br>San Antonio, TX 78230<br>US |
| **Date of Birth** | 05/27/1978 |
| **Gender** | Female |
| **Cell Phone** | 210-278-6377 |

## Dependents - 0

*No Dependents Listed*

EXHIBIT
8

## My Health

### Medical - Aetna HealthFund HDHP

$65.03 Semi-Monthly

#### Medical Covered Members

| Members | Covered |
|---|---|
| **Gwendolyn Laura Ulijasz**<br>Effective Date: 07/01/2026 | Yes |

### Dental - Aetna DMO Plan

$6.67 Semi-Monthly

#### Dental Covered Members

| Members | Covered |
|---|---|
| **Gwendolyn Laura Ulijasz**<br>Effective Date: 07/01/2026 | Yes |

### Vision - UnitedHealthcare Vision Plan

$3.61 Semi-Monthly

#### Vision Covered Members

| Members | Covered |
|---|---|
| **Gwendolyn Laura Ulijasz**<br>Effective Date: 07/01/2026 | Yes |

### Employee Critical Illness - Coverage Waived

### Spouse/Domestic Partner Critical Illness - Coverage Waived

### Child Critical Illness - Coverage Waived

## My Savings

### Health Savings Account - Health Savings Account

$314.77 Semi-Monthly

**Effective Date** 01/01/2026

#### Health Savings Account Contributions

| | |
|---|---|
| Previous Contributions | $0.00 |
| Annual Contribution Amount | $5,575.00 |
| Employer Contribution | $1,000.00 |
| Annual Total | $6,575.00 |
| Estimated Paycheck Deduction | **$314.77** Semi-Monthly |

### Health Care Flexible Spending Account - Coverage Terminated

| | |
|---|---|
| Effective Date | 01/01/2026 |
| Term Date | 06/30/2026 |

### Dependent Care Flexible Spending Account - Coverage Waived

## My Security

### Basic Life Insurance - Basic Life Insurance

$0.00 Semi-Monthly

| | |
|---|---|
| Effective Date | 10/16/2024 |

#### Basic Life Insurance Coverage Amount

| | |
|---|---|
| Coverage Amount | $1,500,000.00 |
| Elected Coverage Amount | $1,500,000.00 |
| Actual Coverage Amount | $1,500,000.00 |

#### Basic Life Insurance Beneficiaries

| Name | Beneficiary Type | Allocation |
|---|---|---|
| Andrew Raymond Ulijasz | Primary | 100.000% |

### Basic Accidental Death & Dismemberment (AD&D) Insurance - Basic AD&D Insurance

$0.00 Semi-Monthly

| | |
|---|---|
| Effective Date | 12/16/2025 |

#### Basic Accidental Death & Dismemberment (AD&D) Insurance Coverage Amount

| | |
|---|---|
| Coverage Amount | 7x Salary |

#### Basic Accidental Death & Dismemberment (AD&D) Insurance Beneficiaries

| Name | Beneficiary Type | Allocation |
|---|---|---|
| Andrew Ulijasz | Primary | 100.000% |

Optional Life Insurance - Coverage Waived

Optional Accidental Death & Dismemberment (AD&D) Insurance - Coverage Waived

Spouse or Domestic Partner Life AD&D Insurance - Coverage Waived

Dependent Child Life/AD&D - Coverage Waived

| | |
|---|---|
| Long-Term Disability Insurance - LTD $25,000 Monthly Maximum | $151.47 Semi-Monthly |
| **Effective Date** | 06/27/2026 |

## Your Cost

| | |
|---|---|
| **Total Premium**<br>Total cost of all plan premiums | $226.78<br>Semi-Monthly |
| **Total Account Contributions**<br>Total amount contributed to accounts | $314.77<br>Semi-Monthly |
| **Total Cost**<br>If Approved | **$541.55**<br>Semi-Monthly |

This online benefit summary is reflective of benefits information contained within the Businessolver, Inc. database on the date this information is being displayed. This information is not intended to be an all inclusive or exhaustive list of benefit enrollment information. Modifications, deletions, and additions to coverage are not immediately effective upon submission. Please contact the Benefits Center at 888-259-6059 if you have any questions.

Important Note: The insurance carriers make the final determination regarding the payable benefit amount and the designated beneficiaries. The information shared reflects the current enrollment system data, but the ultimate benefit recipient or benefit amount to be paid may change based on plan rules, Evidence of Insurability and approvals, and other factors.

Every effort has been made to report information accurately, but the possibility of error exists. In case of any conflict between your benefits election confirmation and an official plan document, the plan document will be the final authority. Please note, some insurance coverage elections only become effective upon approval of your Evidence of Insurability (EOI) by the carrier.

* -Any personal or dependent information that appears in red font indicates a change that is currently pending approval.

Jason >

Collection date:September 9, 2024 9:06 AM
Result date:September 9, 2024 12:28 PM
Result status:Final




**Exquisite 18K Yellow Gold Colombian Emerald and Diamond Ring –Rare Muzo...**
ebay.com

WHoAH ! My ring finger is available for pics whenever. Outside for walk with Katie and leaving for yoga at 5:40. Lemme know if you need any errands run honey.

I'll take pictures whenever you get back

You coming??

EXHIBIT
12

122

Jason >

Sep 10, 2024 at 1:05 PM

Oh and are the rings posted for sale. If not that is not a black mark or something dude. ☠️ I am just asking 🙌🫶. If not lemme know if you need anything from me to get them up there.

I haven't posted them yet. But I have most everything ready. I have the images scanned in and the specs.

I need to write a description for each. If you could give me a few details about each like where you got it or anything like historical, then we can just plug it into AI and have it write up a brief description. Also upload the pictures in the AI and it can elaborate as well.

If you can give me a few details about each, I can get AI to do it in no time

Ok I will do that.
The price is whatever price it needs to be to have them sold and the $ in our hand by Sept 25 . It'll take a few weeks if they don't go up for timed auction.
Getting you the description and the tax stuff today. Xoxo

Sep 10, 2024 at 3:10 PM

FYI – I set the TV to record the debate

Text Message • SMS