FILED

OCT 01 2026

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 26-30161-mvl7** |
| JASON EMORY McKEMIE, | § | |
| | § | **CHAPTER 7** |
| Debtor. | § | |

# DEBTOR'S NOTICE OF STATE-COURT RULING VACATING THE JUNE 26, 2026 PROPERTY DIVISION ENTERED IN VIOLATION OF THE AUTOMATIC STAY, AND STATEMENT OF THE STAY VIOLATIONS OF RECORD

**[Relates to ECF 51, 55, 57, 97, 98, 110, 111, and 116]**

**TO THE HONORABLE MICHELLE V. LARSON, UNITED STATES BANKRUPTCY JUDGE:**

## PRELIMINARY STATEMENT

No party sought relief from the automatic stay before the June 11, 2026 trial, during it, before the June 26, 2026 Final Decree of Divorce (the "Decree") was signed, or in the two and one-half months that followed. No party has ever obtained it. The first request of any kind came on Friday, September 11, 2026 — the last day to object to the Debtor's Rule 2004 motion [ECF 97] and the day Gwendolyn Laura Ulijasz's ("Movant") brief on the stay was due in the 301st Judicial District Court of Dallas County, Texas (the "State Court"). That morning she asked the State Court to treat the Decree as final and to sign nothing. That afternoon she asked this Court to annul the stay retroactively so that the Decree would be "given effect as of the date it was signed" [ECF 110 ¶ 2(a)], and objected to the subpoenas that would show what the Decree had divided [ECF 111]. One week later, on September 18, 2026, the State Court vacated the division. Nothing on this docket reports that.

Movant's counsel had told the State Court, in writing, thirteen days before trial, that the Bankruptcy Code "excludes from that exception proceedings to determine division of property that is property of the estate," that any property awarded by a decree entered before July 11, 2026 "falls within that 180-day window" of § 541(a)(5)(B), and that Movant "does not oppose severance and reservation of the property division portion" if bankruptcy coordination were required. **Exhibit 7** at 8, 12. He then tried the entire division, in the Debtor's medical absence, without saying the word "bankruptcy" once, and tendered a decree that divided everything. This Notice places the State Court's ruling, the reason for it, and each act taken against property of this estate during the stay before the Court in connection with the hearings set for October 6, 2026 [ECF 116] and October 8, 2026 [ECF 97, 111].

On September 29, 2026, Movant filed in the State Court a motion that says what ECF 110 is for. It concedes that the Ruling "eliminate[d] the final judgment" and that "[a] partial new trial leaves no final judgment" (¶¶ 10–11); that "the marital estate remains undivided and neither

party can deal with the property with any certainty" (¶ 36); and that a ruling from this Court would not "of itself restore any vacated provision of the Decree" — rather, "[s]he would ask [the State Court] for whatever further order that ruling warranted" (¶ 32). **Exhibit 8**. Annulment is not sought to protect anything Movant did in reliance on the Decree. It is sought as the predicate for a second state-court order dividing this estate without a trial, and — by the same motion — for a state-court declaration of the "operative date" of the dissolution so that her employer's plan, which "reads the Ruling as leaving the parties married" and "will reinstate Respondent as her dependent retroactive to July 1, 2026" (¶ 5), can terminate him a second time.

## I. THE SEQUENCE

January 12, 2026 — petition [ECF 1]. That morning the Debtor had filed fifteen emergency papers in the State Court — an application for a temporary restraining order, an emergency motion to stay eviction, an emergency motion on medical harm, and affidavits warning of a coordinated clean-out of the residence (State Court filings of January 12, 2026, Envelope Nos. 109910231–109914676) — and was told that court was not the forum for that relief. He filed this case the same day.

February 18, 2026 — Notice of Bankruptcy Automatic Stay filed in the State Court (Envelope 111412461). Movant admits knowledge from that date. ECF 110, Ulijasz Decl. ¶ 4.

April 16, 2026 — ECF 51, 55 (3:08 p.m., 3:24 p.m.); emergency hearing; ECF 57 (6:36 p.m.) reinstating the stay as to the residence and its contents: "no other party shall remove any of the possessions from the premises." **Exhibit 6**.

May 29, 2026 — Movant's counsel swears to the petition date, the Trustee, and this Court's stay orders (**Exhibit 4** ¶ 7) and files the "Bankruptcy overlay" response quoted above (**Exhibit 7**).

June 11, 2026 — 1:17 p.m., Debtor's verified emergency motion (chest pain, shortness of breath, request to appear remotely); 1:30 p.m., trial; 47-page record with no reference to the bankruptcy, the stay, or the Trustee (**Exhibit 5**); 4:28 p.m., counsel transmits the proposed decree.

June 23–24, 2026 — Debtor's written objections that the proposed decree divides estate property without stay relief (Envelope 116545517). June 26 — Decree signed; the same day Movant terminates the Debtor's health coverage and cancels his HSA card "in reliance on the Decree." ECF 110, Ulijasz Decl. ¶ 13.

August 21, 2026 — Rule 2004 motion [ECF 97], emailed to Movant and her counsel that day (ECF 111 ¶ 11). September 3, 2026 — State Court hearing on the motion for new trial; asked whether the stay was in effect and whether it had been lifted, Movant's counsel told the State Court he did not know. September 11 — ECF 110 and 111, and her State Court brief. September 18 — Memorandum Ruling (**Exhibit 1**). September 24 and 28 — Debtor's State Court motion and protective notice of appeal (**Exhibits 2, 3**). September 29 — Movant's State Court motion to clarify and modify the Ruling (**Exhibit 8**). October 6 and 8 — hearings.

## II. THE SEPTEMBER 18, 2026 MEMORANDUM RULING

1. The Honorable Ashley Wysocki signed the Memorandum Ruling on September 18, 2026 (hearing date September 3, 2026). **Exhibit 1**. Its operative text reads, in full:

> "Respondent's Motion for New Trial is GRANTED in part and DENIED in part.
>
> The Court grants the motion for new trial as to division and characterization of material property only.
>
> IT IS ORDERED that Sections 8, 9, 11-15 of the Decree of Divorce signed on June 26, 2026, are VACATED.
>
> IT IS ORDERED that Sections 1 through 7 and 10 of the Decree of Divorce signed on June 26, 2026, remain in full force and effect but are interlocutory. The remaining issues shall be set for trial once the stay has been lifted or Respondent's bankruptcy case is otherwise disposed.
>
> All other relief requested is DENIED."

