# EXHIBIT 1

Memorandum Ruling signed September 18, 2026
Hon. Ashley Wysocki, 301st Judicial District Court, Dallas County, Texas
Cause No. DF-24-18010 (1 page)

**301ST JUDICIAL DISTRICT COURT**
**JUDGE ASHLEY WYSOCKI**
GEORGE L. ALLEN, SR. COURTS BUILDING
600 COMMERCE STREET
DALLAS, TEXAS 75202

**MEMORANDUM RULING**

RENDERED ON September 18, 2026

DF-24-18010
GWENDOLYN ULIJASZ MCKEMIE
vs.
JASON MCKEMIE

HEARING DATE: 09/03/2026

- THE COURT MAKES THE FOLLOWING RULING:

Respondent's Motion for New Trial is GRANTED in part and DENIED in part.

The Court grants the motion for new trial as to division and characterization of material property only.

IT IS ORDERED that Sections 8, 9, 11-15 of the Decree of Divorce signed on June 26, 2026, are VACATED.

IT IS ORDERED that Sections 1 through 7 and 10 of the Decree of Divorce signed on June 26, 2026, remain in full force and effect but are interlocutory. The remaining issues shall be set for trial once the stay has been lifted or Respondent's bankruptcy case is otherwise disposed.

All other relief requested is DENIED.

Signed September 18, 2026.

Hon. Ashley Wysocki, Presiding

# EXHIBIT 2

Debtor's Motion to Vacate the Remaining Provisions of the Void Decree
(Sections 1-7 and 10), for Sanctions, and for a Signed Written Ruling, with Proposed Order,
as submitted to the State Court September 24, 2026 (Envelope No. 120375563),
with the electronic filing manager's notifications of service (18 pages)

CAUSE NO. **DF-24-18010**

| | | |
|---|---|---|
| IN THE MATTER OF THE MARRIAGE OF | § | IN THE DISTRICT COURT |
| | § | |
| GWENDOLYN ULIJASZ-McKEMIE | § | 301ST JUDICIAL DISTRICT |
| AND | § | |
| JASON EMORY McKEMIE | § | DALLAS COUNTY, TEXAS |

# MOTION TO VACATE THE REMAINING PROVISIONS OF THE VOID DECREE (SECTIONS 1–7 AND 10), FOR SANCTIONS, AND FOR A SIGNED WRITTEN RULING

TO THE HONORABLE JUDGE OF SAID COURT:

Respondent, **Jason Emory McKemie,** files this Motion and shows the following.

## I. RELIEF REQUESTED

1. On September 18, 2026, the Court granted a new trial in part, vacated Sections 8, 9, and 11 through 15 of the Final Decree of Divorce signed June 26, 2026, and left Sections 1 through 7 and 10 "in full force and effect but interlocutory," to be tried once the bankruptcy stay is lifted or the Chapter 7 case is otherwise disposed. Exhibit B (September 18, 2026 Memorandum Ruling).

2. This Motion asks the Court to vacate Sections 1 through 7 and 10 as well. Those provisions were entered at the same June 11, 2026 proceeding, in the same judgment, that the Court has already determined it had no authority to conduct while the automatic stay was in effect. Section 5 — the marriage-date and characterization finding — cannot stand while the Court retries the characterization of the marital estate, because Section 5 fixes the very date that controls characterization.

3. Respondent asks the Court to rule now, on the papers, and to sign the proposed order tendered with this Motion. Respondent asks that the order state GRANTED or DENIED as to each numbered item of relief in the prayer, and, for any item denied, the specific legal basis for the denial. Respondent further requests a hearing and, if the Court sets one, the earliest available setting within the Court's plenary power, which expires October 9, 2026; that Respondent be permitted to appear remotely by telephone or video given his documented medical condition and his distance from the courthouse; and that neither remote appearance nor any medically-caused non-appearance be treated as waiver, abandonment, or consent. Whether the Court rules on the papers or after a hearing, Respondent requests a signed written order on or before October 9, 2026.

## II. THE COURT HAS ALREADY FOUND THIS DECREE VOID

4. At the September 3, 2026 hearing, on the record, every party agreed, and the Court confirmed, that a Chapter 7 bankruptcy was pending, that the 11 U.S.C. § 362 automatic stay was in effect, and that no party had sought or obtained relief from the stay for the divorce to proceed on any matter. Exhibit C (reporter's record, September 3, 2026 hearing, when produced); Exhibit D (Respondent's Notice of Bankruptcy Automatic Stay, filed February 18, 2026).

5. On that record, the Court found that a divorce is abated when a bankruptcy is pending unless the stay is lifted; that an order entered in violation of the stay is void, not merely voidable; that the trial court has no authority to divide the marital estate until the stay is lifted; and that this Decree divided the marital estate.

The Court further stated that it would not do what the law forbids, even if Petitioner's counsel preferred a narrower or more convenient course. The Court identified the controlling authority from the bench — York v. State, Adeleye v. Driscal, and Eguia v. Eguia — and stated that those authorities all hold the same thing. The Court acted on that finding on September 18, 2026 when it vacated Sections 8, 9, and 11 through 15. Exhibit B; Exhibit C.

6. This was not a simple oversight of the fact that Respondent was in Chapter 7 bankruptcy, nor was there any genuine confusion about the Court's authority to divide assets during an active stay. Whether the automatic stay was in place was never in dispute among the parties. It is established by Petitioner's counsel's own declarations and by Petitioner's many filings. What became apparent on September 3, 2026 is that this Court was the only participant who had not been made aware of it. For that reason, Respondent has diligently sought the record of the June 11, 2026 proceeding he has never seen. More than three and one-half months after that proceeding (June 11 through September 25), Respondent has still not seen the testimony taken that day, a transcript, a list of the exhibits, or a copy of the exhibits the Court relied on in entering the Decree. Respondent has requested that record through, among other filings and communications:

   a. Respondent's Emergency Verified Motion to Preserve and Produce the Complete June 11 Trial Record and Priority Transcripts (June 21–22, 2026);

   b. Respondent's Verified Motion for New Trial and Motion to Vacate Final Decree (July 27, 2026), which required the June 11 reporter's record, exhibit list, admitted and rejected exhibits, objections, oral findings, and rulings;

   c. Respondent's Verified Renewed Motion for the Existing Evidentiary Record;

   d. Respondent's Complete Reporter's Record and Specific Clerk's Record Designation under Texas Rule of Appellate Procedure 34.6, designating every exhibit offered, marked, admitted, excluded, or tendered, including the "refreshed May 31, 2025 statements";

   e. Respondent's companion Proposed Order on the Existing Evidentiary Record and Rule 21d; and

   f. Respondent's August 25–26, 2026 written request to the official court reporter for expedited preparation of the complete June 11 reporter's record, audio, exhibit list, and copies of all exhibits.

On September 25, 2026, Respondent again emailed the official court reporter, copying the Court Coordinator, requesting that record, enclosing his Statement of Inability to Afford Payment of Court Costs, and stating that he will make himself available at the earliest available date for any indigence hearing required for the record's preparation. Preparation has been conditioned on a $360 charge and a possible indigence determination; Respondent asks the Court to decide any inability-to-pay issue by written order under Texas Rule of Civil Procedure 145. Exhibit M (record requests and September 25, 2026 email).

7. The June 11 proceeding and the resulting Decree did not simply divide assets in violation of the stay; the proceeding went much further, and violated the stay in several distinct ways:

   a. First, the Decree divided property of the bankruptcy estate. 11 U.S.C. § 362(a)(3). That alone renders the property division void.

   b. Second, the Decree ordered Respondent — a Chapter 7 debtor — to pay one-half of the SoFi loan ($10,000), the Chase credit-card account ($50,000), and the Citibank account ($15,000) as those debts are recited in Section 8.F — $37,500 of the $75,000 total — within 30 days. Ordering a debtor to pay a pre-petition claim is a separate act to collect and to continue a proceeding against the debtor. 11 U.S.C. § 362(a)(1), (a)(6). Respondent never had access to those accounts, and no source records for them have been produced.

c. Third, the Decree imposed indemnification and reimbursement obligations, with attorney's fees and post-judgment interest, on the debtor. Creating new enforceable money obligations against the debtor during the stay is a further separate violation. 11 U.S.C. § 362(a)(1), (a)(6).

d. Fourth, and relatedly, Section 5 fixes the date that determines what property belongs to the estate. A finding that fixes the boundary of the estate adjudicates, indirectly, the very estate-property question the stay withdrew from the Court's power; at a minimum it decides a contested characterization fact the Court has now reserved for retrial.

8. By leaving Section 5 in force and setting this case for retrial on the contested June 22, 2024 marriage date, the Court is now doing the very thing it said on September 3 it would not do. The date in Section 5 controls what is separate and what is community. Adjudicating that date during the stay, and then retrying "characterization of material property" against it, is the division of the estate by another name. The provisions the Court left standing rest on the same proceeding and the same defect.

9. Petitioner and her counsel knew of the bankruptcy throughout, and their own conduct confirms it. Petitioner sought no relief authorizing the division before the June 11 trial, during the trial, before entry of the June 26 Decree, or for months afterward. That changed only on September 11, 2026, when Petitioner filed her brief on the bankruptcy stay in this Court and, the same morning, moved the Bankruptcy Court to annul the stay after the fact — the final day to object to Respondent's Rule 2004 motion for third-party financial-records subpoenas (Bankruptcy Case No. 26-30161-MVL-7, ECF Nos. 97–98). Exhibit N (Petitioner's Brief on the Effect of the Bankruptcy Stay, September 11, 2026). Petitioner sought retroactive annulment to validate a division already entered, on the same day she asked this Court to treat the Decree as final — moving in one forum to close the division and in the other to retroactively cure the violation it rests upon. A party actively litigating the bankruptcy cannot claim confusion about the stay, and a post-hoc annulment request does not restore a power the Court did not have on June 26. Respondent's Supplemental Brief on the Bankruptcy Automatic Stay, filed September 14, 2026, addressed these points; the Court's partial ruling followed on September 18. Exhibit A (Respondent's September 14, 2026 supplemental brief).

10. The law the Court identified is controlling. A state court has no power to render a judgment in violation of the automatic stay; such a judgment is void. York v. State, 373 S.W.3d 32, 42 (Tex. 2012). A divorce decree that divides the marital estate in violation of the stay is void, and the state court has no power to render it; the defect may be raised at any time, even sua sponte on appeal. Adeleye v. Driscal, 544 S.W.3d 467, 473–74, 485–86 (Tex. App.—Houston [14th Dist.] 2018, no pet.). A default divorce decree that divides marital property while a stay is in effect is void as shown on the face of the record. Eguia v. Eguia, 367 S.W.3d 455 (Tex. App.—Corpus Christi–Edinburg 2012, no pet.). An act taken in violation of the stay is void, not merely voidable. Cont'l Casing Corp. v. Samedan Oil Corp., 751 S.W.2d 499, 501 (Tex. 1988) (per curiam); Evans v. Unit 82 Joint Venture, 377 S.W.3d 694 (Tex. 2012) (per curiam); Howell v. Thompson, 839 S.W.2d 92 (Tex. 1992) (per curiam); Kalb v. Feuerstein, 308 U.S. 433 (1940). 11 U.S.C. § 362(a)(1), (a)(3), (a)(6).

## III. THE VOIDNESS REACHES THE MARRIAGE-DATE AND CHARACTERIZATION FINDING (SECTION 5)

11. The Court granted a new trial "as to division and characterization of material property." Exhibit B. Section 5 is the master characterization finding. It finds that the parties were married on June 22, 2024; that no informal (common-law) marriage existed before that date; and that the community estate commenced June 22, 2024. Exhibit E (Decree § 5). Every asset's character — separate or community — is measured against that date.

12. The characterization the Court has sent to retrial rests on that date. The vacated Section 8.C confirmed Petitioner's separate property "traced to pre-marital sources" — the AIG 401(k) valued at $121,271.77, the Ameriprise accounts stated at a combined $449,000.53, and the Advantigen Biosciences LLC units — and "pre-marital" is defined solely by the June 22, 2024 date in Section 5. Exhibit E (Decree § 8.C). Under Texas Family Code § 3.003, all property possessed by either spouse during the marriage is presumed to be community property, and the marriage date is the line from which that presumption runs; fixing the wrong date in Section 5 therefore distorts the separate-versus-community determination across the entire estate before the retrial can make it. The Court cannot retry the characterization of the estate while Section 5 pre-decides the date that controls characterization. Section 5 must be vacated with Section 8.

13. Section 5 is independently defective. The marriage date is a contested, material fact that Petitioner's own filings state two different ways, and that the parties' conduct places earlier still. The Decree finds June 22, 2024. Petitioner's sworn Amended Inventory and Appraisement dated February 7, 2026 states July 26, 2024. And the record of the parties' cohabitation and holding-out supports an informal marriage arising in 2023 under Texas Family Code § 2.401(a)(2), which is established by an agreement to be married, living together in Texas as spouses after the agreement, and representing to others that they were married. That record includes the parties' agreement to be married; their cohabitation in Texas beginning in 2023; a joint Chase bank account opened in July 2023; joint Ameriprise investment accounts; Respondent's designation as a beneficiary of Petitioner's employer-provided insurance; reciprocal medical and general durable powers of attorney, each party holding one over the other; the parties' joint enrollment in the Texas Address Confidentiality Program as a single protected household; a Declaration of Domestic Partnership executed in February 2024; and the sworn testimony of the parties' wedding officiant that the parties agreed to be, held themselves out as, and were regarded by others as, a married couple. Petitioner cannot swear to one marriage date, obtain a Decree reciting another, and foreclose an earlier informal-marriage date, all while the very date that fixes what is separate and what is community is the question the Court has reserved for the retrial it has ordered. Section 5 forecloses that question and must be vacated with it.

## IV. THE VACATED ESTATE MUST BE RETRIED AS A WHOLE — NO PIECEMEAL SALVAGE

14. Once reversible error materially affects the "just and right" division of the community estate, the entire community estate must be redivided as a unit; the court cannot excise or salvage individual provisions. Jacobs v. Jacobs, 687 S.W.2d 731 (Tex. 1985); Tex. Fam. Code § 7.001.

15. The Court's own preamble to Section 8 tied every award into one plan — the short duration of the marriage, the disparity in earning capacity, the conduct of the parties, the debt-heavy and net-negative character of the estate, and the finding that Petitioner serviced community debt from her separate income. Exhibit E (Decree § 8). Having vacated Section 8, the Court cannot preserve any characterization or valuation premise that fed that plan, including Section 5. Characterization and division return to trial together.

16. A just-and-right division also cannot be made on the residue Petitioner chose to display. Petitioner's brief on the bankruptcy stay argues that the estate lost nothing and that Respondent has not identified any asset awarded to Petitioner that was property of the estate. Exhibit N. That argument is answered by the record Petitioner herself relies on: the Chapter 7 Trustee's Individual Estate Property Record and Report (Form 1) records a community interest in Petitioner's assets, values that interest "Unknown," and states it is "subject to divorce proceedings," and the Decree's own Section 8.G reserved "the rights of the Chapter 7 trustee." Estate property was therefore squarely at issue in the division. Petitioner's further

position — that any source-record review be confined to identified accounts and conducted account by account — would exclude the undisclosed accounts into which Respondent has maintained throughout this case that marital funds were moved, and would immunize the precise concealment at issue; a withdrawal changes the form or location of an asset without proving the asset ceased to exist, and depletion requires tracing rather than excusing it. The estate cannot be characterized or divided without the source records now being sought, and any required reconstitution belongs in the new trial under Texas Family Code § 7.009. Respondent further preserves, for that new trial and for separate proceedings, his claims that the community estate was subjected to fraud, concealment, and dissipation predating and continuing through the removal described below, and does not waive them by omitting their detail here.

## V. THE COURT PROCEEDED WITH NOTICE THAT RESPONDENT WAS IN MEDICAL AND LOGISTICAL COLLAPSE, AND THE DECREE WAS PROCURED BY FRAUD UPON THE COURT

17. Section 1 recites that the case proceeded by post-answer default because Respondent "failed to appear." Exhibit E (Decree § 1). Respondent did not abandon the trial. Before the June 11, 2026 trial began, and with the Court on notice, Respondent was in documented medical and logistical collapse and had requested the ability to appear remotely. Between 1:17 p.m. and 1:46 p.m. that day he filed an emergency motion to abate, continue, or appear by telephone or video. Exhibit F (June 11, 2026 emergency motion). Whatever the Court understood in the moment, Petitioner's counsel was on notice of Respondent's condition and of his request to appear. The Court has already vacated Section 14, which denied Respondent's affirmative relief on the same "failed to appear" recital. The recital in Section 1 is the predicate for the ruling the Court has struck and cannot remain in force after it. Craddock v. Sunshine Bus Lines, 133 S.W.2d 124 (Tex. 1939); Stoner v. Thompson, 578 S.W.2d 679 (Tex. 1979).

18. The Decree was procured by knowingly withholding from the Court the facts necessary to know it had no power to sign it. Counsel submitted the proposed Decree for entry — "APPROVED AND ENTRY REQUESTED, /s/ Jonathan D. Steele" — and moved the Court to sign it. Exhibit E (Decree, signature page); Exhibit G (Petitioner's motion to sign the Decree). The proposed Decree recited the pending bankruptcy on its face, and its Section 8.G expressly reserved "the rights of the Chapter 7 trustee in In re McKemie, N.D. Tex. No. 26-30161-MVL-7" — establishing that the drafter knew the bankruptcy was pending. It then divided estate property and entered debt obligations against the debtor — on accounts Respondent never had access to, that were not shown to have been spent for the benefit of both parties, for which no statements or invoices have ever been produced, and in amounts unsupported by the financial records produced in these proceedings — and added indemnity, without disclosing that no relief from the stay had been granted. A party who presents a court a judgment it has no power to enter, while withholding the fact that the stay bars it, commits fraud upon the court, and the court's inherent power reaches the entire judgment so procured.

19. The provisions the Court left standing — Sections 1, 5, 6, and 10 — are part of that same judgment, procured at the same proceeding, in the same instrument. They cannot be salvaged from the procurement that produced them.

## VI. WHAT THE COURT WAS NOT TOLD, AND THE POSSESSION AWARD THAT RATIFIED THEFT; AND REWARDED FINANCIAL DEPRIVATION AND HEALTHCARE OBSTRUCTION

20. The following facts existed when the Decree was signed on June 26, 2026, and were not placed before the Court:

   a. That the automatic stay was in effect and that no relief from stay had been granted.

   b. That the Court was ordering Respondent — homeless and in Chapter 7 — to pay $37,500, one-half of the $75,000 in SoFi, Chase, and Citibank debts recited in Section 8.F, within 30 days, on accounts he never had access to and for which Petitioner's own prior filings valued the Chase account far lower and the Citibank account at zero. Exhibit E (Decree § 8.F).

   c. That the indemnity and reimbursement obligations in Section 8.G were being imposed on a homeless Chapter 7 debtor. Exhibit E (Decree § 8.G).

   d. That the Court's own December 17, 2025 order requiring reinstatement within twenty-four hours remained unsatisfied and defied, with the $20,643.56 obligation under its Section III unpaid. Exhibit H (December 17, 2025 order).

   e. That Petitioner had taken the physical property the Court had placed in Respondent's exclusive possession — his clothing and personal effects; his identification and passport; family photographs and irreplaceable family heirlooms; his medication and auto-injectors; his computers, printers, and data storage; his litigation, tax, and business records and trial binders; and the tools of his trade and the equipment he needed to earn a living — when the Court signed an order awarding each party "the property in that party's possession."

21. The award of "the property in that party's possession" was not simply unfortunate wording; it was chosen with precision to convert the removal of virtually everything Respondent owned — his medication, his family heirlooms, the tools of his trade, and all of his litigation materials, evidence, hard drives, and proof of his marital contributions — into a state-sanctioned property judgment, leaving him without the ability to earn income, litigate, or access healthcare, down to his clothing and basic grooming supplies. This was not a normal property removal; nothing of value left behind survived. Exhibit T (Declaration of Dane Patching); Exhibit U (Declaration of Lucas Levenberg).

The January 7, 2025 temporary orders gave Respondent exclusive use and possession of the marital residence at 5609 La Foy Boulevard and the property within it, and the mutual injunctions barred Petitioner's entry, removal, concealment, or destruction of property. The Decree divided the estate during the stay and then awarded each party the property in that party's possession — notwithstanding those orders, and at a time when Respondent possessed nothing because Petitioner had already taken everything. That clause did not operate on a neutral possession baseline. It converted possession created by Petitioner's removal into a final ownership allocation, giving state-law effect to the removal of property the Court itself had placed in Respondent's exclusive possession, including his medication, the tools of his trade, his clothing, and his music studio. More than seventy terabytes of hard drives were removed from the residence, containing, among other irreplaceable materials, the entirety of Respondent's lifetime of original musical work.

22. The eviction that produced that removal was engineered by fraud on the community. Petitioner was the sole financial guarantor on the lease; Respondent was not a financially obligated party. Petitioner and the landlord executed a buyout of the lease that was concealed from Respondent for approximately five months. At an October 31, 2025 hearing, Petitioner represented that she was not on the lease; when Respondent produced the lease identifying Petitioner as the guarantor, Petitioner's counsel then disclosed the buyout executed five months earlier. Respondent's own security deposit was surrendered to the landlord in connection with that arrangement. The eviction was then pursued against Respondent — who was not obligated on the lease — in a proceeding for which he was never served. On April 16, 2026, minutes after Respondent left the residence to seek emergency relief in the Bankruptcy Court, a fifteen-camera security system was disabled and two individuals entered; Petitioner, who lives

approximately five hours away in San Antonio, arrived within minutes with a twenty-six-foot moving truck funded by a third party. Petitioner is recorded on Respondent's home-camera system, during the removal, stating that she needed to "get more of the evidence." The Bankruptcy Court ordered the removal to cease and that no party remove property from the premises; the constable present testified on September 3 that the movers stopped but Petitioner continued to take items and left with them. Exhibits I (constable testimony), J (home-camera video and index), O (lease and concealed buyout/nonsuit), and P (Bankruptcy Court order, Doc. 57).

23. The identification Petitioner used to enter is facially irreconcilable with the record. The constable testified that the identification bore Respondent's surname and listed the residence address. Both parties are enrolled in the Texas Address Confidentiality Program, and neither party's identification has ever carried that residential address. Petitioner does not use, and since December 2024 has not used, Respondent's surname; not a single financial account, statement, or legal document Petitioner holds bears it, and she has since opened new accounts, changed her name, and purchased a vehicle she did not disclose to the Court — none in Respondent's surname. An identification bearing Respondent's surname and the protected residence address cannot be reconciled with any of that. Exhibit Q (Address Confidentiality Program enrollment). The removal also took Respondent's medication: nothing in the refrigerator was disturbed except the medication in the bottom drawer, which Petitioner alone knew the location of, and which was gone. Cut off without warning and without a taper after more than two years at a maximum dose of a GLP-1 medication, Respondent gained approximately thirty-seven pounds as initially sworn, ultimately over fifty pounds of fluid, and was hospitalized with congestive heart failure. Exhibit K (Respondent's declaration).

