FILED
OCT 02 2026
CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 26-30161-mvl7** |
| JASON EMORY McKEMIE, | § | |
| | § | **CHAPTER 7** |
| Debtor. | § | |

# DEBTOR'S RESPONSE IN OPPOSITION TO THE MOTION OF GWENDOLYN LAURA ULIJASZ FOR ANNULMENT OF THE AUTOMATIC STAY, FOR A DETERMINATION THAT PROPERTY WAS NOT PROPERTY OF THE ESTATE, AND ALTERNATIVELY FOR MODIFICATION OF THE STAY, AND OBJECTION TO THE APPLICATION FOR EXPEDITED HEARING AND TO SHORTEN TIME [ECF 110]

**TO THE HONORABLE MICHELLE V. LARSON, UNITED STATES BANKRUPTCY JUDGE:**

Jason Emory McKemie, the Debtor, files this Response in opposition to the Motion of Gwendolyn Laura Ulijasz ("Movant") for Annulment of the Automatic Stay et al. [ECF 110] (the "Motion") and to her Application for Order Shortening Time and Expedited Hearing, and respectfully states:

## PRELIMINARY STATEMENT

1. No party sought relief from the automatic stay before the June 11, 2026 trial, during it, before the June 26, 2026 Final Decree of Divorce (the "Decree") was signed, or in the two and one-half months that followed. No party has ever obtained it. The first request of any kind came on Friday, September 11, 2026 — the last day to object to the Debtor's Rule 2004 motion [ECF 97] and the day Movant's brief on the stay was due in the 301st Judicial District Court of Dallas County, Texas (the "State Court"). That morning Movant asked the State Court to treat the Decree as final and to sign nothing. That afternoon she asked this Court to annul the stay retroactively so that the Decree would be "given effect as of the date it was signed" [ECF 110 ¶ 2(a)], and objected to the subpoenas that would show what the Decree had divided [ECF 111]. One week later, on September 18, 2026, the State Court vacated the division.

2. On the record of her own Motion, Movant asks this Court for four things: to annul the stay retroactively so that a divorce decree signed while the stay was in effect, after a trial the Debtor could not attend, is "given effect as of the date it was signed"; to declare, without an adversary proceeding, without the Chapter 7 Trustee, and without records, that every asset the Decree awarded her was never property of this estate; to confine the Debtor's Rule 2004 subpoenas to accounts "identified account by account" on a Trustee's report that identifies none of her accounts; and to forbid the use of any records in the divorce court that divided the estate. Motion ¶¶ 2, 19–21; ECF 111 ¶ 43(c). Each request protects the same thing: the routing of

community funds into accounts the Debtor could not identify before this case began, which drove him into this Court, and which the Trustee's Form 1 still carries at a value of "Unknown."

3. Since the Motion was filed, the State Court has acted. On September 18, 2026, it signed its Memorandum Ruling on the Debtor's Motion for New Trial: the motion is "GRANTED in part and DENIED in part"; the court "grants the motion for new trial as to division and characterization of material property"; "Sections 8, 9, 11-15 of the Decree of Divorce signed on June 26, 2026, are VACATED"; "Sections 1 through 7 and 10 . . . remain in full force and effect but are interlocutory"; and "[t]he remaining issues shall be set for trial once the stay has been lifted or Respondent's bankruptcy case is otherwise disposed." **Exhibit R-14**. The property division, the debt allocation, the turnover and execution provisions, the discharge of the parties' preservation duty, the denial of the Debtor's counterpetition, and the finality clause are gone. There is no division left to annul the stay "as to," and the determination the Motion asks this Court to make now — that Movant's property was never the estate's — is the very question the State Court has reserved for a new trial it will not hold until this case is resolved.

4. The Debtor came to this Court for the protection the Code gives a debtor against exactly this. Annulment must be denied. The property determination cannot be made on this Motion. The stay should not be modified to let the division be "completed" on a record Movant is blocking. And the request to hear all of it on shortened time — so that the State Court could be told how to rule before its plenary power expired — is now pointless: the State Court has ruled, in the Debtor's favor, and the October 6, 2026 setting Movant noticed [ECF 116] is a preliminary hearing under 11 U.S.C. § 362(e)(1), at which the stay should be continued pending a final hearing.

## I. BACKGROUND

### *A. The petition, the stay, and what this Court was told*

5. The Debtor filed his Chapter 7 petition on January 12, 2026 [ECF 1]. His Schedule A/B listed as property of the estate his "[c]ommunity property interest in marital funds and assets currently held and controlled by spouse" and identified the Voya/Cognizant 401(k), the Accenture Voluntary Equity Investment Plan, the Accenture restricted stock units, the AdvantiGen units, and the Ameriprise accounts [ECF 29, Sch. A/B]. The Chapter 7 Trustee's Form 1, filed July 24, 2026, carries each of those interests forward for administration and records, as Asset 21, that the "Debtor asserts a community property interest in all marital assets and funds acquired or retained by non-filing spouse," at an estimated net value of "Unknown" [ECF 91]. The Motion agrees that "no determination has been made" of the estate's interest in any of it. Motion ¶ 15. The case remains open. A discharge entered September 9, 2026 [ECF 106] was vacated September 10, 2026 [ECF 107]; no discharge is in effect, and the stay of any act against property of the estate has continued without interruption since the petition. 11 U.S.C. § 362(c)(1).

6. On February 18, 2026, the Debtor filed a Notice of Bankruptcy Automatic Stay in the State Court. Motion ¶ 7. Movant admits she knew of this case from that date at the latest. ECF 110, Ulijasz Decl. ¶ 4. On April 9, 2026, on a motion the Debtor was not served with at his registered address, the Court terminated the stay as to the Debtor's residence [ECF 43]. On April 16, 2026, the Debtor filed his Verified Declaration [ECF 51, 3:08 p.m.] and Emergency Motion [ECF 55, 3:24 p.m.], the Court held an emergency hearing at which the Debtor appeared, and at

6:36 p.m. the Court reinstated the stay as to the residence and its contents, ordering that "no other party shall remove any of the possessions from the premises" [ECF 57]. In ECF 51 and ECF 55 the Debtor told this Court, under penalty of perjury, that more than $650,000 had been moved out of the marital estate before the divorce was filed; that Movant held the marital assets while he carried the marital debt; that his healthcare had been functionally obstructed since December 2024, including the blocking of antibiotics after a hospitalization and the termination of his coverage by a false divorce qualifying-life event before any decree existed; and that there was "a real risk of coordinated clean-out" of estate property if the writ was executed. ECF 51; ECF 55 § IV.

***B. What the divorce court was not told, and the trial the Debtor could not attend***

7. Nothing in the Motion or the Ulijasz Declaration states that Movant or her counsel informed the State Court, at the June 11, 2026 trial or before the Decree was signed, that the automatic stay was in effect and that no relief from it had been sought. The Decree's § 8.G reservation of the Trustee's rights shows the bankruptcy was known when Movant's counsel drafted the Decree; nothing shows the State Court was told that the division it was signing was unauthorized. Movant's account is that she "proceeded on the understanding" that the property was hers and now "asks the Court to decide whether it was right." Motion ¶ 18(a).

8. The June 11, 2026 trial was conducted in the Debtor's absence. At 1:17 p.m. that day, thirteen minutes before the setting, the Debtor filed a verified emergency motion stating that he was suffering chest pain and shortness of breath en route, could not appear, and asked to appear remotely by any means the court would permit, and asked the State Court not to treat his medical inability to appear as "waiver, abandonment, failure to prosecute, consent to trial, or consent to final orders." Exhibit R-10. The State Court proceeded without him and, on June 26, 2026, signed a Decree reciting that he had "failed to appear, prosecute, or proceed at trial." The Decree awarded Movant every asset listed on the Debtor's Schedule A/B as the estate's asserted interest (§§ 8.A, 8.C), awarded the Debtor only property the estate already held (§ 8.B; Motion ¶ 18(c)), ordered the Debtor to pay one-half of debts in Movant's name within thirty days (§ 8.F), and imposed indemnity and turnover obligations on him (§§ 8.D–8.G, 11). Exhibit R-11.

9. The Decree's § 8.F figures appear in no filing of Movant's. Her February 17, 2026 itemized proposal listed the SoFi loan at $22,533 allocated 100% to her, the Chase card x3444 at $9,648 allocated 100% to her, and the Citibank account x2295 at $0. Her February 23, 2026 amended proposal — her last statement of the estate before trial — valued the SoFi loan at "approximately $13k," stated she would pay it, represented that it was "the last of the community debt known to the Petitioner," and stated that each party would pay their own credit cards. Exhibit R-13. The Decree values the SoFi loan at approximately $10,000 and divides it equally, and divides equally "[t]he Chase credit card account, with an approximate outstanding balance of $50,000" and "[t]he Citibank account, with an approximate outstanding balance of $15,000," identifying neither account by number. Movant's own Motion, filed in this Court, still carries her counsel's unresolved drafting note: "[Confirm the identity of the Chase account referred to in Section 8.F before filing; see the cover note.]" Motion ¶ 14. Movant does not know which account the Decree ordered the Debtor to pay half of.

***C. The day the Decree was signed***

10. The signed Decree was first transmitted to the parties by the State Court's Court Administrator by email at 4:01 p.m. on June 26, 2026. Exhibit R-5. Movant's Exhibit 8, which

her Declaration calls the "Benefits Center receipt" for the removal of the Debtor from her coverage "in reliance on the Decree," is a Businessolver "Benefit Summary Generated On 06/26/2026 At 05:31:28 CDT," already showing "Dependents - 0," employee-only coverage effective July 1, 2026, and the health-care flexible spending account terminated as of June 30, 2026. Ulijasz Decl. ¶ 13 & Ex. 8. On either a.m. or p.m. reading of that timestamp, the Debtor's coverage was terminated the day the Decree was signed, without notice to him, thirteen days before the Plan Administrator told him on July 9, 2026 that his coverage had ceased effective June 30, 2026. Exhibit R-9.

11. The "card he held" that Movant swears she cancelled on June 26, 2026, Ulijasz Decl. ¶ 13, was card 5379, which Movant produced in open court in the State Court on or about January 7, 2026 as compliance with the December 17, 2025 healthcare order. On January 8, 2026, the Debtor called Inspira Financial, the account administrator, with that card. Inspira stated that card 5379 "is not the one that's associated anymore on the account" because a replacement card had been ordered by the account holder approximately twenty-five days earlier; that there is one login for the account; and that no receipts need be submitted. Exhibit R-7; Exhibit R-15 ¶ 10. The Debtor has never held a functioning card on that account and has never completed a charge on it. Movant's own sworn inventory in the State Court, executed July 22, 2025, listed that account as "Accenture Inspira / Account holder: Jason McKemie / Value: Unknown." Ulijasz Decl. Ex. 3 § 12.C.2. The "cancellation" she offers this Court as detrimental reliance was the cancellation of a card that did not work, on an account she had sworn was his.

