# EXHIBIT 4

Affidavit of Jonathan Steele
filed in Cause No. DF-24-18010 on May 29, 2026 (Envelope 115516576)
(4 pages)

*In re Jason Emory McKemie, No. 26-30161-mvl7*

FILED
5/29/2026 3:42 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Donna Hall DEPUTY

**NO. DF-24-18010**

| | |
|---|---|
| IN THE MATTER OF THE MARRIAGE OF | IN THE DISTRICT COURT |
| GWENDOLYN ULIJASZ-MCKEMIE AND JASON MCKEMIE | 301ST JUDICIAL DISTRICT |
| | DALLAS COUNTY, TEXAS |

## AFFIDAVIT OF JONATHAN D. STEELE REGARDING PRODUCTION RECORD, BANKRUPTCY ORDERS, ABSENCE OF ATTACHED ORDERS, PROTECTIVE-ORDER NEED, AND FEES

STATE OF ILLINOIS

COUNTY OF COOK

BEFORE ME, the undersigned authority, on this day personally appeared Jonathan D. Steele, who, being by me duly sworn, stated under oath as follows:

1. My name is Jonathan D. Steele. I am over eighteen years of age, of sound mind, competent to make this affidavit, and authorized to make it on behalf of Petitioner. I am counsel for Petitioner Gwendolyn Ulijasz-McKemie in this matter, admitted pro hac vice, and I have been actively involved in the preparation and review of Petitioner's discovery production in this case. The facts stated below are within my personal knowledge or are based on my review of the Court's file and counsel's production records, and they are true and correct.

2. Petitioner is represented by Armstrong Divorce & Family Law, PLLC, 5949 Sherry Lane, Suite 835, Dallas, Texas 75225, Tel. (972) 544-1662, Fax (972) 408-3455, as resident counsel, together with the undersigned, admitted pro hac vice.

3. Based on my review of the production and the production index in this case, Petitioner produced records to Respondent during the discovery period, and the production index identifies production from GU000001 through GU002225. The highest burned-in Bates stamp I have identified on a produced PDF is GU001922, and the production index reflects additional produced materials through GU002225.

4. Attached as Exhibit A is a true and correct copy of the production index and Bates log reflecting those productions.

5. I have reviewed Respondent's May 26, 2026 Motion. The Motion does not attach any proposed nonparty subpoena or Rule 205.3 notice, and based on my review of the file, Respondent did not, during the discovery period, serve on Petitioner any Rule 205 notice or proposed subpoena for the third-party records he now says he requires.

6. Respondent's May 26, 2026 Motion does not attach a signed January 6, 2026 discovery order, a signed January 9, 2026 discovery order, a signed January 20, 2026 discovery order, or a signed February 5, 2026 discovery order.

7. Respondent is a Chapter 7 debtor. He filed his Chapter 7 petition on January 12, 2026. The Chapter 7 trustee is Areya Holder. Attached as Exhibit B are true and correct copies of the relevant bankruptcy filings and orders, which include the notice of the Chapter 7 case identifying the trustee and petition date; the order terminating the automatic stay to permit the landlord to pursue eviction remedies; the order entered the afternoon of April 16, 2026 reinstating the automatic stay and directing that writ enforcement cease; and the later order extending Respondent's move-out deadline and reserving claims for rent, expenses, damages, and automatic-stay violations for separate motion or adversary proceeding. None of those orders adjudicates theft, spoliation, stay violation, damages, property ownership, or turnover against Petitioner.

8. Petitioner is confirming whether the discovery-control plan in effect is the default Level 2 plan or was modified by the September 8, 2025 302nd District Court pretrial order. Under either plan, ordinary nonparty discovery is not open on the eve of the June 11, 2026 trial.

9. Respondent's Motion required Petitioner to prepare a written response, counter-motion for protective order, proposed order language, evidentiary objections, hearing preparation, and

related protective relief to avoid a continuance, subpoena leave, and privilege-invasive discovery sixteen days before the June 11, 2026 trial setting.

10. Petitioner requests an award of reasonable attorney's fees, court costs, expenses, and protective expenses incurred in responding to Respondent's Motion and obtaining protective relief. The amount of fees, costs, expenses, and protective expenses is reserved for later prove-up by separate submission or hearing.

11. If the Court requires fee proof as to amount, Petitioner will submit lodestar detail, including date, timekeeper, hourly rate, task description, hours, total, reasonableness and necessity, and segregation to the May 26 Motion, the June 1 response, the protective-order work, and related hearing preparation.

12. In my opinion, the protective relief requested by Petitioner is reasonable and necessary to prevent undue burden, unnecessary expense, harassment, invasion of privilege, invasion of work product, and disruption of the June 11 trial setting.

Further affiant sayeth not.

JONATHAN D. STEELE

Admitted Pro Hac Vice

Counsel for Petitioner

SUBSCRIBED AND SWORN TO BEFORE ME on this 29th day of May, 2026, to certify which witness my hand and seal of office.

OFFICIAL SEAL
ROSA E GUTIERREZ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 05/26/2027

Notary Public in and for the State of Illinois

My commission expires: 5/26/2027

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Terra Aguirre on behalf of Rebecca Armstrong
Bar No. 24062589
terra@armstronglawtexas.com
Envelope ID: 115516576
Filing Code Description: Response
Filing Description: TO MOTION FOR ENFORCEMENT AND COUNTER MOTION FOR PROTECTIVE ORDER
Status as of 6/1/2026 10:16 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kim Jones | | kjones@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Jeffrey ECook | | jcook@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Tiffany Castenada | | tcastenada@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| William CCook | | wcook@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Rebecca LArmstrong | | rebecca@armstronglawtexas.com | 5/29/2026 3:42:21 PM | SENT |
| Terra Aguirre | | terra@armstronglawtexas.com | 5/29/2026 3:42:21 PM | SENT |
| Chandler Alt | | calt@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| Lauren N.Shaw | | lauren@armstronglawtexas.com | 5/29/2026 3:42:21 PM | SENT |
| Jason McKemie | | jmckemie@mckemie.net | 5/29/2026 3:42:21 PM | SENT |
| Gwendolyn Ulijasz McKemie | | GUlijasz@gmail.com | 5/29/2026 3:42:21 PM | SENT |
| Gwendolyn Ulijasz | | gulijasz@gmail.com | 5/29/2026 3:42:21 PM | SENT |
| JONATHAN STEEL | | jsteele@beermannlaw.com | 5/29/2026 3:42:21 PM | SENT |
| Ethan Scroggins | | escroggins@sullivancook.com | 5/29/2026 3:42:21 PM | SENT |
| JASON EMORYMCKEMIE | | jason@callvital.com | 5/29/2026 3:42:21 PM | SENT |

# EXHIBIT 5

Reporter's Record, Trial Before the Court, June 11, 2026
Cause No. DF-24-18010, 301st Judicial District Court
Shantel Beheler, CSR 3031 (47 pages)

REPORTER'S RECORD

VOLUME 1 OF 1 VOLUME

TRIAL COURT CAUSE NO. DF-24-18010

| | | |
|---|---|---|
| IN THE MATTER OF<br>THE MARRIAGE OF | ) | IN THE 301ST JUDICIAL |
| | ) | |
| | ) | |
| GWENDOLYN ULIJASZ-McKEMIE<br>AND | ) | DISTRICT COURT OF |
| | ) | |
| JASON EMORY McKEMIE | ) | DALLAS COUNTY, TEXAS |

**********************************************************

TRIAL BEFORE THE COURT

**********************************************************

BE IT REMEMBERED, that on the 11th day of June, 2026, the above-entitled and numbered cause came on to be heard for hearing in the said court, HONORABLE ASHLEY WYSOCKI, Judge Presiding of the 301st Judicial District Court of Dallas County, Texas, at which time the following proceedings were had. Proceedings reported by machine shorthand. Transcript produced by computer.

**APPEARANCES**

JONATHAN D. STEELE
Beermann, LLP
161 N. Clark Street
Suite 3000
Chicago, Illinois 60601
Telephone: 312-621-9700

*Attorney for Petitioner, Gwendolyn Ulijasz McKemie*

# INDEX

## INDEX OF TESTIMONY

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Gwendolyn Ulijasz-McKemie | 4 | | | |

## EXHIBIT INDEX

| No. | Description | Offered | Admit/Deny |
|---|---|---|---|
| PX-2 | Marriage License | 6 | 6 |
| PX-3 | Advantigen Shares | 9 | 9 |
| PX-4 | Advantigen Shares tracing | 10 | 10 |
| PX-5 | AIG 401(k) | 11 | 11 |
| PX-6 | AIG 401(k) tracing | 11 | 11 |
| PX-7 | Ameriprise Account | 13 | 13 |
| PX-8 | Ameriprise stmts | 13 | 13 |
| PX-8A | Ameriprise stmt E-Trade | 13 | 13 |
| PX-8B | Ameriprise stmt Cognizant rollover | 13 | 13 |
| PX-9 | Employment Agreement for Accenture | 15 | 15 |
| PX-12 | Pay stubs & W-2 for 2024 | 26 | 26 |
| PX-13 | Monthly Expenses | 17 | 17 |
| PX-14 | Chase statement May '25 | 18 | 18 |
| PX-15 | Chase stmt Dec '23 to Jan '24 | 19 | 20 |
| PX-26 | American Express stmt Dec '24 | 27 | 27 |
| PX-29 | Pay stubs | 24 | 24 |
| PX-30 | VEIP UBS statements | 24 | 25 |
| PX-31 | Separation Agreement w/Cognizant | 25 | 25 |
| PX-32 | Chase Stmt Dec '23 to May '25 | 29 | 29 |
| PX-36 | K-1 for Advantigen | 28 | 28 |
| PX-37 | Tax Return 2023 | 28 | 28 |

PROCEEDINGS

13:34:21 THE COURT: Cause No. 24-18010. State your names and appearances.

13:34:26 MR. STEELE: Jonathan Steele. I represent Gwendolyn McKemie, who's also present.

13:34:32 THE COURT: Officer, can you please call the hall for Jason McKemie.

13:34:59 (Hall was called)

13:35:03 THE BAILIFF: No response, Your Honor.

13:35:05 THE COURT: Let the record reflect that the hall has been called for Jason McKemie, and he has failed to appear, despite what the Court finds is proper notice of today's trial.

