FILED

NOV 25 2026

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br>**JASON EMORY McKEMIE,**<br>Debtor. | Case No. 26-30161-mvl7<br>Chapter 7 |

**DEBTOR'S MOTION FOR HSA CARD AND FSA ACCESS AND FOR STAY SANCTIONS**

**EXPEDITED HEARING REQUESTED. The Debtor asks that this Motion be heard on or before December 8, 2026 at 1:30 p.m., when his Rule 2004 motion (ECF 97) is set. The 2026 FSA covers only expenses incurred through December 31, 2026. Fed. R. Bankr. P. 9006(c)(1); N.D. Tex. L.B.R. 9014-1(g). A response is required. L.B.R. 9014-1(a).**

TO THE HONORABLE MICHELLE V. LARSON, UNITED STATES BANKRUPTCY JUDGE:

Since she left the marriage, Gwendolyn Laura Ulijasz has pursued one purpose: to burn the Debtor's cash, cut off his income and his healthcare, burden him with the marital estate's costs, and keep him from hiring competent counsel. This Motion is about one tool of that purpose: the debit card and login that pay from the Accenture health savings account (HSA), administered by Inspira Financial, and the Accenture Health Care Flexible Spending Account (FSA). She controls both. The Debtor has never had a working card on the Accenture HSA. Since December 18, 2024 he has been able to make exactly one charge on any HSA card: $41. After the petition, and without asking this Court, she cancelled the card she swears he held.

The Debtor asks for one thing: **a working card in his name, in his hands within fourteen days, with the money in both accounts available on it.** The Motion rests on her own words, the Plan's words and the record. The $20,643.56 that a Texas court ordered her to pay on December 17, 2025 is the subject of a separate motion, and nothing here reduces it. The Debtor's Declaration and Exhibits 1 through 4 follow this Motion.

## I. THE TWO ACCOUNTS

Two accounts appear in the papers. She answers questions about the second with papers about the first.

| | **The old account** | **The account this Motion concerns** |
|---|---|---|
| Custodian and administrator | MetLife, through Cognizant, her employer until October 2024. ECF 110 at 27 ¶ 3. | Inspira Financial, through Accenture, her employer since October 2024. ECF 110 at 27 ¶ 3. |
| Her sworn inventory, July 2025 | "Institution holding account: MetLife," coupled with the "Cognizant Aetna Healthplan." Value as of June 30, 2025: "$14." ECF 110 at 33, 83. | "Institution holding account: Accenture Inspira." "Account holder: Jason McKemie." ECF 110 at 33, 83. |
| Card | Ending 9602. The card the Debtor used for his care through 2024. ECF 121-1 at 122; Decl. ¶ 3. | The Debtor has never had a working card. The card ending 5379 that she handed him on January 6, 2026 was already cancelled. ECF 138-1 at 59, 71; Decl. ¶¶ 3, 10. |
| Status | Closed, $0, as of February 7, 2026. ECF 149-3 at 74. | Open. $6,575.00 a year going in. ECF 137-3 at 2–3. |

1. **Inspira Financial is the custodian and administrator of the Accenture HSA. MetLife is not.** Ms. Ulijasz swore to it herself: the Accenture HSA is "administered by Inspira Financial." ECF 110 at 30. The HSA statement she attached to that sworn filing is an Inspira Financial statement, not a MetLife statement. ECF 110 at 103. The Inspira portal page in her own Notice of Compliance lists the Accenture Inspira card with two cardholders: "GWENDOLYN ULIJASZ (PRIMARY)" and "Jason McKemie (DEPENDENT)." ECF 121-1 at 137. Every MetLife paper she offers comes from Cognizant, her employer before October 2024, and says nothing about the account this Motion concerns.