2. The vacated Sections are every provision that divided property or allocated debt and every provision that depended on that division: Section 8 ("Division of the Marital Estate") — 8.A (community property awarded to Movant, W-1 through W-9), 8.B (community property awarded to the Debtor, H-1 through H-4), 8.C (Movant's separate property), 8.D–8.F (debts, including 8.F's equal division of the SoFi, Chase, and Citibank accounts), 8.G (mutual indemnification and the reservation of the Trustee's rights); Section 9 (attorney's fees); Section 11 (turnover and execution); Section 12 (discharge from the duty to preserve discovery); Section 13 (costs); Section 14 (denial of the Debtor's counterpetition); and Section 15 (finality). The Sections left "interlocutory" are 1 (appearances), 2 (record), 3 (jurisdiction), 4 (jury), 5 (findings on the marriage), 6 (divorce), 7 (children), and 10 (name change). The Decree is Exhibit 1 to ECF 110.

3. The ruling rests on the ground the Debtor raised. At the September 3 hearing every party agreed that this case was pending, that the stay was in effect, and that no one had sought relief from it for the divorce to proceed on any matter. The State Court stated from the bench that a decree entered in violation of the stay is void, not voidable; that it had no authority to divide the marital estate until the stay was lifted; that this Decree divided the marital estate; and that it would not do what the law forbade. **Exhibit 2** ¶¶ 4–5. The reporter's record of that hearing has been ordered and will be filed by supplement. The ruling conditions any retrial on the lifting of the stay or the disposition of this case.

## III. THE TRIAL WAS CONDUCTED WITH SWORN KNOWLEDGE OF THE STAY AND WITHOUT A WORD ABOUT IT

4. Thirteen days before trial, Movant's lead counsel, Jonathan D. Steele, swore in the State Court:

> "Respondent is a Chapter 7 debtor. He filed his Chapter 7 petition on January 12, 2026. The Chapter 7 trustee is Areya Holder. Attached as Exhibit B are true and correct copies of the relevant bankruptcy filings and orders, which include the notice of the Chapter 7 case identifying the trustee and petition date; the order terminating the automatic stay to permit the landlord to pursue eviction remedies; the order entered the afternoon of April 16, 2026 reinstating the automatic stay and directing that writ enforcement cease; and the later order extending Respondent's move-out

> deadline and reserving claims for rent, expenses, damages, and automatic-stay violations for separate motion or adversary proceeding."

Affidavit of Jonathan Steele ¶ 7, May 29, 2026 (Envelope 115516576). **Exhibit 4**.

5. The same day, the response he filed for Movant contained a section titled "Bankruptcy overlay" that stated the governing rule and the consequence:

> "The Bankruptcy Code excepts certain domestic-relations matters from the automatic stay, including dissolution proceedings, but excludes from that exception proceedings to determine division of property that is property of the estate. 11 U.S.C. § 362(b)(2)(A)(iv). Section 541 includes property interests of the debtor and, in appropriate circumstances, community-property interests, and § 541(a)(5)(B) includes property the debtor becomes entitled to acquire within 180 days after filing as a result of a property settlement agreement or divorce decree. Because Respondent filed Chapter 7 on January 12, 2026, any property awarded to Respondent by decree entered before July 11, 2026 falls within that 180-day window."
>
> ". . . [I]f the Court determines that the property division portion of the June 11 trial requires coordination with the Chapter 7 trustee or further bankruptcy-court action beyond what is available at this setting, Petitioner does not oppose severance and reservation of the property division portion only, with the dissolution of marriage and any matters expressly excepted from the automatic stay under § 362(b)(2) proceeding on June 11 as scheduled. Trustee Areya Holder's rights, bankruptcy-court jurisdiction, and any party's right to seek appropriate relief in the bankruptcy court are expressly preserved."

Petitioner's Response filed May 29, 2026, at 8, 12. **Exhibit 7**. Counsel knew the rule, knew the estate was implicated, and offered the State Court the lawful course. No coordination with the Trustee or this Court occurred. On June 11 he took the full division by default.

6. The trial lasted from 1:30 p.m. to 2:45 p.m. The certified reporter's record is 47 pages. **Exhibit 5**. The words "bankruptcy," "stay," "trustee," and "362" do not appear in it. Counsel did not tell the State Court that the estate it was dividing was the estate of a pending Chapter 7 case, that no relief from the stay had been sought, that this Court had reinstated the stay as to the Debtor's residence and its contents eight weeks earlier, or that his own filing had offered to reserve the division. He tendered a proposed decree that mentioned the bankruptcy in one sentence — § 8.G: "Nothing in this Decree modifies the rights of the Chapter 7 trustee" — and asked the State Court to sign it. It did, on June 26, 2026.

7. Counsel was served with the Rule 2004 motion on August 21, 2026 (ECF 111 ¶ 11). At the September 3 hearing, when the State Court asked whether the stay was in effect and whether it had been lifted, he answered that he did not know. The State Court then asked where the decree addressed the bankruptcy; he pointed to § 8.G. The affidavit in Exhibit 4 and the response in Exhibit 7 are his.

8. The Debtor was not present. At 1:17 p.m., thirteen minutes before the setting, he filed a verified emergency motion stating that he was suffering chest pain and shortness of breath

en route to the courthouse, asking to appear by telephone or video, and asking that his medical inability to appear not be treated as waiver, abandonment, or consent to final orders; after the setting he filed a supplemental verified notice of current medical emergency and inability to safely appear (State Court filings of June 11, 2026, Envelope Nos. 116028476 and 116030521; Response Exhibit R-10). He was in medical and logistical collapse: homeless since the May 22 writ, without transportation, without his records, and without his medications. That collapse was the product of healthcare obstruction that began in December 2024, when his access to the health savings account and to marital funds was cut off days after spinal surgery (ECF 51 ¶¶ 14–20, 29), and that culminated on October 31, 2025, when every dependent benefit he held was terminated on a "divorce" qualifying event submitted while no divorce existed. Over the following twenty-one months he was without his medications for extended periods, was hospitalized repeatedly, and was left needing three surgeries — a ruptured bicep, a torn rotator cuff, and a compressed L5/L6 condition — each blocked when coverage was cut (Statement of Inability to Afford Costs, sworn February 28, 2026, at 6; Response Exhibit R-15). Counsel had notice of all of it. The trial proceeded by post-answer default and the Decree recites that he "failed to appear."