## VII. THE MANUFACTURED-DIVORCE BENEFITS STRIPPING: FURTHER VIOLATIONS OF THE STAY, FRAUD UPON THE COMMUNITY, AND DEFIANCE OF THIS COURT'S ORDERS

24. The benefits stripping was carried out through a manufactured divorce, and it began well before the Decree. Respondent's health-savings-account access was first cut off on December 18, 2024. On January 20, 2025, Petitioner emailed Respondent's counsel and threatened to cut off Respondent's access to healthcare, establishing from the outset both the intent and the method. Exhibit K (Respondent's declaration). On October 31, 2025, a qualifying-life-event was submitted to Petitioner's employer alleging a divorce that did not exist, and Respondent's benefits were terminated. Its effects fell on property of the bankruptcy estate and on accounts in Respondent's name identified in that estate.

25. The termination coincided with sworn testimony to the contrary. On October 31, 2025 — the same day, at a hearing where Respondent sought enforcement of the temporary orders — Petitioner testified that she had never obstructed Respondent's access to healthcare and would not do so; that same day, Respondent's coverage was terminated. Respondent learned of the termination on November 23, 2025, as he was being admitted to an emergency room with a fully torn rotator cuff and a ruptured bicep, and was told that all of his benefits had been terminated effective October 31 on the basis of a divorce-based qualifying-life-event, though no divorce existed. The injuries required surgery that had been prioritized before year-end, when Respondent's deductibles and out-of-pocket maximums had been met. For that reason, this Court entered its December 17, 2025 emergency order requiring reinstatement within twenty-four hours, to preserve access to that surgery. The surgery never occurred, and has still not occurred, because Respondent has never regained unobstructed access to healthcare.

26. Neither the coverage nor the funds were restored as ordered. The preservation funds this Court awarded were never paid, and they are property of the bankruptcy estate. Other dependent benefits protected by

the standing and temporary orders were never restored — supplemental life insurance, of which Respondent was a beneficiary; dependent accidental death and dismemberment; dependent critical illness; and the dependent flexible spending account. Respondent has never been provided a functional health-savings-account card or the PIN Petitioner established for that account, has never been authorized to communicate with the plan, and cannot access or process any claim; the claims that have been paid were paid to Petitioner. The health-savings account is property of the bankruptcy estate. Exercising control over it, and stripping the community benefits enumerated above, during an active stay are further acts in violation of 11 U.S.C. § 362(a)(3) and the dissipation of the very marital estate now returned to trial. These terminations also defied this Court's standing and temporary orders and its December 17, 2025 order, whose $20,643.56 obligation under Section III remains unpaid.

27. The harm did not end there. The false submission corrupted every COBRA notice that followed: each bore the October 31 termination date, so that the election window had expired months before Respondent received the notice. It took roughly three months to obtain a valid COBRA notice, during which Respondent paid for all of his care out of pocket, exhausting the funds that would have paid COBRA premiums; Petitioner's employer now demands retroactive payment of those premiums before it will process the claims Respondent already paid, and Respondent's ability to elect COBRA is itself being cut off on October 5, 2026. The termination and the clawbacks that followed forced Respondent into bankruptcy. The conduct is under federal review in EBSA File No. 202630-18882, in which a formal demand has been made for the qualifying-life-event records for both the October 31, 2025 and June 26, 2026 terminations; that federal review does not displace this Court's authority over its own orders or the marital estate. Petitioner mocked the fluid retention Respondent suffered after the medication cutoff; her June 18, 2026 email is evidence that the deprivation was knowing. Exhibit L (June 18, 2026 email).

28. The remedy Respondent seeks for this conduct is not new relief ordering that healthcare be provided; it is vacatur of the provisions that sustain it, and enforcement of the orders this Court has already entered. While Sections 1 through 7 and 10 remain on the books, they supply the footing on which the manufactured-divorce status, and the stripping it drives, is maintained. Vacating them removes it.

## VIII. THE QUESTIONS THE COURT MUST ANSWER

29. This Motion turns on five questions of record. Respondent asks the Court to answer each in its written ruling:

(1) Was the Court told there was an active bankruptcy stay at the trial?

(2) Was the Court told there was an active bankruptcy stay when it ordered Respondent — homeless and in Chapter 7 — to pay approximately $37,500 of the parties' credit-card and loan debt he never had access to?

(3) Was the Court told Respondent was homeless and in bankruptcy when the indemnity was imposed on him?

(4) Was the Court told there was an active twenty-four-hour emergency order reinstating Respondent's health insurance, with $20,643.56 attached and unpaid?

(5) Was the Court told that Petitioner had taken all of the physical property the Court placed in Respondent's exclusive possession when it signed an order awarding each party "the property in that party's possession" — that Respondent was left without clothing, identification, family heirlooms, basic grooming items, cherished family photographs, and the two-hundred-year-old crystal of the great-grandmother who raised him while his father underwent a bone-marrow transplant?

30. If the Court was not told these things, the Decree — in whole, including the provisions left standing — was procured by knowingly withholding the facts the Court needed to know it had no power to enter it, and it cannot stand. If the Court was told these things, the Decree was entered in violation of the automatic stay, and it cannot stand. Under either answer, the provisions left standing must be vacated.

31. Respondent does not ask the Court to find that it erred. The record shows that material facts were withheld from the Court before it signed. The Court is asked to complete the ruling it began on September 18, 2026 and to vacate what remains of a judgment it was never given the information to enter.

## IX. FORTHCOMING EVIDENCE

32. Respondent has requested and paid for the constables' body-worn camera footage of the April 16, 2026 and May 22, 2026 writ executions and will produce and authenticate that footage when it is received. Respondent reserves the right to supplement the record with it. Exhibit R (body-worn camera footage, to be supplemented).

33. Respondent will further supplement the record with additional documentary and location-tracking evidence concerning the removal and dispersal of his property as it is assembled and authenticated. Exhibit S (to be supplemented).

## X. PRAYER

Respondent asks the Court, ruling on the papers or, if the Court determines a hearing is necessary, at the earliest available setting within the Court's plenary power, to enter a signed written order — on or before October 9, 2026 — that states GRANTED or DENIED as to each of the following, and states the specific legal basis for each item denied:

i. Vacate Sections 1 through 7 and 10 of the June 26, 2026 Decree in their entirety.

ii. Order that the characterization and division of the entire marital estate be tried as a whole, with no provision of the vacated Decree salvaged, carried forward, or given preclusive effect at that trial.

iii. Suspend any enforcement of, or action upon, the provisions left standing — including any name change and any turnover, transfer, or third-party action — pending the Court's ruling on this Motion.

iv. Find that Petitioner intentionally removed and failed to preserve marital property and litigation evidence after a served preservation demand, and order an adverse-inference instruction at the trial of the estate. Brookshire Bros., Ltd. v. Aldridge, 438 S.W.3d 9 (Tex. 2014).

v. Impose sanctions against Petitioner and her counsel under Texas Rule of Civil Procedure 13, Chapter 10 of the Texas Civil Practice and Remedies Code (§§ 10.001, 10.004), and the Court's inherent authority, for submitting for entry, and moving the Court to sign, a Decree the Court had no power to enter under the automatic stay, and award Respondent his costs and expenses.

vi. Enforce this Court's December 17, 2025 order and the standing and temporary orders by ordering Petitioner to restore the dependent benefits those orders protect — supplemental life insurance (Respondent as beneficiary), dependent accidental death and dismemberment, dependent critical illness, the dependent flexible spending account, and functional access to the health-savings account identified in the bankruptcy estate — to satisfy the unpaid $20,643.56 obligation under Section III of the

December 17, 2025 order, and to reimburse Respondent for the amounts he was forced to pay out of pocket as a result of the terminations.

vii. Decide any pending inability-to-pay issue by written order under Rule 145 and direct prompt preparation of the June 11 reporter's record and availability of the admitted exhibits.

viii. Award Respondent such further relief, at law or in equity, to which he is entitled.

Respondent asks that the Motion and the medical and property exhibits be considered in camera and under seal.

Dated: September 24th, 2026

Respectfully submitted,

/s/ Jason Emory McKemie

Jason Emory McKemie, Pro Se
539 W. Commerce St., Ste. 2010
Dallas, Texas 75208
(214) 519-8958
jmckemie@mckemie.net

## CERTIFICATE OF SERVICE

I certify that on September 24th, 2026, a true and correct copy of this Motion was served on Petitioner's counsel of record — Jonathan D. Steele and Sara A. Boucher, Beermann LLP, and Rebecca L. Armstrong, Armstrong Divorce & Family Law, PLLC — through the electronic filing manager and by email.

/s/ Jason Emory McKemie
Jason Emory McKemie

## INDEX OF EXHIBITS


A Respondent's Supplemental Brief on the Bankruptcy Automatic Stay in Support of Complete Vacatur and a New Trial (filed September 14, 2026)

B September 18, 2026 Memorandum Ruling granting new trial in part

C Reporter's Record, September 3, 2026 hearing (to be supplemented upon preparation)

D Respondent's Notice of Bankruptcy Automatic Stay (filed February 18, 2026)

E Final Decree of Divorce (signed June 26, 2026)

F Respondent's June 11, 2026 Emergency Motion to Abate, Continue, or Appear Remotely

G Petitioner's Motion to Sign and Enter Final Decree

H December 17, 2025 Order (24-hour healthcare reinstatement; Section III obligation, $20,643.56)

I Constable testimony, September 3, 2026 hearing

J Home security-camera video and index

K Declaration of Jason Emory McKemie

L June 18, 2026 email from Petitioner

M Record-production requests and September 25, 2026 email to the official court reporter (copying the Court Coordinator), with Statement of Inability to Afford Payment of Court Costs

N Petitioner's Brief on the Effect of the Bankruptcy Stay (filed September 11, 2026)

O Residential lease (Petitioner as sole guarantor) and the concealed buyout/nonsuit agreement

P Bankruptcy Court order to cease removal (In re McKemie, Doc. 57)

Q Texas Address Confidentiality Program enrollment

R Constable body-worn camera footage, April 16 and May 22, 2026 writs (to be supplemented)

S Additional documentary and location-tracking evidence of removal and dispersal (to be supplemented)

T Declaration of Dane Patching (property removal)

U Unsworn Declaration of Lucas Levenberg (KRK S8 subwoofer)

| CAUSE NO. DF-24-18010 | | |
|---|---|---|
| IN THE MATTER OF THE MARRIAGE OF | § | IN THE DISTRICT COURT |
| | § | |
| GWENDOLYN ULIJASZ-McKEMIE | § | 301ST JUDICIAL DISTRICT |
| AND | § | |
| JASON EMORY McKEMIE | § | DALLAS COUNTY, TEXAS |

**ORDER ON THE MOTION TO VACATE THE REMAINING PROVISIONS OF THE VOID DECREE (SECTIONS 1–7 AND 10), FOR SANCTIONS, AND FOR A SIGNED WRITTEN RULING**

On this day the Court considered the Motion to Vacate the Remaining Provisions of the Void Decree (Sections 1–7 and 10), for Sanctions, and for a Signed Written Ruling. Having considered the Motion, the record, and the applicable law — including that the Final Decree of Divorce signed June 26, 2026 was entered while the automatic stay under 11 U.S.C. § 362 was in effect and no relief from the stay had been granted — the Court rules as set out below. The Court states GRANTED or DENIED as to each numbered request, and, for each request denied, the basis for the denial.

1. Sections 1 through 7 and 10 of the Final Decree of Divorce signed June 26, 2026 are VACATED in their entirety.
   GRANTED __________ DENIED __________ Basis for any denial:
   ______________________________

2. The characterization and division of the entire marital estate shall be tried as a whole; no provision of the vacated Decree is salvaged, carried forward, or given preclusive effect at that trial.
   GRANTED __________ DENIED __________ Basis for any denial:
   ______________________________

3. Any enforcement of, or action upon, the provisions previously left standing — including any name change and any turnover, transfer, or third-party action — is SUSPENDED pending this Order.
   GRANTED __________ DENIED __________ Basis for any denial:
   ______________________________

4. The Court FINDS that Petitioner intentionally removed and failed to preserve marital property and litigation evidence after a served preservation demand, and an adverse-inference instruction shall be given at the trial of the estate. Brookshire Bros., Ltd. v. Aldridge, 438 S.W.3d 9 (Tex. 2014).
   GRANTED __________ DENIED __________ Basis for any denial:
   ______________________________

5. Sanctions are awarded against Petitioner and her counsel under Texas Rule of Civil Procedure 13, Chapter 10 of the Texas Civil Practice and Remedies Code (§§ 10.001,

10.004), and the Court's inherent authority, for submitting for entry, and moving the Court to sign, a Decree the Court had no power to enter under the automatic stay; and Respondent is awarded his costs and expenses in an amount to be determined.

GRANTED __________ DENIED __________ Basis for any denial:

______________________________

6. Petitioner is ORDERED to restore the dependent benefits protected by this Court's December 17, 2025 order and the standing and temporary orders — supplemental life insurance (Respondent as beneficiary), dependent accidental death and dismemberment, dependent critical illness, the dependent flexible spending account, and functional access to the health-savings account identified in the bankruptcy estate — to satisfy the unpaid $20,643.56 obligation under Section III of the December 17, 2025 order, and to reimburse Respondent for the amounts he was forced to pay out of pocket as a result of the terminations.

GRANTED __________ DENIED __________ Basis for any denial:

______________________________

7. Any pending inability-to-pay issue is decided by written order under Texas Rule of Civil Procedure 145, and the official court reporter is directed to prepare the June 11, 2026 reporter's record and to make the admitted exhibits available.

GRANTED __________ DENIED __________ Basis for any denial:

______________________________

8. All other relief requested and not expressly granted above is addressed as marked.

GRANTED __________ DENIED __________ Basis for any denial:

______________________________

The Court further answers, on the record, the questions presented in the Motion:

(1) The Court was informed of the active bankruptcy stay at the June 11, 2026 trial:
YES __________ NO __________

(2) The Court was informed of the active stay when it ordered Respondent to pay approximately $37,500 of the parties' credit-card and loan debt:
YES __________ NO __________

(3) The Court was informed that Respondent was homeless and in bankruptcy when the indemnity was imposed on him:
YES __________ NO __________

(4) The Court was informed of the active twenty-four-hour emergency order reinstating Respondent's health insurance, with $20,643.56 attached and unpaid:
YES __________ NO __________

(5) The Court was informed that Petitioner had taken the physical property placed in Respondent's exclusive possession when it awarded each party "the property in that party's possession":
YES __________ NO __________

This Order disposes of the Motion.

SIGNED this ______ day of ______________________, 2026.

______________________________
JUDGE PRESIDING

**From:** no-reply@efilingmail.tylertech.cloud
**Subject:** Notification of Service for Case: DF-24-18010, GWENDOLYN ULIJASZ MCKEMIE vs. JASON MCKEMIE for filing Motion (No Fee), Envelope Number: 120375563
**Date:** September 24, 2026 at 11:53 PM
**To:** jmckemie@mckemie.net

# Notification of Service

Case Number: DF-24-18010
Case Style: GWENDOLYN ULIJASZ MCKEMIE vs. JASON MCKEMIE
Envelope Number: 120375563

This is a notification of service for the filing listed. Please click the link below to retrieve the submitted document. If the link does not work, please copy the link and paste into your browser. You can also obtain this document by following the steps on this article.

| Filing Details | |
|---|---|
| **Case Number** | DF-24-18010 |
| **Case Style** | GWENDOLYN ULIJASZ MCKEMIE vs. JASON MCKEMIE |
| **Date/Time Submitted** | 9/24/2026 11:52 PM CST |
| **Filing Type** | Motion (No Fee) |
| **Filing Description** | Motion to Vacate Remaining Provisions of Decree (???? 1????7 & 10), for Sanctions & Signed Written Ruling |
| **Filed By** | Jason McKemie |
| **Service Contacts** | GWENDOLYN ULIJASZ MCKEMIE:<br>Rebecca Armstrong (rebecca@armstronglawtexas.com)<br>Terra Aguirre (terra@armstronglawtexas.com)<br>Lauren Shaw (lauren@armstronglawtexas.com)<br>Gwendolyn Ulijasz McKemie (GUlijasz@gmail.com)<br>Gwendolyn Ulijasz (gulijasz@gmail.com)<br>JONATHAN STEEL (jsteele@beermannlaw.com)<br>REBECCA ARMSTRONG (REBECCA@ARMSTRONGLAWTEXAS.COM)<br><br>JASON MCKEMIE: |

| | |
|---|---|
| | Jason McKemie (jmckemie@mckemie.net)<br>JASON MCKEMIE (jason@callvital.com) |

| Document Details | |
|---|---|
| **Served Document** | Download Document |
| This link is active for 45 days. To access this document, you will be required to enter your email address. Click here for more information. | |

**From:** no-reply@efilingmail.tylertech.cloud
**Subject:** Notification of Service for Case: DF-24-18010, GWENDOLYN ULIJASZ MCKEMIE vs. JASON MCKEMIE for filing No Fee Documents, Envelope Number: 120375563
**Date:** September 24, 2026 at 11:53 PM
**To:** jmckemie@mckemie.net

# Notification of Service

Case Number: DF-24-18010
Case Style: GWENDOLYN ULIJASZ MCKEMIE vs. JASON MCKEMIE
Envelope Number: 120375563

This is a notification of service for the filing listed. Please click the link below to retrieve the submitted document. If the link does not work, please copy the link and paste into your browser. You can also obtain this document by following the steps on this article.

| Filing Details | |
|---|---|
| **Case Number** | DF-24-18010 |
| **Case Style** | GWENDOLYN ULIJASZ MCKEMIE vs. JASON MCKEMIE |
| **Date/Time Submitted** | 9/24/2026 11:52 PM CST |
| **Filing Type** | No Fee Documents |
| **Filing Description** | Proposed Order on Motion to Vacate Remaining Provisions of Decree (???? 1????7 & 10), for Sanctions & Signed Written Ruling |
| **Filed By** | Jason McKemie |
| **Service Contacts** | JASON MCKEMIE:<br>Jason McKemie (jmckemie@mckemie.net)<br>JASON MCKEMIE (jason@callvital.com)<br><br>GWENDOLYN ULIJASZ MCKEMIE:<br>Rebecca Armstrong (rebecca@armstronglawtexas.com)<br>Terra Aguirre (terra@armstronglawtexas.com)<br>Gwendolyn Ulijasz McKemie (GUlijasz@gmail.com)<br>Gwendolyn Ulijasz (gulijasz@gmail.com)<br>JONATHAN STEEL (jsteele@beermannlaw.com)<br>REBECCA ARMSTRONG |

| | |
|---|---|
| | (REBECCA@ARMSTRONGLAWTEXAS.COM)<br>Lauren Shaw (lauren@armstronglawtexas.com) |

| Document Details | |
|---|---|
| **Served Document** | Download Document |
| This link is active for 45 days. To access this document, you will be required to enter your email address. Click here for more information. | |

# EXHIBIT 3

Respondent's Protective Notice of Appeal Without Concession of Finality (2 pages)
and Respondent's Supplemental Notice Regarding the Interlocutory Posture,
Appellate Timetable, and September 24, 2026 Motion (2 pages),
as submitted to the State Court September 28, 2026 (Envelope Nos. 120440476 and 120440539)

**CAUSE NO. DF-24-18010**

| | |
|---|---|
| **IN THE MATTER OF THE MARRIAGE OF** | **IN THE DISTRICT COURT** |
| **GWENDOLYN ULIJASZ-McKEMIE AND JASON EMORY McKEMIE** | **301ST JUDICIAL DISTRICT** |
| | **DALLAS COUNTY, TEXAS** |

## RESPONDENT'S PROTECTIVE NOTICE OF APPEAL

***WITHOUT CONCESSION OF FINALITY AND WITHOUT CHALLENGING THE FAVORABLE PROPERTY VACATUR***

TO THE HONORABLE COURT:

**1.** Respondent Jason Emory McKemie files this written notice under Texas Rules of Appellate Procedure 25.1 and 27.1 solely to preserve appellate rights. To the extent either instrument is presently appealable, Respondent desires to appeal from the Final Decree of Divorce signed June 26, 2026, as modified by the Memorandum Ruling signed September 18, 2026.

**2.** The September 18 Memorandum Ruling granted a new trial in part, vacated Sections 8, 9, and 11 through 15 of the June 26 Decree, and expressly stated that Sections 1 through 7 and 10 remain "interlocutory." Respondent does not concede that a final appealable judgment currently exists.

**3.** Respondent does not seek reversal of the September 18 ruling insofar as it vacated Sections 8, 9, and 11 through 15, granted a new trial concerning property, or recognized the interlocutory posture of the surviving provisions. That favorable relief is expressly preserved.

**4.** If and when appellate jurisdiction exists, Respondent seeks review only of adverse rulings and issues preserved in the trial court, including: (a) Section 5's findings concerning the existence and date of marriage and the rejection of an earlier informal marriage; (b) the denial of the remaining grounds raised in the Verified Motion for New Trial; (c) healthcare, HSA/FSA, benefits, record-access, evidentiary, and due-process rulings; and (d) any other adverse ruling that becomes reviewable in an appeal from a final judgment.

**5.** If this notice precedes a final appealable judgment, Respondent requests that it be treated as a premature notice under Texas Rule of Appellate Procedure 27.1(a), effective and deemed filed on the day of, but after, the event that begins the period for perfecting the appeal.

**6.** The appeal is taken to the Court of Appeals for the Fifth District of Texas at Dallas.

**7.** Respondent previously filed a Statement of Inability to Afford Payment of Court Costs in the trial court. Respondent states that he is presumed unable to pay appellate-court costs under Texas Rule of Appellate Procedure 20.1 unless and until a qualifying order provides otherwise.

**8.** This is an ordinary civil appeal, not an accelerated appeal. This notice does not request a stay, does not ask the appellate court to exercise jurisdiction prematurely, and does not waive Respondent's position that the September 18 ruling left the case pending and interlocutory.

Respectfully submitted,

/s/ Jason Emory McKemie
Jason Emory McKemie
Respondent / Appellant, Pro Se
539 W. Commerce St., Suite 2010
Dallas, Texas 75208
Telephone: 214-868-4901
Email: jmckemie@mckemie.net

## CERTIFICATE OF SERVICE

I certify that on September 26, 2026, a true and correct copy of this filing was served through the electronic filing manager on all counsel and parties of record, and was delivered to each court reporter responsible for preparing the reporter's record to the extent required by Texas Rule of Appellate Procedure 25.1(e). The principal service recipients include Jonathan D. Steele, Rebecca L. Armstrong, Sara A. Boucher, and all other counsel and parties reflected in the electronic service record.