### *D. The Rule 2004 motion, the September 11 filings, and the State Court's ruling*

12. On August 21, 2026, the Debtor filed his Motion for Order Authorizing Rule 2004 Subpoenas for Third-Party Financial Records Concerning Assets Identified by the Chapter 7 Trustee [ECF 97] and a motion to expedite it [ECF 98], and emailed both to Movant and her counsel the same day. ECF 111 ¶ 11. On September 3, 2026, the State Court heard the Debtor's Motion for New Trial, overruled it on every ground but one, and took under advisement whether the Decree is void because it divided the estate while the stay was in effect. Motion ¶ 9. The Debtor was present at that hearing; Movant's counsel stated that he did not know the status of the automatic stay and did not know whether it had been lifted, although he had been served with the Debtor's Rule 2004 motion by email on August 21, 2026. Exhibit R-15 ¶ 24.

13. On September 11, 2026, the last day to object to the Rule 2004 motion, Movant filed in the State Court a brief asking that court to "defer any ruling on the stay issue until the Bankruptcy Court acts on her motion," stating that "[n]othing requires the Court to sign any order at all," and tendering two proposed orders; the same day she filed the Motion, her Declaration, and her Rule 2004 Objection here. Exhibit R-12. On September 16, 2026, Movant's counsel noticed a "Preliminary Hearing" on the Motion for October 6, 2026 at 1:30 p.m., by WebEx [ECF 116]. No order has been entered on her application to shorten time. On September 18, 2026, the State Court signed the Memorandum Ruling quoted in paragraph 3 above. Exhibit R-14. The Debtor has moved in the State Court to clarify and modify that Ruling, to vacate the remaining sections, and to enforce the December 17, 2025 healthcare order. Exhibit R-14-A. On September 29, 2026, Movant filed her own motion in the State Court conceding that the Ruling "eliminate[d] the final judgment," that "the marital estate remains undivided," and that a ruling from this Court would not "of itself restore any vacated provision of the Decree." Exhibit R-14-B ¶¶ 10–11, 32, 36.

## II. THE STAY APPLIED TO THE JUNE 11 TRIAL AND THE JUNE 26 DECREE, AND MOVANT SAYS SO

14. Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The June 11, 2026 proceeding sought, and the June 26 Decree made, a division of property. Movant concedes that the Decree's award to the Debtor (§ 8.B) reached property of the estate and that she "does not contend that this provision fell outside the stay." Motion ¶ 16. She concedes that the Decree's directions as to items W-7 and W-8 and the joint accounts "cannot be given effect as a division of estate property unless this Court annuls the stay as to them." Id. She concedes that the estate's interest in every other asset the Decree awarded her is undetermined. Id. ¶ 15. And she concedes the governing rule: under Brown v. Chesnut (In re Chesnut), 422 F.3d 298 (5th Cir. 2005), the automatic stay "covers at least some arguable property," "in the face of uncertainty or ambiguity, courts should presume protection of arguable property," and "it is no answer for the creditor to defend . . . by claiming that the property was not properly covered by the stay." Id. at 302–04; Motion ¶ 18(a).

15. That ends the threshold question. Property the Debtor scheduled as the estate's, that the Trustee carries on Form 1, and that Movant's own Motion calls "the community property held in her name or possession," Motion ¶ 8(d), was arguable property of the estate on June 11 and June 26, 2026. Chesnut's caution that not every "attendant claim of a right in property" transforms "what is obviously not property of the estate into arguable property," 422 F.3d at 306, does not help Movant: nothing here is obvious. Her Motion calls the restricted stock, the equity-purchase account, the Chase account, and the health savings account "community property"; her Declaration says she paid the community's debts "from my earnings," Ulijasz Decl. ¶ 14, and earnings during marriage are community property, Tex. Fam. Code § 3.002; and her Rule 2004 Objection says that whether "her Chase, Citibank, American Express, SoFi, UBS, and Ameriprise accounts and her Accenture compensation and benefit interests" were property of this estate on January 12, 2026 is the question this Court must decide, ECF 111 ¶ 14. A party who tells this Court that the estate's interest in her accounts is an open question for the Court to decide "with the Trustee before it," Motion ¶ 15, cannot tell the same Court that those accounts were "obviously not property of the estate" when she had them divided in a state court without asking anyone.

16. The Decree did three things during the stay, and each is an act the stay forbids. It divided the assets. It allocated debts in Movant's name onto a Chapter 7 debtor, in amounts that appear in no filing, on accounts the Decree does not identify and that Movant's counsel could not identify when she filed here. And it supplied the qualifying-life event Movant used, the day it was signed, to strip the Debtor's health coverage and cancel his access to the health savings account — item W-4 of the Decree, on Movant's own list of "community property held in her name or possession," and, on her own July 2025 sworn inventory, an account whose holder was the Debtor. Terminating the Debtor's access to it on June 26, 2026 was an act "to exercise control over property of the estate," 11 U.S.C. § 362(a)(3), whatever the ultimate characterization. Movant offers that act as the "detrimental change of position" that justifies annulment. Motion ¶ 18(d). Under this Court's decision in Rojas v. Gomez (In re Rojas), Adv. No. 23-03026-MVL (Bankr. N.D. Tex. June 5, 2024), a party who learns that her acts violated the stay "has an affirmative duty to restore the status quo." Motion ¶ 18(a) (quoting Rojas). Movant has restored nothing. She asks instead that the acts be validated.

## III. ANNULMENT MUST BE DENIED

17. Movant states the standard: annulment is "extraordinary relief"; a party seeking it "must establish cause"; and the "central question" under In re Vasquez and In re Fennell is "whether if relief from the stay had been sought before the action in violation of the stay was taken," it would have been granted. Motion ¶¶ 17–18. The courts of this District weigh, with that central question, the creditor's knowledge of the bankruptcy, the debtor's good or bad faith, whether denying retroactive relief would cause unnecessary expense, and whether the movant has detrimentally and in good faith changed position in reliance on the act. In re Fennell, No. 17-20095-RLJ-13 (Bankr. N.D. Tex. Nov. 13, 2017); Thornburg v. Lynch (In re Thornburg), 277 B.R. 719, 731 n.18 (Bankr. E.D. Tex. 2002). Movant must first establish a prima facie case of cause for the extraordinary relief she requests; only then does 11 U.S.C. § 362(g)(2) place the burden on the party opposing relief "on all other issues." She has not made that showing, and the Motion should be denied on that ground alone. If the Court concludes that she has, the Debtor carries his burden on every remaining issue below.

### *A. Movant knew of the stay, knew where to ask, and chose not to ask*

18. "Movant knew of this case, and she does not ask the Court to excuse her on the ground of ignorance." Motion ¶ 18(a). She knew by February 18, 2026 at the latest. Ulijasz Decl. ¶ 4. She knew, because her counsel drafted it, that the Decree needed a clause reserving "the rights of the Chapter 7 trustee." Decree § 8.G. She says that "[h]ad Movant asked this Court before June 11, 2026" for a determination of the stay's scope or for leave to divide, she believes "the request would have been granted." Motion ¶ 18(c). She did not ask. She tried the case, in the Debtor's medical absence, took a decree dividing every asset the estate had claimed, and used it the same day. Then, when the Debtor moved for Rule 2004 subpoenas on the assets the Trustee had listed, she waited until the last day to object, asked the State Court to do nothing, and came here. She concedes she did not agree the stay was inapplicable — "he filed a notice of it in the State Court on February 18, 2026" — which is the fact that distinguishes the annulment the Fifth Circuit affirmed in In re Okorie, where the debtor's counsel had agreed no stay was in effect. Motion ¶ 18(a).

19. A creditor with notice who proceeds "on the understanding" that the stay does not reach what she is taking is the creditor Chesnut describes: one who cannot "defend . . . by claiming that the property was not properly covered by the stay." 422 F.3d at 304. Movant acknowledges In re Okedokun, 593 B.R. 469 (Bankr. S.D. Tex. 2018), in which the bankruptcy court stated that annulment is available only to parties without knowledge of the filing, and asks the Court to treat knowledge as "one factor among several." Motion ¶ 18(a). Even on that view, the factor is not merely present here; it is dispositive. A creditor who had four months, counsel in two courts, and a drafted reservation clause, and who used none of them to ask this Court a question she now says would have been answered in her favor, has not shown cause for retroactive relief. She has shown a choice to divide first and ask later — and the only reason to divide first was that asking first would have required disclosure of the accounts, the routing, and the records she is still refusing to produce. ECF 111 ¶ 43(c).

### *B. Relief would not have been granted before June 11, 2026*

20. Movant's "central question" answers itself against her. Had she moved this Court before June 11, 2026 for leave to have the State Court divide the marital estate, the motion would have come before a Court that already had, on its own docket, the Debtor's verified account of

April 16, 2026 — that more than $650,000 had been moved out of the estate before the divorce was filed, that his healthcare was being obstructed and the December 17, 2025 order answered with fake compliance, and that his records and evidence were at risk of coordinated removal [ECF 51, 55]; before a Trustee whose Form 1 lists the estate's interest in every asset Movant holds as "Unknown" [ECF 91]; and with a trial setting at which the Debtor had filed a verified emergency motion that he was medically unable to appear and asked to appear remotely [Exhibit R-10]. No bankruptcy court grants a non-debtor spouse leave to divide arguable estate property in a default trial against a hospitalized debtor, without the Trustee, before the estate's interest has been determined, on that record. At most, the Court would have done what Movant's own authorities describe — permitted the dissolution to proceed while reserving every property question "effective upon further relief." Motion ¶ 18(c).

21. Barnes v. Barnes (In re Barnes), 279 F. App'x 318 (5th Cir. 2008) (per curiam) (unpublished), on which Movant relies "for no more than that the relief she requests has been granted in this posture," Motion ¶ 18(c), involved an annulment retroactive to a decree signed three years earlier; it did not involve a decree whose own court had the question of its validity under advisement, a default trial against a debtor who had filed a verified motion of medical inability to appear, or a movant simultaneously blocking the records of the property she divided. And here the State Court has now decided the void question — in the Debtor's favor — and vacated the division. Exhibit R-14. Barnes does not describe this posture.

***C. The estate lost everything the Decree awarded Movant, not "nothing"***

22. Movant argues that "the estate lost nothing" because § 8.B awarded the Debtor "only . . . property the estate already held." Motion ¶ 18(a), (c). That is a description of the harm, not a defense to it. The estate's asserted interest was in the property awarded to Movant, not to the Debtor: the Voya/Cognizant 401(k), the equity-purchase account, the restricted stock, the AdvantiGen units, the Ameriprise accounts, the Chase account, the health savings account, and "all other community assets in Wife's name, possession, or control" (W-9). Every one of them was awarded to Movant by §§ 8.A and 8.C. A judgment that extinguishes the estate's claim to the scheduled assets and leaves the estate with the Debtor's household goods is not a judgment that cost the estate nothing. It is a judgment that cost the estate the case.