13:35:19 So you may proceed.

13:35:21 MR. STEELE: I would call my client.

13:35:24 THE COURT: Ma'am, will you take a seat up here.

13:35:38 (At this time Gwendolyn Ulijasz-McKemie was sworn)

13:35:55 MR. STEELE: Judge, I have a binder for the witness, if I may approach, and also for the Court.

13:36:02 THE COURT: Sure.

13:36:03 **GWENDOLYN ULIJASZ-MCKEMIE**

13:36:03 **DIRECT EXAMINATION**

13:36:03 **BY MR. STEELE:**

13:36:05 Q. Ma'am, could you state your name for the record.

13:36:07 A. Gwendolyn Laura Ulijasz-McKemie.

13:36:11 Q. And you are married to the respondent in this case; is that correct?
13:36:13 A. That's correct.
13:36:13 Q. And when were you married?
13:36:15 A. We had a ceremony on June 22 of 2024, and the marriage license was signed on June 26, 2024.
13:36:25 Q. So almost two years you've been married?
13:36:27 A. That's correct.
13:36:28 Q. And where do you live and where do you work?
13:36:33 A. I now live in San Antonio, Texas and I work as a consultant for Accenture.
13:36:43 Q. Where is the last known residence that your husband lived?
13:36:47 A. 5609 LaFoy Boulevard in Dallas, Texas.
13:36:51 Q. That's Dallas County, correct?
13:36:52 A. That's correct.
13:36:53 Q. And have you and your husband been living separate?
13:36:59 A. Yes.
13:37:00 Q. And has the marriage become insupportable because of discord between you and your husband?
13:37:05 A. Yes.
13:37:06 Q. And does that conflict destroy, from your perspective, the legitimate ends of saving the marriage?
13:37:13 A. Yes.

Q. And is that conflict irreconcilable?

A. Yes.

Q. And you said you are currently working at Accenture; is that correct?

A. That's correct.

Q. Where did you work before?

A. Prior to Accenture I worked for Cognizant.

Q. And when and how did you first meet Mr. McKemie?

A. I met Jason -- it was my first online dating experience. I met him on Tinder in May -- first week in May of 2023.

Q. Can you turn to Tab 2 of the binder that I put in front of you?

A. Yes, sir.

Q. Let me know when you are there.

A. Alright.

Q. Is this your marriage license?

A. It is.

Q. And is this the one you filed with the State of Texas?

A. I did.

MR. STEELE: Judge, I would offer into evidence Petitioner's Exhibit 2.

THE COURT: Exhibit 2 is admitted.

Q (By Mr. Steele) Before you got married to Mr.

McKemie, what, if any, assets did you own?

A. Assets, I had a checking account, I had retirement accounts, and I owned shares in my brother's start-up company.

Q. Starting with checking, where is your checking account?

A. Chase Bank.

Q. Do you still have that Chase checking account today?

A. I do.

Q. Are you asking the judge to award you that as your non-marital property?

A. That's correct, I am.

Q. And you said you have retirement accounts. Did you have more than one?

A. I did.

Q. How many did you have?

A. Can I just clarify? Before I got married?

Q. Correct.

A. I don't recall the number. I know, like, the entity is 401(k), Roth, Traditional Rollover.

Q. Did you have all three of those?

A. I did.

Q. Where was the 401(k)?

A. It was at -- so there were two of them. One was

13:39:43 my former employer, AIG. There was a 401(k) there. Then
13:39:47 at that time I was working for Cognizant, and I had a
13:39:51 401(k) with Cognizant, and I don't recall the broker.
13:39:54 Q. You said you had a traditional IRA as well?
13:39:56 A. That's correct.
13:39:57 Q. Where was that?
13:40:00 A. I believe it was at E-Trade. I consolidated to
13:40:03 Ameriprise before I got engaged.
13:40:07 Q. And a Roth rollover as well?
13:40:09 A. That's correct.
13:40:10 Q. Do you recall where that was?
13:40:11 A. I believe it was also at E-Trade. I
13:40:13 predominantly used E-Trade.
13:40:17 Q. If you turn to Tab 3 in the binder that's in
13:40:20 front of you, you mentioned that you had shares of your
13:40:23 brother's company. What is the name of his company?
13:40:28 A. Advantigen.
13:40:29 Q. Do you recall what, if anything, you paid for
13:40:31 the shares of that company?
13:40:38 A. So my original investment -- bear with me just
13:40:43 one moment. I have to read this email.
13:40:46 So I transferred and purchased shares in the
13:40:50 amount of $25,000 and $5,000. That was the first
13:40:56 investment -- or one of the investments April 3, 2023.
13:41:06 And then there was a second tranche of

investment that I purchased in the fall of 2023. I am just looking for the documentation to support the amount.

Q. So both tranches of stock that you purchased in your brother's company were purchased in 2023; is that correct?

A. Correct. All tranches were purchased before I was engaged.

Q. So you read my mind, then. Were any of those -- did you purchase any additional shares during the course of the marriage?

A. No, I did not.

Q. And are you asking that the shares of Advantigen be awarded to you as your non-marital property?

A. I am.

MR. STEELE: Judge, I would offer into evidence Petitioner's Exhibit 3.

THE COURT: Three is admitted.

Q (By Mr. Steele) If you turn to Tab 4 in your binder, do you recognize the documents that are in Tab 4?

A. I do.

Q. Is this the agreement that you signed when you purchased the shares?

A. It is.

Q. And it looks like the dates of investment are

13:42:20 June 22, 2022, March 19, 2023, October 13, 2023; is that correct?
13:42:27 A. That's correct.
13:42:28 Q. All of which were before the marriage?
13:42:29 A. That's correct.
13:42:31 Q. Is Exhibit 4 a true and accurate copy of the agreement that you entered into with Advantigen?
13:42:37 A. Yes, it is.
13:42:39 MR. STEELE: I would offer Exhibit 4.
13:42:41 THE COURT: Exhibit 4 is admitted.
13:42:46 Q (By Mr. Steele) Turn to Tab 5, please. You mentioned that you had a 401(k) at AIG; is that correct?
13:42:53 A. That's correct.
13:42:54 Q. And do you recognize the statement that is set forth in Tab 5?
13:42:59 A. Yes, I do.
13:43:00 Q. Is this, at least as of June of 2025, a current statement of your account?
13:43:05 A. It is.
13:43:06 Q. And did you contribute any funds to this account during the course of the marriage?
13:43:11 A. No, I did not.
13:43:12 Q. And if you turn to Tab 6, the first page of that exhibit shows the balance in that account as of June of

13:43:27 2024; is that correct?
13:43:28 A. That's correct.
13:43:29 Q. And you testified that you were married when?
13:43:32 A. The ceremony was June 24, 2024.
13:43:38 Q. So this is the account value as of approximately
13:43:41 the date of your marriage; is that correct?
13:43:43 A. That's correct.
13:43:45 Q. And if I asked you this already, I apologize,
13:43:47 but you've contributed nothing additionally during the
13:43:50 course of the marriage, correct?
13:43:51 A. That's correct.
13:43:52 MR. STEELE: I would offer Petitioner's 6 and --
13:43:54 5 and 6.
13:43:55 THE COURT: Five and six are admitted.
13:43:59 Q (By Mr. Steele) Turn to Tab 7, please. Are
13:44:04 you there?
13:44:04 A. I am.
13:44:04 Q. What do you recognize Tab 7 to be?
13:44:07 A. These are my Ameriprise statements.
13:44:10 Q. And this is the value as of May of 2025; is that
13:44:15 correct?
13:44:16 A. That's correct.
13:44:17 Q. Have you contributed to this account during the
13:44:19 course of the marriage?
13:44:19 A. No, I have not.

13:44:21 Q. And if you turn to Tab 8, this account, I believe, was funded from -- I think you testified a couple of accounts rolling into it; is that correct?
13:44:35 A. That's correct.
13:44:36 Q. What do you recognize Tab 8 to be?
13:44:38 A. This was the Cognizant. So former employer 401(k) that I recognized in one of my opening statements.
13:44:45 Q. So this Cognizant account was rolled into Ameriprise, correct?
13:44:48 A. That's correct.
13:44:50 Q. And 8-A, you referenced earlier an E-Trade account as well; is that correct?
13:44:57 A. That's correct.
13:44:58 Q. Was that account also rolled into Ameriprise?
13:45:01 A. Yes, it was.
13:45:02 Q. And 8-A, are those your statements?
13:45:04 A. Yes, they are.
13:45:08 Q. And then turn to 8-B. What do you recognize 8-B to be?
13:45:17 A. 8-B is more Ameriprise financial statements.
13:45:22 Q. So do the exhibits in 8-A and 8-B, are they true and accurate copies of statements you received?
13:45:31 A. Yes, they are.
13:45:32 Q. And the value that we saw on 8 as of -- actually, I'm sorry -- the value in Exhibit 7, as of May

13:45:49 of '25, was approximately $449,000. That was made up of
13:45:56 what's in 8, 8-A, and 8-B rolled into it; is that correct?
13:46:00 A. That's correct.
13:46:00 Q. And again, you contributed nothing during the
13:46:03 marriage; is that correct?
13:46:03 A. That's correct.
13:46:04 Q. And you are asking that the Ameriprise account
13:46:06 be awarded to you as your non-marital property; is that
13:46:08 correct?
13:46:09 A. That's correct.
13:46:21 Q. Is your husband employed?
13:46:24 A. Yes.
13:46:24 THE COURT: Are you going to offer those,
13:46:26 Counsel?
13:46:26 MR. STEELE: I would offer, yes, to the extent I
13:46:28 did not, 7 and then 8 through 8-B.
13:46:31 THE COURT: Seven, 8, 8-A, and 8-B are admitted.
13:46:40 Q (By Mr. Steele) Let's just start with 9,
13:46:40 then. Did you receive a signing bonus or a bonus at
13:46:43 Accenture?
13:46:45 A. Yes, I did.
13:46:46 Q. How much was that bonus, if you recall?
13:46:47 A. I do. So the cash bonus was paid in two
13:46:53 tranches. The first tranche was $150,000 that I received
13:47:00 in November of 2024, which was a couple weeks after my

13:47:07 start date. And then the next tranche cash bonus was another $150,000. It was received in November of 2025. So on the one-year anniversary.