2. **MetLife has no part in the Accenture accounts.** MetLife was the former employer's administrator, and every MetLife paper concerns the old account. Decl. ¶ 3. When the Debtor raises the Accenture card, Ms. Ulijasz answers with MetLife. On or about January 20, 2026 he told the divorce court he had gone a year without an HSA card. She answered that he had cut off his own card and pointed to a MetLife record from January 2025. Decl. ¶ 16. Her July 2025 sworn inventory listed the Accenture HSA. Her amended inventory, with values as of February 7, 2026, lists under "Health Savings Accounts" only the closed MetLife account and a "Metlife FSA." ECF 110 at 83; ECF 149-3 at 74. The relief requested concerns the Accenture HSA and the Accenture FSA. Nothing from MetLife answers it.

3. **The receipts demand is the same device in both accounts.** She demands that he upload receipts, refuses him the login, and uses the missing upload against him. She did it before she filed for divorce, and she did it again on Inspira's recorded line in January 2026, where Inspira told him that a health savings account requires no documents at all. Decl. ¶ 5; ECF 138-1 at 60–61.

## II. HER WORDS, THEN HER ACTS

| Date | What she said | What the record shows |
|---|---|---|
| Mid-Dec. 2024 | To the Debtor, by telephone: "I don't want you to die." She said she would not leave him without anything to live on, that she could not keep him on the health insurance, and that he was "only good for 31 days." She committed to pay for six months of COBRA. Decl. ¶ 4; Ex. 1 at 1. | Within days she cut off the card. |
| Dec. 17–18, 2024 | "Please send by tomorrow end of day so that I can see you have intent to participate responsibly and I can leave the HSA available for your next shot." Then: "They suspended the card already because I have not received receipts from you in a timely manner." "I cannot in good conscience give you money, even for medical care …." "You can choose whether to cooperate so that I can upload the receipts, get the HSA turned back on, and then have your shot." "I am not open to discussion about putting you on COBRA until you can accomplish the above. … Do the needful." Ex. 1 at 1–3. | This was the card on the old MetLife account, the only HSA card he had. The day before, she had written that she would decide whether to "leave the HSA available." Now she wrote: "This was not my doing." Ex. 1 at 1–2. He had already given her the receipts, by hand and by email. Only she could log in to upload them, and she refused him the login. Ex. 1 at 1; Decl. ¶ 5. That same morning, at 9:18 a.m., she had filed an ex parte application for a protective order against him. No. DF-24-18010 (file-marked Dec. 18, 2024). His spinal procedure was six days away. Ex. 1 at 1. |
| Jan. 20, 2025 | To the Debtor's lawyer: "No health insurance of any kind is on the table for discussion as Jason has not demonstrated responsible and ethical actions | The card stayed off. |