## IV. WHAT THE DECREE DID TO PROPERTY OF THIS ESTATE WHILE THE STAY WAS IN EFFECT

Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Section 362(a)(1) and (a)(6) stay the continuation of a proceeding to recover a pre-petition claim against the debtor and any act to collect it. Section 362(b)(2)(A)(iv) excepts a dissolution proceeding "except to the extent that such proceeding seeks to determine the division of property that is property of the estate." Under Brown v. Chesnut (In re Chesnut), 422 F.3d 298, 303–04 (5th Cir. 2005), the stay protects arguable property of the estate, and it is no answer to claim afterward that the property was not covered. Everything below was, at minimum, arguable property: the Debtor scheduled it (ECF 29, Sch. A/B lines 27, 33); the Trustee carries it as Asset 21 (ECF 91); the Decree labeled it "community property"; and Movant's own counsel wrote, before trial, that it fell within § 541. The June 11 trial and the June 26 Decree did the following:

9. **Divided the estate.** Sections 8.A and 8.C awarded Movant every asset the Debtor had scheduled as the estate's interest — the Voya/Cognizant 401(k), the Accenture VEIP account, the Accenture restricted stock, the AdvantiGen units, the Ameriprise accounts, the Chase account, the health savings account, and "[a]ny and all other community assets in Wife's name, possession, or control" (W-9) — approximately $820,000 at scheduled values — and divested the Debtor "of all right, title, interest, and claim" in each. 11 U.S.C. § 362(a)(3). Movant concedes that § 8.B reached "property of the estate under § 541(a)(1) or § 541(a)(2)(A)" and that the directions concerning W-7, W-8, and the joint accounts "are not enforceable against the estate." ECF 110 ¶ 16. The two joint accounts were emptied at the outset of the divorce and have held nothing since; the estate's interest is in the accounts Movant controls.

10. **Ordered a Chapter 7 debtor to pay pre-petition debts within thirty days — debts Movant had placed on him.** Section 8.F ordered the Debtor to pay one-half of "the SoFi loan" (~$10,000), "the Chase credit card account" (~$50,000), and "the Citibank account" (~$15,000) — $37,500 — within 30 days. 11 U.S.C. § 362(a)(1), (a)(6). The accounts are in Movant's name; the Debtor never had access to them; no statement for any of them was in

evidence ("I don't believe there is an exhibit that sets forth the totals of the debts," Tr. 33:8–11); the figures were recited from memory (Tr. 33:12–34:4); Movant's own February 17, 2026 itemization had listed Chase x3444 at $9,648 and Citibank x2295 at $0; and the motion she filed in this Court carries her counsel's unremoved drafting note: "[Confirm the identity of the Chase account referred to in Section 8.F before filing; see the cover note.]" ECF 110 ¶ 14. The party that obtained the order cannot identify the account it ordered the Debtor to pay.

11. **How the debt got there is in this Court's record.** The parties had always paid their cards in full every month. From roughly August through December 2024, Movant told the Debtor the household was in a "short-term cash crunch" because she had front-loaded expenses for her new Accenture position, directed him to carry the community's expenses on his personal credit cards — "leverage credit & preserve cash" — and promised the balances would be cleared when the first half of her $300,000 signing bonus arrived in November 2024. She concealed the bonus and told him it was delayed. In the same weeks she persuaded him to decline a $250,000-per-year position. On December 10, 2024 he underwent spinal surgery. On December 11 he found the documentation of her prior campaigns, called 911 to report that false police filings and a false protective-order campaign were imminent — the 911 incident report reflects the call — and retained counsel that day. On counsel's advice he transferred three months of household funds and paid the retainer on December 12. Movant, who receives notice of every transaction (Tr. 27:1–5), reported the retainer, the transfer, and his rehabilitation-equipment purchases as fraud, and cut off his access to every marital account; the reversals left him with less than $300. He sold plasma to fill his post-surgical pain prescriptions. ECF 51 ¶¶ 9–20, 29; ECF 55 at 4; Response Exhibit R-15. The community debt she directed onto his cards is the debt the Decree then split and ordered him to pay from nothing.

12. **Created new money obligations against the debtor, including for a lease Movant alone had guaranteed.** Section 8.G imposed mutual indemnification with attorney's fees and post-judgment interest; Section 11 imposed turnover and execution obligations. Each is a post-petition judgment obligation entered against a Chapter 7 debtor without relief from the stay. 11 U.S.C. § 362(a)(1), (a)(6). The largest debt behind them is the 5609 La Foy lease. The lease application reads "Guarantor - Gwendolyn Ulijasz"; the Debtor was a tenant with no income and no financial qualification (ECF 55 at 4; ECF 51 ¶¶ 7–8). At the October 31, 2025 hearing in the State Court, Movant represented that she was not on the lease; only when the Debtor produced it did her counsel disclose that she had signed a Mutual Release and Private Settlement Agreement with the landlord on July 22, 2025 — three months earlier — releasing herself, surrendering the Debtor's security deposit as her consideration, and structuring her return to the residence for after his displacement. The landlord filed a nonsuit as to her the next day and the justice court dismissed her with prejudice on July 24, 2025. Neither the agreement nor the nonsuit was disclosed to the Debtor. The eviction then proceeded against the Debtor alone. ECF 110, Ulijasz Decl. ¶ 12 & Exs. 2, 2-A; ECF 51 ¶¶ 59–71 & Ex. 0; Exhibit 2 ¶ 22. The landlord's stay-relief motion in this Court was never served at the Debtor's petition address, and this Court so found when it reinstated the stay. Exhibit 6 at 2–3.