/s/ Jason Emory McKemie

**CAUSE NO. DF-24-18010**

| | |
|---|---|
| **IN THE MATTER OF THE MARRIAGE OF** | **IN THE DISTRICT COURT** |
| **GWENDOLYN ULIJASZ-McKEMIE AND JASON EMORY McKEMIE** | **301ST JUDICIAL DISTRICT** |
| | **DALLAS COUNTY, TEXAS** |

## RESPONDENT'S SUPPLEMENTAL NOTICE REGARDING THE INTERLOCUTORY POSTURE, APPELLATE TIMETABLE, AND SEPTEMBER 24, 2026 MOTION TO MODIFY

***NO SUBSTANTIVE RELIEF REQUESTED IN THE SEPTEMBER 24 MOTION IS WITHDRAWN***

TO THE HONORABLE JUDGE OF SAID COURT:

**1.** Respondent files this short notice to prevent an inaccurate timetable statement in his September 24 motion from obscuring the substantive relief requested there.

**2.** The Court's September 18 Memorandum Ruling granted a new trial in part, vacated Sections 8, 9, and 11 through 15 of the June 26 Decree, and expressly stated that Sections 1 through 7 and 10 remain "interlocutory."

**3.** Under Texas law, an order granting a new trial is generally interlocutory, and a trial court retains continuing control over interlocutory orders before final judgment. Fruehauf Corp. v. Carrillo, 848 S.W.2d 83, 84 (Tex. 1993). Texas divorce decisions further hold that when property remains for retrial, the decree may be interlocutory. Gathe v. Gathe, 376 S.W.3d 308, 314-16 (Tex. App.-Houston [14th Dist.] 2012, no pet.); In re Interest of B.T.G., No. 05-13-00305-CV, slip op. at 5-7 (Tex. App.-Dallas Apr. 6, 2016, no pet.) (op. on reh'g).

**4.** Accordingly, Respondent withdraws only the procedural assertion in paragraph 3 of the September 24 motion that the Court's authority necessarily expires on October 9, 2026. Respondent does not withdraw any fact, ground, requested sanction, healthcare relief, record-access relief, or request to vacate Sections 1 through 7 and 10.

**5.** Alternatively, if the September 18 ruling is treated as a modified final judgment, it restarted the appellate timetable under Texas Rule of Civil Procedure 329b(h) and Texas Rule of Appellate Procedure 4.3(a). Respondent's September 24 written motion specifically seeks substantive modification and is therefore a timely Rule 329b(g) motion if Rule 329b applies.

**6.** Respondent has filed a protective notice of appeal solely to prevent waiver. That notice expressly does not challenge the favorable vacatur of Sections 8, 9, and 11 through 15 and does not concede that a final appealable judgment currently exists.

**7.** Respondent requests that the Court continue to exercise its authority over the pending interlocutory case, present and decide the September 24 motion, and clarify in any written ruling that Section 5's marriage-date finding is interlocutory, nonfinal, subject to revision, and has no preclusive effect at the new trial.

8. Respondent further requests that no person or entity be permitted to use the June 26 Decree as a final judgment establishing the date or finality of divorce while the Court's September 18 ruling expressly leaves the surviving provisions interlocutory.

## PRAYER

Respondent asks the Court to take notice of the corrected procedural posture, set and rule on the September 24 motion, clarify the nonfinal and nonpreclusive status of Section 5, and grant all relief necessary to prevent the interlocutory decree from being treated as a final adjudication.

Respectfully submitted,

/s/ Jason Emory McKemie
Jason Emory McKemie
Respondent / Appellant, Pro Se
539 W. Commerce St., Suite 2010
Dallas, Texas 75208
Telephone: 214-868-4901
Email: jmckemie@mckemie.net

## CERTIFICATE OF SERVICE

I certify that on September 26, 2026, a true and correct copy of this filing was served through the electronic filing manager on all counsel and parties of record, and was delivered to each court reporter responsible for preparing the reporter's record to the extent required by Texas Rule of Appellate Procedure 25.1(e). The principal service recipients include Jonathan D. Steele, Rebecca L. Armstrong, Sara A. Boucher, and all other counsel and parties reflected in the electronic service record.

/s/ Jason Emory McKemie

# EXHIBIT 4

Affidavit of Jonathan Steele
filed in Cause No. DF-24-18010 on May 29, 2026 (Envelope 115516576)
(4 pages)

FIL
5/29/2026 3:42
FELICIA PIT
DISTRICT CLE
DALLAS CO., TEX
Donna Hall DEPU

**NO. DF-24-18010**

| | |
|---|---|
| IN THE MATTER OF<br>THE MARRIAGE OF | IN THE DISTRICT COURT |
| GWENDOLYN ULIJASZ-MCKEMIE<br>AND<br>JASON MCKEMIE | 301ST JUDICIAL DISTRICT<br><br>DALLAS COUNTY, TEXAS |

## AFFIDAVIT OF JONATHAN D. STEELE REGARDING PRODUCTION RECORD, BANKRUPTCY ORDERS, ABSENCE OF ATTACHED ORDERS, PROTECTIVE-ORDER NEED, AND FEES

STATE OF ILLINOIS

COUNTY OF COOK

BEFORE ME, the undersigned authority, on this day personally appeared Jonathan D. Steele, who, being by me duly sworn, stated under oath as follows:

1. My name is Jonathan D. Steele. I am over eighteen years of age, of sound mind, competent to make this affidavit, and authorized to make it on behalf of Petitioner. I am counsel for Petitioner Gwendolyn Ulijasz-McKemie in this matter, admitted pro hac vice, and I have been actively involved in the preparation and review of Petitioner's discovery production in this case. The facts stated below are within my personal knowledge or are based on my review of the Court's file and counsel's production records, and they are true and correct.

2. Petitioner is represented by Armstrong Divorce & Family Law, PLLC, 5949 Sherry Lane, Suite 835, Dallas, Texas 75225, Tel. (972) 544-1662, Fax (972) 408-3455, as resident counsel, together with the undersigned, admitted pro hac vice.

3. Based on my review of the production and the production index in this case, Petitioner produced records to Respondent during the discovery period, and the production index identifies production from GU000001 through GU002225. The highest burned-in Bates stamp I have identified on a produced PDF is GU001922, and the production index reflects additional produced materials through GU002225.



Copy from re:SearchTX

4. Attached as Exhibit A is a true and correct copy of the production index and Bates log reflecting those productions.

5. I have reviewed Respondent's May 26, 2026 Motion. The Motion does not attach any proposed nonparty subpoena or Rule 205.3 notice, and based on my review of the file, Respondent did not, during the discovery period, serve on Petitioner any Rule 205 notice or proposed subpoena for the third-party records he now says he requires.

6. Respondent's May 26, 2026 Motion does not attach a signed January 6, 2026 discovery order, a signed January 9, 2026 discovery order, a signed January 20, 2026 discovery order, or a signed February 5, 2026 discovery order.

7. Respondent is a Chapter 7 debtor. He filed his Chapter 7 petition on January 12, 2026. The Chapter 7 trustee is Areya Holder. Attached as Exhibit B are true and correct copies of the relevant bankruptcy filings and orders, which include the notice of the Chapter 7 case identifying the trustee and petition date; the order terminating the automatic stay to permit the landlord to pursue eviction remedies; the order entered the afternoon of April 16, 2026 reinstating the automatic stay and directing that writ enforcement cease; and the later order extending Respondent's move-out deadline and reserving claims for rent, expenses, damages, and automatic-stay violations for separate motion or adversary proceeding. None of those orders adjudicates theft, spoliation, stay violation, damages, property ownership, or turnover against Petitioner.

8. Petitioner is confirming whether the discovery-control plan in effect is the default Level 2 plan or was modified by the September 8, 2025 302nd District Court pretrial order. Under either plan, ordinary nonparty discovery is not open on the eve of the June 11, 2026 trial.

9. Respondent's Motion required Petitioner to prepare a written response, counter-motion for protective order, proposed order language, evidentiary objections, hearing preparation, and



Copy from re:SearchTX

related protective relief to avoid a continuance, subpoena leave, and privilege-invasive discovery sixteen days before the June 11, 2026 trial setting.

10. Petitioner requests an award of reasonable attorney's fees, court costs, expenses, and protective expenses incurred in responding to Respondent's Motion and obtaining protective relief. The amount of fees, costs, expenses, and protective expenses is reserved for later prove-up by separate submission or hearing.

11. If the Court requires fee proof as to amount, Petitioner will submit lodestar detail, including date, timekeeper, hourly rate, task description, hours, total, reasonableness and necessity, and segregation to the May 26 Motion, the June 1 response, the protective-order work, and related hearing preparation.

12. In my opinion, the protective relief requested by Petitioner is reasonable and necessary to prevent undue burden, unnecessary expense, harassment, invasion of privilege, invasion of work product, and disruption of the June 11 trial setting.

Further affiant sayeth not.

JONATHAN D. STEELE
Admitted Pro Hac Vice
Counsel for Petitioner

SUBSCRIBED AND SWORN TO BEFORE ME on this 29th day of May, 2026, to certify which witness my hand and seal of office.

OFFICIAL SEAL
ROSA E GUTIERREZ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 05/26/2027

Notary Public in and for the State of Illinois
My commission expires: 5/26/2027



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Terra Aguirre on behalf of Rebecca Armstrong
Bar No. 24062589
terra@armstronglawtexas.com
Envelope ID: 115516576
Filing Code Description: Response
Filing Description: TO MOTION FOR ENFORCEMENT AND COUNTER MOTION FOR PROTECTIVE ORDER
Status as of 6/1/2026 10:16 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kim Jones | | kjones@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Jeffrey ECook | | jcook@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Tiffany Castenada | | tcastenada@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| William CCook | | wcook@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Rebecca LArmstrong | | rebecca@armstronglawtexas.com | 5/29/2026 3:42:21 PM | SENT |
| Terra Aguirre | | terra@armstronglawtexas.com | 5/29/2026 3:42:21 PM | SENT |
| Chandler Alt | | calt@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Lauren N.Shaw | | lauren@armstronglawtexas.com | 5/29/2026 3:42:21 PM | SENT |
| Jason McKemie | | jmckemie@mckemie.net | 5/29/2026 3:42:21 PM | SENT |
| Gwendolyn Ulijasz McKemie | | GUlijasz@gmail.com | 5/29/2026 3:42:21 PM | SENT |
| Gwendolyn Ulijasz | | gulijasz@gmail.com | 5/29/2026 3:42:21 PM | SENT |
| JONATHAN STEEL | | jsteele@beermannlaw.com | 5/29/2026 3:42:21 PM | SENT |
| Ethan Scroggins | | escroggins@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| JASON EMORYMCKEMIE | | jason@callvital.com | 5/29/2026 3:42:21 PM | SENT |

# EXHIBIT 5

Reporter's Record, Trial Before the Court, June 11, 2026
Cause No. DF-24-18010, 301st Judicial District Court
Shantel Beheler, CSR 3031 (47 pages)

REPORTER'S RECORD

VOLUME 1 OF 1 VOLUME

TRIAL COURT CAUSE NO. DF-24-18010

| | | |
|---|---|---|
| IN THE MATTER OF<br>THE MARRIAGE OF | ) | IN THE 301ST JUDICIAL |
| | ) | |
| | ) | |
| GWENDOLYN ULIJASZ-McKEMIE | ) | DISTRICT COURT OF |
| AND | ) | |
| JASON EMORY McKEMIE | ) | DALLAS COUNTY, TEXAS |

*********************************************************

TRIAL BEFORE THE COURT

*********************************************************

BE IT REMEMBERED, that on the 11th day of June, 2026, the above-entitled and numbered cause came on to be heard for hearing in the said court, HONORABLE ASHLEY WYSOCKI, Judge Presiding of the 301st Judicial District Court of Dallas County, Texas, at which time the following proceedings were had. Proceedings reported by machine shorthand. Transcript produced by computer.

**APPEARANCES**

JONATHAN D. STEELE
Beermann, LLP
161 N. Clark Street
Suite 3000
Chicago, Illinois 60601
Telephone: 312-621-9700

*Attorney for Petitioner, Gwendolyn Ulijasz McKemie*

TRIAL BEFORE THE COURT
6-11-26

# INDEX

## INDEX OF TESTIMONY

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Gwendolyn Ulijasz-McKemie | 4 | | | |

## EXHIBIT INDEX

| No. | Description | Offered | Admit/Deny |
|---|---|---|---|
| PX-2 | Marriage License | 6 | 6 |
| PX-3 | Advantigen Shares | 9 | 9 |
| PX-4 | Advantigen Shares tracing | 10 | 10 |
| PX-5 | AIG 401(k) | 11 | 11 |
| PX-6 | AIG 401(k) tracing | 11 | 11 |
| PX-7 | Ameriprise Account | 13 | 13 |
| PX-8 | Ameriprise stmts | 13 | 13 |
| PX-8A | Ameriprise stmt E-Trade | 13 | 13 |
| PX-8B | Ameriprise stmt Cognizant rollover | 13 | 13 |
| PX-9 | Employment Agreement for Accenture | 15 | 15 |
| PX-12 | Pay stubs & W-2 for 2024 | 26 | 26 |
| PX-13 | Monthly Expenses | 17 | 17 |
| PX-14 | Chase statement May '25 | 18 | 18 |
| PX-15 | Chase stmt Dec '23 to Jan '24 | 19 | 20 |
| PX-26 | American Express stmt Dec '24 | 27 | 27 |
| PX-29 | Pay stubs | 24 | 24 |
| PX-30 | VEIP UBS statements | 24 | 25 |
| PX-31 | Separation Agreement w/Cognizant | 25 | 25 |
| PX-32 | Chase Stmt Dec '23 to May '25 | 29 | 29 |
| PX-36 | K-1 for Advantigen | 28 | 28 |
| PX-37 | Tax Return 2023 | 28 | 28 |

TRIAL BEFORE THE COURT
*6-11-26*

**PROCEEDINGS**

13:34:21 THE COURT: Cause No. 24-18010. State your names and appearances.

13:34:26 MR. STEELE: Jonathan Steele. I represent Gwendolyn McKemie, who's also present.

13:34:32 THE COURT: Officer, can you please call the hall for Jason McKemie.

13:34:59 (Hall was called)

13:35:03 THE BAILIFF: No response, Your Honor.

13:35:05 THE COURT: Let the record reflect that the hall has been called for Jason McKemie, and he has failed to appear, despite what the Court finds is proper notice of today's trial.

13:35:19 So you may proceed.

13:35:21 MR. STEELE: I would call my client.

13:35:24 THE COURT: Ma'am, will you take a seat up here.

13:35:38 (At this time Gwendolyn Ulijasz-McKemie was sworn)

13:35:55 MR. STEELE: Judge, I have a binder for the witness, if I may approach, and also for the Court.

13:36:02 THE COURT: Sure.

13:36:03 **GWENDOLYN ULIJASZ-MCKEMIE**

13:36:03 **DIRECT EXAMINATION**

13:36:03 **BY MR. STEELE:**

13:36:05 Q. Ma'am, could you state your name for the record.

13:36:07 A. Gwendolyn Laura Ulijasz-McKemie.

13:36:11 Q. And you are married to the respondent in this case; is that correct?
13:36:13 A. That's correct.
13:36:13 Q. And when were you married?
13:36:15 A. We had a ceremony on June 22 of 2024, and the marriage license was signed on June 26, 2024.
13:36:25 Q. So almost two years you've been married?
13:36:27 A. That's correct.
13:36:28 Q. And where do you live and where do you work?
13:36:33 A. I now live in San Antonio, Texas and I work as a consultant for Accenture.
13:36:43 Q. Where is the last known residence that your husband lived?
13:36:47 A. 5609 LaFoy Boulevard in Dallas, Texas.
13:36:51 Q. That's Dallas County, correct?
13:36:52 A. That's correct.
13:36:53 Q. And have you and your husband been living separate?
13:36:59 A. Yes.
13:37:00 Q. And has the marriage become insupportable because of discord between you and your husband?
13:37:05 A. Yes.
13:37:06 Q. And does that conflict destroy, from your perspective, the legitimate ends of saving the marriage?
13:37:13 A. Yes.

13:37:13 Q. And is that conflict irreconcilable?
13:37:17 A. Yes.
13:37:18 Q. And you said you are currently working at Accenture; is that correct?
13:37:24 A. That's correct.
13:37:25 Q. Where did you work before?
13:37:26 A. Prior to Accenture I worked for Cognizant.
13:37:28 Q. And when and how did you first meet Mr. McKemie?
13:37:33 A. I met Jason -- it was my first online dating experience. I met him on Tinder in May -- first week in May of 2023.
13:37:51 Q. Can you turn to Tab 2 of the binder that I put in front of you?
13:37:55 A. Yes, sir.
13:37:57 Q. Let me know when you are there.
13:37:59 A. Alright.
13:38:04 Q. Is this your marriage license?
13:38:07 A. It is.
13:38:08 Q. And is this the one you filed with the State of Texas?
13:38:10 A. I did.
13:38:14 MR. STEELE: Judge, I would offer into evidence Petitioner's Exhibit 2.
13:38:18 THE COURT: Exhibit 2 is admitted.
13:38:26 Q (By Mr. Steele) Before you got married to Mr.

13:38:27 McKemie, what, if any, assets did you own?
13:38:29 A. Assets, I had a checking account, I had retirement accounts, and I owned shares in my brother's start-up company.
13:38:52 Q. Starting with checking, where is your checking account?
13:38:55 A. Chase Bank.
13:38:55 Q. Do you still have that Chase checking account today?
13:38:58 A. I do.
13:38:58 Q. Are you asking the judge to award you that as your non-marital property?
13:39:02 A. That's correct, I am.
13:39:03 Q. And you said you have retirement accounts. Did you have more than one?
13:39:06 A. I did.
13:39:07 Q. How many did you have?
13:39:11 A. Can I just clarify? Before I got married?
13:39:14 Q. Correct.
13:39:19 A. I don't recall the number. I know, like, the entity is 401(k), Roth, Traditional Rollover.
13:39:29 Q. Did you have all three of those?
13:39:30 A. I did.
13:39:31 Q. Where was the 401(k)?
13:39:34 A. It was at -- so there were two of them. One was

13:39:43 my former employer, AIG. There was a 401(k) there. Then
13:39:47 at that time I was working for Cognizant, and I had a
13:39:51 401(k) with Cognizant, and I don't recall the broker.
13:39:54 Q. You said you had a traditional IRA as well?
13:39:56 A. That's correct.
13:39:57 Q. Where was that?
13:40:00 A. I believe it was at E-Trade. I consolidated to
13:40:03 Ameriprise before I got engaged.
13:40:07 Q. And a Roth rollover as well?
13:40:09 A. That's correct.
13:40:10 Q. Do you recall where that was?
13:40:11 A. I believe it was also at E-Trade. I
13:40:13 predominantly used E-Trade.
13:40:17 Q. If you turn to Tab 3 in the binder that's in
13:40:20 front of you, you mentioned that you had shares of your
13:40:23 brother's company. What is the name of his company?
13:40:28 A. Advantigen.
13:40:29 Q. Do you recall what, if anything, you paid for
13:40:31 the shares of that company?
13:40:38 A. So my original investment -- bear with me just
13:40:43 one moment. I have to read this email.
13:40:46 So I transferred and purchased shares in the
13:40:50 amount of $25,000 and $5,000. That was the first
13:40:56 investment -- or one of the investments April 3, 2023.
13:41:06 And then there was a second tranche of

investment that I purchased in the fall of 2023. I am just looking for the documentation to support the amount.

Q. So both tranches of stock that you purchased in your brother's company were purchased in 2023; is that correct?

A. Correct. All tranches were purchased before I was engaged.

Q. So you read my mind, then. Were any of those -- did you purchase any additional shares during the course of the marriage?

A. No, I did not.

Q. And are you asking that the shares of Advantigen be awarded to you as your non-marital property?

A. I am.

MR. STEELE: Judge, I would offer into evidence Petitioner's Exhibit 3.

THE COURT: Three is admitted.

Q (By Mr. Steele) If you turn to Tab 4 in your binder, do you recognize the documents that are in Tab 4?

A. I do.

Q. Is this the agreement that you signed when you purchased the shares?

A. It is.

Q. And it looks like the dates of investment are

13:42:20 June 22, 2022, March 19, 2023, October 13, 2023; is that correct?
13:42:27 A. That's correct.
13:42:28 Q. All of which were before the marriage?
13:42:29 A. That's correct.
13:42:31 Q. Is Exhibit 4 a true and accurate copy of the agreement that you entered into with Advantigen?
13:42:37 A. Yes, it is.
13:42:39 MR. STEELE: I would offer Exhibit 4.
13:42:41 THE COURT: Exhibit 4 is admitted.
13:42:46 Q (By Mr. Steele) Turn to Tab 5, please. You mentioned that you had a 401(k) at AIG; is that correct?
13:42:53 A. That's correct.
13:42:54 Q. And do you recognize the statement that is set forth in Tab 5?
13:42:59 A. Yes, I do.
13:43:00 Q. Is this, at least as of June of 2025, a current statement of your account?
13:43:05 A. It is.
13:43:06 Q. And did you contribute any funds to this account during the course of the marriage?
13:43:11 A. No, I did not.
13:43:12 Q. And if you turn to Tab 6, the first page of that exhibit shows the balance in that account as of June of

13:43:27 2024; is that correct?

13:43:28 A. That's correct.

13:43:29 Q. And you testified that you were married when?

13:43:32 A. The ceremony was June 24, 2024.

13:43:38 Q. So this is the account value as of approximately the date of your marriage; is that correct?

13:43:43 A. That's correct.

13:43:45 Q. And if I asked you this already, I apologize, but you've contributed nothing additionally during the course of the marriage, correct?

13:43:51 A. That's correct.

13:43:52 MR. STEELE: I would offer Petitioner's 6 and -- 5 and 6.

13:43:55 THE COURT: Five and six are admitted.

13:43:59 Q (By Mr. Steele) Turn to Tab 7, please. Are you there?

13:44:04 A. I am.

13:44:04 Q. What do you recognize Tab 7 to be?

13:44:07 A. These are my Ameriprise statements.

13:44:10 Q. And this is the value as of May of 2025; is that correct?

13:44:16 A. That's correct.

13:44:17 Q. Have you contributed to this account during the course of the marriage?

13:44:19 A. No, I have not.