23. The Decree also loaded the estate's debtor with liabilities. Section 8.F orders the Debtor to pay, within thirty days, one-half of accounts in Movant's name whose balances appear in none of her filings and one of which her counsel cannot identify. Motion ¶ 14. Sections 8.D through 8.G and 11 impose indemnity, turnover, and execution obligations. A judgment against a Chapter 7 debtor for pre-petition community obligations, entered post-petition without relief from the stay, is prejudice to the estate and to the discharge by definition. It is also why Movant scheduled herself as a creditor holding a disputed $250,000 claim in this case. ECF 111 ¶ 11.

***D. Annulment would inflict grave, immediate, and partly irreversible harm on the Debtor, and that prejudice is itself cause to deny it***

24. The prejudice to the Debtor from granting annulment is severe, immediate, and in part irreversible, and it is prejudice Movant would inflict a second time. First, annulment "as of the date [the Decree] was signed" would place the community interests the Trustee is administering beyond the estate and beyond the Debtor on Movant's say-so — before the Trustee has valued them, before any adversary determination, and before the Debtor has obtained a single source record — converting a stay violation into a final deprivation of the only assets from

which this estate can be funded. Second, annulment would ratify, and would be the predicate for Movant to repeat, the termination of the Debtor's health coverage. The Debtor suffers from congestive heart failure and cardiomyopathy and requires uninterrupted medication; his treating physicians have warned in writing that interruption of his care creates a significant risk of acute decompensated heart failure. Exhibit R-15 ¶¶ 14–14-B. Movant used the Decree, the day it was signed, to end his coverage effective June 30, 2026 and to cut his access to the health savings account. After the State Court vacated the division on September 18, 2026, the plan "reads the Ruling as leaving the parties married" and "will reinstate [the Debtor] as her dependent retroactive to July 1, 2026"; Movant now asks this Court to annul the stay and asks the State Court to fix an "operative date" of the dissolution so that the plan can terminate him a second time. Exhibit R-14-B ¶ 5. An order of this Court that re-terminates the coverage of a debtor with the Debtor's documented cardiac condition is not a routine validation; it is a threat to his life, and the Code's equitable annulment power should not be used to deliver it. Third, annulment would cement the Debtor's inability to recover: the contents of the marital residence — including his professional clothing, his computers and printers, and the single hard drive on which every financial record in this case was stored — were removed on April 16, 2026 [ECF 51; Exhibit R-15 ¶ 5]; he is homeless, without a vehicle (surrendered to InTouch under this Court's order [ECF 103]), without counsel, and without health coverage; and the community funds that would let him obtain care, housing, and the means to return to work are the funds the annulment would place beyond reach. Against all of this, Movant loses nothing by the denial of annulment: she holds every asset, and the stay disturbs none of her possession, employment, or compensation (Part VII). The balance of harms is not close, and extraordinary equitable relief is not granted where it would gravely injure the party opposing it and benefit only the party who created the situation.

***E. Movant's "reliance" is a further stay violation, and equity does not reward it***

25. Movant's reliance factor is that she "has already acted on the Decree": she removed the Debtor from coverage the day it was signed, cancelled the card, and changed her beneficiaries. Motion ¶ 18(d). None of that is reliance the law protects. Removing the Debtor's access to an account she had sworn was his, on the strength of a judgment she knew was entered without stay relief, in the face of a December 17, 2025 state-court order requiring her to maintain his coverage and HSA access and not to interfere with either, Exhibit R-8, is not a change of position; it is the injury. A party cannot violate the stay, use the violation to strip the debtor of medical care, and then cite the stripping as the reason the violation must be validated. If the Decree falls, the qualifying-life event falls with it, and Movant's "reliance" consists of undoing what she should not have done — the restoration Rojas requires, not a hardship.

26. Equity weighs the rest of the record too. The December 17, 2025 order was answered with a card that had been replaced before it was handed over and a refusal, on a recorded line, to provide the login. Exhibit R-7. The landlord settlement that released Movant was concealed until the Debtor could prove she was the lease guarantor, and it surrendered the Debtor's deposit as her consideration. ECF 51 ¶¶ 59–71 & Ex. 0; Ulijasz Decl. Ex. 2. The writ was coordinated with instructions to Movant not to notify the Debtor and not to arrive "until at least 10 a.m." Ulijasz Decl. Ex. 2-B. The State Court was not told the stay was in effect. And on the day she asked this Court for retroactive relief, Movant asked it to bar the records that would show what she took. A movant with unclean hands does not receive extraordinary equitable relief, and a movant who is still obstructing the record cannot show that the record supports her.

### *F. The York footnote cuts against Movant, and the division is already vacated*

27. Movant told this Court that the prospect of a bankruptcy court validating "a judgment already set aside by a state court" is "unlikely," quoting York v. State, 373 S.W.3d 32, 42 n.64 (Tex. 2012), while telling the State Court the same day to defer and sign nothing. The footnote she quotes says, in full, that validation of "a judgment already set aside by a state court" "seems unlikely as long as the parties in state court could seek relief from the bankruptcy court before the state court's decision." 373 S.W.3d at 42 n.64. Movant could have sought relief from this Court before the State Court's decision — from February 18, 2026, through June 11, through June 26, and through September 3, when the State Court reserved the question — and did not. The condition the footnote describes is met, and the consequence it describes follows. On September 18, 2026, the State Court vacated Sections 8, 9, and 11 through 15 of the Decree — the provisions that divided the property, allocated the debts, ordered turnover and execution, and declared the judgment final — and held the remaining sections interlocutory pending a trial to be set "once the stay has been lifted or Respondent's bankruptcy case is otherwise disposed." Exhibit R-14. A judgment rendered in violation of the stay is void, York, 373 S.W.3d at 37; Continental Casing Corp. v. Samedan Oil Corp., 751 S.W.2d 499, 501 (Tex. 1988), and the court that rendered this one has set its division aside. There is nothing left to annul the stay "as to." Annulment "to the extent the stay applied to the June 26, 2026 Final Decree," Motion ¶ 2, would supply "the validity the act lacked when taken" to provisions that no longer exist, and would ask this Court to do exactly what the York footnote calls "unlikely." The request is moot as to the vacated sections and should be denied as to the interlocutory sections, which divide nothing and which the Debtor has moved the State Court to vacate as well. Exhibit R-14-A.

## IV. THE § 541 DETERMINATION MOVANT REQUESTS CANNOT BE MADE ON THIS MOTION

### *A. It requires an adversary proceeding, with the Trustee as a party*

28. Movant's second request is for an order "determining, for purposes of § 362, that . . . the property confirmed and awarded to Movant in Sections 8.C and 8.A (W-1 through W-6) was not under the Debtor's management and control as of January 12, 2026 and did not become property of the estate under § 541(a)(2)(A)." Motion, Prayer (2). That is a proceeding "to determine the validity, priority, or extent of . . . [an] interest in property," and a request for a declaratory judgment related to it. Fed. R. Bankr. P. 7001(b), (i). It is an adversary proceeding. It cannot be obtained by a motion for relief from stay on shortened notice, and it cannot be obtained against the Trustee, who holds the estate's interest and is not a party to the Motion. The phrase "for purposes of § 362" does not change what the determination is; Movant asks for it precisely so that it will bind the estate and the State Court on the merits. Motion ¶ 21. Her request that the Court make the determination "now, with the Trustee before it," Motion ¶ 15, describes an adversary proceeding in which the Trustee is a defendant — and she has filed none. In re Trammell, 399 B.R. 177 (Bankr. N.D. Tex. 2007), on which she relies, decided the character of a single titled vehicle on a developed record; it did not bless determining the character of a non-filing spouse's entire financial estate, on a declaration, at a preliminary hearing, over the Debtor's dispute, before discovery, with the Trustee absent.

### *B. In all events the disputed facts require testimony, not a contest of declarations*

29. Even if the determination could be made in this contested matter — it cannot — it turns on disputed material facts, and "[a] witness's testimony on a disputed material factual issue

must be taken in the same manner as testimony in an adversary proceeding." Fed. R. Bankr. P. 9014(d). Section 541(a)(2)(A) reaches community property under the "sole, equal, or joint management and control of the debtor." Under Texas law each spouse has sole management of the community property that spouse would have owned if single, Tex. Fam. Code § 3.102(a), but sole-management community property that "is mixed or combined with" the other spouse's sole-management community property "is subject to the joint management, control, and disposition of the spouses," id. § 3.102(b). Movant's earnings began as her sole-management community property; whether they stayed that way is the disputed question, and her own Motion concedes the facts that join the issue. She admits she "funded the joint account by transfers from her own accounts"; that funds passed from the joint account into her sole-name account; that her Chase x9259 account was overdrawn on October 14, 2025 after a payment to her own card and then refilled; and, decisively, that "[n]o one has identified an asset into which any earlier funds can be traced." Motion ¶ 13. That is the admission that forecloses a paper ruling: the tracing has not been done, the records that would do it are the records the Debtor subpoenaed, and Movant filed her objection to those subpoenas on the same day she asked the Court to find, without them, that nothing in her accounts was ever mixed with anything of the community's. A determination made on that record would be the June 26 Decree again, with a federal signature on it.

30. Nor is § 541(a)(2)(B) excluded. Sole-management community property is liable for the other spouse's debts where "both spouses are personally liable," Tex. Fam. Code § 3.202(b), including debts "for necessaries," id. § 3.201(a)(2). The rent on the marital residence, for which Movant was the lease guarantor and from which she released herself in July 2025 by surrendering the Debtor's deposit, is a debt for necessaries; the landlord is a scheduled creditor. ECF 29, Sch. E/F; ECF 51 ¶¶ 55–71. The community's medical expenses incurred while Movant obstructed the Debtor's coverage are debts for necessaries. To the extent Movant's sole-management community property is liable for those claims, it is property of the estate under § 541(a)(2)(B). Movant's statement that "[n]o claim of either kind has been identified," Motion ¶ 14, is not a finding; it is an invitation to decide the question without the Trustee and without the records, which the Court should decline.

31. Finally, the determination would be made on a record in which Movant's own sworn statements conflict. Her July 22, 2025 inventory listed the health savings account with "Account holder: Jason McKemie"; her Declaration calls it "my health savings account." Ulijasz Decl. ¶ 10 & Ex. 3 § 12.C.2. Her inventory valued the restricted stock as community property; her Motion now asks that it be declared never the estate's. A Court asked to determine title on a sworn record decides it on evidence, after discovery, with the Trustee. Movant asks for the opposite.

## V. THE STAY SHOULD NOT BE MODIFIED TO LET THE DIVISION BE "COMPLETED OR REDONE" NOW

32. Movant's third request is that, if any provision of the Decree divided estate property, the stay be modified to let the State Court "complete or redo the division of that property." Motion ¶ 20. The Debtor does not ask this Court to keep the State Court from ever dividing the marital estate. He asks that no division of arguable estate property occur until two things exist: a determination of the estate's interest, made with the Trustee and on records, and the records themselves. Neither exists. The Trustee's Form 1 says "Unknown." The Debtor's own financial records were taken on April 16, 2026. Movant's last production in the State Court was

February 17, 2026, was password-protected, and expired March 20, 2026. A "just and right" division under Tex. Fam. Code § 7.001 of an estate that has never been shown to any court is not a division; it is the June 26 Decree again.