13:47:20 Q. Does any of that money still exist today?

13:47:22 A. No.

13:47:25 Q. Do you and your husband have debt that was incurred during the marriage?

13:47:30 A. Yeah.

13:47:31 Q. Can you tell the judge who the creditors are and the approximate amounts of those debts?

13:47:38 A. Clarifying question. Does that include the debts that I have already paid off and retired?

13:47:44 Q. I will do that in a minute. The currently existing debts?

13:47:48 A. Currently existing debts would be -- I have -- so there is about a $10,000 balance left on a SoFi loan that we took out during the marriage. I have $50,000 in credit card debt on my Chase card, and I have got about $15,000 in debt on my CitiBank card.

13:48:17 Q. And what, if any, cash -- well, let me back up. You testified or you asked me a question, I think, about debt that has been retired during the marriage. Did you and your husband incur debt that was paid down during the marriage?

13:48:33 A. Yes, we did.

13:48:34 Q. How much debt was incurred and how much was paid down?
13:48:41 A. Sorry, just give me a second. I am not thinking. It's embarrassing for me.
13:48:52 So we incurred about -- it was close to $200,000 in debt, and that's exclusive of my credit cards that I just mentioned, which is another $65,000.
13:49:07 Q. And the $200,000 that you incurred during the marriage, was that you and your husband?
13:49:15 A. Can you clarify? He spent a lot of money on my cards.
13:49:20 Q. Who paid the debt?
13:49:21 A. I did.
13:49:24 Q. If we go back to Exhibit 9, is this the employment agreement that you entered into with Accenture?
13:49:33 A. Yes, it is.
13:49:34 Q. Is it a true and accurate copy of your employment agreement?
13:49:39 A. Yes, it is.
13:49:42 MR. STEELE: I would offer into evidence Petitioner's 9.
13:49:45 THE COURT: Nine is admitted.
13:50:07 Q (By Mr. Steele) I will come back to 10. And you did testify to this, I think, but nothing is left from that bonus you received; is that correct?

13:50:11 A. That's correct.
13:50:12 Q. What is your current annual income?
13:50:17 A. Inclusive or exclusive of regular annual
13:50:21 bonuses?
13:50:23 Q. Start excluding annual bonuses.
13:50:25 A. Exclusive of annual bonuses, it's $390,000 a
13:50:27 year.
13:50:29 Q. 390 or 380?
13:50:31 A. 390.
13:50:32 Q. Are you guaranteed a bonus?
13:50:33 A. No.
13:50:34 Q. When is the last time you got a bonus?
13:50:37 A. I never have gotten a bonus.
13:50:39 Q. Do you know what your approximate monthly
13:50:41 expenses are?
13:50:47 A. Like, inclusive of attorney's fees during this
13:50:50 time, yeah -- just give me a second. Sorry.
13:51:15 Q. Why don't you turn to Tab 13.
13:51:15 A. Okay.
13:51:15 Q. Does this represent your -- at least as of the
13:51:16 time you put it together -- your monthly expenses?
13:51:18 A. It does.
13:51:20 Q. And it's a true and accurate representation of
13:51:25 them?
13:51:25 A. It is.

13:51:26 MR. STEELE: I would offer Petitioner's 13.
13:51:28 THE COURT: Thirteen is admitted.
13:51:38 Q (By Mr. Steele) Turn to 14, please.
13:51:42 A. That one never lies. Sorry. Go ahead.
13:51:45 Q. What is 14? What are we looking at there?
13:51:48 A. That is -- this is a statement from my Chase 13:51:55 Bank on June 5 of 2025. And let me just identify if it's 13:52:02 checking or -- this would be my checking account.
13:52:04 Q. And what is this exhibit showing the Court, if 13:52:08 you know?
13:52:10 A. It shows a deposit of $36,789 on May 8, I think 13:52:20 it is, and a payment to credit cards totaling in 13:52:24 approximately the same amount shortly thereafter.
13:52:28 Q. And then if you turn to the June 6th to July 7th 13:52:32 statement, there looks to be a deposit of 104,000 and then 13:52:35 some withdrawals. Do you see that?
13:52:44 A. Can you tell me what page are we still on 14?
13:52:49 Q. Still Exhibit 14, but it's the second page of 13:52:52 the statement June 6th to July 7th.
13:52:54 A. Okay. I see.
13:52:55 Q. You deposited $104,000 into your account and 13:52:57 then you made some withdrawals that look like credit card 13:53:01 payments; is that correct?
13:53:01 A. That's correct.
13:53:02 Q. So these were credit cards that were paid during

the marriage?

A. That's correct.

Q. And these were for expenses that you used to live with you and your husband; is that correct?

A. I don't know what's on -- I don't know what a lot of -- he spent this money was on, but yes. So, yes.

Q. So he had access to your credit cards and made charges on them; is that correct?

A. In excess, yeah.

MR. STEELE: I would offer Petitioner's 14.

THE COURT: Fourteen is admitted.

THE WITNESS: Can I just have 30 seconds to take a breath?

THE COURT: Yes.

(Brief Recess)

THE WITNESS: Okay. Alright. I'm ready.

Q (By Mr. Steele) Turn to 15, please. Is this a Chase statement for an account that you and your husband had?

A. Yes, it is.

Q. Did he ever deposit any money into this account?

A. Never.

Q. Where did the money come from?

A. It came from my personal checking account in my name only and my income.

13:54:13 Q. Now, the cover sheet for this exhibit says that it's your debt payments for the husband. Is that what we are looking at in this exhibit?
13:54:22 A. Yes.
13:54:23 Q. Is this a true and accurate copy of your Chase statement from December 22 of '23 to January 23 of '24?
13:54:31 A. Yes.
13:54:32 Q. Was there a Federal tax lien put on this account?
13:54:39 A. Not to my knowledge.
13:54:41 Q. What's the last page of this Exhibit 15?
13:54:51 A. This is a Federal tax lien that I uncovered that was in Jason's name from the state of Florida. Some things were hidden from me.
13:55:07 MR. STEELE: I would offer just the first two pages of 15.
13:55:13 THE COURT: Are you going to use the ones that you've given me to go to the court reporter or have you emailed her your exhibits?
13:55:21 MR. STEELE: I have an extra set. I can give her a set.
13:55:28 THE COURT: Well, it's okay. I can -- I just didn't know if you had already emailed her.
13:55:28 MR. STEELE: No.
13:55:29 THE COURT: Then 15 is admitted.

13:55:42 Q (By Mr. Steele) Does your husband have health insurance?
13:55:44 A. Yes, he does.
13:55:45 Q. Is he on your policy?
13:55:46 A. Yes.
13:55:47 Q. During the course of these proceedings was there, like, a gap in coverage that was then corrected?
13:55:52 A. There was.
13:55:54 Q. So with that correction has there been any period of time during which your husband had a lapse in coverage?
13:56:00 A. No, no lapse in coverage.
13:56:02 Q. Do you have an HSA account?
13:56:04 A. Yes, I do.
13:56:05 Q. What's in there today?
13:56:06 A. It's a couple thousand dollars. If there were a document for me to refer to, I could be more specific.
13:56:12 Q. Was the money that's in there today contributed during the marriage?
13:56:15 A. Yes.
13:56:17 Q. So you would admit that that's community property?
13:56:20 A. That's true.
13:56:43 Q. Is your husband currently employed?
13:56:44 A. Yes, he is.

13:56:45 Q. How do you know that?
13:56:46 A. Because he filed a letter from his current employer, ATI, and the letter was signed off on by Ron Nations, who is president of ATI, and that letter was dated October of 2025, and in that letter he confirmed Jason's employment and said that he had a new product for him to sell.
13:57:11 Q. And during the course of your marriage was he employed?
13:57:14 A. Yes.
13:57:15 Q. What was his historic earnings, if you know?
13:57:18 A. I don't know.
13:57:20 Q. Do you know whether he earns six figures?
13:57:23 A. Yes. So traditionally he has earned six figures, I think, going back to about 2013.
13:57:29 Q. Do you believe he's capable of supporting himself?
13:57:32 A. Absolutely.
13:57:33 Q. Did you pay some of your husband's attorney's fees during the course of these proceedings?
13:57:38 A. Yes, I did.
13:57:39 Q. Do you know how much?
13:57:40 A. It was at least 5,000. It was the first retainer, if I recall.
13:57:53 Q. You have a VEIP account through Accenture; is

13:57:56 that correct?
13:57:57 A. That's correct.
13:57:58 Q. Tell the judge what that is.
13:58:00 A. That is -- the account, as we call it, is a plan
13:58:08 where partners of the consultancy, we need to buy and,
13:58:12 like, hold a certain amount of stock. So that's the
13:58:16 savings plan where some of my paycheck is diverted there
13:58:21 in order to purchase stock. It's a taxable account.
13:58:31 Q. Is it a requirement of your employment?
13:58:32 A. It is a requirement to hold a certain number of
13:58:35 shares, yes.
13:58:36 Q. Do you know what the value of the VEIP account
13:58:38 is today?
13:58:39 A. It's about $40,000.
13:58:40 Q. And that was all contributed during the
13:58:42 marriage; is that correct?
13:58:42 A. That's correct.
13:58:43 Q. So you are conceding that that amount is
13:58:47 community property?
13:58:48 A. Yes, it is.
13:58:57 Q. So, so far we have about 40,000 in the VEIP
13:59:00 account and you said a couple or a few thousand in HSA; is
13:59:02 that correct?
13:59:02 A. That's correct.
13:59:02 Q. Is that the entirety of your community property?

13:59:09 A. Let me just think for a moment. Yes.
13:59:16 Q. And I believe you testified that you have some community debt as well, correct?
13:59:20 A. Correct.
13:59:21 Q. Does the debt exceed the community property?
13:59:24 A. Yes, by quite a lot.
13:59:26 Q. Can you quantify that?
13:59:28 A. If I recall what we just -- you know, what I just went through earlier, there is 50,000 on one of my credit cards, there is about 15,000 on a second credit card, and then there is just about 10,000 left on one of the loans that I had to take out during the marriage to cover whatever. I am not sure what I was covering. There is about $10,000 left on a SoFi loan. Let me just think for a moment.
14:00:02 That's everything that I'm aware of.
14:00:03 Q. Are you asking the judge to allocate the community debt between you and your husband?
14:00:08 A. No.
14:00:08 Q. What are you asking her to do with the community debt?
14:00:15 A. I just want to get divorced. I don't understand the question.
14:00:19 Q. Do you want to pay all of it by yourself or do you want your husband to contribute to some of the debt?