| Date | What she said | What the record shows |
|---|---|---|
| | required to have health insurance." Decl. ¶ 6. | |
| 2025 | Of the Accenture HSA: "The HSA account has not been touched. It's a qualified investment account and community property." ECF 110 at 74 (May 18, 2025). | She had worked at Accenture since October 2024 and had given him no card on the Accenture HSA. Ten days earlier he had written to her that he had "no access to prescriptions necessary for congestive heart failure and post-operative care." ECF 110 at 72–73. After he was hospitalized five days for a staph infection, the old MetLife card worked for one $41 charge. By the next morning it had been reported lost or stolen, and he could not fill the antibiotics. He did not report it. Decl. ¶ 7. On July 27, 2025 he sent her lawyers his twenty-sixth written request for the card. ECF 71 at 14. |
| Oct. 31, 2025 | Under oath in the divorce court: she had not changed, limited or restricted the Debtor's healthcare and would not. Decl. ¶ 8. | Ms. Ulijasz, the participant, reported a divorce to the Plan as a qualifying life event. No divorce had occurred. The report terminated his coverage effective that same day. COBRA notice: coverage "ends on 10/31/2025 due to the following qualifying event: Divorce." Ex. 2. The Plan: coverage "was dropped due to a participant-reported life event"; he was "still an eligible dependent"; "no COBRA qualifying event occurred." Ex. 3 at 1; Ex. 4 at 1. The Plan's earlier statement that the Benefits Center acted on a "misunderstanding" was, in the Plan's words, "made before all relevant facts were fully understood." Ex. 4 at 1. He has never been given the report. Decl. ¶ 15. Perjury, Tex. Penal Code §§ 37.02, 37.03. False statement to a health plan, 18 U.S.C. § 1035(a)(2). |
| Dec. 17, 2025 to Jan. 13, 2026 | To the divorce court: she "confirms compliance with the Court's order." "A physical HSA card for Respondent ... was then physically provided to Respondent in the presence of the Court on January 6, 2026." ECF 121-1 at 125. | The order gave her twenty-four hours to give him "card and/or portal access information sufficient for Respondent to use the benefits without obstruction." ECF 55 at 53. Her own notice admits "she had no functioning card for either herself or Respondent" and that the replacement cards "were issued and delivered to her." ECF 121-1 at 125. The card she handed him had been cancelled before she gave it to him: "that's not the one associated here on the account." ECF 138-1 at 59; Decl. ¶ 10. On Inspira's recorded line she said, "You can go ahead. Please remind him that everything requires a receipt, and it must be uploaded in your portal." Asked for the portal password: "No, I don't have a password. You got to do this on your own Jason. So I'm not doing anything." She hung up. Inspira: with a health savings account, "no need to submit any documents at all." Inspira still needed the last four digits of the active card, which she had and he did not. ECF 138-1 at 60– |

| Date | What she said | What the record shows |
|---|---|---|
| | | 61. |
| On or after June 26, 2026 | To this Court, under oath: "I cancelled the card he held on my health savings account." ECF 110 at 33 ¶ 13. | After the petition (January 12, 2026). No relief from the stay. The Debtor held no working card. She cancelled a card in her own possession and swore that he held it. ECF 134 at 18. False declaration, 18 U.S.C. §§ 152(3), 1623(a). |

## III. WHAT THE CUTOFFS DID

4. **The medication.** His coverage was terminated on October 31, 2025 with no notice to him. He learned of it on or about November 23, 2025, in an emergency room. He had been taking a prescribed GLP-1 medication. He was cut off with no taper, gained about fifty-two pounds of fluid, and was hospitalized with congestive heart failure. He did not get the medication back until about April 2026. Decl. ¶ 8; ECF 71 at 11; ECF 121-1 at 10. Photographs of his legs, ankles and feet are Exhibit 5. Decl. ¶ 17.

5. **The surgery.** He needs surgery for a torn rotator cuff and a ruptured biceps. It was set for December 27, 2025, when he had met his 2025 deductible and out-of-pocket maximum. The December 17, 2025 order had two parts. The twenty-four-hour requirement, with written proof, was what would let the surgery go forward before the year ended. The $20,643.56 was the safeguard if she delayed into 2026: to preserve his access to the surgery after the deductible and out-of-pocket maximum started over, and what he had paid out of pocket while the card was cut off. She did neither. The October 31, 2025 termination blocked the surgery once; her delay past year-end blocked it again. He has not had the surgery. Decl. ¶ 9; ECF 55 at 53–54.

6. **The glasses and the cash.** On April 16, 2026 she entered his home and destroyed his only pair of prescription glasses. The frame was crushed and twisted, a temple arm was bent back on itself, and a lens was out of the frame. They cannot be worn. Criminal mischief, Tex. Penal Code § 28.03(a)(1). He cannot replace them, and he needs dental work. Decl. ¶ 12; ECF 149 at 44. He pays cash for his prescriptions and care, and he has never received one reimbursement from either account. Decl. ¶ 11. Asked whether reimbursement for what he pays can be paid only to her, the Plan answered: "Yes, except where payment is made directly to a service provider or at a point of sale." Ex. 3 at 4. That is a profit model for benefits obstruction: he pays cash for his own care, and the reimbursement is paid to her. A card in his hands is the point of sale.