13. **Took the health savings account, on a sworn statement that is false.** Item W-4 awarded Movant "[t]he Accenture HSA account, together with all funds on deposit therein." Movant's own sworn inventory of July 22, 2025 listed that account as "Account holder: Jason McKemie" (ECF 110, Ulijasz Decl. Ex. 3 § 12.C.2). The pronouncement at trial was one sentence: "The Court awards the VEIP account to wife and the HSA account to wife." Tr. 41:10–

11. Movant now swears that on June 26, 2026, "the day it was signed," she removed the Debtor from her employer health plan, "cancelled the card he held on my health savings account," and changed her beneficiary designations to remove him. ECF 110, Ulijasz Decl. ¶ 13; Motion ¶ 18(d). The Debtor never held a functioning card. The State Court's December 17, 2025 order required Movant, within twenty-four hours, to restore the Debtor's coverage with functional prescription and HSA/FSA access or to pay $20,643.56 for substitute coverage, and prohibited her from interfering with either (Response Exhibit R-8). Movant did neither within twenty-four hours: she never deposited the $20,643.56, she handed the Debtor a non-functioning card on January 6, 2026 (twenty days after the Order), and she filed a "Notice of Compliance" on January 13, 2026, twenty-seven days after the Order (Exhibit 10). Her "compliance" was to hand him, in open court on January 6, 2026, a card that had already been superseded by the replacement she ordered and kept: on January 8, 2026, Inspira Financial stated on its recorded line that the card he held "is not the one associated here on the account, probably because there was a card order before," that it "is not the one that's associated anymore on the account," that the account has one online login, and that an HSA holder has "no need to submit any documents at all"; Inspira bridged Movant onto the call, and she refused to provide the login — she did not have a password, he had to do it "on your own," she was "not doing anything," "[t]here's only one account holder" — and terminated the call (Response Exhibit R-7). Movant's own Notice of Compliance filed in the State Court on January 13, 2026 states that in December 2025 she "had no functioning card for either herself or Respondent," that "[t]he account had not been used all year in anticipation that because this was community property it would be decided at trial," and that replacement cards for both parties were requested December 18, 2025 and "issued and delivered to her on December 23, 2025" (Exhibit 10 at 1). This was performative compliance: Movant ordered new cards, kept the working card issued in her name, and handed the Debtor a cancelled card, ending in 5379, in a new Inspira mailer addressed to Movant and marked "Card Number Ending In: 5379" (Exhibit 11) — staged so the State Court would find the December 17, 2025 Order satisfied and close the issue. The physical mailer was later taken from the Debtor's residence in the April 16, 2026 writ execution; a photograph survives (Exhibit 11). The Debtor completed one pharmacy charge on a health savings account card in 2025, on credentials hospital staff helped restore during a five-day hospitalization for a staph infection at Texas Health Presbyterian Dallas; the card was reported lost or stolen before he could return the next morning for the second antibiotic, and the infection recurred for months (Response Exhibit R-15 ¶ 7). Movant's account of that day is that she "saw a pharmacy charge." The card she swears she "cancelled" on June 26 did not work on June 25. Terminating the Debtor's access to the account on June 26 was an act to exercise control over property of the estate, 11 U.S.C. § 362(a)(3), taken with knowledge of the stay, and Movant offers it to this Court as her "reliance."

14. **The sworn "reliance" statement about the card is false.** Paragraph 13 of Movant's declaration states, under penalty of perjury under 28 U.S.C. § 1746, that on June 26, 2026 she "cancelled the card he held on my health savings account." The card the Debtor held ended in 5379. On January 8, 2026 — five months earlier — the Debtor read that number to Inspira Financial's representative on a recorded line, and the representative stated that it "is not the one associated here on the account, probably because there was a card order before," and that it "is not the one that's associated anymore on the account." **Exhibit 9** at 00:09:21–00:10:24, 00:32:12. Movant's own January 13, 2026 Notice of Compliance states that the replacement cards ordered December 18, 2025 "were issued and delivered to her on December 23, 2025" (Exhibit 10 at 1). The Debtor never held any other card on the account. No card in his possession

was active on June 26, 2026; whatever Movant cancelled that day was a card that, on her own account, had been in her possession since December 23, 2025. The statement was made to this Court to establish reliance on the Decree in support of a motion to annul the stay. It is the counterpart of the "Notice of Compliance" she filed in the State Court on January 13, 2026 — the same dead card, presented in one court as compliance and in this one as an access the Debtor enjoyed until she withdrew it. 18 U.S.C. § 152(3). Inspira's card-issuance and card-cancellation records, which fix each date, are Part XXXII of the Rule 2004 target schedule before the Court on October 8, 2026.

15. **What the June 26 act did to the Debtor.** His coverage ended June 30, 2026. The Plan Administrator informed him on July 9, 2026 (Response Exhibit R-9). Because every notice issued after June 26 carried the same false "divorce" qualifying event first submitted on October 31, 2025 — an event the Plan's counsel had already admitted was "implemented in error" — he received no valid election notice for months, paid for his care out of pocket at full cost, and is now told that retroactive premiums must be paid before any claim is processed. His COBRA election period expires October 5, 2026. He has been without his medications for more than a month; the last such interruption was followed by repeated hospitalizations for congestive heart failure. The December 17, 2025 order was a twenty-four-hour order because the Debtor was in pain with a torn rotator cuff and a ruptured bicep, surgery was scheduled, and his 2025 deductible and out-of-pocket maximum were met; Movant did not comply, the year turned, the accumulators reset, and the surgery was lost a second time; when he met the 2026 accumulators, she cut the coverage again on June 26. The supplemental life insurance of which he was beneficiary, the dependent accidental death and dismemberment coverage, the dependent critical-illness coverage, and the dependent flexible spending account terminated on October 31, 2025 were never restored and have no continuation path; Accenture has never provided him the plan records to which 29 U.S.C. § 1024(b)(4) entitles him; and the United States Department of Labor, Employee Benefits Security Administration, has opened File No. 202630-18882, has demanded the qualifying-event records from Accenture, and has advised the Debtor they are forthcoming. Statement of Inability to Afford Costs at 6; Response Exhibits R-9, R-15, R-16.