13:44:21 Q. And if you turn to Tab 8, this account, I believe, was funded from -- I think you testified a couple of accounts rolling into it; is that correct?
13:44:35 A. That's correct.
13:44:36 Q. What do you recognize Tab 8 to be?
13:44:38 A. This was the Cognizant. So former employer 401(k) that I recognized in one of my opening statements.
13:44:45 Q. So this Cognizant account was rolled into Ameriprise, correct?
13:44:48 A. That's correct.
13:44:50 Q. And 8-A, you referenced earlier an E-Trade account as well; is that correct?
13:44:57 A. That's correct.
13:44:58 Q. Was that account also rolled into Ameriprise?
13:45:01 A. Yes, it was.
13:45:02 Q. And 8-A, are those your statements?
13:45:04 A. Yes, they are.
13:45:08 Q. And then turn to 8-B. What do you recognize 8-B to be?
13:45:17 A. 8-B is more Ameriprise financial statements.
13:45:22 Q. So do the exhibits in 8-A and 8-B, are they true and accurate copies of statements you received?
13:45:31 A. Yes, they are.
13:45:32 Q. And the value that we saw on 8 as of -- actually, I'm sorry -- the value in Exhibit 7, as of May

13:45:49 of '25, was approximately $449,000. That was made up of what's in 8, 8-A, and 8-B rolled into it; is that correct?

13:46:00 A. That's correct.

13:46:00 Q. And again, you contributed nothing during the marriage; is that correct?

13:46:03 A. That's correct.

13:46:04 Q. And you are asking that the Ameriprise account be awarded to you as your non-marital property; is that correct?

13:46:09 A. That's correct.

13:46:21 Q. Is your husband employed?

13:46:24 A. Yes.

13:46:24 THE COURT: Are you going to offer those, Counsel?

13:46:26 MR. STEELE: I would offer, yes, to the extent I did not, 7 and then 8 through 8-B.

13:46:31 THE COURT: Seven, 8, 8-A, and 8-B are admitted.

13:46:40 Q (By Mr. Steele) Let's just start with 9, then. Did you receive a signing bonus or a bonus at Accenture?

13:46:45 A. Yes, I did.

13:46:46 Q. How much was that bonus, if you recall?

13:46:47 A. I do. So the cash bonus was paid in two tranches. The first tranche was $150,000 that I received in November of 2024, which was a couple weeks after my

13:47:07 start date. And then the next tranche cash bonus was
13:47:12 another $150,000. It was received in November of 2025.
13:47:18 So on the one-year anniversary.
13:47:20 Q. Does any of that money still exist today?
13:47:22 A. No.
13:47:25 Q. Do you and your husband have debt that was
13:47:27 incurred during the marriage?
13:47:30 A. Yeah.
13:47:31 Q. Can you tell the judge who the creditors are and
13:47:34 the approximate amounts of those debts?
13:47:38 A. Clarifying question. Does that include the
13:47:41 debts that I have already paid off and retired?
13:47:44 Q. I will do that in a minute. The currently
13:47:46 existing debts?
13:47:48 A. Currently existing debts would be -- I have --
13:47:52 so there is about a $10,000 balance left on a SoFi loan
13:47:57 that we took out during the marriage. I have $50,000 in
13:48:06 credit card debt on my Chase card, and I have got about
13:48:09 $15,000 in debt on my CitiBank card.
13:48:17 Q. And what, if any, cash -- well, let me back up.
13:48:22 You testified or you asked me a question, I think, about
13:48:26 debt that has been retired during the marriage. Did you
13:48:28 and your husband incur debt that was paid down during the
13:48:32 marriage?
13:48:33 A. Yes, we did.

13:48:34 Q. How much debt was incurred and how much was paid down?
13:48:41 A. Sorry, just give me a second. I am not thinking. It's embarrassing for me.
13:48:52 So we incurred about -- it was close to $200,000 in debt, and that's exclusive of my credit cards that I just mentioned, which is another $65,000.
13:49:07 Q. And the $200,000 that you incurred during the marriage, was that you and your husband?
13:49:15 A. Can you clarify? He spent a lot of money on my cards.
13:49:20 Q. Who paid the debt?
13:49:21 A. I did.
13:49:24 Q. If we go back to Exhibit 9, is this the employment agreement that you entered into with Accenture?
13:49:33 A. Yes, it is.
13:49:34 Q. Is it a true and accurate copy of your employment agreement?
13:49:39 A. Yes, it is.
13:49:42 MR. STEELE: I would offer into evidence Petitioner's 9.
13:49:45 THE COURT: Nine is admitted.
13:50:07 Q (By Mr. Steele) I will come back to 10. And you did testify to this, I think, but nothing is left from that bonus you received; is that correct?

13:50:11 A. That's correct.
13:50:12 Q. What is your current annual income?
13:50:17 A. Inclusive or exclusive of regular annual bonuses?
13:50:23 Q. Start excluding annual bonuses.
13:50:25 A. Exclusive of annual bonuses, it's $390,000 a year.
13:50:29 Q. 390 or 380?
13:50:31 A. 390.
13:50:32 Q. Are you guaranteed a bonus?
13:50:33 A. No.
13:50:34 Q. When is the last time you got a bonus?
13:50:37 A. I never have gotten a bonus.
13:50:39 Q. Do you know what your approximate monthly expenses are?
13:50:47 A. Like, inclusive of attorney's fees during this time, yeah -- just give me a second. Sorry.
13:51:15 Q. Why don't you turn to Tab 13.
13:51:15 A. Okay.
13:51:15 Q. Does this represent your -- at least as of the time you put it together -- your monthly expenses?
13:51:18 A. It does.
13:51:20 Q. And it's a true and accurate representation of them?
13:51:25 A. It is.

13:51:26 MR. STEELE: I would offer Petitioner's 13.
13:51:28 THE COURT: Thirteen is admitted.
13:51:38 Q (By Mr. Steele) Turn to 14, please.
13:51:42 A. That one never lies. Sorry. Go ahead.
13:51:45 Q. What is 14? What are we looking at there?
13:51:48 A. That is -- this is a statement from my Chase
13:51:55 Bank on June 5 of 2025. And let me just identify if it's
13:52:02 checking or -- this would be my checking account.
13:52:04 Q. And what is this exhibit showing the Court, if
13:52:08 you know?
13:52:10 A. It shows a deposit of $36,789 on May 8, I think
13:52:20 it is, and a payment to credit cards totaling in
13:52:24 approximately the same amount shortly thereafter.
13:52:28 Q. And then if you turn to the June 6th to July 7th
13:52:32 statement, there looks to be a deposit of 104,000 and then
13:52:35 some withdrawals. Do you see that?
13:52:44 A. Can you tell me what page are we still on 14?
13:52:49 Q. Still Exhibit 14, but it's the second page of
13:52:52 the statement June 6th to July 7th.
13:52:54 A. Okay. I see.
13:52:55 Q. You deposited $104,000 into your account and
13:52:57 then you made some withdrawals that look like credit card
13:53:01 payments; is that correct?
13:53:01 A. That's correct.
13:53:02 Q. So these were credit cards that were paid during

13:53:04 the marriage?

13:53:05 A. That's correct.

13:53:06 Q. And these were for expenses that you used to

13:53:09 live with you and your husband; is that correct?

13:53:18 A. I don't know what's on -- I don't know what a

13:53:18 lot of -- he spent this money was on, but yes. So, yes.

13:53:24 Q. So he had access to your credit cards and made

13:53:26 charges on them; is that correct?

13:53:28 A. In excess, yeah.

13:53:30 MR. STEELE: I would offer Petitioner's 14.

13:53:32 THE COURT: Fourteen is admitted.

13:53:39 THE WITNESS: Can I just have 30 seconds to take

13:53:41 a breath?

13:53:44 THE COURT: Yes.

13:53:45 (Brief Recess)

13:53:45 THE WITNESS: Okay. Alright. I'm ready.

13:53:49 Q (By Mr. Steele) Turn to 15, please. Is this

13:53:56 a Chase statement for an account that you and your

13:53:59 husband had?

13:54:00 A. Yes, it is.

13:54:01 Q. Did he ever deposit any money into this account?

13:54:03 A. Never.

13:54:03 Q. Where did the money come from?

13:54:05 A. It came from my personal checking account in my

13:54:08 name only and my income.

13:54:13 Q. Now, the cover sheet for this exhibit says that it's your debt payments for the husband. Is that what we are looking at in this exhibit?

13:54:22 A. Yes.

13:54:23 Q. Is this a true and accurate copy of your Chase statement from December 22 of '23 to January 23 of '24?

13:54:31 A. Yes.

13:54:32 Q. Was there a Federal tax lien put on this account?

13:54:39 A. Not to my knowledge.

13:54:41 Q. What's the last page of this Exhibit 15?

13:54:51 A. This is a Federal tax lien that I uncovered that was in Jason's name from the state of Florida. Some things were hidden from me.

13:55:07 MR. STEELE: I would offer just the first two pages of 15.

13:55:13 THE COURT: Are you going to use the ones that you've given me to go to the court reporter or have you emailed her your exhibits?

13:55:21 MR. STEELE: I have an extra set. I can give her a set.

13:55:28 THE COURT: Well, it's okay. I can -- I just didn't know if you had already emailed her.

13:55:28 MR. STEELE: No.

13:55:29 THE COURT: Then 15 is admitted.

13:55:42 Q (By Mr. Steele) Does your husband have health insurance?
13:55:44 A. Yes, he does.
13:55:45 Q. Is he on your policy?
13:55:46 A. Yes.
13:55:47 Q. During the course of these proceedings was there, like, a gap in coverage that was then corrected?
13:55:52 A. There was.
13:55:54 Q. So with that correction has there been any period of time during which your husband had a lapse in coverage?
13:56:00 A. No, no lapse in coverage.
13:56:02 Q. Do you have an HSA account?
13:56:04 A. Yes, I do.
13:56:05 Q. What's in there today?
13:56:06 A. It's a couple thousand dollars. If there were a document for me to refer to, I could be more specific.
13:56:12 Q. Was the money that's in there today contributed during the marriage?
13:56:15 A. Yes.
13:56:17 Q. So you would admit that that's community property?
13:56:20 A. That's true.
13:56:43 Q. Is your husband currently employed?
13:56:44 A. Yes, he is.

13:56:45 Q. How do you know that?

13:56:46 A. Because he filed a letter from his current employer, ATI, and the letter was signed off on by Ron Nations, who is president of ATI, and that letter was dated October of 2025, and in that letter he confirmed Jason's employment and said that he had a new product for him to sell.

13:57:11 Q. And during the course of your marriage was he employed?

13:57:14 A. Yes.

13:57:15 Q. What was his historic earnings, if you know?

13:57:18 A. I don't know.

13:57:20 Q. Do you know whether he earns six figures?

13:57:23 A. Yes. So traditionally he has earned six figures, I think, going back to about 2013.

13:57:29 Q. Do you believe he's capable of supporting himself?

13:57:32 A. Absolutely.

13:57:33 Q. Did you pay some of your husband's attorney's fees during the course of these proceedings?

13:57:38 A. Yes, I did.

13:57:39 Q. Do you know how much?

13:57:40 A. It was at least 5,000. It was the first retainer, if I recall.

13:57:53 Q. You have a VEIP account through Accenture; is

13:57:56 that correct?

13:57:57 A. That's correct.

13:57:58 Q. Tell the judge what that is.

13:58:00 A. That is -- the account, as we call it, is a plan
13:58:08 where partners of the consultancy, we need to buy and,
13:58:12 like, hold a certain amount of stock. So that's the
13:58:16 savings plan where some of my paycheck is diverted there
13:58:21 in order to purchase stock. It's a taxable account.

13:58:31 Q. Is it a requirement of your employment?

13:58:32 A. It is a requirement to hold a certain number of
13:58:35 shares, yes.

13:58:36 Q. Do you know what the value of the VEIP account
13:58:38 is today?

13:58:39 A. It's about $40,000.

13:58:40 Q. And that was all contributed during the
13:58:42 marriage; is that correct?

13:58:42 A. That's correct.

13:58:43 Q. So you are conceding that that amount is
13:58:47 community property?

13:58:48 A. Yes, it is.

13:58:57 Q. So, so far we have about 40,000 in the VEIP
13:59:00 account and you said a couple or a few thousand in HSA; is
13:59:02 that correct?

13:59:02 A. That's correct.

13:59:02 Q. Is that the entirety of your community property?

13:59:09 A. Let me just think for a moment. Yes.
13:59:16 Q. And I believe you testified that you have some community debt as well, correct?
13:59:20 A. Correct.
13:59:21 Q. Does the debt exceed the community property?
13:59:24 A. Yes, by quite a lot.
13:59:26 Q. Can you quantify that?
13:59:28 A. If I recall what we just -- you know, what I just went through earlier, there is 50,000 on one of my credit cards, there is about 15,000 on a second credit card, and then there is just about 10,000 left on one of the loans that I had to take out during the marriage to cover whatever. I am not sure what I was covering. There is about $10,000 left on a SoFi loan. Let me just think for a moment.
14:00:02 That's everything that I'm aware of.
14:00:03 Q. Are you asking the judge to allocate the community debt between you and your husband?
14:00:08 A. No.
14:00:08 Q. What are you asking her to do with the community debt?
14:00:15 A. I just want to get divorced. I don't understand the question.
14:00:19 Q. Do you want to pay all of it by yourself or do you want your husband to contribute to some of the debt?

14:00:24 A. I mean, I would like him to contribute to some of the debt. I have done a lot so far.
14:00:29 Q. That's what I meant by "allocate."
14:00:32 Turn to 29. Are these your pay stubs?
14:00:42 A. Yes.
14:00:43 Q. These show your VEIP contributions, correct?
14:00:47 A. Yes, they do.
14:00:49 Q. Are they true and accurate copies of your pay stubs?
14:00:51 A. Yes, they are.
14:00:53 MR. STEELE: I would offer into evidence Petitioner's 29.
14:00:57 THE COURT: Twenty-nine is admitted.
14:01:05 Q (By Mr. Steele) Turn to 30, please. You mentioned that with the VEIP deductions you have to buy stock; is that correct?
14:01:11 A. That's correct.
14:01:12 Q. Is Exhibit 30 the investment account that holds that stock?
14:01:17 A. It is.
14:01:18 Q. Are these true and correct copies of your investment account statements?
14:01:23 A. Is that 2025? Yes.
14:01:26 MR. STEELE: I would offer into evidence Exhibit 30.

14:01:29 THE COURT: Thirty is admitted.
14:01:40 Q (By Mr. Steele) When you left Cognizant and joined Accenture, did you sign a separation agreement with Cognizant?
14:01:46 A. Yes, I did.
14:01:46 Q. If you turn to Exhibit 31, is that your separation agreement and is that your signature on the last page?
14:01:48 A. Yes. Yes.
14:01:58 Q. Is this a true and correct copy of your separation agreement?
14:02:02 A. Yes.
14:02:03 MR. STEELE: I would offer Exhibit 31.
14:02:05 THE COURT: Thirty-one is admitted.
14:02:13 Q (By Mr. Steele) You testified earlier that you had a Chase checking account before you got married. If you turn to Exhibit 32, are these statements from that Chase account?
14:02:22 A. Yes.
14:02:22 Q. These look to span the range of December 28 of '23 through May of '25; is that correct?
14:02:33 A. Yes.
14:02:34 Q. Are these true and correct copies of the Chase account statements for that time period?
14:02:39 A. They are. I would like to make a note on the

14:02:41 record that I had to close the account -- the checking
14:02:45 account that we were looking at previously and opened this
14:02:48 one because I had a disproportionate amount of fraud in
14:02:51 the other checking account. So while I always just had
14:02:53 one, you will see that there is two different checking
14:02:56 account numbers.

14:02:59 MR. STEELE: Judge, if I can just have one
14:03:01 minute to look at my notes.

14:03:03 (Brief Recess)

14:03:19 Q (By Mr. Steele) Turn to Tab 12. What are we
14:03:24 looking at in Exhibit 12?

14:03:35 A. My pay stubs.

14:03:36 Q. Are they true and correct copies of your pay
14:03:39 stubs?

14:03:40 A. Yes.

14:03:42 Q. There also looks to be a W-2 from the year 2024;
14:03:45 is that correct?

14:03:46 A. That's correct.

14:03:47 Q. Is that a true and correct copy of your 2024
14:03:50 W-2?

14:03:50 A. Yes.

14:03:53 MR. STEELE: I would offer Petitioner's 12.

14:03:55 THE COURT: Twelve is admitted.

14:04:09 Q (By Mr. Steele) You testified earlier that
14:04:10 your husband has active health insurance coverage. How

14:04:14 do you know that as you sit here today?
14:04:16 A. I know that because I get -- because I'm the primary on the health insurance, I get notified when a claim comes through. So it will say the doctor and the dollar amount and then whether or not it was covered.
14:04:49 Q. You testified that you made the payment to your husband's attorney in this case. Can I direct you to Tab 26, please, and tell me when you are there.
14:05:05 A. Okay.
14:05:05 Q. If you turn to -- at the bottom Bate's number GU000866, does this reflect that retainer payment?
14:05:20 A. Yes, it's Webb Family Law on December 13, 2024.
14:05:25 Q. Is this a true and accurate copy of your AmEx Platinum card statement for the month of December 2024?
14:05:36 A. It is.
14:05:38 MR. STEELE: I would offer into evidence 26.
14:05:40 THE COURT: Twenty-six is admitted.
14:05:50 Q (By Mr. Steele) I'm going to show you what's not in your binder. So I'm going to mark it as Petitioner's 36 and 37.
14:06:20 Start with 36 and tell us what we are looking at.
14:06:23 A. This would appear to be the K-1s from my investments and my brother's company.
14:06:33 Q. Is it a true and correct copy of the K-1 you

14:06:37 received from Advantigen?

14:06:38 A. Yes.

14:06:39 MR. STEELE: I would offer into evidence
14:06:40 Petitioner's 36.

14:06:42 THE COURT: Thirty-six is admitted.

14:06:49 Q (By Mr. Steele) Then go to 37 and tell us
14:06:52 what we are looking at.

14:07:02 THE COURT: Counsel, it's got her social on it.

14:07:08 MR. STEELE: Can I redact the social and then
14:07:08 give it back?

14:07:08 THE COURT: Yes.

14:07:08 THE WITNESS: There are social security numbers
14:07:08 all over what's already in, though.

14:07:08 THE COURT: The one I checked was redacted. In
14:07:08 the binder, I hadn't seen any that weren't.

14:07:10 Q (By Mr. Steele) Go to 37.

14:07:10 A. Okay.

14:07:10 Q. What is 37?

14:07:12 A. Thirty-seven is my 2023 tax return.

14:07:16 Q. And is it a true and correct copy of the tax
14:07:19 return that you filed with the government?

14:07:22 A. Yes, it appears to be. Yes.

14:07:25 MR. STEELE: I would offer Petitioner's 37.

14:07:28 THE COURT: Thirty-seven is admitted.

14:07:40 MR. STEELE: Judge, can I confirm with the Court

14:07:41 the exhibits I have admitted?
14:07:44 THE COURT: Yes.
14:07:44 MR. STEELE: I have 2, 3, 4, 5, 6, 7, 8, 8-A,
14:07:50 8-B, 9, 12, 13, 14, 15, 29, 30, 31, 32, 36, and 37.
14:08:08 REPORTER: No.
14:08:08 THE COURT: No.
14:08:08 MR. STEELE: Which ones did I get wrong?
14:08:08 REPORTER: I have -- that you didn't say, I have
14:08:08 26, and you didn't say that one. I have 29, 30, 31,
14:08:08 36 and 37. So I don't have 32.
14:08:45 Q (By Mr. Steele) Can you go back to 32? That
14:08:47 was your Chase checking account statements.
14:08:50 A. 32?
14:08:50 Q. Yeah.
14:08:52 A. Yes.
14:08:52 Q. Those were the Chase checking account statements
14:08:54 that you testified to spanning December of '23 through, I
14:09:00 think, May of '25; is that correct?
14:09:03 A. Correct.
14:09:03 Q. Are those true and correct copies of your Chase
14:09:06 checking account statements?
14:09:07 A. Yes, they are.
14:09:09 MR. STEELE: I would offer into evidence 32.
14:09:11 THE COURT: Thirty-two is admitted.
14:09:11 MR. STEELE: Madame reporter, is my list

14:09:11 accurate now?
14:09:11 REPORTER: Yes.
14:09:26 Q (By Mr. Steele) You are asking the judge to order that you and your husband are going to be supporting yourselves going forward, correct?
14:09:31 A. Correct.
14:09:31 Q. And you would like the ability to resume the use of your maiden name?
14:09:35 A. Yes.
14:09:37 Q. And for you and your husband to be responsible for health insurance going forward?
14:09:43 A. Yes, our own health insurance.
14:09:47 Q. And how would you like the judge to allocate debt? Would you like it to be equal between the two of you?
14:09:58 A. Yes.
14:10:00 Q. For convenience sake, would you like the judge to subtract what's in your HSA and your VEIP from the debt and then allocate what's left?
14:10:14 A. Yes, please.
14:10:17 Q. And to the extent that I've not specifically mentioned your other non-marital property, anything else that you testified to that you had prior to the marriage you would like to leave with as your non-marital property and to be allocated to you; is that correct?

A. I don't understand the question, Jonathan.
Q. Let me try to be more articulate. You testified to a number of accounts that you had prior to getting married, correct?
A. Right.
Q. And you are asking the judge to assign those to you as your non-marital property, correct?
A. Yes, please.
MR. STEELE: I have nothing further of this witness.
THE WITNESS: May I confer with my attorney for 60 seconds?
THE COURT: Yes. We can take a recess.
(Brief Recess)
THE COURT: Let's go back on the record.
MR. STEELE: Judge, I had an opportunity to speak with my client. I have nothing further of her as a witness. And then to answer your question, there is a First Amended Petition for Divorce filed on her behalf on June 23, 2025.
THE COURT: Okay. But you don't have any summary of requested relief or anything for me to --
MR. STEELE: I will have a proposed judgment that I can -- I don't know if you want me to email it to you or if I can --

14:18:49 THE COURT: You will have to efile it.
14:18:51 MR. STEELE: I can efile a proposed judgment.
14:19:03 THE COURT: Then I had a question, just to be
14:19:05 sure. Which exhibit is the one that had her debts
14:19:11 listed?
14:19:38 Is there vehicles?
14:19:42 MR. STEELE: I will ask a couple of other
14:19:44 questions. I heard one during your proveup that made
14:19:51 sense to me. Can I ask her just a couple other
14:19:54 questions?
14:19:54 THE COURT: Yes.
14:20:10 Q (By Mr. Steele) A couple follow-ups: Were
14:20:11 any children born to you and your husband during the
14:20:13 marriage?
14:20:14 A. No.
14:20:14 Q. Are you currently pregnant?
14:20:15 A. No.
14:20:16 Q. Do you have a car?
14:20:16 A. Yes.
14:20:17 Q. Is it owned or leased?
14:20:18 A. It's owned.
14:20:19 Q. And what kind of car?
14:20:21 A. A BMW.
14:20:22 Q. Does your husband have a car?
14:20:24 A. Yes, he does.