33. Movant's citation to Tex. Fam. Code §§ 9.201 and 9.203, which give the State Court continuing jurisdiction over property "not divided," is a reason to deny the request, not to grant it: that post-decree jurisdiction will exist whenever the estate's interest is determined and the property, if any, leaves the estate. Nothing is lost by waiting for the determination; everything is lost by dividing first. The State Court has vacated the division and has itself conditioned any retrial on the stay being lifted or this case being disposed of. Exhibit R-14. Movant's request is therefore a request that this Court satisfy that condition now, before the estate's interest has been determined, before the Trustee has taken a position, and before the records that decide the question have been produced. The same sequence should govern here: determination first, division second.

## VI. THE OCTOBER 6, 2026 SETTING IS A PRELIMINARY HEARING; THE STAY SHOULD BE CONTINUED PENDING A FINAL HEARING

34. Movant asked the Court to shorten time so that this Motion could be heard "before October 9, 2026," the last day of the State Court's plenary power, so that the State Court could "deny the Debtor's motion with that determination in hand." Motion ¶ 21. On September 16, 2026 her counsel noticed a "Preliminary Hearing" for October 6, 2026 [ECF 116]. No order has been entered on the application to shorten time. The State Court has since ruled, and it did not deny the Debtor's motion; it vacated the division. The purpose for which expedition was requested no longer exists, and the urgency was manufactured by Movant's own sequence: she had from February 18 to June 11, 2026 to ask this Court anything, and asked nothing; she had from June 26 to September 11 to seek annulment, and waited until the day her Rule 2004 objection was due.

35. Under 11 U.S.C. § 362(e)(1), the October 6 hearing is a preliminary hearing at which the Court "shall order such stay continued in effect pending the conclusion of the final hearing" if "there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing." On this record the reasonable likelihood is not close. Movant concedes knowledge of this case from February 18, 2026; concedes that the Decree's directions as to items W-7 and W-8 and the joint accounts cannot be given effect without annulment; concedes that the estate's interest in every other asset the Decree awarded her is undetermined; concedes that no asset into which earlier community funds were traced has been identified; and concedes she sought nothing from this Court before she tried the case. Motion ¶¶ 13, 15, 16, 18. A movant who must show cause for extraordinary retroactive relief, and whose own filings establish every element of the opposition, has not shown that she is likely to prevail at a final hearing.

36. The Debtor therefore asks that, at the October 6, 2026 hearing, the Court (a) deny the request to annul the stay as moot as to Sections 8, 9, and 11 through 15 of the Decree, which the State Court vacated, and otherwise deny it; (b) deny the request for a determination under § 541(a)(2), which may be made only in an adversary proceeding and in any event only after testimony on the disputed facts; (c) deny the request to modify the stay so that the division may be retried before the estate's interest is determined; (d) order the stay continued in effect pending

a final hearing on any part of the Motion the Court does not deny, 11 U.S.C. § 362(e)(1); (e) decline to consolidate the preliminary and final hearings, because the Trustee has not appeared, because the § 541 determination cannot be made in this contested matter at all, and because the records that decide every question the Motion raises are the subject of the Debtor's pending Rule 2004 motion [ECF 97]; (f) set the final hearing after the Trustee has responded and after production on the Rule 2004 subpoenas, extending the periods of § 362(e)(1) and (e)(2) for that specific time on findings of compelling circumstances and good cause; and (g) hear the Rule 2004 motion [ECF 97] at or before the October 6 setting, because its production is the record on which every question the Motion raises depends. The Debtor will appear by WebEx video.

## VII. ADEQUATE PROTECTION

37. To the extent the Court requires a statement of how Movant is protected if the stay continues: Movant holds every asset at issue. Nothing is being taken from her. The stay preserves the estate's asserted interest in those assets pending the Trustee's administration and a determination of the estate's interest; it does not disturb her possession, her employment, her compensation, or her separate property, whatever it is ultimately determined to be. The State Court retains its jurisdiction over any property that leaves the estate undivided. Tex. Fam. Code § 9.203. Movant's interests are fully protected by the ordinary course: determination first, division second.

## VIII. THE COURT AND THE TRUSTEE HAVE REASONABLE GROUNDS TO REPORT UNDER 18 U.S.C. § 3057

38. Any judge or trustee "having reasonable grounds for believing that any violation under chapter 9 of [title 18] . . . has been committed" shall report the facts to the United States Attorney. 18 U.S.C. § 3057(a). The Debtor identifies the following grounds, each of which appears in Movant's own filings or in records already before the Court; he does not ask the Court to adjudicate guilt.

39. False oath. 18 U.S.C. § 152(3). Movant's Declaration, executed September 10, 2026, states that on June 26, 2026 she "cancelled the card he held on my health savings account." Ulijasz Decl. ¶ 13. Her own sworn inventory of July 22, 2025, filed as her Exhibit 3, listed the account holder of that account as the Debtor, id. Ex. 3 § 12.C.2; and Inspira Financial's recorded line stated on January 8, 2026 that the card the Debtor held had already been replaced at the account holder's request. Exhibit R-7.

40. Concealment. 18 U.S.C. §§ 152(1), (8). In support of a request that the Court declare her accounts never property of the estate, Movant filed a statement of the health savings account with every transaction description and amount blacked out, Ulijasz Decl. Ex. 6, while asking that any subpoena be confined to accounts "identified account by account" on a Trustee's report that identifies none of them. And on April 16, 2026, while this case was pending and hours before the Court reinstated the stay, the single hard drive on which the Debtor kept every financial record in this case was removed from the residence; Movant's own Exhibit 2-B is the landlord's instruction to her the day before not to notify the Debtor, and her Declaration states that her movers "loaded onto their truck the items I identified as mine." Ulijasz Decl. ¶ 12 & Ex. 2-B; ECF 51 ¶¶ 55–56. The Trustee has received none of those records. Under 18 U.S.C. § 3284 the concealment of a debtor's assets is "a continuing offense until the debtor shall have been

finally discharged or a discharge denied"; no discharge is in effect here [ECF 106, 107]. The Debtor asks the Court and the Trustee to make the report § 3057(a) directs.

## IX. RELIEF REQUESTED

41. The Debtor respectfully asks that the Court: (1) deny the request to annul the automatic stay as to the June 11, 2026 trial and the June 26, 2026 Decree — as moot as to Sections 8, 9, and 11 through 15, which the State Court vacated on September 18, 2026, and on the merits as to the remainder; (2) deny the request for a determination under § 541(a)(2), which may be made only in an adversary proceeding under Fed. R. Bankr. P. 7001(b) in which the Trustee is a party, and only on testimony under Rule 9014(d); (3) deny the request to modify the stay to permit the State Court to complete or redo any division of arguable property of the estate before the estate's interest is determined; (4) treat the October 6, 2026 setting [ECF 116] as the preliminary hearing under 11 U.S.C. § 362(e)(1), order the stay continued in effect pending a final hearing, decline to consolidate the hearings, set the final hearing after the Trustee has responded and after production on the Rule 2004 subpoenas, extend the periods of § 362(e)(1) and (e)(2) for that time on findings of compelling circumstances and good cause, hear the Rule 2004 motion [ECF 97] at or before October 6, 2026, and otherwise deny the Application for Expedited Hearing and to Shorten Time; (5) assess no fees or costs against the Debtor and reserve the Debtor's right to seek his costs and any relief under 11 U.S.C. § 362(k) for Movant's June 26, 2026 act of control over the health savings account; (6) report the facts stated in Part VIII to the United States Attorney for the Northern District of Texas under 18 U.S.C. § 3057(a), or direct the Trustee or the United States Trustee to do so; and (7) grant such other and further relief as is just.

42. Every fact stated above from the Debtor's own knowledge is sworn to in the Declaration of Jason Emory McKemie filed with this Response as Exhibit R-15, and in the Debtor's Verified Declaration of April 16, 2026 [ECF 51].

Respectfully submitted,

Jason Emory McKemie
Debtor, pro se
539 W. Commerce St., #2010
Dallas, Texas 75208
(214) 519-8958
jmckemie@mckemie.net

## CERTIFICATE OF SERVICE

I certify that on the 1st day of October, 2026, a true and correct copy of the foregoing was filed with the Clerk of the United States Bankruptcy Court for the Northern District of Texas and served by email and first-class United States mail on: Richard G. Dafoe, Waddell Serafino Geary Rechner Jenevein, P.C., 1717 Main Street, Suite 2500, Dallas, Texas 75201, rdafoe@wslawpc.com, and Jonathan D. Steele, Beermann LLP, 161 N. Clark Street, Suite 3000,

Chicago, Illinois 60601, jsteele@beermannlaw.com, counsel for Gwendolyn Laura Ulijasz; Areya Holder Aurzada, Chapter 7 Trustee, Law Office of Areya Holder, P.C., P.O. Box 2105, Addison, Texas 75001-2105, areya@holderlawpc.com; the Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75202, ustpregion06.da.ecf@usdoj.gov; and Loriann A. Martinez, Quilling, Selander, Lownds, Winslett & Moser, P.C., counsel for InTouch Credit Union, lmartinez@qslwm.com.

Jason Emory McKemie

## INDEX OF EXHIBITS TO THE RESPONSE

Exhibits R-14 and R-15 are attached to this Response. Exhibits R-1 through R-3 are already on file in this case at the ECF numbers shown below and are not reproduced. The remaining exhibits are of record in Cause No. DF-24-18010 or are available on request, and will be tendered at the final evidentiary hearing.

**Exhibit R-1** Debtor's Verified Declaration filed April 16, 2026 [ECF 51], with Exhibit 0 (July 22, 2025 Mutual Release and Private Settlement Agreement). (Of record at ECF 51.)

**Exhibit R-2** Debtor's Emergency Motion filed April 16, 2026 [ECF 55]. (Of record at ECF 55.)

**Exhibit R-3** Order of April 16, 2026 reinstating the automatic stay [ECF 57]. (Of record at ECF 57.)

**Exhibit R-5** Email of the Court Administrator, 301st Judicial District Court, June 26, 2026, 4:01 p.m., transmitting the signed Final Decree of Divorce. (Of record in Cause No. DF-24-18010; available on request.)

**Exhibit R-7** Transcript of recorded call with Inspira Financial, January 8, 2026. The recording governs. (Available on request.)

**Exhibit R-8** Order on Emergency Reinstatement of Healthcare signed December 17, 2025, Cause No. DF-24-18010 (as signed). (Of record in Cause No. DF-24-18010.)

**Exhibit R-9** Email of Accenture US Benefits, July 9, 2026, 3:12 p.m., with the June 27, 2026 email to which it responds. (Available on request.)

**Exhibit R-10** Respondent's verified Emergency Motion to Abate, Stay, or Continue Trial filed June 11, 2026, 1:17 p.m., Cause No. DF-24-18010. (Of record in Cause No. DF-24-18010.)

**Exhibit R-11** Final Decree of Divorce signed June 26, 2026, Cause No. DF-24-18010. (Of record in Cause No. DF-24-18010.)