14:00:24 A. I mean, I would like him to contribute to some of the debt. I have done a lot so far.
14:00:29 Q. That's what I meant by "allocate."
14:00:32 Turn to 29. Are these your pay stubs?
14:00:42 A. Yes.
14:00:43 Q. These show your VEIP contributions, correct?
14:00:47 A. Yes, they do.
14:00:49 Q. Are they true and accurate copies of your pay stubs?
14:00:51 A. Yes, they are.
14:00:53 MR. STEELE: I would offer into evidence Petitioner's 29.
14:00:57 THE COURT: Twenty-nine is admitted.
14:01:05 Q (By Mr. Steele) Turn to 30, please. You mentioned that with the VEIP deductions you have to buy stock; is that correct?
14:01:11 A. That's correct.
14:01:12 Q. Is Exhibit 30 the investment account that holds that stock?
14:01:17 A. It is.
14:01:18 Q. Are these true and correct copies of your investment account statements?
14:01:23 A. Is that 2025? Yes.
14:01:26 MR. STEELE: I would offer into evidence Exhibit 30.

14:01:29 THE COURT: Thirty is admitted.

14:01:40 Q (By Mr. Steele) When you left Cognizant and
14:01:42 joined Accenture, did you sign a separation agreement
14:01:44 with Cognizant?

14:01:46 A. Yes, I did.

14:01:46 Q. If you turn to Exhibit 31, is that your
14:01:46 separation agreement and is that your signature on the
14:01:48 last page?

14:01:48 A. Yes. Yes.

14:01:58 Q. Is this a true and correct copy of your
14:02:01 separation agreement?

14:02:02 A. Yes.

14:02:03 MR. STEELE: I would offer Exhibit 31.

14:02:05 THE COURT: Thirty-one is admitted.

14:02:13 Q (By Mr. Steele) You testified earlier that
14:02:13 you had a Chase checking account before you got
14:02:16 married. If you turn to Exhibit 32, are these
14:02:20 statements from that Chase account?

14:02:22 A. Yes.

14:02:22 Q. These look to span the range of December 28 of
14:02:25 '23 through May of '25; is that correct?

14:02:33 A. Yes.

14:02:34 Q. Are these true and correct copies of the Chase
14:02:37 account statements for that time period?

14:02:39 A. They are. I would like to make a note on the

14:02:41 record that I had to close the account -- the checking
14:02:45 account that we were looking at previously and opened this
14:02:48 one because I had a disproportionate amount of fraud in
14:02:51 the other checking account. So while I always just had
14:02:53 one, you will see that there is two different checking
14:02:56 account numbers.

14:02:59 MR. STEELE: Judge, if I can just have one
14:03:01 minute to look at my notes.

14:03:03 (Brief Recess)

14:03:19 Q (By Mr. Steele) Turn to Tab 12. What are we
14:03:24 looking at in Exhibit 12?

14:03:35 A. My pay stubs.

14:03:36 Q. Are they true and correct copies of your pay
14:03:39 stubs?

14:03:40 A. Yes.

14:03:42 Q. There also looks to be a W-2 from the year 2024;
14:03:45 is that correct?

14:03:46 A. That's correct.

14:03:47 Q. Is that a true and correct copy of your 2024
14:03:50 W-2?

14:03:50 A. Yes.

14:03:53 MR. STEELE: I would offer Petitioner's 12.

14:03:55 THE COURT: Twelve is admitted.

14:04:09 Q (By Mr. Steele) You testified earlier that
14:04:10 your husband has active health insurance coverage. How

14:04:14 do you know that as you sit here today?
14:04:16 A. I know that because I get -- because I'm the primary on the health insurance, I get notified when a claim comes through. So it will say the doctor and the dollar amount and then whether or not it was covered.
14:04:49 Q. You testified that you made the payment to your husband's attorney in this case. Can I direct you to Tab 26, please, and tell me when you are there.
14:05:05 A. Okay.
14:05:05 Q. If you turn to -- at the bottom Bate's number GU000866, does this reflect that retainer payment?
14:05:20 A. Yes, it's Webb Family Law on December 13, 2024.
14:05:25 Q. Is this a true and accurate copy of your AmEx Platinum card statement for the month of December 2024?
14:05:36 A. It is.
14:05:38 MR. STEELE: I would offer into evidence 26.
14:05:40 THE COURT: Twenty-six is admitted.
14:05:50 Q (By Mr. Steele) I'm going to show you what's not in your binder. So I'm going to mark it as Petitioner's 36 and 37.
14:06:20 Start with 36 and tell us what we are looking at.
14:06:23 A. This would appear to be the K-1s from my investments and my brother's company.
14:06:33 Q. Is it a true and correct copy of the K-1 you

14:06:37 received from Advantigen?
14:06:38 A. Yes.
14:06:39 MR. STEELE: I would offer into evidence
14:06:40 Petitioner's 36.
14:06:42 THE COURT: Thirty-six is admitted.
14:06:49 Q (By Mr. Steele) Then go to 37 and tell us
14:06:52 what we are looking at.
14:07:02 THE COURT: Counsel, it's got her social on it.
14:07:08 MR. STEELE: Can I redact the social and then
14:07:08 give it back?
14:07:08 THE COURT: Yes.
14:07:08 THE WITNESS: There are social security numbers
14:07:08 all over what's already in, though.
14:07:08 THE COURT: The one I checked was redacted. In
14:07:08 the binder, I hadn't seen any that weren't.
14:07:10 Q (By Mr. Steele) Go to 37.
14:07:10 A. Okay.
14:07:10 Q. What is 37?
14:07:12 A. Thirty-seven is my 2023 tax return.
14:07:16 Q. And is it a true and correct copy of the tax
14:07:19 return that you filed with the government?
14:07:22 A. Yes, it appears to be. Yes.
14:07:25 MR. STEELE: I would offer Petitioner's 37.
14:07:28 THE COURT: Thirty-seven is admitted.
14:07:40 MR. STEELE: Judge, can I confirm with the Court

the exhibits I have admitted?

THE COURT: Yes.

MR. STEELE: I have 2, 3, 4, 5, 6, 7, 8, 8-A, 8-B, 9, 12, 13, 14, 15, 29, 30, 31, 32, 36, and 37.

REPORTER: No.

THE COURT: No.

MR. STEELE: Which ones did I get wrong?

REPORTER: I have -- that you didn't say, I have 26, and you didn't say that one. I have 29, 30, 31, 36 and 37. So I don't have 32.

Q (By Mr. Steele) Can you go back to 32? That was your Chase checking account statements.

A. 32?

Q. Yeah.

A. Yes.

Q. Those were the Chase checking account statements that you testified to spanning December of '23 through, I think, May of '25; is that correct?

A. Correct.

Q. Are those true and correct copies of your Chase checking account statements?

A. Yes, they are.

MR. STEELE: I would offer into evidence 32.

THE COURT: Thirty-two is admitted.

MR. STEELE: Madame reporter, is my list

14:09:11 accurate now?
14:09:11 REPORTER: Yes.
14:09:26 Q (By Mr. Steele) You are asking the judge to
14:09:28 order that you and your husband are going to be
14:09:29 supporting yourselves going forward, correct?
14:09:31 A. Correct.
14:09:31 Q. And you would like the ability to resume the use
14:09:34 of your maiden name?
14:09:35 A. Yes.
14:09:37 Q. And for you and your husband to be responsible
14:09:40 for health insurance going forward?
14:09:43 A. Yes, our own health insurance.
14:09:47 Q. And how would you like the judge to allocate
14:09:51 debt? Would you like it to be equal between the two of
14:09:55 you?
14:09:58 A. Yes.
14:10:00 Q. For convenience sake, would you like the judge
14:10:04 to subtract what's in your HSA and your VEIP from the debt
14:10:13 and then allocate what's left?
14:10:14 A. Yes, please.
14:10:17 Q. And to the extent that I've not specifically
14:10:19 mentioned your other non-marital property, anything else
14:10:23 that you testified to that you had prior to the marriage
14:10:24 you would like to leave with as your non-marital property
14:10:28 and to be allocated to you; is that correct?

14:10:30 A. I don't understand the question, Jonathan.
14:10:32 Q. Let me try to be more articulate. You testified to a number of accounts that you had prior to getting married, correct?
14:10:39 A. Right.
14:10:40 Q. And you are asking the judge to assign those to you as your non-marital property, correct?
14:10:46 A. Yes, please.
14:10:47 MR. STEELE: I have nothing further of this witness.
14:10:54 THE WITNESS: May I confer with my attorney for 60 seconds?
14:11:00 THE COURT: Yes. We can take a recess.
14:11:16 (Brief Recess)
14:18:20 THE COURT: Let's go back on the record.
14:18:21 MR. STEELE: Judge, I had an opportunity to speak with my client. I have nothing further of her as a witness. And then to answer your question, there is a First Amended Petition for Divorce filed on her behalf on June 23, 2025.
14:18:32 THE COURT: Okay. But you don't have any summary of requested relief or anything for me to --
14:18:44 MR. STEELE: I will have a proposed judgment that I can -- I don't know if you want me to email it to you or if I can --

14:18:49 THE COURT: You will have to efile it.
14:18:51 MR. STEELE: I can efile a proposed judgment.
14:19:03 THE COURT: Then I had a question, just to be sure. Which exhibit is the one that had her debts listed?
14:19:38 Is there vehicles?
14:19:42 MR. STEELE: I will ask a couple of other questions. I heard one during your proveup that made sense to me. Can I ask her just a couple other questions?
14:19:54 THE COURT: Yes.
14:20:10 Q (By Mr. Steele) A couple follow-ups: Were any children born to you and your husband during the marriage?
14:20:14 A. No.
14:20:14 Q. Are you currently pregnant?
14:20:15 A. No.
14:20:16 Q. Do you have a car?
14:20:16 A. Yes.
14:20:17 Q. Is it owned or leased?
14:20:18 A. It's owned.
14:20:19 Q. And what kind of car?
14:20:21 A. A BMW.
14:20:22 Q. Does your husband have a car?
14:20:24 A. Yes, he does.