## IV. WHY THIS COURT CAN ORDER IT

7. **The HSA is community property, in her own words, three times.** At trial, asked whether she would admit that it is community property: "That's true." ECF 138-1 at 26. To the divorce court: the account "had not been used all year in anticipation that because this was community property it would be decided at trial." ECF 121-1 at 125. To the Debtor: "It's a qualified investment account and community property." ECF 110 at 74. Her own benefits statement shows $6,575.00 a year going into it. ECF 137-3 at 2–3. No division of it stands. On September 18, 2026 the state court vacated the property division in the June 26, 2026 decree. ECF 121 at 3; ECF 121-1 at 2.

8. **She cannot call the account hers alone.** Her own sworn inventory lists the Accenture Inspira HSA this way: "Account holder: Jason McKemie." ECF 110 at 33, 83. The Debtor is a named user on it. Decl. ¶ 3.

Her other filings treat him as one. She told the divorce court that "replacement cards were requested for both Petitioner and Respondent" and that she handed over "[a] physical HSA card for Respondent." ECF 121-1 at 125. She told this Court she cancelled "the card he held on my health savings account." ECF 110 at 33 ¶ 13. The Plan confirms that an eligible dependent may be given "an additional debit card." Ex. 3 at 4. An account both spouses are set up to spend from is, at the least, arguably under their joint management and control. Tex. Fam. Code § 3.102(b), (c); 11 U.S.C. § 541(a)(2)(A).

9. **Sole management does not take it out of the estate.** Community property under her sole management is property of the estate to the extent it is liable for an allowable claim against the Debtor. 11 U.S.C. § 541(a)(2)(B). Her own motion recognizes the rule. ECF 110 at 25. In Texas a spouse who fails to discharge the duty of support "is liable to any person who provides necessaries to the spouse to whom support is owed," and is personally liable for the other spouse's "debt for necessaries." Tex. Fam. Code §§ 2.501(b), 3.201(a)(2). Her sole-management community property is shielded from his debts "[u]nless both spouses are personally liable." *Id.* § 3.202(b). The Debtor's unpaid medical bills are debts for necessaries, and his medical providers are creditors in this case. Decl. ¶ 14. The account that exists to pay medical bills is liable for them.

10. **The stay protects it.** The petition stays "any act ... to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The stay "prohibits affirmative acts that would disturb the status quo of estate property." *City of Chicago v. Fulton*, 592 U.S. 154 (2021). It protects property to which the debtor has even an arguable claim. One who acts against it must "first seek relief from the bankruptcy court," and "it is no answer ... to defend ... by claiming that the property was not properly covered by the stay." *In re Chesnut*, 422 F.3d 298, 303–04 (5th Cir. 2005). *Chesnut* involved Texas property titled in the name of the debtor's wife. *Id.* at 300. Ms. Ulijasz acted first, asked this Court afterward to rule the HSA out of the estate, and then asked to withdraw the question "without adjudication." ECF 110 at 25, 39; ECF 143 at 4 ¶ 6. Whoever held the card, she admits the act: after the petition, "[i]n reliance on the Decree," she cancelled a card on this account. ECF 110 at 33 ¶ 13.

11. **The decree is no defense.** The stay's exception for divorce proceedings does not reach "the division of property that is property of the estate." 11 U.S.C. § 362(b)(2)(A)(iv). The decree's award of the HSA to her, item W-4, was a division of property entered without relief from the stay. ECF 110 at 39. Only this Court could have validated it, by annulling the stay. 11 U.S.C. § 362(d). She asked for that and then asked to withdraw the request. ECF 110 at 2; ECF 143 at 4 ¶ 6. The state court has since vacated the division. ECF 121 at 3.