16. **Awarded a vehicle Movant no longer owned, and concealed the one she had bought after the petition.** Item W-5 awarded Movant "[t]he BMW automobile . . . subject to the indebtedness thereon," and the State Court pronounced "the BMW titled in wife's name and the debt associated with the BMW" to her. Tr. 41:12–13. Movant testified: "Do you have a car? — Yes. Is it owned or leased? — It's owned. What kind of car? — A BMW," and listed "BMW Finance is 60,000" among her debts. Tr. 32:18–23, 34:2. She has now sworn to this Court that on February 28, 2026 — forty-seven days after the January 12, 2026 petition in this case — she traded the2023 BMW in to a dealer, had the dealer pay the InTouch loan, "then $54,500," and financed a replacement vehicle in her name alone under a contract dated February 28, 2026. ECF 110, Ulijasz Decl. ¶ 11 & Ex. 7-B. The Decree awarded a car that had been disposed of post-petition, on testimony that did not disclose the disposition or the replacement. The disposition was an act to exercise control over property the Decree itself called community, 11 U.S.C. § 362(a)(3), and a post-petition transfer, 11 U.S.C. § 549.

17. **Converted the April 16, 2026 taking of the Debtor's property into title.** On April 16, 2026, minutes after the Debtor left the residence to file ECF 51 and 55 in this Court, the fifteen-camera security system at 5609 La Foy was disabled and two individuals entered. Movant — who lives five hours away in San Antonio — arrived within minutes with a 26-foot

All My Sons truck booked on the card of Merritt McClayton Rahilly with the instruction that Movant's name not be associated with the job; she is recorded on the Debtor's camera system during the removal saying she needed to get more of the evidence. This Court reinstated the stay at 6:36 p.m. and ordered that "no other party shall remove any of the possessions from the premises." **Exhibit 6** at 3. The Dallas County constable testified in the State Court on September 3, 2026 that when this Court's order was relayed the movers stopped but Movant continued to take items and left with them, and that the identification she presented bore the Debtor's surname and the residence address — a surname she has not used since December 2024 and an address that, because both parties are enrolled in the Texas Address Confidentiality Program, has never appeared on either party's identification. Movant swears she went to the premises that day with "[t]wo movers from All My Sons Moving, booked for me by a friend and paid for by me," and that her movers "loaded onto their truck the items I identified as mine." ECF 110, Ulijasz Decl. ¶ 12. Her Exhibit 2-B is the landlord's email to her the day before: "Do not notify him or give any advanced indication . . . . Do not arrive at the property until at least 10 a.m." She was not there for her belongings. The State Court's January 7, 2025 temporary orders gave the Debtor exclusive possession of the residence and enjoined her entry and any removal of property; she had already been given three separate access periods totaling approximately sixteen hours, with helpers, to retrieve her things; she had asked the State Court for further access and been refused; and her own settlement with the landlord (¶ 5) barred her from the premises until the landlord had recovered possession. State Court filings of July 29, 2026 at 16 and June 24, 2026; Exhibit 2 ¶¶ 21–23. What left the house was the Debtor's clothing, identification and passport, medication and auto-injectors from the one refrigerator drawer only she knew, computers, printers, the drives holding every financial record and evidence repository he had, his trial binders, tools of trade, family photographs, and heirlooms. ECF 51; Response Exhibit R-15 ¶ 5.

18. **The May 22, 2026 writ finished it.** At the second writ Movant's counsel was present at the residence, and the agents she retained inventoried only what the Debtor removed while everything else he owned was loaded into a 26-foot truck and none of it was inventoried. What was not taken was destroyed; the photographs are in the State Court record. Location-tracking records place the Debtor's property at Movant's San Antonio residence; the San Antonio Police Department's report of May 29, 2026 (SAPD26108224) records it being sorted and discarded there; dash-camera footage shows it loaded from her garage and driven away; it was then dispersed across the state. Movant filed police reports concerning the Debtor's own property. The constables' body-worn-camera recordings of both writs have been purchased and are forthcoming. Exhibit 2 ¶¶ 22–23, 32–33; Response Exhibit R-15. Ten weeks after April 16, the Decree awarded Movant "[a]ll clothing, jewelry, electronics, household furnishings, and other personal effects in Wife's possession or control" (W-6), awarded the Debtor only what remained "in Husband's name, possession, or control" (H-4), and the State Court pronounced: "to the extent there is any personal property in possession of wife, that's awarded to her." Tr. 46:1–3. A possession-based award entered ten weeks after a post-petition taking of estate property, in violation of this Court's order, gave state-law title to the taking. 11 U.S.C. § 362(a)(3); ECF 57. Nothing has been returned.

19. **Ignored a pre-petition asset of the estate.** The December 17, 2025 order gave the Debtor an enforceable right against Movant: reinstatement within twenty-four hours or deposit of $20,643.56 under its Sections I.B and III. That right existed on January 12, 2026 and is property of the estate under 11 U.S.C. § 541(a)(1). It has never been performed or paid. The Decree

preserved nothing of that order, supplied the "divorce" event Movant used to terminate the Debtor's coverage, and — through § 8.G's indemnity and § 12's discharge of the duty to preserve — displaced it. 11 U.S.C. § 362(a)(3).

20. **Fixed the boundary of the estate on a contested date.** Section 5 found the parties married on June 22, 2024 and rejected an informal marriage before that date. That finding determines what is separate and what is community — what is property of this estate and what is not — and it is the determination that § 362(b)(2)(A)(iv) withholds from the state court while the stay is in effect. It was made in the Debtor's absence on a record that contains the opposite: a joint Chase account opened in 2023; joint Ameriprise investment accounts opened in October 2023 on which the parties identified themselves as spouses and the Debtor was named beneficiary; reciprocal medical and general durable powers of attorney; the parties' joint enrollment in the Texas Address Confidentiality Program as a single protected household; a Declaration of Domestic Partnership executed in early 2024; a $50,000 joint investment made in October 2023 as a symbol of the marriage; the sworn testimony of the wedding officiant that the parties agreed to be, held themselves out as, and were regarded as married; and Movant's own sworn inventory stating a marriage date different from the one the Decree recites. Exhibit 2 ¶¶ 11–13. Section 5 is the subject of the Debtor's pending September 24 motion.