14:20:25 Q. Is it owned or leased?
14:20:26 A. It's owned.
14:20:28 Q. What kind of car?
14:20:28 A. A Jaguar.
14:20:29 Q. Are you asking the judge to assign your car to you and his car to him?
14:20:33 A. Yes.
14:20:36 Q. I don't believe there is an exhibit that sets forth the totals of the debts. So can you give me a little bit more certainty, if you know, what creditor and what amounts?
14:20:49 A. Yes. So I will just go through. CitiBank credit card in my name is about $15,000.
14:21:04 THE COURT: I think Exhibit 13 is what I was talking about.
14:21:08 THE WITNESS: Is that the one that says "288" on the bottom?
14:21:11 THE COURT: Yes.
14:21:37 MR. STEELE: Her expenses?
14:21:37 THE COURT: Yes.
14:21:41 MR. STEELE: Let's do the credit cards anyway, just for clarity sake.
14:21:45 A. Okay.
14:21:45 Q. So 15,000 to CitiBank. Who else?
14:21:48 A. Chase credit card is 50,000.

14:21:53 Q. 5-0?

14:21:55 A. Correct. Then BMW Finance is 60,000. Let me just think. And then SoFi loan, the current balance is 10,000. I don't know if I'm forgetting anything.

14:22:28 Q. Do you have an AmEx?

14:22:31 A. I do. It might be, like, 5,000.

14:22:33 Q. Does he have any credit cards?

14:22:35 A. Yes, he does.

14:22:36 Q. Do you know what the balances are?

14:22:37 A. No, I do not.

14:22:44 MR. STEELE: With that, Judge, I have nothing further of petitioner.

14:23:13 THE COURT: Just so it's clear, I can only award, divide what there has been specific testimony related to values, and it's been pretty limited what y'all have given me for separate and for community. I just want to be sure that that's the totality, that there is not more, there is not personal property, there is not current bank accounts.

14:23:43 Q. (By Mr. Steele) Is there any other bank accounts, beyond what you've testified to, that you are seeking to be allocated?

14:23:50 A. No, that's it.

14:23:51 Q. Is there any personal property, clothes, couches, things like that, that you are seeking an award

14:23:58 of?

14:24:02 A. I would like to have my guitar back.

14:24:04 Q. Anything else?

14:24:05 A. No.

14:24:05 Q. Who has your guitar?

14:24:07 A. I would like to have my guitar back and my
14:24:11 baptism cross back. Jason does.

14:24:14 Q. Any other bank accounts, any other property?
14:24:17 Now is your time to ask for anything that either of you
14:24:20 have possession of that you would like to be awarded.

14:24:27 A. Please just give me a minute here.

14:24:35 I would like to be awarded any domain names that
14:24:42 Jason holds in my name.

14:24:45 Q. When you say "holds in your name," what does
14:24:48 that mean?

14:24:49 A. That he has purchased that have my name. So,
14:24:51 for example, one that he has purchased is Gwen Ulijasz --
14:24:59 I don't know the exact domain name, but it's like
14:24:59 GwenUlijasz@ulijasz.com. So he owns a website that is in
14:25:11 my name.

14:25:13 Q. So any domain names that have, like, a variation
14:25:17 of your name in them, is what you are saying?

14:25:19 A. That's correct. Thank you.

14:25:20 Q. Any other property that you are seeking to be
14:25:22 divided or allocated?

A. Additionally, any not vested stocks. So, for example, there is stock that vests in 2029.
Q. Where is it held?
A. It's also held at UBS.
Q. In the account that you testified to earlier?
A. I don't know if it has the exact same account number, but those documents have been submitted to the court as part of discovery and reviewed on February 4th with the associate judge in that court at that time.
Q. And they are not vested yet. Do you know when they vest?
A. So 2029, and then there is a small portion -- smaller portion that vests in November 2026.
Q. So your retirement accounts, your Chase account, your car, your guitar, your shares of your brother's company, unvested stock. Anything else?
A. My dogs, just to be clear.
Q. You already have your dogs?
A. Yes, I do. That was a point of contention earlier, even though they predate the marriage.
Q. Your dogs are not marital?
A. They are not marital.
Q. Any other property you are asking to be awarded?
A. I am just asking the Court for a moment to think. It's been a long time.

14:27:00 No.

14:27:17 MR. STEELE: Judge, I think the confusion might lie in why has this case lingered for 18 months with --

14:27:24 THE COURT: No, I am not confused. I just want to make sure that -- because I don't have any summary of requested relief, I just want to make sure that there is nothing that's not being divided.

14:27:38 MR. STEELE: I was actually referring to my own confusion. I came to the case late. I am, like, the third lawyer. It dragged on for a long time, and it seemed simple on its face.

14:27:50 THE COURT: No, I wasn't confused. Sometimes -- let's go off the record.

14:27:53 (Brief Recess)

14:30:13 **DIRECT EXAMINATION CONT'D**

14:30:14 Q (By Mr. Steele) Ma'am, the guitar you are asking the judge for, when did you purchase it?

14:30:21 A. In, like, 1994.

14:30:27 Q. 20-something years ago?

14:30:29 A. Uh-huh.

14:30:30 Q. Do you know what you purchased it for?

14:30:31 A. $300.

14:30:32 Q. It has a sentimental value to you?

14:30:36 A. It does.

14:30:37 Q. And the baptism cross, how did you obtain that?
14:30:41 A. My mom and dad bought it for me when I was born.
14:30:45 Q. Sentimental value, too?
14:30:47 A. Correct.
14:30:48 Q. The dogs, how long have you had them? How long have you been in possession of them?
14:30:58 A. Two different dogs is what I've been in possession of since 2003. Another one I've been in possession of since August of 2025.
14:31:08 Q. And have you been providing the exclusive care of them?
14:31:12 A. I have been, yeah.
14:31:13 Q. Are they sentimental to you?
14:31:14 A. Yes.
14:31:15 Q. Are they like a member of your family almost?
14:31:17 A. Yes.
14:31:19 Q. I think it was the guitar, the cross, and the dogs. Did you name any other additional property that I missed?
14:31:28 THE COURT: Domain names.
14:31:30 A. I would like my sobriety coins back.
14:31:37 Q (By Mr. Steele) What are those?
14:31:40 A. In alcoholics anonymous, you get a coin when you reach different durations of sobriety, and I have 13 years and I would like any coins back that we can find.

14:31:52 Q. Are those sentimental?
14:31:54 A. Yes, they are.
14:31:56 Q. When did you get them?
14:31:57 A. Every year I have been sober since 2013.
14:32:00 Q. Do they have any sort of monetary value to them?
14:32:02 A. No.
14:32:04 Q. The domain names, start with the reason. Why do you want those awarded to you?
14:32:22 A. There is two reasons. One reason is that my past experience with a different partner is that he too purchased domain names in my name and then went on to use them maliciously and published so much information that there was nothing but that for the first three pages of Google on the Internet.
14:32:41 The second reason is because Jason, in emails, has threatened to do the same thing.
14:32:50 Q. When you say, like, the first three things, you are talking about posting exhibits from your order of protection case or divorce case on GwenUlijasz.com, right?
14:33:03 A. Correct, and in monologues, audio of phone calls, monologues about what kind of a person he thinks I am. So court documentation, audio, ranting. Whatever it is that he wanted to post, he posted.
14:33:23 Q. And apart from the cost of acquiring them for, like, $9.00, is there a monetary value? Is there a web

14:33:28 presence on any websites on the domain with your name on them that you know of?
14:33:37 A. What presence?
14:33:38 Q. Like, does your husband have GwenUlijasz.com and he's running a store on the website?
14:33:45 A. No.
14:33:45 Q. Are there any variations of your name in the domain name where it's being used to generate money?
14:33:50 A. No.
14:33:51 Q. So apart from the cost of acquiring them, which is normally nominal, is there any value to those domain names?
14:33:57 A. No.
14:33:57 Q. So you are just asking for them preventively, protectively, something like that?
14:34:03 A. Yes, based on Jason's threat. And it is IONOS.com that is used as -- that he used to purchase the domain.
14:34:15 Q. That's, like, a registrar --
14:34:19 A. Correct.
14:34:20 Q. You are not asking to be awarded IONOS.com; you are just saying that's where he bought them?
14:34:26 A. That's correct. Sorry to confuse the Court.
14:34:27 MR. STEELE: Nothing further with that.
14:34:38 THE COURT: Is there a protective order in the

14:34:40 case?

14:34:40 MR. STEELE: No. I think there was an attempt at one, but no.

14:34:57 THE COURT: Then, ma'am, you may step down.

14:34:59 Do you have any other questions?

14:35:00 MR. STEELE: No.

14:35:33 THE COURT: The Court is going to award the VEIP account to wife --

14:35:46 I'll start with the Court grants the divorce. The Court awards the VEIP account to wife and the HSA account to wife.

14:35:54 The Court awards the BMW titled in wife's name and the debt associated with the BMW to wife.

14:36:06 The Court awards the Jaguar to husband and, to the extent it has any debt associated with it, orders that husband be solely responsible for that debt.

14:36:25 The Court awards the wife all domain names that bear any portion of wife's name to wife.

14:36:58 The Court orders wife will be responsible for the AmEx in her name.

14:37:08 And then the Court orders that the SoFi loan, the Chase debt, and the CitiBank debt will be awarded -- will be split 50-50 by the parties.

14:37:28 Now, ma'am, those are in your name only?

14:37:32 MS. McKEMIE: That's correct.

THE COURT: So I'm sure you know. In order to protect your credit, if he doesn't pay, you should pay them, if you can, and then handle him later.

So the Court finds that the value of the AmEx debt was $5,000, the value of the SoFi loan debt is around $10,000, the value of the Chase Bank debt is $50,000, and the value of the CitiBank debt is $15,000.

The Court finds that neither the BMW -- ma'am, do you know how much the BMW is worth?

MR. STEELE: Judge, just to be clear, the CitiBank is 15.

THE COURT: Oh, 1,500?

MR. STEELE: 15,000, not fifty. I thought you said 5-0.

THE COURT: CitiBank I said 15, Chase I said 50.

MR. STEELE: I apologize.

THE COURT: The BMW, is there any equity over what's owed?

MS. McKEMIE: No.

THE COURT: Do you know for his Jaguar if there is any equity over what he owes?

MS. McKEMIE: I would guess it would be about even. There wouldn't be any equity.

THE COURT: The Court finds that neither the BMW

14:38:54 or the Jaguar have any value.

14:38:54 The Court finds that the VEIP account has
14:38:56 $40,000 and that the HSA account is a few thousand.

14:39:06 The Court finds that there is no value with the
14:39:08 domain names.

14:39:13 The Court finds that the wife's checking
14:39:17 accounts in her name are her separate property.

14:39:23 The Court finds that the retirement accounts in
14:39:26 wife's name with AIG and Ameriprise -- those are the
14:39:49 401(k) accounts and the traditional IRA in wife's
14:40:02 name and the Roth IRA in wife's name -- are her
14:40:06 separate property, confirmed as her separate
14:40:09 property.

14:40:09 The Court confirms the shares in the Advantigen
14:40:13 company held by wife as her separate property and the
14:40:19 unvested UBS shares.

14:40:41 Were those awarded before marriage?

14:40:46 MS. McKEMIE: Yes.

14:40:46 THE COURT: Those are confirmed as wife's
14:40:48 separate property as well.

14:40:51 The Court confirms the 1994 guitar and baptism
14:40:56 cross as wife's separate property and orders --

14:41:01 MS. McKEMIE: I'm sorry, Your Honor, I need to
14:41:02 correct that answer. They were awarded to me when I
14:41:04 started my job at Accenture as part of my hire

14:41:09 package, and that was three months after I got
14:41:16 married.
14:41:18 THE COURT: And those are unvested shares. They
14:41:20 don't have any current value. You have to continue
14:41:21 to work in order for them to earn value?
14:41:24 MS. McKEMIE: That is correct.
14:41:26 THE COURT: Then correction for the record. The
14:41:28 Court is not confirming the unvested UBS shares as
14:41:33 separate property but instead finding that they do
14:41:36 not have a current value and require additional
14:41:41 employment by wife in order to vest; therefore, they
14:41:44 are awarded to wife with no value associated with the
14:41:48 same.
14:41:52 I think I got through that sentence, but just to
14:41:55 be clear, I confirmed the 1994 guitar and the baptism
14:41:59 cross as wife's separate property, and I am ordering
14:42:03 that they be turned over to wife within 14 days of
14:42:07 today's date.
14:42:10 How would you like them returned to you?
14:42:18 MR. STEELE: Mail.
14:42:22 THE COURT: In the mail to what address?
14:42:26 MS. McKEMIE: It would be the address that are
14:42:28 on my statements. Shall I state that for the record?
14:42:31 THE COURT: Yes.
14:42:31 MS. McKEMIE: It's 11703 Huebner, H-U-E-B-N-E-R,

14:42:42 Road, Ste -- that's s-t-e -- 106, PMB for private
14:42:51 mailbox, 499 in San Antonio, Texas, 78230.
14:43:04 THE COURT: Shall be returned to wife at that
14:43:05 address, packed properly so as there is no damage
14:43:09 that comes to them.
14:43:10 So the Court is ordering that they be taken to a
14:43:15 Fed Ex location and -- actually, a UPS location and
14:43:22 professionally packed by UPS and paid for by husband.
14:43:30 MR. STEELE: The sobriety coins?
14:43:32 THE COURT: As well as the sobriety coins.
14:43:35 Those are confirmed to be wife's separate property
14:43:38 and ordered to be included in the package.
14:43:46 And what name are you wanting to change your
14:43:48 name to, ma'am?
14:43:52 MS. McKEMIE: My maiden name, which is Ulijasz.
14:43:55 MR. STEELE: Spell it.
14:43:55 THE COURT: Any middle name?
14:43:55 MS. McKEMIE: So U-L-I-J-A-S-Z, middle name
14:44:01 Laura. So it would be Gwendolyn Laura Ulijasz.
14:44:10 THE COURT: The Court grants the name change to
14:44:15 Gwendolyn Laura Ulijasz.
14:44:21 Anything else? Did I get everything?
14:44:24 MR. STEELE: You got everything. Thank you for
14:44:24 your patience. And I will efile a judgment that
14:44:30 conforms to this.

14:44:37 THE COURT: I will add, to the extent there is any personal property in possession of wife, that's awarded to her; and any personal property that's in the possession of husband, other than those items that I have ordered be returned to wife, that's awarded to husband.

14:44:52 The Court finds that it's a fair and equitable division and that the personal property doesn't have any significant value.

14:45:02 MR. STEELE: Thank you, Judge.

14:45:03 THE COURT: You are excused.

14:45:04 (Brief Recess)

14:45:33 The Court realized that I didn't mention the dogs. So the Court is confirming the one dog purchased in 2003 as the separate property of wife and awarding the dog purchased in 2025 to wife. Both dogs are in the possession wife and shall remain in the possession of wife, and the Court finds that there is no value other than sentimental value for the dogs.

14:45:58 That is the Court's ruling.

14:46:00 (End of Proceedings)

STATE OF TEXAS )
COUNTY OF DALLAS )

I, Shantel Beheler, Official Court Reporter in and for the 301st Judicial District Court of Dallas County, Texas, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by Jason McKemie to be included in this volume of the Reporter's Record in the above-styled and numbered cause, Cause No. DF24-18010, McKemie, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

I further certify that the total cost for the preparation of this Reporter's Record is $329.00 and was not paid.

WITNESS MY OFFICIAL HAND on this the 28th day of September, 2026.

Shantel Beheler

Shantel Beheler, CSR #3031
301st District Court
600 Commerce St., Room 340
Dallas, Texas 75202
Expiration: 10-31-27
Sbeheler@dallascounty.org

# EXHIBIT 6

Order Reinstating the Automatic Stay as to 5609 La Foy Blvd., Dallas, TX 75209
signed April 16, 2026 [ECF 57] (3 pages)

UNITED STATES BANKRUPTCY COURT ★ NORTHERN DISTRICT OF TEXAS ★

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Michelle V. Larson

**Signed April 16, 2026**

**United States Bankruptcy Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 7** |
| | § | |
| **JASON EMORY MCKEMIE,** | § | **CASE NO. 26-30161-MVL-7** |
| | § | |
| **Debtor.** | § | |
| | § | |

**ORDER REINSTATING THE AUTOMATIC STAY AS TO 5609 LA FOY BLVD., DALLAS, TX 75209**

Before the Court is the *Emergency Motion for Stay Pending Appeal, Temporary Administrative Stay, Alternative Motion to Alter or Amend for Reconsideration, and Request for Expedited Hearing* (the "**Emergency Motion**") filed by Jason Emory McKemie (the "**Debtor**"),

*pro se*, on April 16, 2026 [ECF No. 54].[1] In the Motion, the Debtor requests that the Court reconsider its *Order Terminating 11 U.S.C. § 362 Automatic Stay* (the "**Lift Stay Order**") entered on April 9, 2026 [ECF No. 43], in which the Court granted the *Skweres Properties LLC's Motion for Relief from Stay of Action Against Property Pursuant to 11 U.S.C. § 362 Debtor Stay as to Jason Emory McKemie and Co-Debtor Stay as to Gwendolyn Laura Ulijasz, Waiver of Thirty Day Requirement Pursuant to § 362(e), and Request for Hearing in Dallas, Texas* (the "**Lift Stay Motion**") filed by Skweres Properties LLC (the "**Creditor**") on January 21, 2026 [ECF No. 20].

As stated in the Emergency Motion, the Debtor alleges that he was not served with the Lift Stay Motion at the mailing address listed on the Debtor's petition, and therefore did not receive notice of the hearing held with respect to the Lift Stay Motion on March 31, 2026. *See* ECF No. 1. More specifically, the Debtor lists two addresses on the petition: (1) a physical address located at 5609 La Foy Blvd., Dallas, TX 75209—the real property that is the subject of the Lift Stay Motion and the Lift Stay Order: and (2) a mailing address located at 539 W. Commerce St., #2010, Dallas, TX 75208.

The Court held an emergency hearing on April 16, 2026. The Debtor appeared *pro se*. Counsel for the Creditor appeared. At the hearing, the Debtor testified that he has not paid any post-petition lease payments owed with respect to the property that is the subject of the Lift Stay Motion. Furthermore, counsel for the Creditor provided no records indicating that the Debtor was sufficiently served with the Lift Stay Motion or notice of the hearing on March 31, 2026. Finally, the Debtor testified that, if provided the relief requested in the Emergency Motion, he would be able to vacate the property located at 5609 La Foy Blvd by April 30, 2026.

---

[1] The Court notes that the Debtor's Motion has been docketed three times [ECF Nos. 54–56], given that the Debtor requests multiple forms of relief therein.

Therefore, the Court finds that, given the lack of proper service to the Debtor of the Lift Stay Motion, as well as the lack of notice given to the Debtor with respect to the March 31st hearing, the Emergency Motion filed by the Debtor is granted in part and the automatic stay is hereby reinforced pursuant to § 362 of the Bankruptcy Code **temporarily** through April 30, 2026. Any action to enforce a writ of execution in connection with ongoing eviction procedures on the property located at 5609 La Foy Blvd., Dallas, TX 75209 shall **cease immediately**. Moreover, no other party shall remove any of the possessions from the premises.

Accordingly, it is

**ORDERED** that the Emergency Motion is **GRANTED IN PART** solely to the extent that the automatic stay is reinstated as to the property located at 5609 La Foy Blvd., Dallas, TX, 75209 (and the personal property located at same) through April 30, 2026 pursuant to § 362 of the Bankruptcy Code; it is further

**ORDERED** that any and all action to enforce a writ of execution in connection with an eviction of the Debtor with respect to the real property located at 5609 La Foy Blvd., Dallas, TX 75209 shall **CEASE IMMEDIATELY**; it is further

**ORDERED** that if the locks have been changed, the landlord of the property at issue shall supply the Debtor with new keys; and it is further

**ORDERED** that the Clerk of Court shall serve a copy of this Order via regular first-class mail to the Debtor at 539 W. Commerce St., #2010, Dallas, TX 75208, and via e-mail at jmckemie@mckemie.net.

**###END OF ORDER###**

# EXHIBIT 7

Petitioner's Response to Respondent's Motion for Enforcement, Sanctions, Continuance, and Leave to Issue Third-Party Subpoenas, and Counter-Motion for Protective Order, filed in Cause No. DF-24-18010 on May 29, 2026 (Envelope 115516576) pages 1, 8, 12, and 17, with the certificate of eService (5 pages)

FILED
5/29/2026 3:42 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Donna Hall DEPUTY

NO. DF-24-18010

| | |
|---|---|
| IN THE MATTER OF THE MARRIAGE OF | IN THE DISTRICT COURT |
| | 301ST JUDICIAL DISTRICT |
| GWENDOLYN ULIJASZ-MCKEMIE AND JASON MCKEMIE | DALLAS COUNTY, TEXAS |

# PETITIONER'S RESPONSE TO RESPONDENT'S MOTION FOR ENFORCEMENT, SANCTIONS, CONTINUANCE, AND LEAVE TO ISSUE THIRD-PARTY SUBPOENAS, AND COUNTER-MOTION FOR PROTECTIVE ORDER AND FOR OTHER APPROPRIATE RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

Petitioner Gwendolyn Ulijasz-McKemie ("Petitioner" or "Gwen") files this Response to Respondent Jason McKemie's May 26, 2026 Motion for Enforcement, Sanctions, Continuance, and Leave to Issue Third-Party Subpoenas (the "Motion") and this Counter-Motion for Protective Order, and respectfully shows the Court as follows:

## I. Preliminary Statement

Discovery in this case is closed. Respondent had the entire discovery period to ask this Court to issue third-party subpoenas through the procedure the Texas Rules provide. He did not. Nothing prevented him from serving Rule 205 notices, applying for subpoenas to banks, to Accenture, to the taxing authorities, or to any other custodian during the months this case was pending. He chose not to use the tools available to him, and he now asks the Court to continue a final-trial setting so he can begin that work sixteen days before trial.

That is not trial readiness. It is a request to reopen and reset a case that has been pending for roughly eighteen months over a marriage that lasted roughly five. Respondent asks the Court to continue the June 11, 2026 trial because he says he lacks proof today. He asks for third-party



Copy from re:SearchTX

examiner familiarity. and a reasonable likelihood that the proposed methodology will yield relevant information. In re Weekley Homes. L.P.. 295 S.W.3d 309. 317-22 (Tex. 2009).

**E. Bankruptcy overlay.**

Respondent is a Chapter 7 debtor. He filed his Chapter 7 petition on January 12. 2026. The Chapter 7 trustee is Areya Holder. True and correct copies of the relevant bankruptcy orders are attached to the Affidavit of Jonathan D. Steele. and Petitioner describes them functionally here rather than by docket number alone. Those orders include an order terminating the automatic stay to permit the landlord to pursue eviction remedies: an order entered the afternoon of April 16. 2026 reinstating the automatic stay and directing that writ enforcement cease: and a later order extending Respondent's move-out deadline and expressly reserving claims for rent. expenses. damages. and automatic-stay violations for separate motion or adversary proceeding.