**Exhibit R-12** Petitioner's Brief on the Effect of the Bankruptcy Automatic Stay filed September 11, 2026 in Cause No. DF-24-18010, with its proposed orders. (Of record in Cause No. DF-24-18010.)

**Exhibit R-13** Petitioner's Proposed Property Division of February 17, 2026 and Amended Proposed Property Division of February 23, 2026, Cause No. DF-24-18010. (Of record in Cause No. DF-24-18010.)

**Exhibit R-14** Memorandum Ruling signed September 18, 2026 in Cause No. DF-24-18010 (Hon. Ashley Wysocki), granting the Motion for New Trial in part, vacating Sections 8, 9, and 11 through 15 of the Decree, and providing that Sections 1 through 7 and 10 remain in effect but are interlocutory. (Attached.)

**Exhibit R-14-A** Respondent's Motion to Clarify and Modify the September 18, 2026 Memorandum Ruling, to Vacate the Remaining Sections, and for Immediate Enforcement of the December 17, 2025 Healthcare Order, filed in Cause No. DF-24-18010. (Of record in Cause No. DF-24-18010.)

**Exhibit R-14-B** Petitioner's motion filed September 29, 2026 in Cause No. DF-24-18010 (conceding that the Ruling eliminated the final judgment and that a ruling of this Court would not of itself restore any vacated provision of the Decree). (Of record in Cause No. DF-24-18010.)

**Exhibit R-15** Declaration of Jason Emory McKemie in support of this Response. (Attached.)

**301ST JUDICIAL DISTRICT COURT**
**JUDGE ASHLEY WYSOCKI**
GEORGE L. ALLEN, SR. COURTS BUILDING
600 COMMERCE STREET
DALLAS, TEXAS 75202

**MEMORANDUM RULING**

RENDERED ON September 18, 2026

DF-24-18010
GWENDOLYN ULIJASZ MCKEMIE
vs.
JASON MCKEMIE

HEARING DATE: 09/03/2026

- THE COURT MAKES THE FOLLOWING RULING:

Respondent's Motion for New Trial is GRANTED in part and DENIED in part.

The Court grants the motion for new trial as to division and characterization of material property only.

IT IS ORDERED that Sections 8, 9, 11-15 of the Decree of Divorce signed on June 26, 2026, are VACATED.

IT IS ORDERED that Sections 1 through 7 and 10 of the Decree of Divorce signed on June 26, 2026, remain in full force and effect but are interlocutory. The remaining issues shall be set for trial once the stay has been lifted or Respondent's bankruptcy case is otherwise disposed.

All other relief requested is DENIED.

Signed September 18, 2026.

Hon. Ashley Wysocki, Presiding

Copy from re:SearchTX

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

IN RE: JASON EMORY McKEMIE, Debtor.

CASE NO. **26-30161-mvl7** • CHAPTER 7

# EXHIBIT R-15

## DECLARATION OF JASON EMORY McKEMIE IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO THE MOTION FOR ANNULMENT OF THE AUTOMATIC STAY [ECF 110]

1. I am Jason Emory McKemie, the Debtor. I am over eighteen and competent to make this declaration. The property and benefits disputed here are the means by which I obtain medication, recover, earn income, retain counsel and prove what happened. As of October 1, 2026, I have no functioning restored coverage, I am off necessary medication and medically declining, and the October 5 COBRA initial-payment deadline remains unresolved. I oppose Movant's request for retroactive relief while the injuries described below continue and the records needed to trace the disputed property remain missing. I describe events I experienced, communications in which I participated, documents I received or reviewed, and the resulting losses. Where I recount another person's statement or information from a record, I identify that source. I filed my Verified Declaration [ECF 51] and Emergency Motion [ECF 55] on April 16, 2026. This declaration supplies the fuller sequence, present conditions, and the specific facts supporting my opposition to ECF 110.

## THE FINANCIAL AMBUSH BEGAN WHILE I WAS RELYING ON MY WIFE AND RECOVERING FROM SPINAL INJURY

1A. From approximately August through December 2024, Movant told me that our household faced a temporary budget shortage because she needed to advance business expenses. She directed me to put community and household expenses, including gifts for her family, on my personal credit cards. We had ordinarily paid our balances in full each month. As my balances rose, I repeatedly told her I could not fit more charges on the cards. She assured me that the first installment of her $300,000 signing bonus would pay them off. She first said November, then told me the money had not arrived and would arrive in mid-December. I relied on her. The produced bank statement I have since reviewed shows $106,407.03 in Accenture payroll credited on November 21, 2024. That money was not available to me to pay the expenses she had directed me to incur. State-court trial Exhibit PX-32, physical p. 40, GU000960.

1B. In November 2024, I had an opportunity to return to AT&T in a position paying approximately $250,000 annually with the prior benefits package available to me. Movant urged me not to take it.

She said continued investment in her career would yield more for our family, that she wanted us to travel together, and that she did not want both of us in W-2 employment. I relied on those representations. I then suffered a serious spinal injury in late November, experienced temporary paralysis, and underwent a spinal procedure on December 10. I needed medication, rehabilitation equipment, help with basic tasks and money to live while recovering. Those were the circumstances in which my remaining access to money and counsel was cut off.

1C. On December 11, I encountered Movant's messages with her sister, Pam, while using our shared older MacBook Pro to back up home-security-camera material. Movant remained signed in on that shared computer and had also been signed in on my iPad. I handled our digital backups, and we had reciprocal powers of attorney. Her messages appeared on the shared computer. In the December 10 exchange, she had told Pam that she was meeting a family lawyer at 12:30 and had "already put up a retainer." She also wrote, "I have plenty of money and strong sobriety. It's ok." That evening, after Pam suggested cancelling a credit card, Movant said she would wait until she returned the next day and wrote, "They all do when I take the cookie jar away." Those were her statements while she knew I had been hospitalized and needed help recovering. Supplied Gwen McKemie–Pam Woodman conversations, physical pp. 9–14.

1D. I called 911 on December 11 because I feared that I was being set up for false police reports and a fraudulent protective order. I had found material concerning Movant's earlier civil and criminal disputes. I told the operator my concerns, sought to have them recorded, and said that responding officers should know I would be unarmed. The abbreviated police log records that I thought I was being set up and, during the callback, that I was already speaking with an attorney. I retained counsel that day and authorized a $5,750 payment. My December 12 text confirmed the retainer was mine and that I had met the attorney "yesterday." A later date displayed on a card statement does not change when I authorized it.

1E. On counsel's advice, I arranged a $30,000 transfer for approximately three months of living expenses during recovery and purchased a physician-prescribed orthopedic rehabilitation chair. Movant reported my retainer, the survival-funds transfer and the rehabilitation expenditure as fraud. Those were legitimate expenditures I had authorized for legal help, survival and recovery. The resulting reversals deprived me of all three. In our recorded December 12 call, she acknowledged she was "99% sure" I had submitted the retainer payment and discussed reporting the $30,000 transfer. I told her the chair order had been cancelled. I was terrified and in pain. I withdrew approximately $2,000 because I needed food and medication and did not know whether any money would remain available to me. Recorded December 12 call, physical pp. 3–4, 00:06:36–00:07:39 and 00:10:32–00:12:41.

1F. In that same call, Movant repeatedly said we had no money and denied having put up an attorney retainer. She suggested waiting so we could select attorneys together. That contradicted what she had told Pam two days earlier. She also discussed my losing health insurance and said, "Because I don't want you to die Jason," and, "And I can't keep you on Accenture if you go through with this." I understood her use of my survival and insurance as pressure to accept the marital annulment she wanted. She knew what loss of treatment meant to me. Her assurances about my housing, legal expenses and healthcare did not restore the cancelled survival money or rehabilitation equipment. Recorded December 12 call, physical pp. 2–7.

1G. I repeatedly demanded that she reinstate my retainer. The cancellation interrupted a scheduled further consultation when I needed legal help during recovery. She promised on December 12 to make the replacement payment, but I had to demand it again on December 13. The replacement receipt shows payment at 1:25 p.m. that Friday. My attorneys did not resume work that Friday; they resumed the following week. Paying late Friday did not give me working legal representation over that weekend. Based on her earlier concealed retention of counsel, her contradictory denials and her repeated postponements despite my demands, I charge that this delay was deliberate. The separate $30,000 survival transfer and rehabilitation purchase were not restored by replacing the retainer.

1H. On December 15, she told me I could remain in the Dallas house for months while she moved to San Antonio. I was instead left carrying the Dallas household expenses and the community debts in my name, without income during recovery and without access to the marital funds needed to pay them. The January 7, 2025 report granted me exclusive use and possession of the residence, assigned each party their own residence and vehicle expenses, and denied my maintenance and interim-fee requests. My June 24 emergency filing then warned of imminent eviction, recent hospitalization, disabled HSA access and impaired basic functioning. I had asked for housing and medical-survival funds before her counsel negotiated her individual release from the lease. DF-24-18010, January 7 report p. 1; June 24 emergency financial-relief motion pp. 1–2.

## THE CONCEALED LEASE RELEASE, PRIOR RETRIEVAL OPPORTUNITIES AND TWO SEPARATE WRIT EVENTS

2. Movant's Exhibit 2 is the July 22, 2025 Mutual Release and Private Settlement Agreement I filed as Exhibit 0 to ECF 51. I first learned of that agreement at the October 31, 2025 hearing, where I was seeking access to marital funds and reimbursement for rent wrongfully imposed on me while I was recovering from spinal surgery, had no income and was cut off from the marital assets. I was challenging a rental burden imposed through coordinated aggravated perjury by Movant and her out-of-state sister, Pam Woodman, and the fraudulent financials Movant presented to the Court.

At the January 7, 2025 hearing, Movant represented that she was destitute, was living in her car, lacked a functional automobile, and had traveled with her sister to the hearing by Greyhound bus. She said she could not afford to pay more than the $3,800 rent for her San Antonio residence. Her employer reimbursed that housing expense 100%, yet she presented it as a burden that prevented her from contributing to the Dallas residence. At the same time, she demanded possession of both residences. Her claim that she could not afford more than the San Antonio rent contradicted her demand to take possession of the Dallas residence as well. She also accused me of trying to take her dog and withholding her mail. She knew I would never harm a dog, and I had placed her mail out for her to collect when she came to the house. The result was that I was left carrying the Dallas residence and its expenses without income or access to the marital funds needed to pay them. Those were the circumstances behind my October 31 reimbursement request.

At the October 31 hearing, Movant denied ever being on the Dallas lease or being responsible for that residence. She told the Court, in substance, that she did not know why she was there because I had obtained the property on my own. I told the Court that I had emailed myself copies of my exhibits and could retrieve the lease from that backup. As soon as I announced that I could produce it, and before I could present it, her attorney, Ethan Scroggins, jumped up and interrupted. I recall him

telling the Court that they had already executed a buyout agreement on that lease five months earlier. I immediately objected: Movant had just denied being on the lease, and her own attorney was now admitting that they had negotiated a buyout of it. That interruption exposed the concealed transaction while I was asking the Court to reimburse the rent I had been made to bear.