14:20:25 Q. Is it owned or leased?
14:20:26 A. It's owned.
14:20:28 Q. What kind of car?
14:20:28 A. A Jaguar.
14:20:29 Q. Are you asking the judge to assign your car to
14:20:31 you and his car to him?
14:20:33 A. Yes.
14:20:36 Q. I don't believe there is an exhibit that sets
14:20:38 forth the totals of the debts. So can you give me a
14:20:44 little bit more certainty, if you know, what creditor and
14:20:48 what amounts?
14:20:49 A. Yes. So I will just go through. CitiBank
14:20:54 credit card in my name is about $15,000.
14:21:04 THE COURT: I think Exhibit 13 is what I was
14:21:06 talking about.
14:21:08 THE WITNESS: Is that the one that says "288" on
14:21:09 the bottom?
14:21:11 THE COURT: Yes.
14:21:37 MR. STEELE: Her expenses?
14:21:37 THE COURT: Yes.
14:21:41 MR. STEELE: Let's do the credit cards anyway,
14:21:43 just for clarity sake.
14:21:45 A. Okay.
14:21:45 Q. So 15,000 to CitiBank. Who else?
14:21:48 A. Chase credit card is 50,000.

14:21:53 Q. 5-0?
14:21:55 A. Correct. Then BMW Finance is 60,000. Let me just think. And then SoFi loan, the current balance is 10,000. I don't know if I'm forgetting anything.
14:22:28 Q. Do you have an AmEx?
14:22:31 A. I do. It might be, like, 5,000.
14:22:33 Q. Does he have any credit cards?
14:22:35 A. Yes, he does.
14:22:36 Q. Do you know what the balances are?
14:22:37 A. No, I do not.
14:22:44 MR. STEELE: With that, Judge, I have nothing further of petitioner.
14:23:13 THE COURT: Just so it's clear, I can only award, divide what there has been specific testimony related to values, and it's been pretty limited what y'all have given me for separate and for community. I just want to be sure that that's the totality, that there is not more, there is not personal property, there is not current bank accounts.
14:23:43 Q. (By Mr. Steele) Is there any other bank accounts, beyond what you've testified to, that you are seeking to be allocated?
14:23:50 A. No, that's it.
14:23:51 Q. Is there any personal property, clothes, couches, things like that, that you are seeking an award

14:23:58 of?

14:24:02 A. I would like to have my guitar back.

14:24:04 Q. Anything else?

14:24:05 A. No.

14:24:05 Q. Who has your guitar?

14:24:07 A. I would like to have my guitar back and my 14:24:11 baptism cross back. Jason does.

14:24:14 Q. Any other bank accounts, any other property? 14:24:17 Now is your time to ask for anything that either of you 14:24:20 have possession of that you would like to be awarded.

14:24:27 A. Please just give me a minute here.

14:24:35 I would like to be awarded any domain names that 14:24:42 Jason holds in my name.

14:24:45 Q. When you say "holds in your name," what does 14:24:48 that mean?

14:24:49 A. That he has purchased that have my name. So, 14:24:51 for example, one that he has purchased is Gwen Ulijasz -- 14:24:59 I don't know the exact domain name, but it's like 14:24:59 GwenUlijasz@ulijasz.com. So he owns a website that is in 14:25:11 my name.

14:25:13 Q. So any domain names that have, like, a variation 14:25:17 of your name in them, is what you are saying?

14:25:19 A. That's correct. Thank you.

14:25:20 Q. Any other property that you are seeking to be 14:25:22 divided or allocated?

14:25:27 A. Additionally, any not vested stocks. So, for example, there is stock that vests in 2029.
14:25:38 Q. Where is it held?
14:25:40 A. It's also held at UBS.
14:25:42 Q. In the account that you testified to earlier?
14:25:45 A. I don't know if it has the exact same account number, but those documents have been submitted to the court as part of discovery and reviewed on February 4th with the associate judge in that court at that time.
14:25:59 Q. And they are not vested yet. Do you know when they vest?
14:26:03 A. So 2029, and then there is a small portion -- smaller portion that vests in November 2026.
14:26:13 Q. So your retirement accounts, your Chase account, your car, your guitar, your shares of your brother's company, unvested stock. Anything else?
14:26:25 A. My dogs, just to be clear.
14:26:28 Q. You already have your dogs?
14:26:29 A. Yes, I do. That was a point of contention earlier, even though they predate the marriage.
14:26:36 Q. Your dogs are not marital?
14:26:38 A. They are not marital.
14:26:39 Q. Any other property you are asking to be awarded?
14:26:43 A. I am just asking the Court for a moment to think. It's been a long time.

14:27:00 No.

14:27:17 MR. STEELE: Judge, I think the confusion might lie in why has this case lingered for 18 months with --

14:27:24 THE COURT: No, I am not confused. I just want to make sure that -- because I don't have any summary of requested relief, I just want to make sure that there is nothing that's not being divided.

14:27:38 MR. STEELE: I was actually referring to my own confusion. I came to the case late. I am, like, the third lawyer. It dragged on for a long time, and it seemed simple on its face.

14:27:50 THE COURT: No, I wasn't confused. Sometimes -- let's go off the record.

14:27:53 (Brief Recess)

14:30:13 **DIRECT EXAMINATION CONT'D**

14:30:14 Q (By Mr. Steele) Ma'am, the guitar you are asking the judge for, when did you purchase it?

14:30:21 A. In, like, 1994.

14:30:27 Q. 20-something years ago?

14:30:29 A. Uh-huh.

14:30:30 Q. Do you know what you purchased it for?

14:30:31 A. $300.

14:30:32 Q. It has a sentimental value to you?

14:30:36 A. It does.

14:30:37 Q. And the baptism cross, how did you obtain that?
14:30:41 A. My mom and dad bought it for me when I was born.
14:30:45 Q. Sentimental value, too?
14:30:47 A. Correct.
14:30:48 Q. The dogs, how long have you had them? How long
14:30:54 have you been in possession of them?
14:30:58 A. Two different dogs is what I've been in
14:31:01 possession of since 2003. Another one I've been in
14:31:03 possession of since August of 2025.
14:31:08 Q. And have you been providing the exclusive care
14:31:11 of them?
14:31:12 A. I have been, yeah.
14:31:13 Q. Are they sentimental to you?
14:31:14 A. Yes.
14:31:15 Q. Are they like a member of your family almost?
14:31:17 A. Yes.
14:31:19 Q. I think it was the guitar, the cross, and the
14:31:22 dogs. Did you name any other additional property that I
14:31:24 missed?
14:31:28 THE COURT: Domain names.
14:31:30 A. I would like my sobriety coins back.
14:31:37 Q (By Mr. Steele) What are those?
14:31:40 A. In alcoholics anonymous, you get a coin when you
14:31:44 reach different durations of sobriety, and I have 13 years
14:31:49 and I would like any coins back that we can find.

14:31:52 Q. Are those sentimental?
14:31:54 A. Yes, they are.
14:31:56 Q. When did you get them?
14:31:57 A. Every year I have been sober since 2013.
14:32:00 Q. Do they have any sort of monetary value to them?
14:32:02 A. No.
14:32:04 Q. The domain names, start with the reason. Why do you want those awarded to you?
14:32:22 A. There is two reasons. One reason is that my past experience with a different partner is that he too purchased domain names in my name and then went on to use them maliciously and published so much information that there was nothing but that for the first three pages of Google on the Internet.
14:32:41 The second reason is because Jason, in emails, has threatened to do the same thing.
14:32:50 Q. When you say, like, the first three things, you are talking about posting exhibits from your order of protection case or divorce case on GwenUlijasz.com, right?
14:33:03 A. Correct, and in monologues, audio of phone calls, monologues about what kind of a person he thinks I am. So court documentation, audio, ranting. Whatever it is that he wanted to post, he posted.
14:33:23 Q. And apart from the cost of acquiring them for, like, $9.00, is there a monetary value? Is there a web

14:33:28 presence on any websites on the domain with your name on them that you know of?
14:33:37 A. What presence?
14:33:38 Q. Like, does your husband have GwenUlijasz.com and he's running a store on the website?
14:33:45 A. No.
14:33:45 Q. Are there any variations of your name in the domain name where it's being used to generate money?
14:33:50 A. No.
14:33:51 Q. So apart from the cost of acquiring them, which is normally nominal, is there any value to those domain names?
14:33:57 A. No.
14:33:57 Q. So you are just asking for them preventively, protectively, something like that?
14:34:03 A. Yes, based on Jason's threat. And it is IONOS.com that is used as -- that he used to purchase the domain.
14:34:15 Q. That's, like, a registrar --
14:34:19 A. Correct.
14:34:20 Q. You are not asking to be awarded IONOS.com; you are just saying that's where he bought them?
14:34:26 A. That's correct. Sorry to confuse the Court.
14:34:27 MR. STEELE: Nothing further with that.
14:34:38 THE COURT: Is there a protective order in the

case?

MR. STEELE: No. I think there was an attempt at one, but no.

THE COURT: Then, ma'am, you may step down.

Do you have any other questions?

MR. STEELE: No.

THE COURT: The Court is going to award the VEIP account to wife --

I'll start with the Court grants the divorce. The Court awards the VEIP account to wife and the HSA account to wife.

The Court awards the BMW titled in wife's name and the debt associated with the BMW to wife.

The Court awards the Jaguar to husband and, to the extent it has any debt associated with it, orders that husband be solely responsible for that debt.

The Court awards the wife all domain names that bear any portion of wife's name to wife.

The Court orders wife will be responsible for the AmEx in her name.

And then the Court orders that the SoFi loan, the Chase debt, and the CitiBank debt will be awarded -- will be split 50-50 by the parties.

Now, ma'am, those are in your name only?

MS. McKEMIE: That's correct.

14:37:34 THE COURT: So I'm sure you know. In order to protect your credit, if he doesn't pay, you should pay them, if you can, and then handle him later.

14:37:54 So the Court finds that the value of the AmEx debt was $5,000, the value of the SoFi loan debt is around $10,000, the value of the Chase Bank debt is $50,000, and the value of the CitiBank debt is $15,000.

14:38:10 The Court finds that neither the BMW -- ma'am, do you know how much the BMW is worth?