12. **The violation was willful.** A violation is willful when the actor knew of the stay and acted intentionally. *In re Repine*, 536 F.3d 512, 519 (5th Cir. 2008). She learned of this case on February 18, 2026 and cancelled the card more than four months later. ECF 110 at 27 ¶ 4, 33 ¶ 13. An individual injured by a willful violation "shall recover actual damages, including costs," and "may recover punitive damages." 11 U.S.C. § 362(k)(1). This Court enforces the stay by civil contempt, on motion. 11 U.S.C. § 105(a); Fed. R. Bankr. P. 9020; *In re Terrebonne Fuel & Lube, Inc.*, 108 F.3d 609, 613 (5th Cir. 1997). The Debtor asks for an order that undoes the act, and for a coercive fine of $4,100 a day. A court setting a coercive fine considers the financial resources of the person it must move. *United States v. United Mine Workers*, 330 U.S. 258, 304 (1947). Ms. Ulijasz's total target compensation under her Accenture offer is approximately $1.5 million a year, about $4,100 a day. ECF 138 at 13 (PX-9). The Court set $100 a day for the Debtor. ECF 103 at 2. That figure against her pay would coerce nothing.

13. **ERISA names the conduct.** The health care FSA is part of the Accenture US Group Health Plan, and the Debtor is a covered dependent spouse and a beneficiary. Ex. 3 at 2, 4; 29 U.S.C. § 1002(1), (8). It is a federal crime for any person to use fraud to restrain a plan beneficiary for the purpose of interfering with his rights under the plan. The penalty for a willful violation is a $100,000 fine, up to ten years in prison, or both. 29 U.S.C. § 1141. Ms. Ulijasz reported a divorce that had not occurred, and the report terminated his coverage. She handed him a cancelled card and told a court she had complied. After the petition she cancelled a card in her own possession and swore to this Court that he held it. That is coercive interference. 29 U.S.C. § 1141.

14. **The order needs only her act, and it needs proof from the administrator.** Issuing the Debtor a card is permitted and is "at the accountholder's discretion." Ex. 3 at 4. HSA cards, logins and access are "subject to accountholder controls." Ex. 4 at 1. Her own benefits statement lists the health care FSA as "Coverage Terminated," with a term date of June 30, 2026. ECF 137-3 at 3. The Plan says the FSA covers his expenses "from January 1, 2026 through December 31, 2026." Ex. 3 at 2–3. The Plan will not tell him which is right. Ex. 3 at 4. At trial she valued the HSA at "a couple thousand dollars." ECF 138-1 at 26. Her own statement shows $6,575.00 a year going into it, and she told the divorce court it "had not been used all year." ECF 137-3 at 2–3; ECF 121-1 at 125. Only the administrator's written confirmation will show that the card works and what is in each account.

## V. WHAT THIS MOTION DOES NOT COVER

15. This Motion is limited to the card, the login and the reimbursements. Other motions will follow. The benefits terminated on October 31, 2025 were never all restored. The Plan's benefit summary of February 2, 2026 lists spouse critical illness, optional life, optional accidental death and dismemberment, and spouse life and accidental death and dismemberment coverage as "Coverage Waived." Decl. ¶ 13. Ms. Ulijasz swears that after the petition she "changed the beneficiary designations on my accounts to remove him," and her own benefits statement names another person as beneficiary of her $1,500,000 life insurance. ECF 110 at 33 ¶ 13; ECF 137-3 at 3. The Debtor will move separately to restore those benefits and designations, and for relief for the blocked surgeries and the medical harm. He reserves every claim, right and remedy against Ms. Ulijasz; her counsel, including Sullivan & Cook, Beermann LLP and Armstrong Divorce & Family Law, PLLC; Accenture; and the Plan, including damages, sanctions, relief under 29 U.S.C. §§ 1132 and 1140, and criminal referral.

## VI. REQUESTS FOR RULING

16. The Debtor requests a separate written ruling, granted or denied, on each of the following:

(a) After the petition date and without relief from the stay, Ms. Ulijasz cancelled the card on the Accenture HSA that she swears the Debtor held. That was a willful act to exercise control over property of the estate. 11 U.S.C. § 362(a)(3), (k)(1).