21. **Rested the division on testimony Movant's own admitted exhibits contradict, and on a compensation package concealed from the court that divided it.** Movant testified her income was "$390,000 a year" exclusive of bonuses and "I never have gotten a bonus." Tr. 16:6–13. Her own admitted exhibit PX-29 shows gross pay of $610,186.15 through December 15, 2025, Executive Variable Pay of $45,242.00, RSU income of $24,944.15, and the $150,000 signing-bonus installment paid November 21, 2025; her admitted exhibit PX-9 (GU000164–167), her Accenture offer, shows a $300,000 signing bonus, three restricted-stock programs, and a Voluntary Equity Investment Program under which up to 30% of cash compensation is purchased through payroll and matched with a 50% grant of shares. She testified the VEIP held "about $40,000" and the RSUs were unvested; her admitted exhibit PX-30 shows $60,359.21 in the VEIP at December 31, 2025 and vested RSU shares delivered in November 2025. The same sworn inventory carried the Accenture restricted stock — the shares she concedes she holds — at a net value of $0.00, and no equity-account statement supporting that value has been produced since February 2025. In her sworn State Court inventory she carried the VEIP payroll contributions — the samePX-29 paystub shows "Extra Withholding: $0.00" beside a separate VEIP line — as "extra tax withholding," converting an accumulating asset into a claimed liability; the misclassification is document-supported and its effect on the estate's value awaits the source records. The Debtor's demonstrative, built from PX-9, places her total target compensation at approximately $1.5 million per year; the group life-insurance coverage she carries at one times total target compensation is consistent with it (Response Exhibit R-16). She testified "No, no lapse in coverage" as to the Debtor's health insurance, Tr. 20:6–12; his coverage had been terminated on October 31, 2025 and was not restored until 2026 (Response Exhibits R-7, R-9, R-16). The estate this Decree divided was described to the State Court by the party who held every record, and it was described falsely.

22. **Divided what was left after the estate had been emptied — and now asks that no one look.** Before the divorce was filed, hundreds of thousands of dollars were moved out of the marital estate into accounts the Debtor could not identify, while he was told there was a cash shortage (ECF 51 ¶ 12). That money is still unaccounted for. Movant's Declaration to this Court

supplies the dates of what followed: $85,522 paid out January 2, 2026, ten days before the petition; $17,163.30 paid out January 23, 2026, eleven days after it; the $54,500 vehicle payoff February 28, 2026; a SoFi loan paid off in August 2026. ECF 110, Ulijasz Decl. ¶¶ 11, 14. A $62,549.84 wire went to her family members, the Woodmans, as "Loan Repayment" on January 7, 2026, five days before the petition, on loans for which no funding record has ever been produced. The Trustee's Form 1 carries the estate's interest in all of it as "Unknown." ECF 91, Asset 21. And Movant's own words describe the wall she asks this Court to build around it: any subpoena should be limited "to records of the specific interests identified on the Trustee's Form 1, identified account by account" — a report that identifies none of her accounts — and cut off at January 12, 2026 (ECF 111 ¶ 43(c)(ii)–(iii)); "[t]he overdraft establishes that the funds then held in the account were depleted; it does not by itself exclude earlier withdrawals having been placed in another asset or later redeposited"; "[n]o one has identified an asset into which any earlier funds can be traced" (ECF 110 ¶ 13); "I do not recall the source of a $500 deposit" (Ulijasz Decl. ¶ 10). Movant also cancelled the Debtor's auto insurance, which his employment required, and delayed the agreed release of $6,500 to reinstate it until his employer could no longer keep him (Statement of Inability at 6; State Court filing of June 24, 2026 at 10). The Debtor's unemployment, his debt, and this case were manufactured by the party who now asks to keep the records closed.

## V. THE DEBTOR TOLD THIS COURT BEFORE IT HAPPENED

23. On April 16, 2026, at 3:08 p.m. and 3:24 p.m., the Debtor filed his Verified Declaration [ECF 51] and Emergency Motion [ECF 55] and appeared at the emergency hearing that afternoon. He told the Court, under penalty of perjury, that hundreds of thousands of dollars had been moved out of the marital estate before the divorce was filed; that Movant had signed a concealed settlement with the landlord that released her, surrendered his security deposit, and structured her access to the residence for after his displacement; that his healthcare had been obstructed since December 2024 and the December 17, 2025 order answered with a card already cancelled; and that if the writ was executed there was "a real risk of coordinated clean-out" of estate property. ECF 51 ¶¶ 10–12, 37–52, 56, 62–71; ECF 55 § IV. The Court reinstated the stay at 6:36 p.m. The clean-out the Debtor described was in progress while he was describing it.

24. Every act in Part IV was taken after that hearing, after that order, and with the knowledge sworn to in Exhibit 4 and written in Exhibit 7. Under Rojas v. Gomez (In re Rojas), Adv. No. 23-03026-MVL (Bankr. N.D. Tex. June 5, 2024), which Movant herself cites, a party who learns her acts violated the stay has an affirmative duty to restore the status quo. ECF 110 ¶ 18(a). Nothing has been restored: not the property, not the health savings account, not the coverage, not the $20,643.56, not the records. Movant asks instead that the acts be validated retroactively.

25. The Debtor has litigated this matter without counsel, in three district courts (the 254th, the 302nd, and the 301st), in three justice-court eviction proceedings and a county-court eviction appeal, in this case and in the adversary proceeding, and before the Department of Labor, while homeless, without transportation, without his records, and without his medications for extended periods, and while hospitalized repeatedly. He has filed more than one hundred fifty papers in the State Court seeking source records, enforcement of the healthcare order, and access to the marital estate. The State Court has now said it could not divide the estate. This Court is the forum that can protect it.

## VI. THE PENDING STATE-COURT MOTIONS AND THE PROTECTIVE NOTICE OF APPEAL

26. On September 24, 2026, at 11:53 p.m., the Debtor submitted for filing in the State Court (Envelope No. 120375563) his Motion to Vacate the Remaining Provisions of the Void Decree (Sections 1–7 and 10), for Sanctions, and for a Signed Written Ruling, with a proposed order, served electronically on Movant and her counsel. **Exhibit 2**. It asks the State Court to vacate Sections 1 through 7 and 10 — including Section 5 — to try the characterization and division of the entire marital estate as a whole, and to rule by signed written order. It is pending.