The Bankruptcy Code excepts certain domestic-relations matters from the automatic stay. including dissolution proceedings. but excludes from that exception proceedings to determine division of property that is property of the estate. 11 U.S.C. § 362(b)(2)(A)(iv). Section 541 includes property interests of the debtor and. in appropriate circumstances. community-property interests. and § 541(a)(5)(B) includes property the debtor becomes entitled to acquire within 180 days after filing as a result of a property settlement agreement or divorce decree. Because Respondent filed Chapter 7 on January 12. 2026. any property awarded to Respondent by decree entered before July 11. 2026 falls within that 180-day window.

The Texas family court can manage this case and proceed on dissolution and other matters expressly excepted from the automatic stay while preserving trustee and bankruptcy-court rights. What the family court should not do at this June 1 trial-readiness hearing is adjudicate theft.



Copy from re:SearchTX

The bankruptcy orders attached to the Steele Affidavit speak for themselves. One order terminated the automatic stay to permit the landlord to pursue forcible-detainer remedies. A second order, entered the afternoon of April 16, 2026, reinstated the automatic stay and directed that writ enforcement cease. A third order extended Respondent's move-out deadline and expressly reserved claims for rent, expenses, damages, and automatic-stay violations for separate motion or adversary proceeding. No bankruptcy order adjudicated theft, spoliation, stay violation, damages, property ownership, or turnover against Petitioner.

Petitioner's primary position is that the June 11 trial setting should be preserved and the Court should proceed on all matters properly before it, including dissolution, characterization of property, and any property division the Court can conduct with appropriate coordination with the trustee and the bankruptcy court. Respondent cannot use unadjudicated bankruptcy issues to manufacture a continuance.

In the alternative, if the Court determines that the property division portion of the June 11 trial requires coordination with the Chapter 7 trustee or further bankruptcy-court action beyond what is available at this setting, Petitioner does not oppose severance and reservation of the property division portion only, with the dissolution of marriage and any matters expressly excepted from the automatic stay under § 362(b)(2) proceeding on June 11 as scheduled.

Trustee Areya Holder's rights, bankruptcy-court jurisdiction, and any party's right to seek appropriate relief in the bankruptcy court are expressly preserved. Petitioner does not waive, and expressly reserves, any right to seek appropriate relief in the bankruptcy court or through the Chapter 7 trustee if Respondent asks this Court to adjudicate estate-property issues, alleged stay violations, or damages arising from property alleged to be property of the bankruptcy estate.



Copy from re:SearchTX

**Certificate of Service**

I certify that a true and correct copy of the foregoing document was served in accordance with the Texas Rules of Civil Procedure through the Texas eFile and Serve system on all counsel of record and all parties entitled to service on the same date this document is filed.

By: /s/ Jonathan D. Steele

JONATHAN D. STEELE



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Terra Aguirre on behalf of Rebecca Armstrong
Bar No. 24062589
terra@armstronglawtexas.com
Envelope ID: 115516576
Filing Code Description: Response
Filing Description: TO MOTION FOR ENFORCEMENT AND COUNTER MOTION FOR PROTECTIVE ORDER
Status as of 6/1/2026 10:16 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kim Jones | | kjones@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Jeffrey ECook | | jcook@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Tiffany Castenada | | tcastenada@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| William CCook | | wcook@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Rebecca LArmstrong | | rebecca@armstronglawtexas.com | 5/29/2026 3:42:21 PM | SENT |
| Terra Aguirre | | terra@armstronglawtexas.com | 5/29/2026 3:42:21 PM | SENT |
| Chandler Alt | | calt@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Lauren N.Shaw | | lauren@armstronglawtexas.com | 5/29/2026 3:42:21 PM | SENT |
| Jason McKemie | | jmckemie@mckemie.net | 5/29/2026 3:42:21 PM | SENT |
| Gwendolyn Ulijasz McKemie | | GUlijasz@gmail.com | 5/29/2026 3:42:21 PM | SENT |
| Gwendolyn Ulijasz | | gulijasz@gmail.com | 5/29/2026 3:42:21 PM | SENT |
| JONATHAN STEEL | | jsteele@beermannlaw.com | 5/29/2026 3:42:21 PM | SENT |
| Ethan Scroggins | | escroggins@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| JASON EMORYMCKEMIE | | jason@callvital.com | 5/29/2026 3:42:21 PM | SENT |



Copy from re:SearchTX

# EXHIBIT 8

Petitioner's Motion to Clarify and Modify the Memorandum Ruling of September 18, 2026, with Proposed Order, filed in Cause No. DF-24-18010 on September 29, 2026, 12:53 p.m. (Envelope No. 120527042) (17 pages)

**CAUSE NO. DF-24-18010**

| | | |
|---|---|---|
| IN THE MATTER OF<br>THE MARRIAGE OF<br><br>GWENDOLYN ULIJASZ-McKEMIE<br>AND<br>JASON EMORY McKEMIE | §<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br>301ST JUDICIAL DISTRICT<br><br><br>DALLAS COUNTY, TEXAS |

**PETITIONER'S MOTION TO CLARIFY AND MODIFY THE MEMORANDUM RULING OF SEPTEMBER 18, 2026**

Petitioner Gwendolyn Laura Ulijasz (formerly Gwendolyn Ulijasz-McKemie) respectfully asks the Court to clarify and modify its Memorandum Ruling of September 18, 2026 (the "Ruling"), and states:

## I. WHAT THIS MOTION ASKS

1. Petitioner does not ask the Court to revisit its decision to grant a new trial. She asks only that the provisions actually vacated match the ruling the Court announced.

2. The Ruling grants Respondent's Motion for New Trial "as to division and characterization of material property only," and denies all other relief. It then vacates Sections 8, 9, and 11 through 15 of the Final Decree of Divorce signed June 26, 2026 (the "Decree").

3. Section 8 of the Decree is captioned "Division of the Marital Estate." Petitioner reads the Ruling's reference to "material property" as a reference to the marital estate divided in Section 8, and asks the Court to confirm that reading for the reasons in Part V.C below. On that reading, Section 8 and the provisions of Section 11 that implement it fall within the stated grant. The Ruling also vacates provisions addressing attorney's fees, the preservation of records, court costs, and Respondent's requests for affirmative relief. Those provisions require the separate treatment requested below, because they do not necessarily track the scope of the property issues reopened for trial.

4. Petitioner asks for relief of two kinds, and asks the Court to treat them separately. First, she asks the Court to identify what the Ruling reopened and to preserve what is needed to try it: to reinstate Sections 9, 13, and 14, to enter a preservation order in place of vacated Section 12, to confirm what the Ruling's reference to "material property" means, to identify the ground on which the new trial was granted, and to set a status conference. Second, she asks the Court to confirm the present effect of the adjudications it expressly retained in Sections 6 and 10. The two are independent, and a disagreement about the second should not disturb the first.

5. The need for the second request is immediate and concrete. Petitioner's group health plan has advised her that it reads the Ruling as leaving the parties married, that it will reinstate Respondent as her dependent retroactive to July 1, 2026, and that it will recover the premiums for that coverage from her wages. The correspondence is attached to the Affidavit of Gwendolyn Laura Ulijasz filed with this motion. Petitioner does not ask the Court to adjudicate the plan's obligations, and this motion is not the vehicle for that dispute. She offers the correspondence to show that the questions presented here are being answered now, by third parties, without the Court.

## II. BACKGROUND

6. The Court signed the Decree on June 26, 2026, following a trial on June 11, 2026 at which Respondent did not appear. Respondent, appearing pro se, filed a Motion for New Trial on July 27, 2026. The Court heard argument on September 3, 2026 and held open a single question, whether the Decree is void because it was signed while Respondent's Chapter 7 case was pending. Both parties briefed that question, Petitioner's brief being filed September 11, 2026.

7. The Ruling issued September 18, 2026. It grants the Motion for New Trial in part, as to division and characterization of material property only; denies all other relief; vacates Decree Sections 8, 9, and 11 through 15; leaves Sections 1 through 7 and 10 "in full force and effect but .

. . interlocutory"; and provides that "[t]he remaining issues shall be set for trial once the stay has been lifted or Respondent's bankruptcy case is otherwise disposed."

8. On September 11, 2026, through counsel admitted in that court, Petitioner filed a motion in the United States Bankruptcy Court for the Northern District of Texas, No. 26-30161-mvl7, asking that court to determine that the automatic stay did not apply to the dissolution or to property that was not property of the bankruptcy estate, and alternatively to annul the stay as to the Decree. That motion is pending.

**III. THE COURT HAS AUTHORITY TO GRANT THIS RELIEF**

9. Petitioner does not question the Court's authority to sign the Ruling. Respondent's timely Motion for New Trial was overruled by operation of law on September 9, 2026, seventy-five days after the Decree was signed, Tex. R. Civ. P. 329b(c), and under Rule 329b(e) the Court's plenary power ran for thirty days after that date. The Ruling was signed within that period.

10. What the Ruling did, however, was eliminate the final judgment. It vacated most of the Decree and declared the remainder interlocutory. Rule 329b "terminates the trial court's plenary power 30 days after all timely motions for new trial are overruled, but there is no provision limiting its plenary power if such motions are granted." *In re Baylor Medical Center at Garland*, 280 S.W.3d 227, 230 (Tex. 2008). "Plenary power of course expires only after final judgments, not vacated judgments," and "if no judgment is signed, no plenary-power clock is ticking." *Id.* When a new trial is granted the case "stands on the trial court's docket 'the same as though no trial had been had,'" and the court retains power to revisit its order "any time before a final judgment is entered." *Id.* at 230–31 (quoting *Wilkins v. Methodist Health Care System*, 160 S.W.3d 559, 563 (Tex. 2005), and *Fruehauf Corp. v. Carrillo*, 848 S.W.2d 83, 84 (Tex. 1993)); accord *Hidalgo v. Hidalgo*, 310 S.W.3d 887 (Tex. 2010) (per curiam).

11. Petitioner therefore does not ask the Court to exercise plenary power over a final judgment. She asks a court with continuing jurisdiction over a pending cause to conform one of its own interlocutory orders to the ruling the Court announced in it. That the new trial here is partial does not change the analysis. A partial new trial leaves no final judgment against which a plenary-power clock can run, and the authority the Court retains is the authority to say what its own order decided.

## IV. THE ANCILLARY PROVISIONS REQUIRE CLARIFICATION OR LIMITED MODIFICATION

### A. Section 14 denied Respondent's counterpetition and all of his affirmative relief.

12. Section 14 provides that Respondent, "having failed to appear, prosecute, or proceed at trial, all relief requested in Respondent's Original Counterpetition for Divorce, his First Amended Counterpetition for Divorce, and any other pleading or request for affirmative relief filed by Respondent is in all respects DENIED."

13. The consequence of vacating that denial is not self-evident, and that is the difficulty. The denial is an omnibus one: it reaches relief inside the reopened issues and relief outside them, and the Ruling does not say which part of it fell. Respondent's Original Counterpetition for Divorce, filed December 20, 2024, and his First Amended Counterpetition for Divorce, filed December 31, 2024, each allege that the parties "entered into an informal marriage on or about February 1, 2024," some five months before the ceremonial marriage. Section 5 of the Decree, which the Ruling leaves in force, finds that no informal marriage existed between the parties before June 22, 2024 and that the community estate commenced on that date. Vacating Section 14 while leaving Section 5 standing creates uncertainty whether the relief requested in those pleadings has been reopened.

14. Respondent's own pleadings do not put the date of the ceremonial marriage in issue. His First Amended Counterpetition alleges that the parties "entered into a ceremonial marriage on or about June 22, 2024," and the declaration he filed with it states the same. What the counterpetitions add is the allegation of an earlier informal marriage, which is the proposition Section 5 resolves.

15. Petitioner does not read the Ruling as reopening that question. The Ruling grants a new trial on division and characterization "only," and it denies "[a]ll other relief requested." But the tension between a vacated denial and a standing finding is real, it goes to what will be tried, and it is better resolved on a motion to clarify than on the eve of the retrial.

16. Petitioner asks the Court to reinstate Section 14 to the extent it denies affirmative relief outside the division and characterization of the marital estate, and to clarify that the new trial reaches those issues and no others. Nothing in the relief requested is intended to prevent either party from litigating the issues the Ruling expressly reopened.

**B. Section 12's preservation obligation should be restored; its discharge from Rule 191.4(d) should not.**

17. Section 12 discharged the parties from the document-retention requirement of Rule 191.4(d), and then imposed an affirmative obligation on each of them to preserve "all documents, financial records, account statements, transfer records, domain-registration records, communications, shipment records, exhibits, and other materials reasonably necessary to enforce this Decree, respond to any appeal, restricted appeal, motion for new trial, bankruptcy trustee request, creditor claim, tax filing, or enforcement proceeding."

18. That obligation is a preservation order. It divides nothing and characterizes nothing. Its removal takes away the Decree's tailored preservation obligation at the moment the Court has ordered a new trial on the division of the marital estate, which is to say at the moment the records it covers matter most, and while collateral proceedings concerning those same records are pending in the bankruptcy court.

19. Petitioner does not ask the Court to reinstate Section 12 as written. That section did two things and only one of them should return. Petitioner asks the Court to enter a preservation order directed to both parties in the terms of Section 12's preservation obligation, and asks the Court not to restore the discharge from Rule 191.4(d). With a new trial pending on the division of the marital estate, the retention requirement that rule imposes should operate rather than be excused.

20. A preservation order of that kind compels no production, determines the character or ownership of no property, directs no transfer or turnover, and is not intended to authorize any act stayed by 11 U.S.C. § 362.

**C. Sections 9 and 13 allocate fees and costs.**

21. Section 9 orders each party to bear his or her own attorney's fees and costs. Section 13 taxes costs of court against the party who incurred them. Petitioner recognizes that attorney's fees may bear on a just and right division of the community estate. *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981). The Ruling, however, does not say whether the Court intended to reopen the existing allocation as part of the division it has sent back or to leave fees and costs for determination at the conclusion of the new trial. Petitioner does not suggest that the Court was confined to the relief Respondent requested; Rule 320 permits a new trial on the Court's own motion.

22. Petitioner asks the Court either to reinstate the existing allocation, or, in the alternative, to clarify that entitlement to and allocation of those fees and costs remain undecided and will be determined at the conclusion of the new trial. Either disposition tells the parties where the question stands; silence does not. Any reinstatement is directed to fees and costs incurred through entry of the Decree and is not intended to reach fees or costs arising from proceedings after that date.

**D. Petitioner does not ask for Sections 11 or 15 back.**

23. Section 11 requires the parties to execute instruments and to turn over property "awarded to the other party under this Decree." It implements the division in Section 8, and with Section 8 vacated it has nothing to operate on. Section 15 recites that the Decree is final and appealable, which the Ruling has made inaccurate. Petitioner does not ask the Court to reinstate either one, and identifies them here so that the Court may see that this motion is directed only at the provisions that fall outside the stated grant.

## V. CLARIFICATIONS

**A. The dissolution and the name change.**

24. The Ruling leaves Sections 1 through 7 and 10 "in full force and effect" while describing them as interlocutory. Section 5 finds that the parties were married on June 22, 2024 and that no informal marriage existed between them before that date. Section 6 grants the divorce. Section 10 changes Petitioner's name to Gwendolyn Laura Ulijasz. Petitioner has already presented that name change to third parties who will be asked to act on it.

25. This is no longer an uncontested point. Respondent has since moved to vacate Sections 1 through 7 and 10 as well, so that nothing of the Decree would remain. Petitioner will respond to that motion separately and does not brief it here. She notes it only because it bears on the relief requested in this Part.

26. Respondent's argument rests on *Jacobs v. Jacobs*, 687 S.W.2d 731 (Tex. 1985), which holds that a court "must remand the entire community estate for a new division when it finds reversible error which materially affects the trial court's 'just and right' division of the property." *Id.* at 732. That is a correct statement of the rule and Petitioner does not quarrel with it. It is a rule about the community estate. *Jacobs* was "a divorce case in which only the property division is challenged on appeal," *id.*, and nothing in the opinion suggests that a new division unsettles the dissolution. The premise of the rule is that the two travel separately.

27. The stay provision addressed in the parties' briefing draws the same line. The automatic stay does not reach "the commencement or continuation of a civil action or proceeding . . . for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate." 11 U.S.C. § 362(b)(2)(A)(iv). Petitioner does not offer that provision as an answer to any question of Texas finality; it does not speak to that subject. She offers it for the narrower proposition that if the ground for the new trial is the stay, the provisions the stay never reached had no occasion to be disturbed on that ground. The dissolution in Section 6, the name change in Section 10, and the finding in Section 5 that the parties married and that no informal marriage preceded that marriage are provisions of that kind.

28. Two questions follow, and Petitioner asks the Court to keep them separate. The first is what the Ruling reopened. The Ruling preserves Section 5 in terms, and Petitioner asks the Court to confirm that the new trial does not reopen the findings in that section. Petitioner does not contend that the Court lacks authority to modify an interlocutory ruling. She asks the Court to identify whether it has done so, rather than leaving the scope of the retrial to competing inferences.

29. The second question is the present legal effect of the provisions the Court expressly retained: whether the dissolution granted in Section 6 and the name change ordered in Section 10 are effective now, so that a bank, an employer, a plan administrator, or a taxing authority presented with the Decree and the Ruling together is not left to reconcile "in full force and effect" with "interlocutory" on its own. That is the question paragraph 5 describes, and it is the one question Petitioner does not ask the Court to answer on this motion.

30. The reason is candor about what the question requires. The effect of a partial new trial on a dissolution has been addressed in Texas decisions that do not all point the same direction. Compare *Vautrain v. Vautrain*, 646 S.W.2d 309, 314, 316 (Tex. App.—Fort Worth 1983, writ dism'd), with *In re Marriage of Sandoval*, 619 S.W.3d 716, 723 (Tex. 2021), where the Supreme Court of Texas, granting a new trial on a spouse's separate-property claim, stated that affording him the opportunity to establish ownership "will not upset the underlying divorce, custody, support, or division of the community assets," a proposition the Court restated last term in *Tabakman v. Tabakman*, No. 24-0919 (Tex. Dec. 5, 2025) (per curiam). Answering the question properly requires briefing those decisions rather than assuming them away. Petitioner therefore asks the Court to confirm only that the Ruling did not reopen the findings in Section 5 or the merits of the adjudications in Sections 6 and 10, and separately requests expedited briefing and a determination of the present legal effect of those retained adjudications, including the operative date of the dissolution and the name change. The Court may grant the scope, preservation, and case-management relief requested in this motion without deciding those separate questions. Petitioner does not seek through this motion an adjudication of the health plan's eligibility rules or of its authority to deduct premiums.

**B. The ground for the new trial.**

31. The Ruling does not state the ground on which the new trial was granted. The only question the Court held open at the September 3 hearing was the effect of the automatic stay, and both parties briefed that question. A new trial after a default may rest on a ground other than the one the movant presses: Rule 320 permits the Court to find good cause on a ground identified in the motion or on its own. *Tabakman v. Tabakman*, No. 24-0919, slip op. at 4 n.3 (Tex. Dec. 5, 2025) (per curiam). Petitioner therefore asks the Court to identify whether the partial new trial rests on the automatic stay, on an independent ground, or on both, so that the parties can conform their conduct to it and so that the scope of the retrial is not litigated again when the case is reached.

32. The distinction is practical. If the new trial rests on the stay, the Bankruptcy Court's determination of the stay's application, or its ruling on Petitioner's alternative request to annul the stay, may materially affect whether a new trial remains necessary and what it must reach. An independent ground for a new trial may remain even if the Bankruptcy Court grants the relief Petitioner seeks. Petitioner does not suggest that a ruling in the Bankruptcy Court would of itself restore any vacated provision of the Decree. She would ask this Court for whatever further order that ruling warranted.

**C. The reference to "material property."**

33. The Ruling grants a new trial "as to division and characterization of material property only." The Decree contains no section, and Texas marital-property law contains no category, by that name. What Section 8 of the Decree divides is the marital estate.

34. Petitioner does not raise this to make something of a single word. She raises it because the scope of the retrial and the reach of the vacatur both depend on it, and because a dispute later about what the Ruling covered is avoidable now. Petitioner asks the Court to confirm that the Ruling refers to the marital estate divided in Section 8. If the Court intended something narrower, Petitioner asks the Court to identify the property to which the new trial extends.

**D. The vacatur does not divest Petitioner of separate property.**

35. Section 8.C confirmed and set aside to Petitioner five items as her separate property, S-1 through S-5, including a 401(k) valued as of the date of marriage, two individual retirement accounts traced to periods before the marriage, and membership units confirmed by clear and convincing evidence of inception of title. Vacating Section 8 removes that adjudication, and Petitioner accepts that characterization is among the issues the Court has reopened. She does not ask the Court to restore the vacated characterizations. She asks the Court to confirm what is not open: that the Ruling itself makes no replacement award of the property formerly addressed in Section 8 and directs no transfer or turnover of it, and that the vacatur does not operate to divest either party of separate property. A trial court has no power to do the latter. "Trial courts have a broad latitude in the division of the marital community property, but that discretion does not extend to a taking of the fee to the separate property of the one and its donation to the other. . . . The fee to the separate property, however, may not be divested." *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 142 (Tex. 1977). The rule reaches separate personal property as well: "We can find no justifiable reason for treating separate personalty in a different manner than separate realty in divorce proceedings." *Cameron v. Cameron*, 641 S.W.2d 210, 219–20 (Tex. 1982); see Tex. Fam. Code §§ 3.001, 7.001. The institutions holding the accounts identified in Section 8.C were presented with the Decree, and the confirmation Petitioner asks for is directed at them as much as

at Respondent. It does not determine the character of any asset, resolve any claim of the bankruptcy estate, or authorize any act stayed by 11 U.S.C. § 362.

## VI. A STATUS CONFERENCE, AND THE PENDING BANKRUPTCY MOTION

36. The Ruling defers the new trial until "the stay has been lifted or Respondent's bankruptcy case is otherwise disposed." No discharge has been entered in that case. A creditor's complaint objecting to Respondent's discharge is pending as Adversary No. 26-03034-mvl, with a docket call set for October 6, 2026. Discharge, closure of the bankruptcy case, and termination of the stay as to particular property are distinct events under 11 U.S.C. § 362(c), and relief as to particular property may be granted under § 362(d) before any of them. While the condition the Ruling sets remains unsatisfied, the marital estate remains undivided and neither party can deal with the property with any certainty.

37. Petitioner's pending motion under 11 U.S.C. § 362 asks the Bankruptcy Court to resolve the stay question as it bears on this cause. Petitioner asks this Court to set a status conference within thirty days, and to direct the parties to report the disposition of that motion within seven days after it is decided, so that this cause can be reached promptly.