I signed the lease as a tenant. Movant was the sole financial guarantor. I did not authorize or sign the later private release. The residence's $4,999 security deposit was not hers to sacrifice in secret. I charge that she offered that deposit as a bribe to induce the landlord to join a call and hear her further proposal for how they could work things out. The deposit inducement and the later buyout were separate parts of the concealed transaction. I do not represent that $4,999 was the full consideration she provided. I seek the complete payment records, credits, agreements and communications to establish everything she gave or promised the landlord. I did not consent to the use of the deposit or the secret bargain. I learned of the buyout only when her lease denial was confronted with my ability to produce the lease itself.

2A. The July 15 correspondence is part of that record. Ethan Scroggins, of Sullivan & Cook, described my unpaid rent as "targeting Gwen's financial health." He proposed a deposit waiver, property access and her complete release from the eviction, expressly acting only for her. The July 22 agreement surrendered her leasehold and "any interest she may have" in the deposit, released her, and provided for dismissal against her while the eviction continued against me. It also required confidentiality except as legally required. Those papers do not supply a complete payment history or establish that the deposit was everything she gave the landlord. The call-inducement account also appears in my previously filed account, DF24 filing 194, physical p. 14, and sworn W-8, MNT Exhibit G-15, physical p. 41. I seek the complete source records, not an assumption that the disclosed deposit exhausted the consideration. I do not know the full amount paid and am not presenting my estimate of remaining lease exposure as proof of a particular cash payment.

2B. I warned the State Court before the later cleanout. On January 12, 2026, I expressly addressed the possibility of eviction or execution of a writ and asked that Movant be prohibited from entering or removing personal or marital property, with preservation and a written inventory for any lawful removal. I specifically sought protection for records, computers, storage media, work tools, medications, medical equipment and survival essentials. The signed January 12 report records denial of my ex parte eviction, temporary-stay and temporary-support requests. The property-preservation conditions were requests; my proposed order was unsigned. The warning identified the very kinds of property whose later loss impaired my treatment, work and ability to defend this case. DF-24-18010, January 12 motion concerning property retrieval, pp. 1–4, particularly ¶12; January 12 report p. 1.

2C. Movant had already been given three separate retrieval periods totaling approximately sixteen hours to collect her belongings. On the last occasion, she came with five other people. The January 7 report expressly gave me exclusive use and possession of the Dallas residence and gave her a further four-hour retrieval window on January 8. I repeatedly opposed her later attempts to regain personal access; by my count, the divorce court denied that access five times. I sought a neutral retrieval process for any legitimate remaining item, not another opportunity for her to enter and take my property. Her return on April 16 came after those prior opportunities and denials, approximately sixteen months after she moved out.

2D. The January 7 report also made the requested injunctions mutual, adopting items 1–34 of the December 20 amended application except item 31. The adopted terms prohibited intentional

property destruction, concealment or transfers to obstruct division; damage to property and electronic information; destruction or alteration of financial records, hard drives and relevant electronic evidence; and interference with security services. Those were existing restraints on both parties. The July 22 private release separately prohibited her from entering while I remained in possession, with a later access provision after the landlord recovered possession. Neither the release nor the writ identified my separate-property evidence drives as hers or authorized their theft, destruction or use against me. January 7 report, physical p. 1; incorporated amended application, physical pp. 4–6, items 6–11, 25–27 and 30.

3. At the April 16, 2026 hearing in this Court, I explained the lease agreement and the concealed consideration. The Court asked me, in substance, whether Movant had paid the landlord an additional month's rent and whether that excused my remaining without paying rent. I answered that we did not know what she had paid, that the agreement and payment information had been withheld despite my demand, and that she had used the deposit in the concealed negotiations with the landlord. That was why I needed third-party records. I was asking for the evidence needed to identify the transaction, not asking the Court to accept an invented amount.

4. Movant's own Exhibit 2-B now supplies the advance coordination I had been describing. It is the landlord's April 15, 2026 email to her at 11:07 a.m. I first saw it on September 11, 2026. It told her that I would be removed at 9:30 the next morning, directed, "Do not notify him or give any advanced indication," and told her not to arrive until at least 10 a.m. Her sworn declaration admits attending, paying for movers whom she says a friend booked for her, and identifying items for loading. Those records bear directly on the coordinated cleanout I warned about in ECF 55, Part IV, filed at 3:24 p.m. on April 16. I did not learn the coordination from a neutral reconstruction months later; the concealed email was attached to her own request for retroactive relief.

5. There were two separate writ events: April 16 and May 22, 2026. On April 16, Movant personally participated. On May 22, she was not there; an attorney from Armstrong's firm was present. I distinguish those events because the first theft and destruction left me struggling to recover essential belongings, and the second clearout took what remained. Across those events, my separate-property hard drives and litigation repositories, financial records, computers, identification, medication, professional clothing, printers, work equipment and other survival property were stolen, destroyed or left beyond my ability to recover. My principal financial-record repository was on a drive I kept disconnected from the internet. It was taken. I charge felony theft of my property and evidence, not merely a dispute about how a move was performed. Selected copies recovered later from email or backups do not restore the stolen repository or supply the complete institution records needed to trace the estate.

5A. On April 16, I left the residence at approximately 2:37 p.m. to seek emergency relief because I had not been served with notice of the landlord's hearing. I did not leave under a bankruptcy-court order directing me to surrender the residence or abandon my belongings. The preserved security footage shows personnel entering the rear driveway approximately two minutes after I left and disabling the fifteen-camera security system. Movant arrived at approximately 2:46 p.m. with luggage. At approximately 2:57 p.m., the recording captures her saying that I was at the courthouse and might return, followed by: "I just need to grab more of this evidence." The remaining cameras and internet went down at approximately 3:23 p.m. She knew she was taking evidence while I was in court seeking protection. The sequence of my departure, the disabling of cameras and her arrival is why I

charge a planned evidence seizure. The supplied photo exhibit reproduces the video statement and timed frames at physical pp. 4–7.

5B. I sought and obtained emergency intervention that afternoon. ECF 51 and ECF 55 were filed, and I appeared at the emergency hearing. The Court directed that the taking stop and that its direction be communicated to the constable. The constable subsequently told me that he had ordered Movant to stop and unload what she had put in her SUV. Instead of unloading, she went to the vehicle, got in and fled with my property. When I asked why he had not recovered it, he told me that he lacked authority to chase her. I am recounting the command and her defiance as reported to me by the constable, as well as the Court's direction I heard. She did not comply by driving away with the property she had been told to unload.

5C. The written April 16 order [ECF 57], entered at 6:36 p.m., prohibited further removal of possessions. The earlier oral direction, its transmission, her notice and her departure require examination alongside that written order. The later May 6 order [ECF 76] authorized later landlord remedies on its own terms and preserved prior claims. It did not adjudicate ownership of my hard drives, authorize theft or destruction, or erase the conduct I reported on April 16. My challenge to the first taking and my claims arising from the later May 22 destruction concern distinct acts and dates.

5D. A twenty-six-foot All My Sons truck was loaded at the residence. When I returned after obtaining the stop order, property was being unloaded. In my recorded calls on April 16 and 17, the moving company's personnel identified Merritt McClayton Rahilly as the person whose card was on file and told me that Movant had directed that her name not be associated with the job. Her current declaration admits that a friend booked the movers and that she paid for them. On April 23, Jonathan Steele wrote that "the moving company communicated directly to Gwen." Concealing her name from the moving arrangement did not make her an uninvolved bystander. These communications, her personal participation, her recorded reference to grabbing evidence, and the landlord's secret advance instructions identify the coordinated operation I had warned the courts about.

5E. I returned to smashed and exposed belongings. Electronics and personal effects were stuffed into trash bags; fragile property was broken; heavy items were stacked on breakables; wardrobe boxes were used for electronics while my clothing remained inside; security cameras and cables had been ripped from their mounts; and equipment, legal papers and valuables were mixed with trash. My prescription glasses were destroyed. My music studio and work systems were stripped of equipment. I found my MacBook Pro in a discarded pizza box inside a trash bag. My family's china and crystal were broken, including an approximately 150-year-old family crystal piece. The photographs at physical pp. 12–17 and 22–25 of the supplied Writ Aftermath and Medical Harm exhibit show the wreckage I confronted. This was destruction of my means of treatment, work and proof.

5F. Dane Patching came that evening and helped me rescue property. His signed declaration describes broken china and crystal, electronics near trash, ripped security cameras, damaged power cables and piles of belongings outside. He also identifies items still inside on April 16, including mounted televisions, monitors, my desk, filing cabinet and clothing. I do not attribute the disappearance of every remaining item to that first day. I worked through the night trying to save what I could. Dane and I saw a blue Lexus repeatedly circling the residence. After sleeping outside

near the property, I awoke to the same vehicle stopped while its driver photographed me. Dane's declaration, physical pp. 1–2; photo exhibit, physical pp. 12–17.

5G. My spinal condition deteriorated while I was struggling with that aftermath. I collapsed after coming out of the shower and was taken by ambulance to UT Southwestern. Late on May 21, I left the hospital against medical advice and reached the residence close to midnight because the second writ was to be executed the next morning. I was in pain and trying to save medication, evidence and the remaining essentials before they were taken or destroyed. Firas Junaid's signed declaration describes the condition he saw before that second writ, my pain, my destroyed glasses, and our unsuccessful search for the hard drives, medication, legal files and work equipment I needed. It corroborates my condition and the absence of critical items when I was attempting to prepare for trial. His declaration, physical pp. 2–6 and 10–13.

5H. The second writ was executed first thing on May 22. Movant was not personally present that day. An attorney from Armstrong's firm was there. I told her that mutual injunctions restricted what she and those acting for Movant were doing. She asked whether I had a paper copy. I told her that my printer had been stolen during the earlier entry. She said she did not know what I was talking about. I had not abandoned my property, consented to its destruction, or authorized others to take it. I was urgently seeking court protection while the remaining property was exposed, taken and destroyed.

5I. Steele's own emails show the unequal preservation demands. At 1:25 p.m. on May 22, he demanded that I protect property he claimed was Movant's, "Whatever the status of the writ," including against weather, theft and loss. At 5:07 p.m., I demanded preservation of the entire marital estate and all property under her or her agents' custody or control, including my drives, records, medication, identification and work equipment. I expressly rejected any claim of abandonment or consent and demanded the locations, identities of custodians and payors, inventories, photographs and chain-of-custody records. At 5:18 p.m., Steele replied, "Received, in triplicate," rejected my account with "Neither is accepted," and asserted that my notices did not create facts, items or duties. He asserted that Movant was complying with existing orders. He did not supply the requested inventory, locations or preservation confirmation. I charge that her side demanded protection for property it claimed while refusing to commit to protecting the property and evidence being taken from me. The May 22 correspondence is reproduced at physical p. 1 of Steele Preservation Demand (2) and physical pp. 1–3 of the Immediate Preservation Demand chain.