14:38:18 MR. STEELE: Judge, just to be clear, the CitiBank is 15.

14:38:22 THE COURT: Oh, 1,500?

14:38:22 MR. STEELE: 15,000, not fifty. I thought you said 5-0.

14:38:30 THE COURT: CitiBank I said 15, Chase I said 50.

14:38:36 MR. STEELE: I apologize.

14:38:37 THE COURT: The BMW, is there any equity over what's owed?

14:38:43 MS. McKEMIE: No.

14:38:43 THE COURT: Do you know for his Jaguar if there is any equity over what he owes?

14:38:50 MS. McKEMIE: I would guess it would be about even. There wouldn't be any equity.

14:38:53 THE COURT: The Court finds that neither the BMW

14:38:54 or the Jaguar have any value.

14:38:54 The Court finds that the VEIP account has
14:38:56 $40,000 and that the HSA account is a few thousand.

14:39:06 The Court finds that there is no value with the
14:39:08 domain names.

14:39:13 The Court finds that the wife's checking
14:39:17 accounts in her name are her separate property.

14:39:23 The Court finds that the retirement accounts in
14:39:26 wife's name with AIG and Ameriprise -- those are the
14:39:49 401(k) accounts and the traditional IRA in wife's
14:40:02 name and the Roth IRA in wife's name -- are her
14:40:06 separate property, confirmed as her separate
14:40:09 property.

14:40:09 The Court confirms the shares in the Advantigen
14:40:13 company held by wife as her separate property and the
14:40:19 unvested UBS shares.

14:40:41 Were those awarded before marriage?

14:40:46 MS. McKEMIE: Yes.

14:40:46 THE COURT: Those are confirmed as wife's
14:40:48 separate property as well.

14:40:51 The Court confirms the 1994 guitar and baptism
14:40:56 cross as wife's separate property and orders --

14:41:01 MS. McKEMIE: I'm sorry, Your Honor, I need to
14:41:02 correct that answer. They were awarded to me when I
14:41:04 started my job at Accenture as part of my hire

package, and that was three months after I got married.

THE COURT: And those are unvested shares. They don't have any current value. You have to continue to work in order for them to earn value?

MS. McKEMIE: That is correct.

THE COURT: Then correction for the record. The Court is not confirming the unvested UBS shares as separate property but instead finding that they do not have a current value and require additional employment by wife in order to vest; therefore, they are awarded to wife with no value associated with the same.

I think I got through that sentence, but just to be clear, I confirmed the 1994 guitar and the baptism cross as wife's separate property, and I am ordering that they be turned over to wife within 14 days of today's date.

How would you like them returned to you?

MR. STEELE: Mail.

THE COURT: In the mail to what address?

MS. McKEMIE: It would be the address that are on my statements. Shall I state that for the record?

THE COURT: Yes.

MS. McKEMIE: It's 11703 Huebner, H-U-E-B-N-E-R,

Road, Ste -- that's s-t-e -- 106, PMB for private mailbox, 499 in San Antonio, Texas, 78230.

THE COURT: Shall be returned to wife at that address, packed properly so as there is no damage that comes to them.

So the Court is ordering that they be taken to a Fed Ex location and -- actually, a UPS location and professionally packed by UPS and paid for by husband.

MR. STEELE: The sobriety coins?

THE COURT: As well as the sobriety coins. Those are confirmed to be wife's separate property and ordered to be included in the package.

And what name are you wanting to change your name to, ma'am?

MS. McKEMIE: My maiden name, which is Ulijasz.

MR. STEELE: Spell it.

THE COURT: Any middle name?

MS. McKEMIE: So U-L-I-J-A-S-Z, middle name Laura. So it would be Gwendolyn Laura Ulijasz.

14:44:37 THE COURT: I will add, to the extent there is any personal property in possession of wife, that's awarded to her; and any personal property that's in the possession of husband, other than those items that I have ordered be returned to wife, that's awarded to husband.

14:44:52 The Court finds that it's a fair and equitable division and that the personal property doesn't have any significant value.

14:45:02 MR. STEELE: Thank you, Judge.

14:45:03 THE COURT: You are excused.

14:45:04 (Brief Recess)

14:45:33 The Court realized that I didn't mention the dogs. So the Court is confirming the one dog purchased in 2003 as the separate property of wife and awarding the dog purchased in 2025 to wife. Both dogs are in the possession wife and shall remain in the possession of wife, and the Court finds that there is no value other than sentimental value for the dogs.

14:45:58 That is the Court's ruling.

14:46:00 (End of Proceedings)

STATE OF TEXAS )
COUNTY OF DALLAS )

I, Shantel Beheler, Official Court Reporter in and for the 301st Judicial District Court of Dallas County, Texas, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by Jason McKemie to be included in this volume of the Reporter's Record in the above-styled and numbered cause, Cause No. DF24-18010, McKemie, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

I further certify that the total cost for the preparation of this Reporter's Record is $329.00 and was not paid.

WITNESS MY OFFICIAL HAND on this the 28th day of September, 2026.

Shantel Beheler

Shantel Beheler, CSR #3031
301st District Court
600 Commerce St., Room 340
Dallas, Texas 75202
Expiration: 10-31-27
Sbeheler@dallascounty.org

# EXHIBIT 9

Transcript of recorded call with Inspira Financial (administrator of the Accenture health savings account), January 8, 2026, with Movant bridged onto the call; speaker labels corrected by the Debtor from the audio (15 pages; Movant's telephone numbers, mailing address, and Social Security digits redacted).

*In re Jason Emory McKemie, No. 26-30161-mvl7*

# HSA - Gwen Demands Receipt Uploads, hung up on operator when asked for Credentials, operator confirms Only 1 Login per HSA, Gwen ordered new card gave me disconnect old at hearing, no bal avail despite testimony, >2months no Meds. >$36k Bills so Far

2026-01-08 18:56:23

**00:00:04 IVR**
Your call will be recorded for quality assurance and training purposes.

**00:00:17 HSA Rep.**
Thank you for calling Inspira. This is Jen. To better assist, can I please have the account holder's first and last name?

**00:00:25 Jason M.**
It's Jason McKinney.

**00:00:31 HSA Rep.**
Thank you. Correct me if I'm wrong, is your first name spelled J-A-S-O-N?

**00:00:40 Jason M.**
It is and the last name is McKemie M C K E M I E.

**00:00:52 HSA Rep.**
Thank you and can I also please have a zip code?

**00:00:59 Jason M.**
I mean the one that the HSA card is registered to is [redacted].

**00:01:07 HSA Rep.**
Thank you. Are you the account holder?

**00:01:09 Jason M.**
That's my wife is actually.

**00:01:14 HSA Rep.**

Oh okay, but your name is Jason McHenry correct? Correct. Alright thank you so much Mr McHenry, but can I also please have the account holder's login so that I can pull up the account.

**00:01:29 Jason M.**

Sure, it's Gwendolyn G W E N D O L Y N UliJazz U L I J A S Z.

**00:01:46 HSA Rep.**

Thank you, and the zip code is [redacted] correct. That's correct. Thank you. And is the account holder an active participant of a plan? Yes. I have the card with me. Just go ahead and try to pull it up one moment.

**00:02:34 Jason M.**

Do you need her phone number? Would that help, or her date of birth, or social, anything like that?

**00:02:42 HSA Rep.**

I'll try it here first. And you said this is for a Health Savings Account, right there HSA correct? That is correct. Thank you. I was not able to pull it up. Thank you so much for waiting, Mr. McKemie. And before I proceed, sir, can the account holder be available right now to get a verbal authorization?

**00:03:19 Jason M.**

We can definitely bridge her in. She's not here with me right now, but we're both authenticated within the account and I am covered under her plan. We've always had the same credentials on the cards. She gave me the card. We can bridge her in.

**00:03:44 HSA Rep.**

Sir, no worries. With regards to that case, I can definitely help you and provide any information you need about the account. However, it will be a process we have to go through on the account. I need to get verbal authorization. Before I proceed with the verification process, what do you call this one?

**00:04:11 Jason M.**

May I know what the reason is why you're calling? I was trying to activate the card, but I didn't. I was trying to link it up with Apple Pay, but it wasn't adding to my account.

**00:04:24 HSA Rep.**

I can definitely help you with that. This activation of the card and adding Apple Pay to the account will be a process, so we have to get verbal authorization from Mr. McKemie. We can do a three-way call. Allow me to go ahead and call her. May I know her best phone number?

**00:04:55 Jason M.**

It's here. I've got it right here. Let's see. The oh it just changed recently actually. So there is a couple here, try her at [redacted]. And then the second number you can try her at, if you don't get her, there would be [redacted] five. And we are going through a divorce at this time, but I am covered through her plan, so I'll just let you talk to her. But I am authenticated. I am authenticated to use this card. I'm supposed to be getting a card with my.

**00:05:52 Jason M.**

Own name. I was supposed to be, but she was saying there's some issue with that. Is there a problem issuing a second card in my name?

**00:06:03 HSA Rep.**

No sir. Actually, if requested, we will definitely send you a card. But in this case, since we have

**00:06:15 Jason M.**

No, I just have an official document from her. A card was already requested twenty five days ago.

**00:06:25 HSA Rep.**

Oh okay I see, I can go ahead and check if there's an update on that one, but can you please provide me with the full address associated with the account.

**00:06:34 Jason M.**

[redacted].

**00:06:39 HSA Rep.**

Oh sorry sir sorry to cut you off

**00:06:45 HSA Rep.**

That is not actually the one that we have here on file.

**00:06:49 Jason M.**

For me? You might have fifty [redacted]

**00:06:56 HSA Rep.**

Hold on one second for me. Are you talking about for me or for her? It's her address, the one that's on the file.

**00:07:05 Jason M.**

Oh okay I thought you were asking for me because we're both covered under the plan. I just sorry

**00:07:13 HSA Rep.**

Here. It's.

**00:07:17 Jason M.**
You probably got Well, the main ones are [redacted].
It's either that one or you have [redacted].

**00:07:31 HSA Rep.**
Are these the first ones you provided to me?

**00:07:34 Jason M.**
[redacted] San Antonio [redacted].

**00:07:42 HSA Rep.**
Thank you. After the suite number, there's another information in here on the address. Could you provide that one to me as well? What's that? After the suite number, there is another information on the address.