(b) Within three business days after entry of the order Ms. Ulijasz shall cause Inspira Financial, and any other administrator of the Accenture FSA, to issue a debit card in the Debtor's name that pays from the Accenture HSA and FSA, and shall give the Debtor a working login to both.

(c) Within fourteen days after entry of the order she shall cause the activated card to be delivered to the Debtor by overnight courier with tracking, at the delivery address the Debtor gives her counsel by email. The full balance of the Accenture HSA and the full unused 2026 Accenture FSA election shall be available on it, and the Debtor may use the card and login for his medical, dental and vision care.

(d) Within one business day after delivery she shall file the administrator's written confirmation that the card is active, stating the balance of each account and listing each claim paid from either account since December 18, 2024 for an expense of the Debtor, with its date, amount and payee.

(e) Ms. Ulijasz shall not cancel, suspend, report lost or stolen, or otherwise disable the Debtor's card or login, and shall not close or empty either account.

(f) Ms. Ulijasz shall pay to the Debtor, within three business days after she receives it, every reimbursement from either account of an expense the Debtor paid, and within fourteen days after entry of the order every such reimbursement she has already received.

(g) If Ms. Ulijasz does not comply with (b), (c) and (d) by their deadlines, she shall pay the Debtor $4,100 for each day until she does.

(h) Ms. Ulijasz shall pay the Debtor's costs of this Motion, as stated in a declaration the Debtor will file within seven days after entry of the order, and the Court sets a hearing on his actual and punitive damages under 11 U.S.C. § 362(k)(1).

(i) A card, account or record of MetLife, or of any former employer, does not satisfy the order.

(j) Nothing in the order performs Option A of the December 17, 2025 order in Cause No. DF-24-18010, satisfies or reduces the $20,643.56 ordered there, or releases any claim, right or remedy of the Debtor.

Respectfully submitted,

[signature]

Jason Emory McKemie
Debtor, pro se
539 W. Commerce St., #2010, Dallas, TX 75208
(214) 519-8958 | jmckemie@mckemie.net

**CERTIFICATE OF CONFERENCE**

No conference was held before filing. By July 27, 2025 the Debtor had asked Ms. Ulijasz's lawyers in writing for the HSA card twenty-six times. ECF 71 at 14; Decl. ¶ 7. The Debtor treats this Motion as opposed.

[signature]

Jason Emory McKemie

## CERTIFICATE OF SERVICE

I certify that on November 24, 2026, a true copy of this Motion, the Declaration, Exhibits 1 through 5, and the proposed order was served by email on counsel of record for Gwendolyn Laura Ulijasz in this bankruptcy case, including:

- Jonathan D. Steele (jsteele@beermannlaw.com), Beermann LLP (Chicago)
- Sara Boucher (saboucher@beermannlaw.com), Beermann LLP (Chicago)
- Rosa Gutierrez (rgutierrez@beermannlaw.com), Beermann LLP (Chicago)
- Richard G. Dafoe (rdafoe@wslawpc.com), Waddell Serafino Geary Rechner Jenevein, P.C. (Dallas)
- Rebecca L. Armstrong (rebecca@armstronglawtexas.com), Armstrong Divorce & Family Law, PLLC (Dallas)
- Lauren Shaw (lauren@armstronglawtexas.com), Armstrong Divorce & Family Law, PLLC (Dallas)
- Terra Aguirre (terra@armstronglawtexas.com), Armstrong Divorce & Family Law, PLLC (Dallas)

and on:

- Areya Holder Aurzada, Chapter 7 Trustee (areya@holderlawpc.com)
- Office of the United States Trustee (ustpregion06.da.ecf@usdoj.gov)

On the same date a copy was emailed to the courtroom deputy (mvl_settings@txnb.uscourts.gov), and the ink-signed original was sent by overnight delivery to the Clerk, United States Bankruptcy Court, Northern District of Texas, 1100 Commerce Street, Room 1254, Dallas, Texas 75242.

Jason Emory McKemie