27. On September 28, 2026, the Debtor submitted a Protective Notice of Appeal and a Supplemental Notice Regarding the Interlocutory Posture (Envelope Nos. 120440476 and 120440539). **Exhibit 3**. The Notice of Appeal is filed "solely to preserve appellate rights"; it states that the Debtor "does not concede that a final appealable judgment currently exists," that he "does not seek reversal of the September 18 ruling insofar as it vacated Sections 8, 9, and 11 through 15," and that if it precedes a final judgment it is to be treated as premature under Texas Rule of Appellate Procedure 27.1(a). The Supplemental Notice withdraws only the statement that the State Court's authority expires October 9, 2026, and asks that Section 5 be declared nonfinal and without preclusive effect. Neither filing treats the Decree as final.

28. On September 29, 2026, at 12:53 p.m., Movant filed in the State Court her Motion to Clarify and Modify the Memorandum Ruling of September 18, 2026 (Envelope No. 120527042). **Exhibit 8**. Its certificate of service is dated September 25, 2026, four days before it was submitted. The "Affidavit of Gwendolyn Laura Ulijasz filed with this motion" to which it attaches the plan correspondence (¶ 5) was not filed or served with it. The motion asks the State Court to: (a) reinstate Section 14 of the Decree — the default denial, for "having failed to appear," of every claim in the Debtor's counterpetitions and "any other pleading or request for affirmative relief filed by Respondent" — as to everything except the division (¶ 16; proposed order ¶ 3), which would dispose without trial of the Debtor's informal-marriage claim under Tex. Fam. Code § 2.401, his enforcement of the December 17, 2025 order, his sanctions motions, and his fee claim under Tex. Fam. Code § 6.708; (b) reinstate Sections 9 and 13 (¶ 22); (c) confirm that Section 5 — the finding that the community estate commenced June 22, 2024 and that no informal marriage preceded it — is not reopened (¶ 28), while conceding that her separate-property items S-1 through S-5 were "valued as of the date of marriage" (¶ 35), so that the characterization line is fixed before characterization is retried; (d) enter a preservation order "directed to both parties" for materials "within that party's possession, custody, or control," expressly for use on ECF 110 and in Adversary No. 26-03034-mvl (proposed order ¶ 5) — an order under which Movant would hold the Debtor's drives, computers, and records taken on April 16 and May 22, 2026 as their court-designated custodian, with no turnover under 11 U.S.C. § 542 and no prohibition on access, imaging, or use; (e) state "the ground" on which the new trial rests (¶ 31); (f) set a status conference and require a report on ECF 110 within seven days of its decision (¶ 37); and (g) set expedited briefing on "the present legal effect" of the dissolution and name change, "including the operative date" (¶ 30; prayer (i)).

29. Movant states why (g) is "immediate and concrete": her group health plan "has advised her that it reads the Ruling as leaving the parties married, that it will reinstate Respondent as her dependent retroactive to July 1, 2026, and that it will recover the premiums for that coverage from her wages." Exhibit 8 ¶ 5. The plan is restoring the coverage Movant

terminated on June 26, 2026 "in reliance on the Decree" (ECF 110, Ulijasz Decl. ¶ 13) and that the Plan Administrator cut off retroactively to June 30, 2026 on July 9, 2026 (Part IV ¶ 14). Movant asks the State Court to fix an "operative date" for the dissolution so that the plan can terminate it again. That is the October 31, 2025 "divorce" qualifying event — the one already admitted to have been "implemented in error" — sought a second time, by court order, against a Chapter 7 debtor whose coverage, health savings account, and rights under the December 17, 2025 order are property of this estate. 11 U.S.C. §§ 362(a)(3), 541(a)(1). Movant's motion says it "does not seek . . . an adjudication of the health plan's eligibility rules" (¶ 30); it seeks the one ruling on which the plan would act.

30. The same motion abandons the premise of ECF 110. ECF 110 asks that the Decree be "given effect as of the date it was signed" and pleads as its urgency the expiration of the State Court's plenary power on October 9, 2026 (ECF 110 ¶¶ 1, 21; Ulijasz Decl. ¶ 16). Movant now tells the State Court that "[w]hat the Ruling did . . . was eliminate the final judgment," that "there is no provision limiting its plenary power if such motions are granted," and that "if no judgment is signed, no plenary-power clock is ticking." Exhibit 8 ¶¶ 10–11 (quoting In re Baylor Med. Ctr. at Garland, 280 S.W.3d 227, 230 (Tex. 2008)). She tells the State Court that "the marital estate remains undivided" (¶ 36) — that is, that the community property of this estate, 11 U.S.C. § 541(a)(2), stands undivided and under the Trustee's control, which is the position the Debtor has taken since February 18, 2026. And she tells the State Court that her bankruptcy motion asks this Court to determine that property divided by the Decree "was not property of the bankruptcy estate" (¶ 8) — relief that Fed. R. Bankr. P. 7001(2) reserves to an adversary proceeding — and that a ruling here "would [not] of itself restore any vacated provision"; "[s]he would ask [the State Court] for whatever further order that ruling warranted" (¶ 32). There is no act taken in reliance on the Decree to validate. There is a division of estate property that the State Court has vacated, and a plan to restore it by order rather than by trial.

## VII. WHAT THIS MEANS FOR ECF 110, ECF 111, AND THE OCTOBER 6 AND 8 HEARINGS

31. ECF 110 asks the Court to annul the stay "so that the Decree is given effect as of the date it was signed" (¶ 2(a)) and to determine that the property "confirmed to Movant in Section 8.C . . . and . . . awarded to her in Section 8.A, items W-1 through W-6" was never property of the estate (¶ 2(b)); its urgency is the State Court's plenary power expiring October 9, 2026 (¶¶ 1, 21; Ulijasz Decl. ¶ 16). Sections 8.A and 8.C no longer exist. There is no division to give effect to, and Movant's own authority says a bankruptcy court validating "a judgment already set aside by a state court" is the outcome to be avoided. York v. State, 373 S.W.3d 32, 42 n.64 (Tex. 2012) (quoted at ECF 110 ¶ 21). What remains of ECF 110 is a request to declare title to the estate's largest asset without an adversary proceeding and without the Trustee, and a request to modify the stay so that the division can be retried now — on the record described in Part IV, before the estate's interest is determined, and while Movant objects to producing the records that would determine it. As of September 29, 2026, Movant's own State Court filing concedes that no final judgment exists, that no plenary-power clock is running, that the marital estate "remains undivided," and that annulment is sought so that she may return to the State Court for a "further order" (Exhibit 8 ¶¶ 10–11, 32, 36). The Debtor's Response, filed with this Notice, addresses each request.