## VII. PRAYER

38. Petitioner respectfully requests that the Court:

(a) confirm that the Ruling's reference to "material property" is a reference to the marital estate divided in Section 8 of the Decree, or, if the Court intended something narrower, identify the property to which the new trial extends;

(b) clarify that the new trial granted by the Ruling is limited to the division and characterization of the marital estate, and that it does not reopen the findings in Section 5 of the Decree;

(c) reinstate Section 14 of the Decree to the extent it denies relief outside the division and characterization of the marital estate;

(d) reinstate Sections 9 and 13 of the Decree as to attorney's fees and court costs incurred through entry of the Decree, or state that fees and costs are carried to the conclusion of the new trial;

(e) enter a preservation order directed to both parties in the terms of Section 12's preservation obligation, without restoring Section 12's discharge from Tex. R. Civ. P. 191.4(d);

(f) confirm that the Ruling makes no replacement award of the property formerly addressed in Section 8 and directs no transfer or turnover of that property, and that the vacatur does not divest either party of separate property;

(g) identify whether the new trial rests on the automatic stay, on an independent ground, or on both;

(h) set a status conference within thirty days and direct the parties to report the disposition of Petitioner's pending motion under 11 U.S.C. § 362 within seven days after it is decided;

(i) confirm that the Ruling did not reopen the merits of the adjudications in Sections 6 and 10 of the Decree, and set expedited briefing and a determination of the present legal effect of those adjudications, including the operative date of the dissolution and the name change; and

(j) grant Petitioner such other and further relief to which she is entitled.

39. The relief requested in subparagraphs (a) through (h) is independent of the relief requested in subparagraph (i), and Petitioner asks that it be granted whether or not the Court grants subparagraph (i).

Respectfully submitted,
BEERMANN LLP
By: /s/ Jonathan D. Steele

Jonathan D. Steele (admitted pro hac vice)
Illinois ARDC No. 6308171
161 N. Clark Street, Suite 3000
Chicago, Illinois 60601
Tel. 312.621.9700 | Fax 312.621.0909
jsteele@beermannlaw.com

Rebecca Lee Armstrong
State Bar No. 24062589
Resident/Sponsoring Counsel
ARMSTRONG DIVORCE AND FAMILY LAW, PLLC
5949 Sherry Lane, Suite 835
Dallas, Texas 75225
Tel. 214.741.9906 | Fax 972.408.3455
rebecca@armstronglawtexas.com

**ATTORNEYS FOR PETITIONER GWENDOLYN LAURA ULIJASZ**

## CERTIFICATE OF CONFERENCE

This is a motion for the correction, modification, or amendment of an order, which Local Rule 3.03(i) excepts from the certificate of conference requirement. Conference with Respondent was not held. Petitioner will promptly advise the Court if Respondent states that he does not oppose any part of the relief requested.

/s/ Jonathan D. Steele

## CERTIFICATE OF SERVICE

I certify that on September 25, 2026, a true and correct copy of this motion was served on Respondent Jason Emory McKemie, pro se, through the electronic filing manager and by email to jmckemie@mckemie.net, and at 539 W. Commerce St., #2010, Dallas, Texas 75208.

/s/ Jonathan D. Steele

**EXHIBIT A: PROPOSED ORDER**

**CAUSE NO. DF-24-18010**

IN THE MATTER OF THE MARRIAGE OF GWENDOLYN ULIJASZ-McKEMIE AND JASON EMORY McKEMIE

IN THE DISTRICT COURT, 301ST JUDICIAL DISTRICT, DALLAS COUNTY, TEXAS

**ORDER ON PETITIONER'S MOTION TO CLARIFY AND MODIFY**

On this day the Court considered Petitioner's Motion to Clarify and Modify the Memorandum Ruling of September 18, 2026. Having considered the motion, the Court ORDERS as follows.

1. The reference in the Memorandum Ruling of September 18, 2026 to "material property" is a reference to the marital estate divided in Section 8 of the Final Decree of Divorce signed June 26, 2026.

2. The new trial granted by the Memorandum Ruling of September 18, 2026 is limited to the division and characterization of the marital estate, being Section 8 of the Final Decree of Divorce, and the provisions of Section 11 that implement it. The new trial does not reopen the findings in Section 5 of the Final Decree of Divorce.

3. Section 14 of the Final Decree of Divorce is REINSTATED except as to the division and characterization of the marital estate and except as to any matter reserved in paragraph 4 of this Order. The denial in Section 14 of the relief requested in Respondent's Original Counterpetition for Divorce, his First Amended Counterpetition for Divorce, and any other pleading or request for affirmative relief filed by Respondent otherwise stands. Nothing in this paragraph prevents either party from litigating the issues reopened by paragraph 2.

4. Sections 9 and 13 of the Final Decree of Divorce are REINSTATED as to attorney's fees and court costs incurred through June 26, 2026.

[ALTERNATIVE to paragraph 4, if the Court prefers to reserve the question: Entitlement to and allocation of attorney's fees and court costs incurred through June 26, 2026 are RESERVED for determination at the conclusion of the new trial. This Order does not adjudicate entitlement to or allocation of fees or costs incurred after that date.]

5. Until further order of this Court, each party is ORDERED to preserve, to the extent within that party's possession, custody, or control, all documents, financial records, account statements, transfer records, domain-registration records, communications, shipment records, exhibits, and other materials reasonably necessary to the new trial ordered by the Memorandum Ruling, to Petitioner's pending motion under 11 U.S.C. § 362 in In re Jason Emory McKemie, No. 26-30161-mvl7 (Bankr. N.D. Tex.), and to Adversary No. 26-03034-mvl in that case. The document-retention requirement of Tex. R. Civ. P. 191.4(d) applies to both parties in this cause. This paragraph compels no production, determines the character or ownership of no property, directs no transfer or turnover of property, and authorizes no act stayed by 11 U.S.C. § 362.

6. The Memorandum Ruling makes no replacement award of the property formerly addressed in Section 8 of the Final Decree of Divorce and directs no transfer or turnover of that property, and its vacatur of Section 8 does not divest either party of separate property. This paragraph does not determine the character of any asset, resolve any claim of the bankruptcy estate, or authorize any act stayed by 11 U.S.C. § 362.

7. The new trial granted by the Memorandum Ruling rests on the following ground or grounds: ______________________________________.

8. This cause is set for a status conference on ____________________, 2026, at ________ __.m. The parties shall report to the Court the disposition of Petitioner's pending motion under 11 U.S.C. § 362 in In re Jason Emory McKemie, No. 26-30161-mvl7 (Bankr. N.D. Tex.), within seven days after that motion is decided.

9. The Memorandum Ruling did not reopen the merits of the dissolution granted in Section 6 of the Final Decree of Divorce or of the change of Petitioner's name to GWENDOLYN LAURA ULIJASZ ordered in Section 10. The present legal effect of those adjudications, including their operative date, is set for briefing and determination as follows: Petitioner's brief due ____________________, 2026; Respondent's response due ____________________, 2026.

SIGNED on ____________________, 2026.

________________________________
JUDGE PRESIDING

# EXHIBIT 9

Transcript of recorded call with Inspira Financial (administrator of the Accenture health savings account), January 8, 2026, with Movant bridged onto the call; speaker labels corrected by the Debtor from the audio (15 pages; Movant's telephone numbers, mailing address, and Social Security digits redacted).

# HSA - Gwen Demands Receipt Uploads, hung up on operator when asked for Credentials, operator confirms Only 1 Login per HSA, Gwen ordered new card gave me disconnect old at hearing, no bal avail despite testimony, >2months no Meds. >$36k Bills so Far

2026-01-08 18:56:23

**00:00:04 IVR**
Your call will be recorded for quality assurance and training purposes.

**00:00:17 HSA Rep.**
Thank you for calling Inspira. This is Jen. To better assist, can I please have the account holder's first and last name?

**00:00:25 Jason M.**
It's Jason McKinney.

**00:00:31 HSA Rep.**
Thank you. Correct me if I'm wrong, is your first name spelled J-A-S-O-N?

**00:00:40 Jason M.**
It is and the last name is McKemie M C K E M I E.

**00:00:52 HSA Rep.**
Thank you and can I also please have a zip code?

**00:00:59 Jason M.**
I mean the one that the HSA card is registered to is [redacted].

**00:01:07 HSA Rep.**
Thank you. Are you the account holder?

**00:01:09 Jason M.**
That's my wife is actually.

**00:01:14 HSA Rep.**
Oh okay, but your name is Jason McHenry correct? Correct. Alright thank you so much Mr McHenry, but can I also please have the account holder's login so that I can pull up the account.

**00:01:29 Jason M.**
Sure, it's Gwendolyn G W E N D O L Y N UliJazz U L I J A S Z.

**00:01:46 HSA Rep.**
Thank you, and the zip code is [redacted] correct. That's correct. Thank you. And is the account holder an active participant of a plan? Yes. I have the card with me. Just go ahead and try to pull it up one moment.

**00:02:34 Jason M.**
Do you need her phone number? Would that help, or her date of birth, or social, anything like that?

**00:02:42 HSA Rep.**
I'll try it here first. And you said this is for a Health Savings Account, right there HSA correct? That is correct. Thank you. I was not able to pull it up. Thank you so much for waiting, Mr. McKemie. And before I proceed, sir, can the account holder be available right now to get a verbal authorization?

**00:03:19 Jason M.**
We can definitely bridge her in. She's not here with me right now, but we're both authenticated within the account and I am covered under her plan. We've always had the same credentials on the cards. She gave me the card. We can bridge her in.

**00:03:44 HSA Rep.**
Sir, no worries. With regards to that case, I can definitely help you and provide any information you need about the account. However, it will be a process we have to go through on the account. I need to get verbal authorization. Before I proceed with the verification process, what do you call this one?

**00:04:11 Jason M.**
May I know what the reason is why you're calling? I was trying to activate the card, but I didn't. I was trying to link it up with Apple Pay, but it wasn't adding to my account.

**00:04:24 HSA Rep.**
I can definitely help you with that. This activation of the card and adding Apple Pay to the account will be a process, so we have to get verbal authorization from Mr. McKemie. We can do a three-way call. Allow me to go ahead and call her. May I know her best phone number?

**00:04:55 Jason M.**
It's here. I've got it right here. Let's see. The oh it just changed recently actually. So there is a couple here, try her at [redacted]. And then the second number you can try her at, if you don't get her, there would be [redacted] five. And we are going through a divorce at this time, but I am covered through her plan, so I'll just let you talk to her. But I am authenticated. I am authenticated to use this card. I'm supposed to be getting a card with my.

**00:05:52 Jason M.**
Own name. I was supposed to be, but she was saying there's some issue with that. Is there a problem issuing a second card in my name?

**00:06:03 HSA Rep.**
No sir. Actually, if requested, we will definitely send you a card. But in this case, since we have

**00:06:15 Jason M.**
No, I just have an official document from her. A card was already requested twenty five days ago.

**00:06:25 HSA Rep.**
Oh okay I see, I can go ahead and check if there's an update on that one, but can you please provide me with the full address associated with the account.

**00:06:34 Jason M.**
[redacted].

**00:06:39 HSA Rep.**
Oh sorry sir sorry to cut you off

**00:06:45 HSA Rep.**
That is not actually the one that we have here on file.

**00:06:49 Jason M.**
For me? You might have fifty [redacted]

**00:06:56 HSA Rep.**
Hold on one second for me. Are you talking about for me or for her? It's her address, the one that's on the file.

**00:07:05 Jason M.**
Oh okay I thought you were asking for me because we're both covered under the plan. I just sorry

**00:07:13 HSA Rep.**
Here. It's.

**00:07:17 Jason M.**
You probably got Well, the main ones are [redacted]. It's either that one or you have [redacted].

**00:07:31 HSA Rep.**
Are these the first ones you provided to me?

**00:07:34 Jason M.**
[redacted] San Antonio [redacted].

**00:07:42 HSA Rep.**
Thank you. After the suite number, there's another information in here on the address. Could you provide that one to me as well? What's that? After the suite number, there is another information on the address.

**00:08:00 Jason M.**
San Antonio, Texas. It's suite number [redacted] San Antonio [redacted].

**00:08:16 HSA Rep.**
Hold on. There is a suite number, which is correct: one O, six and then PMB. But there's another number in here after the PMB.

**00:08:27 Jason M.**
It's private mailbox. Everything I've ever mailed is to One O six. Oh yeah, you do. Hold on here. I got it.

**00:08:41 HSA Rep.**
Take your time.

**00:08:46 Jason M.**
Four nine.

**00:08:51 HSA Rep.**
Thank you so much for that information. And sir, what's the last four digits of the account holder's socials of Miss Yolijas?

**00:09:02 Jason M.**
Hold on. It's that is, let's see here. Two four five seven.

**00:09:15 HSA Rep.**
Two four five seven. And what's the last four digits of the card, sir?

**00:09:21 Jason M.**
That is five three seven nine. Five three seven nine.

**00:09:27 HSA Rep.**
Is that the one you have right now?

**00:09:34 Jason M.**
Five three seven nine is the last four.

**00:09:38 HSA Rep.**
Correct last four. Hold on one second for me, is there more than one I'm? Actually sorry, that's not the one associated here on the account, probably because there was a card order before. That's why that's not. The one that's updated here is the one that we sent out updated.

**00:10:09 HSA Rep.**
Twenty five days ago, that account holder requested.

**00:10:14 Jason M.**
So wait, wait, wait, hold on. You said that you ordered. There was a card order twenty five days ago.

**00:10:24 HSA Rep.**
The date I cannot confirm that. But since the card you have or the card you provided to me is not matching what we have here on file. You stated that there was a requested card order. Probably the one associated with this account already is the one we sent out for the requested card.

**00:10:52 Jason M.**
So I think what might have happened. All of our HSA cards have always worked the same. We've had it so it doesn't matter if it's my name or her name on it. It's always the same card credentials. It's the same zip code, it's the same PIN, so it doesn't really matter which card. She was supposed to produce it at the court yesterday. And if she hadn't ordered that in time, I think she brought the card that she had because she had to comply with a court order. This is supposed to be a working card for me right now because I am actually having surgery.

**00:11:40 Jason M.**
So I don't know if you need to call her, but I need to get a card mailed to me asap because I need it for a procedure.

**00:11:51 HSA Rep.**
So no worries. Here's what we'll do. We will call the account holder to ask her about that and then just get verbal authorization as well. So that I can freely provide you information about the account because all of the information that I'm providing right now is general information. Since I cannot fully authenticate the account first, we will try to call her with the best number that you provided to me earlier. But just in case we got disconnected, what's going to be your best callback number for me to call? 214-868-4901.

**00:12:36 HSA Rep.**
I got two one four eight six eight four nine zero one. Correct? That's correct. Thank

you so much. So I just placed the call on hold, sir. I'll go ahead and dial this. I might place it for thirty seconds or one minute and then I'll merge the call once I got through.

**00:12:57 Jason M.**
It's okay. If you find out what you need, that's fine. That's great. That sounds good. Talk to you soon. I'll be right here.

**00:13:06 HSA Rep.**
Thank you so much and please stay on the line.

(Gwendolyn Ulijasz) Hello? Hello?

**00:13:31 HSA Rep.**
Hi, ma'am. This is Bein from Inspire Financial. I am looking tfor Gwen Ulijasz. (Gwendolyn Ulijasz) Hi, Yes, this is she. (HSARep). Hi, ma'am. I have your ex-spouse here on the other line, Mister Jason McKemie, and we are here trying to process things about your Inspire Financial account or information. I'm calling because we wanted to get a verbal authorization from you. Are you free today? (Gwendolyn Ulijasz). So what is the authorization for? (HSA Rep) I'm calling your Oh, let's see sorry. Mr. McKemie is calling in trying to activate the (HSA) card and add his Apple Pay to the HSA.

**00:14:28 HSA Rep.**
We are here trying to validate the card associated with the account. We wanted to get a verbal authorization from you before we process this. (Gwendolyn Ulijasz) You can go ahead. Please remind him that everything requires a receipt, and it must be uploaded in your portal. (HSA Rep) He is actually on the line ma'am.

**00:14:54 Jason M.**
Yeah, So I just need the portal web address and the password and that'll be done. As soon as I receive that password, I will begin uploading those receipts. But thank you. (Gwendolyn Ulijasz) No, I don't have a password. You got to do this on your own Jason. So I'm not doing anything. (Jason McKemie) There's only one account holder. (Gwendolyn Ulijasz) Thank you very much. (Gwendolyn Hangs up the Phone) (Jason McKemie) Tell me, are there two passwords for this system, or is there only one? Predominant, is there only one account holder password like our old one?

**00:15:31 HSA Rep.**
I'm so sorry about that.

**00:15:34 Jason M.**
I need to know if I can set up a separate account other than hers. I don't want to get into this game where she tells me to upload receipts but won't give me a password to log in and submit receipts. That was the old game.

**00:15:47 HSA Rep.**
I understand, Sir. Generally, if she has a health savings account, no need to submit any documents at all. All you have to do is keep the documentation, just in case the IRS does a random audit. But Sir, I will ask her for the last four digits of the (active) card. Probably she actually has it. I wasn't able to get that. I'm so sorry about that, but since I already got a verbal authorization from her.

**00:16:21 HSA Rep.**
About your account, I just need one more thing. I really needed the last four digits associated with the account, but since you don't have it with you, the other option is to provide me with the effective date of the account. I just need the month and the year.

**00:16:44 Jason M.**
Is it card? I have? Card? I have?

**00:16:48 HSA Rep.**
The HSA of the account holder.

**00:16:52 Jason M.**
I don't. I don't have the card that she has. I have the card that I read off to you earlier. So, are you telling me to?

**00:17:08 HSA Rep.**
Actually.

**00:17:10 IVR**
Mhm So

**00:17:11 Jason M.**
What are you asking me for? I am just curious because the card I have ends in five three seven nine, and that's the one that she presented to the court as the active card right now.

**00:17:25 HSA Rep.**
Card right now. Sir, here's what happened. You stated that there was a card order twenty five days ago. Correct?

**00:17:38 Jason M.**
No, I said that there was supposed to be a card. I don't have any clue whether a card was ordered or not.

**00:17:49 HSA Rep.**
Sir, I will be very honest with you. In this case, your call wasn't fully verified yet because I haven't caught the last four digits of the Inspire Financial debit card associated with the account. So I am very careful to provide any account information yet until I verify this. Even if we already got a verbal authorization from

the account holder, because it's part of our verification process for security purposes. We did go to the case and yes sir. Do you want me to call her back?

**00:18:33 Jason M.**
I want you to call her back. We need to get that card number.

**00:18:41 IVR**
So I'm sorry about that. I'll try to call her back. Just give me one moment.

**00:19:36 HSA Rep.**
Sorry sir, I was already routed to a voicemail when I dialed her number 210-278-6377. Let me just go ahead and try [redacted]. Thank you. Hold on.

**00:20:18 IVR**
She does this thing.

**00:20:34 HSA Rep.**
Sir, I actually tried to dial [redacted], but it says here bad number. It doesn't ring.

**00:20:47 Jason M.**
She's not getting into the phone now. She's not going to answer it. So I'll just have to go back to the court tomorrow.

**00:20:56 HSA Rep.**
I apologize.

**00:20:57 Jason M.**
It's okay that I'm sorry you had to go through that. I know it's not fun, but it's so I mean just to validate. There is only one login for the HSA card, right? One username and password. Is that correct or do we each get our own username and password? And passwords via online account. Correct.

**00:21:27 HSA Rep.**
Correct. So if there is only one account,

**00:21:34 Jason M.**
It's always the same. That's the problem. We always get into is she demands that I upload receipts to it and I'm like, I just need the login credentials and I am more than happy to do that. But she won't ever give me the password. It's like a catch twenty. And she just it's her favorite game to play. I will just keep calling. Keep going. All right thanks.

**00:22:06 HSA Rep.**
I really do apologize for that one, sir. But in case you will call back next time.

**00:22:14 Jason M.**
Verbal authorization has been denied for this. She authenticated me. Can I get a

card sent out that works? I'm having surgery. I need to get a card.

**00:22:25 HSA Rep.**
But with regards to that one sir, we really have to authenticate this first. Here's the thing: if you can just provide me with the effective date of the account with the month and year, we can proceed or any one of the last three recent transactions that she had on the account. I just need a date and amount.

**00:22:47 Jason M.**
The last transaction was forty one dollars. It was at CVS. I believe that was in May.

**00:23:02 HSA Rep.**
May I ask you to verbally state to me, sir, what that is? What's the exact date of this?

**00:23:07 Jason M.**
You got to be kidding me. I don't remember what exact date it was. You got to be kidding me. That was like May. I don't freaking know May eighteenth. I really you got to be joking. You know how long ago that was? Remember a CVS visit from half a year ago? And I don't remember the exact day of the month I went to CVS seven or eight months ago. But I can tell you, it was forty one dollars. It was forty one dollars and something cents. And it was done in May of twenty five. The card started in it was probably September or October of twenty four.

**00:24:00 Jason M.**
If that's not enough to authenticate this card, I don't know what else to do.

**00:24:11 HSA Rep.**
Sir, for the effective date of the account, the year was correct but the month isn't. I checked the twenty five transaction and I wasn't able to see the forty one dollars here on our system.

**00:24:32 Jason M.**
So well, the only HSA purchase made in twenty five was a forty one dollar charge. I've got the statements at home. That's the only charge on the entire HSA for the year. And then what month? July August. I thought it was September of twenty four. If it wasn't September, then it would have been August. August.

**00:25:15 HSA Rep.**
It's not the one as well here on our end.

**00:25:20 Jason M.**
Are you talking about starting the card or are you talking about when she started for censure?

**00:25:27 HSA Rep.**
Sir, when did the HSA get effective or start?

**00:25:34 Jason M.**
I'm so sorry. I thought you were asking when she started at Accenture. This is valid through 1130.

**00:25:53 Jason M.**
I don't know when she started. I figured you would have got it in the beginning of the year. It probably would have been December or January. I actually don't know when she got it.

**00:26:07 HSA Rep.**
I understand that, sir. Here is what we can do. How about you get a court order.

**00:26:16 Jason M.**
And send it over to you? I got a copy of a court order where she has said that she's ordered me a card. Is there something you can do with that?

**00:26:27 HSA Rep.**
Let me just go ahead and verify that one here on our end. This is actually my first time encountering that letter. Let me just go ahead and verify if we can add it on the account. Let me just go ahead and check. Hold on one second, sir. I'll just place it all on hold. No problem. You've been really great.

**00:26:52 Jason M.**
By the way, I want you to know that you've been really great.

**00:26:58 HSA Rep.**
Thank you so much about that. No worries, I'll get back to you as soon as I can. Can we stand in line for me? Thanks.

**00:27:47 Jason M.**
So she sent me a non-working. She will not provide me.

**00:30:37 IVR**
I will listen. Hello

**00:31:02 HSA Rep.**
Mr. McHenry? I'm here. Hi, thank you so much for patiently waiting. I actually tried to double check it here on our system, if there's any way that she can upload a documentation about the court documents. But I only got an information. The only thing that we can do is for her to submit authorized to release personal information on the account as well as provide you the last four digits of the card.