5J. I subsequently tracked my stolen belongings to Movant's San Antonio residence. The preserved location screenshots show my carbon-fiber briefcase and other devices there and later at other locations. The May 29 police-camera stills show a red truck at her garage and property being loaded; I identify my belongings in those images. The same record depicts the vehicle I had not been told she acquired. I also reviewed the police material in which she presented my Apple TV and tracking devices from my belongings as supposed evidence against me. She had taken my possessions and then used them to accuse me of tracking her. The police-camera images and location history at physical pp. 1–9 of Writ Aftermath—Briefcase 2 show why I demand the complete custody and disposal records. The missing inventory is needed to account for everything taken. My belongings were dispersed while I was left without the means to replace them.

5J-1. One stolen computer was a system I had built for a client for approximately $4,500. The client had already paid approximately $2,500. The computer was stolen, leaving me responsible to the client for repayment or replacement and damaging my ability to earn. I described that specific

transaction in my June 15 emergency recusal supplement, physical p. 9, and the system is identified in my sworn W-8 filing, physical p. 48. This is an identified equipment loss with an actual transaction price, apart from the unquantified value of my stolen evidence.

5K. I demand preservation and return of my stolen separate-property drives and evidence. I do not consent to Movant, her counsel, her agents or anyone acting for them accessing, inspecting, imaging, copying, authenticating, testing, reviewing, using or creating derivatives of their contents. I seek their sequestration away from her side, preservation of the external custody chain and return to me. The theft deprived me of proof; using the stolen contents against me would compound that injury. I need institution-origin records to reconstruct the missing financial history, not an order allowing the side that took my evidence to control access to it.

## HEALTHCARE WAS REPEATEDLY WITHHELD, CONDITIONED AND PRESENTED AS RESTORED WHEN I COULD NOT USE IT

6. My benefit-card access was cut off on or about December 18, 2024. Before that cutoff, my December 17 message recorded an HSA copayment that had worked. I distinguish that earlier payment and the MetLife correspondence from the later Accenture Inspira card dispute. The card handed to me as compliance in January 2026 never gave me working access to the Inspira account, and no later functioning replacement was provided to me. An account appearing on an inventory, a card handed over in court and coverage appearing in a system did not put medication in my hands.

6A. The obstruction was made explicit to my attorney. In a January 20, 2025 email to my attorney, Movant wrote: "No health insurance of any kind is on the table for discussion as Jason has not demonstrated responsible and ethical actions required to have health insurance." Earlier correspondence conditioned benefit-card access on receipts I had repeatedly supplied. I was asking for access to treatment, not permission to satisfy conditions she chose to impose. She already knew I was recovering from spinal injury and depended on uninterrupted care. January 20 email reproduced in the January 23, 2026 benefits-demand packet, physical pp. 162–164.

7. On May 8, 18 and 20, 2025, I demanded the card credentials in writing. Movant attached those demands as her Exhibit 2-C. She did not provide the credentials. On May 18 she wrote that the account "has not been touched" and was "community property." Those were my repeated demands for use of an existing medical resource, not demands for a new benefit she had never agreed to provide.

8. After a five-day hospitalization for a staph infection in June 2025, I obtained one prescription using the stored card for approximately $41. When I tried to obtain the additional antibiotic the next morning, the card did not work. I could not complete the prescribed antibiotic regimen. The infection recurred, with painful sores on the back of my neck, scarring and difficulty sleeping because contact with the pillow hurt. I repeatedly begged for access to the medication. My July 27 healthcare request included photographs showing the condition I was reporting. The pharmacy told me the card had been reported lost or stolen. The recurring infection and sores persisted for approximately eight months while I sought access to treatment.

8A. By my count, I made approximately twenty-six requests for healthcare access during the relevant period. My July 27 message itself identified a "26th request." My requests included emails, filed motions and demands. Some requests were denied or left unheard; others resulted in directions that did not produce usable access. I continued requesting help because the medication remained unobtainable. A court order in my favor did not stop the harm when the required performance never reached me.

8B. On October 31, 2025, a "Divorce" qualifying-life event was used to terminate benefits when no divorce decree existed. I notified the administrators and repeatedly contested it. The plan later acknowledged that no COBRA qualifying event had occurred. Claims previously paid were reversed and billed back to me. I lost the scheduled December 27 surgical opportunity after the year's deductible and out-of-pocket limits had been met. Correction was delayed into the next plan year, when those accumulators reset. Partial restoration afterward did not recreate the surgery, medication or funds I had lost, and did not restore every terminated benefit or independent access. These events preceded the June 2026 decree on which Movant now relies.

9. On December 17, 2025, the associate judge signed the healthcare ruling identified as Exhibit R-8. It required active dependent healthcare with information sufficient to fill prescriptions and functional HSA/FSA access within twenty-four hours, or its funding alternative: $671.14 by 6:00 p.m. on the day of signing, with the balance bringing the total to $20,643.56 within twenty-four hours of signing. It also prohibited interference. I did not receive the working access the ruling required, and that funding obligation has not been paid to me. I continue to seek its enforcement.

9A. The January report and Movant's Notice of Compliance record that she handed over a card on January 6, 2026. The card ended in 5379. On January 8, she emailed that I could use the physical card immediately in person. I then called Inspira Financial on its recorded line. I participated in that call, and Exhibit R-7 is the supplied transcript; the recording controls any transcription dispute. The representative said card 5379 was not the card currently associated with the account. The representative brought Movant onto the call. She insisted that receipts had to be uploaded. When I asked for the portal address and password, she declined to supply the login and left the call. The representative explained that HSA access did not require receipt submission and that further account-holder verification was necessary. The call did not produce working access.

9B. No functioning replacement card was provided to me after that call. As of June 26, the only Inspira card in my possession was 5379. The disagreement was not resolved by her filing a notice saying a card had been delivered. I had the card; I could not use the account for my medication. I charge that presenting that result as completed healthcare compliance concealed the continuing deprivation from the Court.

10. Movant's declaration states that on June 26 she "cancelled the card he held on my health savings account." The card I held was 5379, which Inspira told me during the January 8 recorded call was not associated with the account, as described in paragraphs 9A–9B. Her July 22, 2025 sworn inventory listed "Accenture Inspira / Account holder: Jason McKemie / Value: Unknown." Ulijasz Declaration, Exhibit 3 §12.C.2. I dispute her presentation of the June cancellation as if I had enjoyed functional access until she acted in reliance on the decree. I had repeatedly sought access and remained unable to use the card she had delivered.

## THE DECREE WAS USED TO REMOVE BENEFITS AGAIN, AND THE CURRENT DEADLINE IS REAL

11. I first received the signed decree by email from the State Court's administrator at 4:01 p.m. on June 26, 2026. Exhibit R-5. Movant's declaration admits that she submitted the benefits change that day, removed me, cancelled the HSA card and changed beneficiary designations. Her attached Benefit Summary shows employee-only coverage effective July 1 and the Health Care FSA terminated June 30. On June 27, Jonathan Steele instructed the benefits administrators to process the divorce event and related HSA/FSA changes and asserted that the decree controlled over the December 17 order. I received no notice of the termination from Movant, Accenture or Businessolver before Accenture's July 9 email telling me coverage ended effective June 30. Exhibit R-9. I again faced reversed claims and bills.

12. I have five native Businessolver Benefit Summary files, including one Movant emailed to me and others the plan supplied concerning my benefits. I have no Businessolver login and was never designated an authorized user on Movant's account. On November 28, 2025, the Benefits Center refused on a recorded call to tell me whether my own coverage was active, pending termination or terminated without her authorization. I examined the document properties of the native files I hold. In those five files, the embedded creation time is one second after the printed "Generated On" time; one summary printed "At 05:24:32 CST" has an embedded creation time of 17:24:33. Movant's Exhibit 8 prints "At 05:31:28 CDT" without a.m. or p.m. I have never received its native file. I cannot establish its time of day from that printed notation alone. The missing native file and transaction log are necessary to resolve the exact timing; her admission establishes that she submitted the change on June 26.

13. As of October 1, 2026, I have no functioning restored coverage. No pharmacy has processed a prescription successfully under the promised Accenture restoration, and the plan has not told me in writing that the October 5 payment requirement is cancelled. I elected COBRA on August 21. October 5 is the initial-payment deadline, not an election deadline. The administrator's writing requires $2,110.14 for the initial July–September period; the additional October premium is $703.38. If restoration does not eliminate those obligations, the combined protection needed is $2,813.52. I cannot advance it. Paying cash for prescriptions and care while contesting the cutoffs and defective notices exhausted the money I would otherwise have used to sustain coverage. When I elected, I expected to submit claims and use reimbursements toward continuation; the requirement to fund the past months before access became functional left me unable to do that.

14. I have been diagnosed with congestive heart failure and cardiomyopathy. My physicians have advised me in writing that I need uninterrupted prescribed medication and care, and that interruption creates a significant risk of acute cardiac decompensation and hospitalization. I am now off necessary medication and medically declining. During an earlier medication interruption I gained 52.5 pounds and was repeatedly hospitalized with congestive heart failure. These are events I lived through. I have already experienced the deterioration that can occur when treatment is interrupted. My fear about the current cutoff is grounded in those events and my physicians' warnings.

14-A. I have lost surgical opportunities, endured untreated pain and recurrent infection, paid full out-of-pocket prices while fighting benefit errors, and then faced demands for retroactive premiums after those payments exhausted my remaining money. The loss of housing, medication,

transportation, telephone access, work equipment and records left me less able to earn, obtain counsel and reconstruct what happened. Those consequences compounded one another. I cannot obtain treatment through a paper enrollment that fails at the pharmacy, a disabled card, an inaccessible portal, or a reimbursement that is sent to and controlled by Movant.

14-B. Movant's September 29 filing states that the plan "will reinstate" me retroactive to July 1 and recover premiums from her wages. It does not establish completed, usable restoration. Exhibit R-14-B ¶5. I oppose using annulment to validate the acts that deprived me of benefits or to supply another basis to obstruct restoration. I am explaining the risk from the use she has already made of the decree. I seek restoration of the entire benefits package terminated on October 31, 2025: healthcare, prescriptions, surgical and rehabilitation access, dental, vision, dependent AD&D, dependent critical illness, the FSA benefits and reimbursement access I held as a dependent, HSA access with my own issued active card, and my beneficiary interests in her life, optional-life and optional-AD&D coverage. She has taken reimbursements for my expenses. I need an independent, functioning way to submit past claims, obtain decisions, correct or appeal them and receive the reimbursements lawfully payable to me. Cash for one premium does not restore that package or satisfy the December 17 obligation.

14-C. I am homeless. I have no car, no passport, no identification, no bed and no adequate clothing; I do not even have a belt to hold up my pants. I cannot stabilize my health, return to work or fund counsel while these essential resources remain unavailable. My present deprivation followed the cancelled survival funds, repeated healthcare cutoffs, imposed housing burden, concealed lease bargain, theft of my evidence and work equipment, and destruction of the property I tried to save. I repeatedly sought intervention before these consequences occurred.