**00:08:00 Jason M.**
San Antonio, Texas. It's suite number [redacted] San Antonio [redacted].

**00:08:16 HSA Rep.**
Hold on. There is a suite number, which is correct: one O, six and then PMB. But there's another number in here after the PMB.

**00:08:27 Jason M.**
It's private mailbox. Everything I've ever mailed is to One O six. Oh yeah, you do. Hold on here. I got it.

**00:08:41 HSA Rep.**
Take your time.

**00:08:46 Jason M.**
Four nine.

**00:08:51 HSA Rep.**
Thank you so much for that information. And sir, what's the last four digits of the account holder's socials of Miss Yolijas?

**00:09:02 Jason M.**
Hold on. It's that is, let's see here. Two four five seven.

**00:09:15 HSA Rep.**
Two four five seven. And what's the last four digits of the card, sir?

**00:09:21 Jason M.**
That is five three seven nine. Five three seven nine.

**00:09:27 HSA Rep.**
Is that the one you have right now?

**00:09:34 Jason M.**
Five three seven nine is the last four.

**00:09:38 HSA Rep.**
Correct last four. Hold on one second for me, is there more than one I'm? Actually sorry, that's not the one associated here on the account, probably because there was a card order before. That's why that's not. The one that's updated here is the one that we sent out updated.

**00:10:09 HSA Rep.**
Twenty five days ago, that account holder requested.

**00:10:14 Jason M.**
So wait, wait, wait, hold on. You said that you ordered. There was a card order twenty five days ago.

**00:10:24 HSA Rep.**
The date I cannot confirm that. But since the card you have or the card you provided to me is not matching what we have here on file. You stated that there was a requested card order. Probably the one associated with this account already is the one we sent out for the requested card.

**00:10:52 Jason M.**
So I think what might have happened. All of our HSA cards have always worked the same. We've had it so it doesn't matter if it's my name or her name on it. It's always the same card credentials. It's the same zip code, it's the same PIN, so it doesn't really matter which card. She was supposed to produce it at the court yesterday. And if she hadn't ordered that in time, I think she brought the card that she had because she had to comply with a court order. This is supposed to be a working card for me right now because I am actually having surgery.

**00:11:40 Jason M.**
So I don't know if you need to call her, but I need to get a card mailed to me asap because I need it for a procedure.

**00:11:51 HSA Rep.**
So no worries. Here's what we'll do. We will call the account holder to ask her about that and then just get verbal authorization as well. So that I can freely provide you information about the account because all of the information that I'm providing right now is general information. Since I cannot fully authenticate the account first, we will try to call her with the best number that you provided to me earlier. But just in case we got disconnected, what's going to be your best callback number for me to call? 214-868-4901.

**00:12:36 HSA Rep.**
I got two one four eight six eight four nine zero one. Correct? That's correct. Thank

you so much. So I just placed the call on hold, sir. I'll go ahead and dial this. I might place it for thirty seconds or one minute and then I'll merge the call once I got through.

**00:12:57 Jason M.**
It's okay. If you find out what you need, that's fine. That's great. That sounds good. Talk to you soon. I'll be right here.

**00:13:06 HSA Rep.**
Thank you so much and please stay on the line.

(Gwendolyn Ulijasz) Hello? Hello?

**00:13:31 HSA Rep.**
Hi, ma'am. This is Bein from Inspire Financial. I am looking tfor Gwen Ulijasz. (Gwendolyn Ulijasz) Hi, Yes, this is she. (HSARep). Hi, ma'am. I have your ex-spouse here on the other line, Mister Jason McKemie, and we are here trying to process things about your Inspire Financial account or information. I'm calling because we wanted to get a verbal authorization from you. Are you free today? (Gwendolyn Ulijasz). So what is the authorization for? (HSA Rep) I'm calling your Oh, let's see sorry. Mr. McKemie is calling in trying to activate the (HSA) card and add his Apple Pay to the HSA.

**00:14:28 HSA Rep.**
We are here trying to validate the card associated with the account. We wanted to get a verbal authorization from you before we process this. (Gwendolyn Ulijasz) You can go ahead. Please remind him that everything requires a receipt, and it must be uploaded in your portal. (HSA Rep) He is actually on the line ma'am.

**00:14:54 Jason M.**
Yeah, So I just need the portal web address and the password and that'll be done. As soon as I receive that password, I will begin uploading those receipts. But thank you. (Gwendolyn Ulijasz) No, I don't have a password. You got to do this on your own Jason. So I'm not doing anything. (Jason McKemie) There's only one account holder. (Gwendolyn Ulijasz) Thank you very much. (Gwendolyn Hangs up the Phone) (Jason McKemie) Tell me, are there two passwords for this system, or is there only one? Predominant, is there only one account holder password like our old one?

**00:15:31 HSA Rep.**
I'm so sorry about that.

**00:15:34 Jason M.**
I need to know if I can set up a separate account other than hers. I don't want to get into this game where she tells me to upload receipts but won't give me a password to log in and submit receipts. That was the old game.

**00:15:47 HSA Rep.**
I understand, Sir. Generally, if she has a health savings account, no need to submit any documents at all. All you have to do is keep the documentation, just in case the IRS does a random audit. But Sir, I will ask her for the last four digits of the (active) card. Probably she actually has it. I wasn't able to get that. I'm so sorry about that, but since I already got a verbal authorization from her.

**00:16:21 HSA Rep.**
About your account, I just need one more thing. I really needed the last four digits associated with the account, but since you don't have it with you, the other option is to provide me with the effective date of the account. I just need the month and the year.

**00:16:44 Jason M.**
Is it card? I have? Card? I have?

**00:16:48 HSA Rep.**
The HSA of the account holder.

**00:16:52 Jason M.**
I don't. I don't have the card that she has. I have the card that I read off to you earlier. So, are you telling me to?

**00:17:08 HSA Rep.**
Actually.

**00:17:10 IVR**
Mhm So

**00:17:11 Jason M.**
What are you asking me for? I am just curious because the card I have ends in five three seven nine, and that's the one that she presented to the court as the active card right now.

**00:17:25 HSA Rep.**
Card right now. Sir, here's what happened. You stated that there was a card order twenty five days ago. Correct?

**00:17:38 Jason M.**
No, I said that there was supposed to be a card. I don't have any clue whether a card was ordered or not.

**00:17:49 HSA Rep.**
Sir, I will be very honest with you. In this case, your call wasn't fully verified yet because I haven't caught the last four digits of the Inspire Financial debit card associated with the account. So I am very careful to provide any account information yet until I verify this. Even if we already got a verbal authorization from

the account holder, because it's part of our verification process for security purposes. We did go to the case and yes sir. Do you want me to call her back?

**00:18:33 Jason M.**
I want you to call her back. We need to get that card number.

**00:18:41 IVR**
So I'm sorry about that. I'll try to call her back. Just give me one moment.

**00:19:36 HSA Rep.**
Sorry sir, I was already routed to a voicemail when I dialed her number 210-278-6377. Let me just go ahead and try [redacted]. Thank you. Hold on.

**00:20:18 IVR**
She does this thing.

**00:20:34 HSA Rep.**
Sir, I actually tried to dial [redacted], but it says here bad number. It doesn't ring.

**00:20:47 Jason M.**
She's not getting into the phone now. She's not going to answer it. So I'll just have to go back to the court tomorrow.

**00:20:56 HSA Rep.**
I apologize.

**00:20:57 Jason M.**
It's okay that I'm sorry you had to go through that. I know it's not fun, but it's so I mean just to validate. There is only one login for the HSA card, right? One username and password. Is that correct or do we each get our own username and password? And passwords via online account. Correct.

**00:21:27 HSA Rep.**
Correct. So if there is only one account,

**00:21:34 Jason M.**
It's always the same. That's the problem. We always get into is she demands that I upload receipts to it and I'm like, I just need the login credentials and I am more than happy to do that. But she won't ever give me the password. It's like a catch twenty. And she just it's her favorite game to play. I will just keep calling. Keep going. All right thanks.

**00:22:06 HSA Rep.**
I really do apologize for that one, sir. But in case you will call back next time.

**00:22:14 Jason M.**
Verbal authorization has been denied for this. She authenticated me. Can I get a

card sent out that works? I'm having surgery. I need to get a card.

**00:22:25 HSA Rep.**
But with regards to that one sir, we really have to authenticate this first. Here's the thing: if you can just provide me with the effective date of the account with the month and year, we can proceed or any one of the last three recent transactions that she had on the account. I just need a date and amount.

**00:22:47 Jason M.**
The last transaction was forty one dollars. It was at CVS. I believe that was in May.

**00:23:02 HSA Rep.**
May I ask you to verbally state to me, sir, what that is? What's the exact date of this?

**00:23:07 Jason M.**
You got to be kidding me. I don't remember what exact date it was. You got to be kidding me. That was like May. I don't freaking know May eighteenth. I really you got to be joking. You know how long ago that was? Remember a CVS visit from half a year ago? And I don't remember the exact day of the month I went to CVS seven or eight months ago. But I can tell you, it was forty one dollars. It was forty one dollars and something cents. And it was done in May of twenty five. The card started in it was probably September or October of twenty four.

**00:24:00 Jason M.**
If that's not enough to authenticate this card, I don't know what else to do.

**00:24:11 HSA Rep.**
Sir, for the effective date of the account, the year was correct but the month isn't. I checked the twenty five transaction and I wasn't able to see the forty one dollars here on our system.

**00:24:32 Jason M.**
So well, the only HSA purchase made in twenty five was a forty one dollar charge. I've got the statements at home. That's the only charge on the entire HSA for the year. And then what month? July August. I thought it was September of twenty four. If it wasn't September, then it would have been August. August.

**00:25:15 HSA Rep.**
It's not the one as well here on our end.

**00:25:20 Jason M.**
Are you talking about starting the card or are you talking about when she started for censure?

**00:25:27 HSA Rep.**
Sir, when did the HSA get effective or start?

**00:25:34 Jason M.**
I'm so sorry. I thought you were asking when she started at Accenture. This is valid through 1130.

**00:25:53 Jason M.**
I don't know when she started. I figured you would have got it in the beginning of the year. It probably would have been December or January. I actually don't know when she got it.