32. ECF 111 asks that the Rule 2004 Motion be deferred until ECF 110 is decided and that any records produced not be used "in Cause No. DF-24-18010" (¶ 43(b), (c)(vi)). The State Court has now set the characterization and division of this property for retrial after this case is resolved. The records of this estate are the record on which that retrial will be conducted. The Debtor's Reply, filed with this Notice, addresses the Objection.

33. The acts described in Part IV are the subject of the Debtor's Response to ECF 110 and of his motion under 11 U.S.C. § 362(k), which seeks findings on each act, actual damages, turnover under § 542, and the report contemplated by 18 U.S.C. § 3057(a). The Debtor files this Notice so that the Court has the State Court's ruling, the reason for it, and the record of what was done to this estate during the stay before it in connection with ECF 97, 98, 110, 111, and 116. Nothing in this Notice waives any position stated in the Debtor's other filings in this case.

Dated: September 30, 2026

Respectfully submitted,

/s/ Jason Emory McKemie
**JASON EMORY McKEMIE**
Debtor, Pro Se
539 W. Commerce St., #2010
Dallas, Texas 75208
(214) 519-8958
jmckemie@mckemie.net

## CERTIFICATE OF SERVICE

I certify that on September 30, 2026, I sent the foregoing Notice, with Exhibits 1 through 11, by overnight delivery to the Clerk of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, 1100 Commerce Street, Room 1254, Dallas, Texas 75242, for filing, and that on the same date I served a true and correct copy, with exhibits, by email and by first-class United States mail on:

**Richard G. Dafoe**, Waddell Serafino Geary Rechner Jenevein, P.C., 1717 Main Street, Suite 2500, Dallas, Texas 75201, rdafoe@wslawpc.com, and **Jonathan D. Steele**, Beermann LLP, 161 N. Clark Street, Suite 3000, Chicago, Illinois 60601, jsteele@beermannlaw.com, counsel for Gwendolyn Laura Ulijasz [ECF 110, 111];

**Areya Holder Aurzada**, Chapter 7 Trustee, Law Office of Areya Holder, P.C., P.O. Box 2105, Addison, Texas 75001-2105, areya@holderlawpc.com;

**Office of the United States Trustee**, 1100 Commerce Street, Room 976, Dallas, Texas 75202, ustpregion06.da.ecf@usdoj.gov; and

**Loriann A. Martinez**, Quilling, Selander, Lownds, Winslett & Moser, P.C., counsel for InTouch Credit Union, lmartinez@qslwm.com.

Upon docketing, registered CM/ECF participants will also receive electronic notice through the Court's CM/ECF system. As a courtesy, a copy was also transmitted by email to Gwendolyn Laura Ulijasz (gulijasz@gmail.com); to Sara A. Boucher and Rosa Gutierrez, Beermann LLP; to Rebecca L. Armstrong, Lauren N. Shaw, and Terra Aguirre, Armstrong Divorce & Family Law,

PLLC; and to the Courtroom Deputy to the Honorable Michelle V. Larson (mvl_settings@txnb.uscourts.gov).

/s/ Jason Emory McKemie
Jason Emory McKemie, Debtor, Pro Se

**INDEX OF EXHIBITS**

**Exhibit 1** Memorandum Ruling signed September 18, 2026, Hon. Ashley Wysocki, 301st Judicial District Court, Dallas County, Texas, Cause No. DF-24-18010 (1 page).

**Exhibit 2** Debtor's Motion to Vacate the Remaining Provisions of the Void Decree (Sections 1–7 and 10), for Sanctions, and for a Signed Written Ruling, with proposed order, as submitted to the State Court September 24, 2026 (Envelope No. 120375563), with the electronic filing manager's notifications of service (18 pages).

**Exhibit 3** Respondent's Protective Notice of Appeal Without Concession of Finality (2 pages) and Respondent's Supplemental Notice Regarding the Interlocutory Posture, Appellate Timetable, and September 24, 2026 Motion (2 pages), as submitted September 28, 2026 (Envelope Nos. 120440476 and 120440539).

**Exhibit 4** Affidavit of Jonathan Steele, filed in Cause No. DF-24-18010 on May 29, 2026 (Envelope 115516576) (4 pages).

**Exhibit 5** Reporter's Record, Trial Before the Court, June 11, 2026, Cause No. DF-24-18010, 301st Judicial District Court (Shantel Beheler, CSR 3031) (47 pages).

**Exhibit 6** Order Reinstating the Automatic Stay as to 5609 La Foy Blvd., Dallas, TX 75209, signed April 16, 2026 [ECF 57] (3 pages).

**Exhibit 7** Petitioner's Response to Respondent's Motion for Enforcement, Sanctions, Continuance, and Leave to Issue Third-Party Subpoenas, and Counter-Motion for Protective Order, filed in Cause No. DF-24-18010 on May 29, 2026 (Envelope 115516576), pages 1, 8, 12, and 17, with the certificate of eService (5 pages).

**Exhibit 8** Petitioner's Motion to Clarify and Modify the Memorandum Ruling of September 18, 2026, with proposed order, filed in Cause No. DF-24-18010 on September 29, 2026, 12:53 p.m. (Envelope No. 120527042) (17 pages).

**Exhibit 9** Transcript of recorded call with Inspira Financial (administrator of the Accenture health savings account), January 8, 2026, with Movant bridged onto the call; speaker labels corrected by the Debtor from the audio, the auto-transcription's speaker assignments having been defective (15 pages; Movant's telephone numbers, mailing address, and Social Security digits redacted).

**Exhibit 10** Petitioner's Notice of Compliance with Court Order, filed January 13, 2026 in Cause No. DF-24-18010 (Envelope No. 110019516) (20 pages).

**Exhibit 11** Photograph of the Inspira Financial mailer Movant handed the Debtor in open court on January 6, 2026, addressed to Movant and marked 'Number of Cards: 1'

and 'Card Number Ending In: 5379' (1 page; Movant's street address and mail-routing barcodes redacted).