**00:31:34 HSA Rep.**
That's active and associated on the account.

**00:31:37 Jason M.**
But I don't have that card anyway, so it's not going to help me. But you see, she lives

five hours away from me. She brought this to be compliant with the court. And because I was having a procedure done, and my healthcare is covered under her. So it just got turned back on now. Are you seeing a disruption in service for me, perhaps where I was on the account but not on the account.

**00:32:12 HSA Rep.**
Sir, technically you are held up in there. But every call, we really have to authenticate everything here in our end. The one that's active, the one that's on the file before we were able to proceed. We were able to get a verbal authorization. So if you wanted to know everything on the account and the process, we can do that. But the only problem is that the one that you provided to me, the last four digits of the card is not the one that's associated anymore on the account. So we have to get the one that's associated.

**00:32:53 Jason M.**
That's just it. She's going to have a card. I don't want her card numbers. I need my own card that's separate from hers. Do you see what I'm saying? She could give you those card numbers, but I do not have that card. She's five hours away and I need my own card. I just don't see how that's going to help us.

**00:33:30 HSA Rep.**
I understand. Hold on one second for me. I'll try my very best to help you get your own card.

**00:35:30 HSA Rep.**
Hello, Mr. McHenry. I'm so sorry for the silence. I actually did try to double check it here, but the only thing is that the account holder should be the one to order a card for you. So technically, if you are the dependent, we will provide you one. We can also send it to the address where you live. Just that the account holder should be the one to order that card for the account.

**00:35:59 Jason M.**
Good luck with that happening. It's taken me months to get to this point. She literally drove into Dallas, met with our judge in person yesterday, and handed over the old card while keeping the new card. So you just kind of got to think about that. From that perspective, the way I see it is, there's a plan that you'll have under my name. I have access to the HSA account.

**00:36:33 Jason M.**
I am covered under Accenture's healthcare plan right now. If you are going to bar me from using it, I'll just have to go a legal route to get a card from you because she's not giving me a card. I haven't been able to use health insurance since October thirty-first. So you all are going to have to figure out a way or I'll just have to send a court order over.

**00:37:03 HSA Rep.**
I totally understand, sir. But here's the process. For security purposes, we are following the right procedure.

**00:37:12 Jason M.**
But that doesn't trump a that doesn't trump a court order. You, can't you can't turn down a court order for that? And it's I mean, it'll go I'll send it to get us into your legal department

**00:37:28 HSA Rep.**
Your legal department. I totally understand, no worries, since this call is recorded, feel free to do it. But here's what I can advise you: try your best to contact her to ask her about.

**00:37:47 Jason M.**
How she wants to proceed with the divorce. We can only contact each other through the court. That's why I allowed you to contact her. We don't communicate. There are things at play where it is not safe for me to communicate with her.

**00:38:20 HSA Rep.**
I understand. But sir, since she is the primary account holder, we did a verbal authorization from her, but we still have to fully authenticate the account.

**00:38:33 Jason M.**
But you look, there's no doubt that it's her. You're just asking for her a card number and I'm saying that card number doesn't do anything to help me. I need my own card issued, which she said that she had already ordered, but it doesn't sound like you're seeing one in your system. It sounds like what she did was she replaced her card and she gave me the old dead one.

**00:39:01 HSA Rep.**
Sir, we can order a card for the dependent. Technically, the account will have a card for the account holder and cards for the dependent. It just so happened that it cannot provide any account specifics right now, especially about the status of the card order because the account was not yet fully attended.

**00:39:25 Jason M.**
I understand. Can you mail me the card? We live five hours away. She's not going to give it to me.

**00:39:33 HSA Rep.**
With regards to that one, we really have to get the last four digits of the card from the account holder before we order you a new card, activate it, and link your Apple Pay.

**00:39:49 Jason M.**
I'll get a court order, and it'll serve her first, so don't worry.

**00:39:57 HSA Rep.**
I understand, sir. But that's what I will advise her, or you can just ask for the effective date of the account or any transactions that she can give you so that you can authenticate here. Once you call back, we can do a verbal authorization again.

**00:40:18 Jason M.**
Because that's not a protocol. I actually have the records for the HSA card. So you're saying if I can get when this card was established, that's good enough.

**00:40:31 HSA Rep.**
Good enough. I'm sorry, the date effective date that I needed is the HSA effective date of that account holder or any one of their last three recent transactions that she had on the account.

**00:40:47 Jason M.**
She testified that there was only one transaction. She provided receipts showing there was only a forty-one dollar charge and that all funds were available on the card yesterday. Is that so?

**00:41:08 HSA Rep.**
I let me go up and get here. I can walk up and I've got some records.

**00:41:15 Jason M.**
Let me go see what records I have.

**00:41:20 HSA Rep.**
But I'm here to verify, sir, that I wasn't able to see any debit card purchase amounting to forty one dollars in the month of May.

**00:41:33 Jason M.**
Well here let me walk upstairs. I've got all the files up there. So let me go up and look. Sir, you've been patient. Thanks. It's just frustrating.

**00:41:51 HSA Rep.**
You can just take your time. I'll be here on the line. Just call my attention once you have that information.

**00:41:58 Jason M.**
Let me see here where would that be? That is going to be. I'm gonna put you on speaker real quick.

**00:42:32 IVR**
Think I got it here.

**00:42:39 IVR**
Let's see.

**00:42:50 IVR**
So we've got HSA.

**00:42:54 Jason M.**
Card, can you hear me? It says HSA card account opening balance was sixty dollars and seventy two cents. That was May first twenty five. That doesn't make sense. There was six thousand on it.

**00:43:24 Jason M.**
Withdrawals of three sixty eight fifty four. Withdrawal of forty four thirty five. This is debit card ending in nine six zero two. Two.

**00:43:47 IVR**
Six zero two, let me go ahead and pull that up.

**00:43:59 HSA Rep.**
Sorry, that card is not the one associated with or on the account anymore.

**00:44:06 Jason M.**
I'm just going down the statements that I have.

**00:44:10 IVR**
Go ahead.

**00:44:28 Jason M.**
So there was, in twenty-five, we allocated six thousand dollars onto that card. Where did those funds go?

**00:44:50 HSA Rep.**
Sir, may I know what the date is on that so I can check?

**00:44:54 Jason M.**
Let me go back to this statement. That statement is This is a MetLife chip card from five one, twenty five to five thirty one, twenty five.

**00:45:36 HSA Rep.**
As per checking here, sir, there is no transaction on that amount on May twenty-five.

**00:45:51 Jason M.**
Wish there was a way to email this to you. It says employee number ending in zero three four two. Debit card ending in nine six zero two has an opening balance of sixty dollars and seventy two cents, and an ending balance of sixteen dollars thirty seven cents. But it doesn't show transactions.

**00:46:26 HSA Rep.**
Oh, I see, but the one I needed, sir, is the transaction on the account.

**00:46:33 HSA Rep.**
The recent one.

**00:46:36 Jason M.**
If you are talking about the card she has, she lives five hours away from me. I have never seen nor touched that card. I do not have statements for that card. If you are still talking about the card that she has, there is no possible way I would have any information on it because she just ordered it. She must have just got it. I don't have statements from a card she received last week.

**00:47:20 HSA Rep.**
Last week. You see? Sir. Totally understand, but here is the thing. If the recent transaction I am talking about can be only with the debit card transaction, any debit card transaction, a payment or withdrawal or contribution on the account. It can be the transaction here or recent transaction on the account. I needed the date and amount for me to fully authenticate it, even if you don't have the card with you, the one that's active on the account.

**00:47:58 Jason M.**
That's the problem. She testified that she ordered a new card for me, but it looks like she kept that for herself and gave me the terminated card.

**00:48:15 HSA Rep.**
With regards to that information, I cannot verify it yet. The only thing I can provide is that the one you provided to me wasn't the one associated with the account.

**00:48:27 Jason M.**
It's fine. I'll call back tomorrow. Thank you.

**00:48:31 HSA Rep.**
You're welcome, but before I let you go sir, is there any more questions that I can check for you?

**00:48:38 Jason M.**
That's all. Thank you. That's all.

**00:48:42 HSA Rep.**
You're welcome, thank you as well for taking the time to call into RF Financial. Enjoy the rest of your day. Bye-bye!

# EXHIBIT 10

Petitioner's Notice of Compliance with Court Order, filed January 13, 2026 in Cause No. DF-24-18010, 301st Judicial District Court (then 302nd), Dallas County, Texas (Envelope No. 110019516) (20 pages).

FILED
1/13/2026 9:33 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Brittany Irvin DEPUTY

Petitioners Notice of Compliance with Court Order (Health Insurance & Health Savings Account access)

CASE DF-24-18010
IN THE MATTER OF THE MARRIAGE OF
GWENDOLYN ULIJASZ, Petitioner
AND
JASON McKEMIE, Respondent
IN THE 302nd JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

PETITIONER'S NOTICE OF COMPLIANCE WITH COURT ORDER

Petitioner files this Notice to confirm compliance with the Court's order regarding reinstatement of health insurance coverage and delivery of the Health Savings Account (HSA) card.

Petitioner confirms that health insurance coverage has been reinstated as directed by the Court. Petitioner was alerted of the issue by the court order and escalated to senior HR leadership for faster research and resolution. Reinstatement was complete in a matter of days thereafter. In the email from her employer's HR that Petitioner read outloud to the Respondent and the Court confirmed this was an Employer mistake, that the coverage reinstatement was being expedited, that there would be no gap in coverage, and that the Respondent will lose his health insurance provided by the Petitioner's employer on February 24, 2026 in conjunction with a divorce ruling. Eligibility determinations and coverage status are controlled by the employer and plan administrator, not by Petitioner.

The insurance card and the prescriptions card and coverage remain the same.

With respect to the Health Savings Account ("HSA"), Petitioner confirms compliance with the Court's order. Access to the HSA card was addressed promptly upon discovery that she had no functioning card for either herself or Respondent. The account had not been used all year in anticipation that because this was community property it would be decided at trial. At that time replacement cards were requested for both Petitioner and Respondent on December 18, 2025, and those cards were issued and delivered to her on December 23, 2025. They were physically received by the Petitioner when she came home from holiday travel on December 28th.

A physical HSA card for Respondent, together with activation instructions, was then physically provided to Respondent in the presence of the Court on January 6, 2026.



Copy from re:SearchTX

No separate HSA portal is available for dependents to the best of Petitioner's knowledge. A portal and a password is not required to utilize the physical HSA card for qualified expenses, whether in person or online.

To ensure proper documentation and avoid tax and penalties, Respondent may submit receipts for qualified medical expenses by email to Petitioner, consistent with the process previously used by the parties but in a timely manner. Petitioner requests the Court's awareness that this has been an issue in the past resulting in tax and penalities.

**Respondent repeatedly and incorrectly continues to assert that**

- health insurance removal in 2025 was a result of the Petitioner's intentional actions,
- continued insinuations that insurance was not continuous and , that as a result ,$30,000 of Respondent's recent medical claims during what is now a non-existent gap period will not be paid;
- that Petitioner continues to restrict HSA access because he does not have her portal account password.

**Petitioner attaches limited documentation solely to confirm compliance and avoid future confusion.**

Respectfully submitted,

Gwendolyn Ulijasz
Petitioner, Pro Se
11703 Huebner Road, Ste106 PMB499
210-278-6377
GUlijasz@gmail.com



Copy from re:SearchTX

# Exhibit A1:

# Accountability and clarification from Petitioner's HR (employer) Re: Respondent's Insurance issue



Copy from re:SearchTX

Exhibit A: Proof of Employer Insurance responsibility; no retro gap in coverage; and 2/24/26 Respondent coverage end.

**Ulijasz, Gwen**

**From:** Pott, Wynn E.
**Sent:** Friday, December 19, 2025 1:35 PM
**To:** Ulijasz, Gwen
**Subject:** Benefits Coverage

Hi Gwen.
As we discussed, your husband (Jason McKemie) was mistakenly dropped from coverage due to a misunderstanding at our Benefits Center. It appears they thought your husband was no longer eligible for coverage, so contrary to your wishes, they terminated coverage.

I have directed them to reinstate coverage, with no gap in care, and asked them to send urgent eligibility updates to our medical and pharmacy vendors. It may still take a couple of days to get through their internal systems, but will be much quicker than waiting to our next eligibility file.

Please note, that once you are divorced, your husband will no longer be eligible for Accenture coverage, but will be eligible for COBRA.

Please let me know if you have any questions, or need anything further.

Wynn

Wynn E. Pott
Accenture – North America Benefits Director
Phone: 727-897-4230
Email: wynn.e.pott@accenture.com

**Please note our new Benefits administrators:**
**Health & Insurance – benefitscenter.accenture.com or 888 259 6059**
**401(k) – www.benefits.mi.com/login/accenture or 888 401 8258**



Copy from re:SearchTX

# Exhibit A:

# Proof Jason is on the HSA account



Copy from re:SearchTX

View History Bookmarks Window Help Jan 10 2:46 PM

mybenefits.inspirafinancial.com

Apple Bing Google Yahoo

Login for Individuals | Inspira Financial
Dependents | Inspira Financial

inspira™ FINANCIAL

Home | Inspira Card | Help & Support | Account Settings | Aetna Member Website | Logout

Your Accounts | Alerts | Health Plan Claims | Documents & Forms

- Account notifications
- Health plan claims
- Beneficiaries
- **Dependents**
- Inspira Card
- Privacy
- Online shopping preference

# Health Saving Account (HSA) Dependents

This is the list of eligible dependents you think may use your Health Savings Account (HSA) funds. You can add, edit or remove your dependents at any time.

Adding dependents here can make it easier to track your HSA expenses. It will let you link your dependent to their expenses on the HSA Transaction pages. And when you request funds from your HSA, you can select who the expense is for.

Feedback

+ Add a dependent

| First name | Last name | Dependent type | | |
|---|---|---|---|---|
| Jason | McKemie | Other | Edit | Remove |

Privacy & Legal notices · Online services agreement · Terms of use

Share my screen

# Exhibit B:

## New cards were needed and ordered for both parties (12/18/25)



Copy from re:SearchTX

**Ulijasz, Gwen**

**From:** Inspira <eNotify@inspirafinancial.com>
**Sent:** Thursday, December 18, 2025 10:20 PM
**To:** Ulijasz, Gwen
**Subject:** [External] Inspira Financial Confirmation: Your debit card

**External email. Inspect before opening any links or attachments.**

Dear GWENDOLYN,

This notice confirms we received your request for an Inspira debit card.

- If you made this request, you don't need to do anything else.
- If you didn't make this request, email us immediately at accountsecurity@inspirafinancial.com.

Sincerely,
Inspira Financial

Inspira Financial Health, Inc. does not provide legal, tax or financial advice. Please contact a professional for advice on eligibility, tax treatment, and other restrictions

Inspira and Inspira Financial are trademarks of Inspira Financial Trust, LLC.



Copy from re:SearchTX

# Exhibit C: Proof no password or anything further needed from Petitioner to use the account funds



Copy from re:SearchTX

Safari File Edit View History Bookmarks Window Help Jan 11 11:38 AM

mybenefits.inspirafinancial.com

Apple Bing Google Yahoo

Frequently Asked Questions (FAQs) | Inspira Financial

inspira™ FINANCIAL

Home | Inspira Card | Help & Support | Account Settings | Aetna Member Website | Logout

Your Accounts | Alerts | Health Plan Claims | Documents & Forms

your card will be activated.

### After I activate my card, when can I start using it to pay for eligible expenses?

You can use your card as soon as you activate it. But you'll need to have funds in your account to use the card. You can view your account balance online or through the Inspira Mobile app. You'll use the same username and password for both.

### If I activate my card and then order a card for my spouse or dependent, do they need to activate their new card?

No. If your card is already active, your spouse or dependent does not need to activate their new card. This means your spouse or dependent should be able to use their card as soon as they receive it. If someone tries to activate an active card, they'll hear this message: "*Our records indicate this account has already been activated. Please contact the customer service phone number on the back of your card if you need further assistance.*"

### If I receive a replacement card, do I need to activate it?

Feedback



Copy from re:SearchTX

# Exhibit D:

## Proof Jason has card use authorization

Copy from re:SearchTX

Copy from re:SearchTX

View History Bookmarks Window Help Jan 10 2:51PM

mybenefits.inspirafinancial.com

Apple Bing Google Yahoo

Login for Individuals | Inspira Financial

InspiraCard | Inspira Financial

inspira™ FINANCIAL

Home | Inspira Card | Help & Support | Account Settings | Aetna Member Website | Logout

Your Accounts | Alerts | Health Plan Claims | Documents & Forms

# Account settings

- My profile
- Bank accounts
- Account notifications
- Health plan claims
- Beneficiaries
- Dependents
- **Inspira Card**

## My Inspira Card™

You can view the status of your Inspira Card. And you can order a card for your spouse or dependent.

## Accenture LLP ACNFSA

**Mastercard® *****41**

**Cardholders**

GWENDOLYN ULIJASZ (PRIMARY)

Jason McKemie (DEPENDENT)

Feedback



Copy from re:SearchTX

# Exhibit E:

## Insurance Card copies and proof Jason has insurance (date stamp/name appears)

Copy from re:SearchTX

Printed 1/10/2026

aetna

RXBIN:004336 CVS
RXPCN: ADV
RXGRP RX23EG

Choice POS II
DMO

ID W2903 70360

01 GWENDOLYN L ULIJASZ
PCD: NO ELECTION
PCP NO ELECTION REQUIRED

02 JASON E MCKEMIE
PCD NO ELECTION
PCP NO ELECTION REQUIRED

[illegible]

Payer # 60054 0048
Med Grp#0867974-010-00004
Den Grp#0657455-055-00004

DOI-DENTAL CLAIMS ONLY

First Health Network Complementary NAP

| MEDICAL INDIVIDUAL | Tier 1 | FAMILY Tier 1 |
| --- | --- | --- |
| INN DED | $ 3600 | $ 3600 |
| INN OOP MAX | $ 4800 | $ 9600 |
| OON DED | $ 6000 | $ 6000 |
| OON OOP MAX | $ 9000 | $ 18000 |

| | |
| --- | --- |
| AETNA MEDICAL | 1-855-240-0835 |
| PROVIDERS CALL/PRECERT | 1-888-632-3862 |
| AETNA DMO DENTAL | 1-877-238-6200 |
| CVS CAREMARK | 1-800-932-7515 |
| TELADOC.COM/ACCENTURE | 1-855-835-2362 |
| MENTAL/BEHAVIORAL HEALTH | 1-800-424-4047 |

Aetna Life Insurance Company (MED)
Aetna Dental Inc. - Texas (DEN)
Submit Claims To PO BOX 981106
EL PASO TX 79998-1106 www.aetna.com

See your plan documents for all plan requirements, including precertification. In an emergency, seek care immediately or call 911. This card does not guarantee coverage.

Feedback



Copy from re:SearchTX

aetna

Effective date:
01/01/2026

**Member ID#:** W2903 70360
**Member:** Gwendolyn E Ulasz
**Group #:** 0657455 055 00004
Member Services: 1 800 525 4207

http://www.aetna.com/

**Note:** This card does not guarantee coverage

AETNA
P.O. BOX 14344
LEXINGTON, KY 40512-4344

Payer ID# 60054 146





Copy from re:SearchTX

aetna

RXBIN:004336 CVS
RXPCN: ADV
RXGRP: RX23EG

Choice POS II
DMO

ACCENTURE
MEDICAL - HEALTHFUND

ID W2903 70360

01 GWENDOLYN L ULIJASZ
PCD: NO ELECTION
PCP: NO ELECTION REQUIRED

02 JASON E MCKEMIE
PCD: NO ELECTION
PCP: NO ELECTION REQUIRED

Payer # 60054 0048
Med Grp#0867974-010-00004
Den Grp#0657455-055-00004

DOI-DENTAL CLAIMS ONLY

First Health Network Complementary NAP

| MEDICAL INDIVIDUAL | Tier 1 | FAMILY | Tier 1 |
|---|---|---|---|
| INN DED | $ 3600 | | $ 3600 |
| INN OOP MAX | $ 4800 | | $ 9600 |
| OON DED | $ 6000 | | $ 6000 |
| OON OOP MAX | $ 9000 | | $18000 |

| | |
|---|---|
| AETNA MEDICAL | 1-855-240-0835 |
| PROVIDERS CALL/PRECERT | 1-888-632-3862 |
| AETNA DMO DENTAL | 1-877-238-6200 |
| CVS CAREMARK | 1-800-932-7515 |
| TELADOC.COM/ACCENTURE | 1-855-835-2362 |
| MENTAL/BEHAVIORAL HEALTH | 1-800-424-4047 |

Aetna Life Insurance Company(MED)
Aetna Dental Inc. - Texas(DEN)
Submit Claims To PO BOX 981106
EL PASO TX 79998 1106 www.aetna.com

*See your plan documents for all plan requirements, including precertification. In an emergency, seek care immediately or call 911. This card does not guarantee coverage.*



Copy from re:SearchTX

aetna

Effective date:
01/03/2026

Member ID#: W2903 70360
Member: Jason E Mckeime
Group #: 0657455 055 00004
Member Services: 1 800 525 4207

http://www.aetna.com/

Note: This card does not guarantee coverage

AETNA
P.O. BOX 14394
LEXINGTON, KY 40512 4094

Payer ID# 60054 185


Copy from re:SearchTX

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 110019516
Filing Code Description: Notice Of Filing
Filing Description: PETITIONER'S NOTICE OF COMPLIANCE WITH COURT ORDER
Status as of 1/15/2026 9:45 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason McKemie | | jmckemie@mckemie.net | 1/13/2026 9:33:24 PM | SENT |
| Gwendolyn Ulijasz McKemie | | GUlijasz@gmail.com | 1/13/2026 9:33:24 PM | SENT |
| Gwendolyn Ulijasz | | gulijasz@gmail.com | 1/13/2026 9:33:24 PM | SENT |
| JASON EMORYMCKEMIE | | jason@callvital.com | 1/13/2026 9:33:24 PM | SENT |



Copy from re:SearchTX

# EXHIBIT 11

Photograph of the Inspira Financial mailer Movant handed the Debtor in open court on January 6, 2026, marked ·Number of Cards: 1· and ·Card Number Ending In: 5379· (1 page; Movant's address and mail-routing barcodes redacted).

inspira FINANCIAL

[redacted]

Number of Cards: 1

Card Number Ending In: 5379

1056416102403340

[redacted]

[redacted]




# Simplify your health care spending with your Inspira debit Mastercard®

**Good news!** Your Inspira Financial™ account comes with a debit card, which will make it easier for you to spend your funds on eligible expenses.

**1. Activate your card**

Call the number on the sticker on your card. **If your card doesn't have a sticker, it's ready to use.** When you call, you'll get your PIN. If you order cards for covered family members, they'll use the same PIN.

**2. Set up your online account**

Visit the website on the back of your card to create your online account. Keep your card nearby — **you'll need to enter the card number.** Don't forget to download the Inspira app too!

QC8