## MY ABSENCE FROM TRIAL WAS A MEDICAL EMERGENCY, NOT CONSENT OR ABANDONMENT

15. On June 11, 2026, while attempting to reach the final trial setting, I suffered chest pain and shortness of breath and could not appear. At 1:17 p.m., thirteen minutes before the stated 1:30 setting, I filed the verified emergency motion identified as Exhibit R-10. I asked the State Court to abate, stay or continue the trial; let me appear remotely by any means it would permit; and not treat my medical inability to appear as waiver, abandonment, failure to prosecute, consent to trial or consent to final orders. My separate non-waiver notice was filed at 1:26 p.m. The trial proceeded without me. I was trying to participate and asking for a means to do so.

15A. I have since reviewed the official June 11 transcript. After counsel acknowledged a corrected coverage gap, Movant answered that there was "No, no lapse in coverage." She relied on an October 2025 employment letter and answered "Absolutely" when asked whether I could support myself. Her counsel requested separate support and separate health insurance, and she agreed. Reporter's record pp. 20–21, 30. An eligibility correction made later did not supply the medication or surgery I lacked when I needed them. That older employment letter did not provide June 2026 wages, replace my equipment, restore my HSA access or resolve my medical condition. The presentation of self-sufficiency omitted the deprivation I was experiencing and the repeated requests I had made to stop it.

16. Before trial I repeatedly sought compelled financial disclosure and third-party records; my count of the motions to compel is approximately eighteen. The January report records a January 6 direction to produce financial documents by January 9. I do not equate entry of that direction with compliance. I still lacked the complete source records, tracing and usable production necessary to examine the property and debts presented for division. I requested de novo review of the June 1 denial of my enforcement, sanctions, continuance and subpoena-leave motion and was told on June 8 that no hearing could be set before trial. My efforts to obtain particular subpoenas or partial records did not yield the full bank, brokerage, compensation and receiving-account records now sought through ECF 97.

16A. The February 17, 2026 production was a password-protected archive whose links expired March 20. I have not received the complete replacement source production I have repeatedly demanded. The copies I have recovered do not answer where all the money went. One concrete omission is the third printed page missing from the supplied December Chase statement copy. A fuller copy later located contains that page and a December 10 Jennifer Hargrave entry. Recovery of a page from another copy does not erase the omission from the copy I was required to use or resolve the earlier concealed retainer arrangements. It demonstrates why completeness and original institution records matter.

17. I have been without counsel in the State Court since my last attorney withdrew in 2025. For more than a year I sought representation by emailing approximately twenty offices each week and telephoning firms. The firms willing to discuss undertaking the divorce required retainers of at least $50,000, which I did not have. The marital resources needed to fund counsel were in accounts I could not fully identify or reach. The initial cancelled retainer, later inability to fund counsel, loss of records and equipment, and medical decline were successive barriers to defending the case. I also maintain that Movant intentionally delayed an agreed order and caused me to lose employment. I did not choose this condition and then ask her to bear its consequences; I repeatedly sought the access and orders that would let me recover, work and litigate.

18. At the August 26 hearing [ECF 102], this Court directed me to reach terms with InTouch Credit Union or surrender my vehicle. The September 2 Order in Aid followed [ECF 103]. I surrendered the vehicle at InTouch's Plano location on or about September 3 in compliance. I have no vehicle and no independent means of making the approximately four-hour trip to Dallas from where I am staying. Movant's declaration states that she traded in her vehicle on February 28, had the dealer pay $54,500 to InTouch and financed a replacement in her name. That transaction was not disclosed to me before the decree was signed, and I maintain that it was not disclosed to the State Court before entry of the decree. The June 11 transcript instead records her testimony that she owned a BMW, owed BMW Finance approximately $60,000, and wanted the car assigned to her. She did not identify the February 28 trade-in or the $54,500 payoff in that testimony. Reporter's record pp. 32–34, 41–42. Her access to a replacement and my loss of transportation are part of the actual circumstances the Court should consider.

## THE MISSING RECORDS CONCERN THE VERY ASSETS AND LIABILITIES SHE ASKS THE COURT TO DETERMINE

19. Since December 2024, I have stated that community funds were siphoned away and concealed before the divorce filing in accounts I could not identify or access. ECF 51 ¶¶9–13 records my charge

that more than $650,000 had been removed from the marital estate. I maintain the claim and seek the source records to trace and quantify it. Movant's current declaration supplies dates and amounts for transfers, payoffs and withdrawals that I had been seeking to examine. Her motion acknowledges that no one has identified an asset into which earlier funds can be traced. ECF 110 ¶13; Ulijasz Declaration ¶¶10–14. That missing tracing is the issue. It is not proof that the money never existed or that all property in her possession was separate.

20. Her July 22, 2025 inventory listed restricted-stock grants with stated market values of $144,044 and $82,473, while claiming smaller community portions, and separately listed an anticipated $150,000 signing-bonus payment for November 2025. Ulijasz Declaration, Exhibit 3 §§7.B, 8.1. The decree says she paid community debts from "her separate income"; her declaration says "from my earnings." I dispute the claimed separate source and seek the underlying payroll, equity, deposit, transfer and receiving-account records. A label does not tell me where the money came from, where it went, what was mixed together or what remained on the petition date.

21. The decree confirmed property as hers separately without supplying the tracing I had requested. The Cognizant settlement agreement and counsel billing materials appear in the State Court record, but I have not received a complete account trail identifying the settlement deposit, its subsequent transfers and the funding of her legal fees. I need those records to identify and test the asserted interests, cooperate with the Trustee and answer the claims against me. I am not asking the Court to award me unidentified funds on my declaration alone. I am opposing a determination against me and the asserted estate interests before the records needed to decide the issue can be obtained.

22. On August 21, 2026, I filed my Rule 2004 motion [ECF 97] and motion to expedite [ECF 98] and emailed them to Movant and her counsel. On September 11, she filed the annulment motion and objected to the record requests. The objection asks that records be withheld from me absent further order and that I be prohibited from using them in the divorce or another proceeding. ECF 111 ¶43(c)(v)–(vi). I object to being excluded from the evidence of my own transactions and asserted community interests after my working records were taken. I can identify account relationships and events that a current balance alone will not explain. I need institution-origin records, with access for the Trustee and for me, to reconstruct what is missing and test what she now asks the Court to accept.

23. I first met Movant on March 3, 2023. That month I hired and paid for a three-person armed security team to escort her to a Chicago court appearance concerning a protective order involving a former partner, and I arranged the transportation and courthouse escort. At the June 11 trial, she testified that she first met me through Tinder in the first week of May 2023. That is false: I met her on March 3 and had already arranged and paid for the March Chicago escort. Reporter's record p. 6:8–11. Her declaration describes the vehicle as purchased before she met me and relies on June 2023 title evidence. Our relationship had already begun by June. The title date does not establish an earlier purchase date, and I seek the actual acquisition and funding documents to test the claim that the acquisition preceded our relationship. I also dispute the decree's exclusion of our earlier informal marriage. We held ourselves out as spouses, executed partnership and reciprocal power-of-attorney documents, and opened joint financial accounts before the ceremonial marriage. Those facts and records must be heard and examined; I did not consent to their exclusion at a trial I was medically unable to attend.

24. Movant's own declaration acknowledges that she learned of this bankruptcy from the February 18 notice sent to her email. Ulijasz Declaration ¶4. I was present at the September 3, 2026 hearing on my motion for new trial. Movant's counsel stated that he did not know the status of the automatic stay or whether it had been lifted. I had already given notice of the bankruptcy in the State Court and had emailed the Rule 2004 papers on August 21. I never agreed that the stay could be disregarded for division of the property I had scheduled or that my inability to attend trial supplied consent. On September 18, the State Court vacated decree §§8, 9 and 11–15 and left §§1–7 and 10 interlocutory. Exhibit R-14. I continue seeking vacatur of the remaining provisions and working benefits. I have not accepted the property division or abandoned my objections because I am ill, displaced, without counsel or unable to obtain the withheld records.

## ADDITIONAL RECORDS BEAR ON HER PRESENTATION OF MY CONDUCT

25. On May 27, 2026, a San Antonio Police Department officer took a report on Movant's complaint about my January 8 Inspira call. The report records that the officer determined I was an authorized user checking on my own card and found no criminal intent. My purpose in making the call was to obtain the medication access the State Court had ordered. The need to answer a police complaint about that effort compounded the obstruction I was already experiencing.

25A. By my current count, I have had to answer eighteen false police reports during these proceedings. I have repeatedly been read my Miranda rights and forced to respond to accusations while trying to recover, obtain medication and defend this case. The original stalking accusation concerning AirTags must be distinguished from my later efforts to locate property taken from my home. Detective Vidal explained to me that the Apple subpoena results identified the disputed tags as registered to Movant's own Apple account, not mine. I had installed tags at her request and did not retain tracking access. She used her own tags to accuse me, and later treated the devices accompanying my stolen belongings as a new basis for police accusations. My testimony concerns the accusations I answered and the investigative results communicated to me; the underlying police, Apple and recording records should be produced.

26. A representative of the Dallas County Constable, Precinct 5, informed me that body-worn-camera recordings of the April 16 writ execution showed Movant presenting identification bearing the surname McKemie and the residence address. We were enrolled in the Texas Address Confidentiality Program and used its substitute address. We did not use the protected residence address on our identification. She had moved out approximately sixteen months earlier and had resumed using Ulijasz on her financial accounts. She had no right to represent that she still lived there merely to gain entry. I charge that she used a credential inconsistent with our actual address-confidentiality arrangements to misrepresent a current right of residence and obtain access to my property. I seek the actual body-camera recording and credential evidence to establish exactly what she displayed and said. Her prior retrieval opportunities and the repeated denials of personal access are set out above.

## WHY I OPPOSE RETROACTIVE VALIDATION

27. I have repeatedly sought treatment, funds, records, counsel and protection of the property needed to recover and work. I warned about the cleanout before it occurred. I sought emergency participation before the trial proceeded without me. I challenged the decree and obtained partial vacatur. I pursued the account records and then faced the request to decide their ownership while excluding me from them. I charge deliberate financial destabilization, concealment, healthcare obstruction, coordinated aggravated perjury, fraud upon the court, fraud on the community, felony theft of my medication, equipment and separate-property evidence drives, destruction of property and evidence, false police reports, and violations of the mutual injunctions and the automatic stay. I identify the acts, actors, commands, defiance and resulting harm above; I seek express rulings on the relief properly before this Court. The events and sources above are the basis for those charges. I ask the Court to consider the whole sequence when weighing the claimed reliance and prejudice asserted in ECF 110. Retroactive validation would affect my ability to challenge the division, obtain the records and restore the means of survival. These injuries are ongoing. I ask the Court to deny ECF 110 by written order and expressly decide my pending request for the records needed to identify the property and transactions at issue. I oppose any fees, costs or sanctions against me for seeking those records or opposing annulment. I need my ability to receive treatment, work and present the evidence restored while the disputed property and accountability issues are adjudicated.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 1, 2026, at Brazos County.

[signature]

Jason Emory McKemie