**00:26:07 HSA Rep.**
I understand that, sir. Here is what we can do. How about you get a court order.

**00:26:16 Jason M.**
And send it over to you? I got a copy of a court order where she has said that she's ordered me a card. Is there something you can do with that?

**00:26:27 HSA Rep.**
Let me just go ahead and verify that one here on our end. This is actually my first time encountering that letter. Let me just go ahead and verify if we can add it on the account. Let me just go ahead and check. Hold on one second, sir. I'll just place it all on hold. No problem. You've been really great.

**00:26:52 Jason M.**
By the way, I want you to know that you've been really great.

**00:26:58 HSA Rep.**
Thank you so much about that. No worries, I'll get back to you as soon as I can. Can we stand in line for me? Thanks.

**00:27:47 Jason M.**
So she sent me a non-working. She will not provide me.

**00:30:37 IVR**
I will listen. Hello

**00:31:02 HSA Rep.**
Mr. McHenry? I'm here. Hi, thank you so much for patiently waiting. I actually tried to double check it here on our system, if there's any way that she can upload a documentation about the court documents. But I only got an information. The only thing that we can do is for her to submit authorized to release personal information on the account as well as provide you the last four digits of the card.

**00:31:34 HSA Rep.**
That's active and associated on the account.

**00:31:37 Jason M.**
But I don't have that card anyway, so it's not going to help me. But you see, she lives

five hours away from me. She brought this to be compliant with the court. And because I was having a procedure done, and my healthcare is covered under her. So it just got turned back on now. Are you seeing a disruption in service for me, perhaps where I was on the account but not on the account.

**00:32:12 HSA Rep.**
Sir, technically you are held up in there. But every call, we really have to authenticate everything here in our end. The one that's active, the one that's on the file before we were able to proceed. We were able to get a verbal authorization. So if you wanted to know everything on the account and the process, we can do that. But the only problem is that the one that you provided to me, the last four digits of the card is not the one that's associated anymore on the account. So we have to get the one that's associated.

**00:32:53 Jason M.**
That's just it. She's going to have a card. I don't want her card numbers. I need my own card that's separate from hers. Do you see what I'm saying? She could give you those card numbers, but I do not have that card. She's five hours away and I need my own card. I just don't see how that's going to help us.

**00:33:30 HSA Rep.**
I understand. Hold on one second for me. I'll try my very best to help you get your own card.

**00:35:30 HSA Rep.**
Hello, Mr. McHenry. I'm so sorry for the silence. I actually did try to double check it here, but the only thing is that the account holder should be the one to order a card for you. So technically, if you are the dependent, we will provide you one. We can also send it to the address where you live. Just that the account holder should be the one to order that card for the account.

**00:35:59 Jason M.**
Good luck with that happening. It's taken me months to get to this point. She literally drove into Dallas, met with our judge in person yesterday, and handed over the old card while keeping the new card. So you just kind of got to think about that. From that perspective, the way I see it is, there's a plan that you'll have under my name. I have access to the HSA account.

**00:36:33 Jason M.**
I am covered under Accenture's healthcare plan right now. If you are going to bar me from using it, I'll just have to go a legal route to get a card from you because she's not giving me a card. I haven't been able to use health insurance since October thirty-first. So you all are going to have to figure out a way or I'll just have to send a court order over.

**00:37:03 HSA Rep.**
I totally understand, sir. But here's the process. For security purposes, we are following the right procedure.

**00:37:12 Jason M.**
But that doesn't trump a that doesn't trump a court order. You, can't you can't turn down a court order for that? And it's I mean, it'll go I'll send it to get us into your legal department

**00:37:28 HSA Rep.**
Your legal department. I totally understand, no worries, since this call is recorded, feel free to do it. But here's what I can advise you: try your best to contact her to ask her about.

**00:37:47 Jason M.**
How she wants to proceed with the divorce. We can only contact each other through the court. That's why I allowed you to contact her. We don't communicate. There are things at play where it is not safe for me to communicate with her.

**00:38:20 HSA Rep.**
I understand. But sir, since she is the primary account holder, we did a verbal authorization from her, but we still have to fully authenticate the account.

**00:38:33 Jason M.**
But you look, there's no doubt that it's her. You're just asking for her a card number and I'm saying that card number doesn't do anything to help me. I need my own card issued, which she said that she had already ordered, but it doesn't sound like you're seeing one in your system. It sounds like what she did was she replaced her card and she gave me the old dead one.

**00:39:01 HSA Rep.**
Sir, we can order a card for the dependent. Technically, the account will have a card for the account holder and cards for the dependent. It just so happened that it cannot provide any account specifics right now, especially about the status of the card order because the account was not yet fully attended.

**00:39:25 Jason M.**
I understand. Can you mail me the card? We live five hours away. She's not going to give it to me.

**00:39:33 HSA Rep.**
With regards to that one, we really have to get the last four digits of the card from the account holder before we order you a new card, activate it, and link your Apple Pay.

**00:39:49 Jason M.**
I'll get a court order, and it'll serve her first, so don't worry.

**00:39:57 HSA Rep.**
I understand, sir. But that's what I will advise her, or you can just ask for the effective date of the account or any transactions that she can give you so that you can authenticate here. Once you call back, we can do a verbal authorization again.

**00:40:18 Jason M.**
Because that's not a protocol. I actually have the records for the HSA card. So you're saying if I can get when this card was established, that's good enough.

**00:40:31 HSA Rep.**
Good enough. I'm sorry, the date effective date that I needed is the HSA effective date of that account holder or any one of their last three recent transactions that she had on the account.

**00:40:47 Jason M.**
She testified that there was only one transaction. She provided receipts showing there was only a forty-one dollar charge and that all funds were available on the card yesterday. Is that so?

**00:41:08 HSA Rep.**
I let me go up and get here. I can walk up and I've got some records.

**00:41:15 Jason M.**
Let me go see what records I have.

**00:41:20 HSA Rep.**
But I'm here to verify, sir, that I wasn't able to see any debit card purchase amounting to forty one dollars in the month of May.

**00:41:33 Jason M.**
Well here let me walk upstairs. I've got all the files up there. So let me go up and look. Sir, you've been patient. Thanks. It's just frustrating.

**00:41:51 HSA Rep.**
You can just take your time. I'll be here on the line. Just call my attention once you have that information.

**00:41:58 Jason M.**
Let me see here where would that be? That is going to be. I'm gonna put you on speaker real quick.

**00:42:32 IVR**
Think I got it here.

**00:42:39 IVR**
Let's see.

**00:42:50 IVR**
So we've got HSA.

**00:42:54 Jason M.**
Card, can you hear me? It says HSA card account opening balance was sixty dollars and seventy two cents. That was May first twenty five. That doesn't make sense. There was six thousand on it.

**00:43:24 Jason M.**
Withdrawals of three sixty eight fifty four. Withdrawal of forty four thirty five. This is debit card ending in nine six zero two. Two.

**00:43:47 IVR**
Six zero two, let me go ahead and pull that up.

**00:43:59 HSA Rep.**
Sorry, that card is not the one associated with or on the account anymore.

**00:44:06 Jason M.**
I'm just going down the statements that I have.

**00:44:10 IVR**
Go ahead.

**00:44:28 Jason M.**
So there was, in twenty-five, we allocated six thousand dollars onto that card. Where did those funds go?

**00:44:50 HSA Rep.**
Sir, may I know what the date is on that so I can check?

**00:44:54 Jason M.**
Let me go back to this statement. That statement is This is a MetLife chip card from five one, twenty five to five thirty one, twenty five.

**00:45:36 HSA Rep.**
As per checking here, sir, there is no transaction on that amount on May twenty-five.

**00:45:51 Jason M.**
Wish there was a way to email this to you. It says employee number ending in zero three four two. Debit card ending in nine six zero two has an opening balance of sixty dollars and seventy two cents, and an ending balance of sixteen dollars thirty seven cents. But it doesn't show transactions.

**00:46:26 HSA Rep.**
Oh, I see, but the one I needed, sir, is the transaction on the account.

**00:46:33 HSA Rep.**
The recent one.

**00:46:36 Jason M.**
If you are talking about the card she has, she lives five hours away from me. I have never seen nor touched that card. I do not have statements for that card. If you are still talking about the card that she has, there is no possible way I would have any information on it because she just ordered it. She must have just got it. I don't have statements from a card she received last week.

**00:47:20 HSA Rep.**
Last week. You see? Sir. Totally understand, but here is the thing. If the recent transaction I am talking about can be only with the debit card transaction, any debit card transaction, a payment or withdrawal or contribution on the account. It can be the transaction here or recent transaction on the account. I needed the date and amount for me to fully authenticate it, even if you don't have the card with you, the one that's active on the account.

**00:47:58 Jason M.**
That's the problem. She testified that she ordered a new card for me, but it looks like she kept that for herself and gave me the terminated card.

**00:48:15 HSA Rep.**
With regards to that information, I cannot verify it yet. The only thing I can provide is that the one you provided to me wasn't the one associated with the account.

**00:48:27 Jason M.**
It's fine. I'll call back tomorrow. Thank you.

**00:48:31 HSA Rep.**
You're welcome, but before I let you go sir, is there any more questions that I can check for you?

**00:48:38 Jason M.**
That's all. Thank you. That's all.

**00:48:42 HSA Rep.**
You're welcome, thank you as well for taking the time to call into RF Financial. Enjoy the rest of your day. Bye-bye!

# EXHIBIT 11

Photograph of the Inspira Financial mailer Movant handed the Debtor in open court on January 6, 2026, marked ·Number of Cards: 1· and ·Card Number Ending In: 5379· (1 page; Movant's address and mail-routing barcodes redacted).

inspira™
FINANCIAL

[redacted]

Number of Cards: 1

Card Number Ending In: 5379

1056416102403340

[redacted]

[redacted]




# Simplify your health care spending with your Inspira debit Mastercard®

**Good news!** Your Inspira Financial℠ account comes with a debit card, which will make it easier for you to spend your funds on eligible expenses.

**1. Activate your card**
Call the number on the sticker on your card. **If your card doesn't have a sticker, it's ready to use.** When you call, you'll get your PIN. If you order cards for covered family members, they'll use the same PIN.

**2. Set up your online account**
Visit the website on the back of your card to create your online account. Keep your card nearby — **you'll need to enter the card number.** Don't forget to download the Inspira app too!

QC9