FILED

NOV 25 2026

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Case No. 26-30161-mvl7 |
| **JASON EMORY McKEMIE,** | Chapter 7 |
| Debtor. | |

# DEBTOR'S NOTICE OF FILING OF CONFERRAL STATEMENT TO MOVANT'S COUNSEL, AND OF MOVANT'S FAILURE TO SERVE AND MISREPRESENTATION OF DEBTOR'S POSITIONS [ECF 141, 142, 143]

**Why this is filed with the Court.** Debtor files his conferral statement because Movant's counsel will not put it before the Court, and because Movant's counsel does not serve him. This is what happened last week:

1. On November 11, 2026 at 12:39 p.m., Debtor sent Jonathan D. Steele a written Statement of Positions replacing his November 10 email. At 1:42 p.m. Mr. Steele committed in writing that Movant would attach that Statement in full to her filings, report Debtor's positions as stated, and serve the filings on Debtor by email when filed.

2. Movant did not. ECF 141 reproduces Debtor's replaced November 10 email instead and omits the Statement. ECF 141 and ECF 143 do not attach it. Movant misrepresented Debtor's positions to this Court.

3. In ECF 142 Movant asked the Court to shorten Debtor's time to respond to 5:00 p.m. on November 13, 2026, and presented that schedule to the Court as agreed. Debtor did not agree to it.

4. Movant's certificates state that ECF 141, 142 and 143 were served on Debtor by email and first-class mail on November 12, 2026. Debtor was not served on November 12. The first email transmitting them came from Sara A. Boucher on November 13, 2026 at 9:45:03 a.m., leaving Debtor less than eight hours before the deadline Movant asked the Court to impose. Debtor had to pay $131.10 to PACER on November 12 at 4:44 p.m. to learn the papers existed.

5. This is not the first time. The lift-stay motion that produced the April 16, 2026 writ at Debtor's residence was never served on him; this Court found lack of proper service and notice (ECF 57 at 3). Movant had the landlord's advance notice of that writ the day before, with the instruction "Do not notify him or give any advanced indication" (ECF 110 at 48). Paragraph 16B of Debtor's Declaration and Record Index, filed today, sets out the same pattern in the divorce court.

6. Movant's counsel asks this Court to shorten Debtor's time, tells the Court a schedule is agreed when it is not, omits Debtor's written positions, and then serves him late. Debtor cannot be heard on papers he does not receive.

**Requests.** Debtor requests that the Court (a) measure every certificate of conference and service filed by Movant against the attached statement; (b) order Movant's counsel to produce, within two business days, the sending and mailing records for the November 12 service of ECF 141, 142 and 143 and to file updated certificates stating the actual date and method; (c) order Movant to pay Debtor's costs of responding, $131.10 in PACER

fees and his delivery and travel costs, within three business days; and (d) grant the service, conferral and no-agreement-without-signature protections and the sanctions requested in Debtor's Supplement filed today.

Attached: Debtor's conferral statement to Mr. Steele, version 18, sent November 17, 2026.

Respectfully submitted,

Jason Emory McKemie
Debtor, pro se
539 W. Commerce St., #2010, Dallas, TX 75208
(214) 519-8958 | jmckemie@mckemie.net

**CERTIFICATE OF SERVICE**

I certify that on November ~~17~~ 24, 2026 I served this Notice and its attachment by email on Jonathan D. Steele (jsteele@beermannlaw.com), Beermann LLP; Richard G. Dafoe (rdafoe@wslawpc.com), Waddell Serafino Geary Rechner Jenevein, P.C.; and Rebecca L. Armstrong (rebecca@armstronglawtexas.com), Armstrong Divorce & Family Law, PLLC; Areya Holder Aurzada, Chapter 7 Trustee (areya@holderlawpc.com; trustee@holderlawpc.com); and the Office of the United States Trustee (ustpregion06.da.ecf@usdoj.gov), with a copy to the courtroom deputy (mvl_settings@txnb.uscourts.gov). The ink-signed original was delivered by hand to the Clerk on November ~~17~~ 24, 2026.

Jason Emory McKemie

# CONFERRAL RESPONSE

In re Jason Emory McKemie, Debtor | Case No. 26-30161-mvl7 | Bankr. N.D. Tex., Dallas Division
Debtor's response to the November 14, 2026 conferral email of Jonathan D. Steele | November 16, 2026

Mr. Steele:

Thank you for your email.

I received your conferral request on Saturday, November 14, 2026 at 6:26 p.m. Central. This PDF is my complete response. I emailed it to you on Monday, November 16, 2026, with the courtroom deputy and the Trustee copied. My position on each item is below.

**SHORT ANSWER.** Dates: Friday, December 18, 2026 is my first choice and Tuesday, December 8, 2026 my second. I oppose Tuesday, December 1, 2026 for ECF 110 (item 1). Time: ninety minutes is not agreed. I ask for a full day, or the half day already reserved and a second setting (item 5). My agreement to a date is on the four conditions in item 1(d): the stay remains in place; Ms. Ulijasz appears in person and testifies; my computers and drives are returned first; and ECF 97 is decided now, on the papers, and is not part of the reset. My motions on health and insurance benefits (item 6) and on the return of my property (item 8) should be heard first, on the Court's earliest date. Nothing in this response is agreed unless it says so, and my silence on any point is not agreement.

On November 11 you committed to me in writing that my Statement of Positions would be attached "in full" to Ms. Ulijasz's WebEx motion and to her response to my motion to compel, and that "each certificate of conference will report your positions as stated in it." The next day you filed both (ECF 141 and 143), with an application to shorten my time to respond (ECF 142). The Statement is attached to none of them and mentioned in none of them. Your certificates of conference give the Court the November 10 email that the Statement replaced. Fourteen of its sixteen positions are reported nowhere in your filings. You did not serve the three filings on me until the following day (item 7(b); Exhibits C and D), knowing that if I learned of them only when I was served, filing a response before the Monday ruling you requested would not have been possible. This was not an isolated event. It is the pattern set out in item 7(f), and it is why my November 10 motion told the Court, before any of it happened, to expect "a request to appear remotely or not at all" (ECF 134 at 2).

Attach this response in full, with its page numbers, to whatever you send or file with the Court. I do not agree to its being summarized, excerpted, edited or shortened. Where we disagree, report it as a disagreement and not as a joint estimate. If you have already reported to chambers or filed anything on this conferral, file this response in full on the docket as a supplement by 5:00 p.m. Central on Monday, November 16, 2026, and email me the filed copy. You file through CM/ECF in minutes and at no cost. I have no CM/ECF access; everything I file must be printed and sent to the Clerk overnight at my expense. After what happened to my Statement of Positions (item 7(b)), the Court should not have to wait on that to see this response. I have copied the courtroom deputy and the Trustee, and I am filing this response as an exhibit to the motions described below, so the Court will have it in full whatever you send.

Every item below goes to the one purpose behind the acts of Gwendolyn Laura Ulijasz: **to keep me from ever being able to retain counsel.** To that end she has buried me in community debt on a false narrative;

exhausted my cash; cut off my income and my health care; placed the entire weight of the marital estate on me through perjury and false financial statements to the divorce court at the January 7, 2025, hearing on temporary orders and her application for a protective order; and stolen or destroyed everything I need to live, survive and provide for myself. She has done it through procedural gamesmanship and delay across every part of my life: money, housing, health care, prescriptions, transportation, employment and property, all to make access to counsel impossible.

**THE COURT'S NOVEMBER 13 EMAIL.** Your message relies on "the Court's November 13 email." I did not receive it, and you did not copy the courtroom deputy on your message. Court staff told me on November 13 that the Court denied Ms. Ulijasz's request to testify by WebEx and ordered her to appear in person on November 18; that her counsel answered that she could not, citing her provider's letter; and that the Court continued the hearing to a date when she will appear in person. As of November 15 the docket shows no order on ECF 134, 141, 142 or 143 and no entry resetting November 18. Forward the Court's email to me today with its full recipient list. I ask that the ruling be entered as a written order; my proposed order was submitted with my November 13 supplement.

1. **DATES.**

   a. **FIRST CHOICE:** Friday, December 18, 2026.

   b. **SECOND CHOICE:** Tuesday, December 8, 2026.

   c. **OPPOSED FOR ECF 110:** Tuesday, December 1, 2026. It leaves no time for the amended lists (item 3), the records (item 4), or rulings on my motions (items 5 through 8).

   d. **CONDITIONS.** My agreement to either date is on these conditions. State each one, and Ms. Ulijasz's answer to it, in your report to chambers.

      i. **The stay remains in place.** The reset results from her filings and her statement that she cannot travel to Dallas on November 18. State in writing that Ms. Ulijasz agrees that the automatic stay remains in effect as to her and that the periods in 11 U.S.C. § 362(e) are extended through the Court's ruling on ECF 110. § 362(e)(2)(B)(i). Put that term in the order resetting the hearing so that the Court orders it as well, § 362(e)(1), (e)(2)(B)(ii), and report the Trustee's position on it with hers. I asked for this on October 2 (ECF 122 at 11–12) and on November 13.

      ii. **She appears in person and testifies.** Her declaration and her provider's letter say she is to "refrain from travel for the next two months, through approximately January 11, 2027," and that this "applies to the travel to Dallas" (ECF 141 at 23–24, 35). December 1, 8 and 18 all fall inside that period. She has told the Court she "will comply with any order" it enters (ECF 143 ¶ 2 at 2). Your email says "We are available." State that Ms. Ulijasz herself will be in the courtroom on the date selected, will testify when I call her (item 3), and will not seek remote testimony or another continuance on that ground.

      iii. **My property is returned first.** Ms. Ulijasz stole what I need to live, work and litigate, and she holds it today (item 8). I have no vehicle, no passport, no suits, no desktop computer, no monitor, no printer and no funds (ECF 134 at 27 ¶ 17), and my litigation files are on the drives

she took. My position is that ECF 110 should not be heard until my motion in item 8 is decided and my computers and drives are in my hands. I am asking the Court to hear that motion and my motion in item 6 first, on its earliest date, to order the return by a date certain, and to set a date before the ECF 110 hearing to confirm the return. You are available on December 1 and December 8.

iv. **ECF 97 should not be part of the reset.** It can be decided without a hearing, and I have asked the Court to rule on it now, on the papers (item 4).

2. **WHAT CHANGED.**

a. **THE RELIEF.** My November 10 motion told the Court to expect, before this hearing, "a request to appear remotely or not at all" (ECF 134 at 2). On November 12 Ms. Ulijasz filed ECF 141, 142 and 143. ECF 143 states that she "is not pressing annulment" (¶ 13) and "does not intend to offer her declaration or to testify" (¶ 1 at 2), and asks leave to withdraw her requests for annulment of the stay and for a determination that particular property was not property of the estate (¶ 6 at 4). That changes the relief to be heard and the evidence on it. A request withdrawn after the other side has responded requires a court order, on terms the Court considers proper. Fed. R. Civ. P. 41(a)(2); Fed. R. Bankr. P. 7041, 9014(c). I have received no such order, so I must prepare on ECF 110 both as filed and as she now describes it. My November 13 supplement asks that the withdrawn requests be denied with prejudice, with my costs.

b. **THE REASON GIVEN FOR NOT APPEARING.** You told me on November 7 that she opposed my motion to compel her appearance in person, and on November 10 at 11:24 a.m. that she would move to testify by WebEx. Her provider's letter is dated November 11 (ECF 141 at 35), and your own certificate says you learned of "the medical circumstances" on November 11 (ECF 141 at 13). The position came first; the medical reason came after. Your November 12 filings then gave the Court two versions of that advice. The letter, the only provider letter in the record, recommends that she "refrain from travel for the next two months, through approximately January 11, 2027," and her declaration says that this "applies to the travel to Dallas" (ECF 141 at 23–24, 35). ECF 142, filed eight minutes after ECF 141 over your signature, tells the Court that she was advised "not to fly until she is reassessed" and calls it "advice against air travel" (ECF 142 ¶ 2 at 2, ¶ 5 at 3). The letter says nothing about flying or about reassessment, and her declaration puts Dallas at a drive of "about four and a half hours each way" (ECF 141 at 23 ¶ 4). If the advice is not to fly, it does not stop that drive. If it is no travel through January 11, she cannot appear on December 1, 8 or 18, the three in-person dates you now offer. I will examine her on it.

3. **MY WITNESSES AND EXHIBITS.** Because the relief changed, I will file amended witness and exhibit lists under L.B.R. 9014-1(c). My witness list will expand. I will call Ms. Ulijasz as an adverse witness, in person. I will call additional witnesses, including third parties under subpoena, and will identify them in the amended list. Her examination will cover her transfers and concealment of assets before and after January 12, 2026; the debts placed on me; the account statements she has not produced; the termination of my health coverage and the December 17, 2025 order; the June 11, 2026 trial conducted during the automatic stay; her payoff of the landlord that caused the eviction; and the theft of my property, including my litigation drives, on April 16 and May 22, 2026. Each goes to the one purpose stated above.

4. **RECORDS.**

   a. **WHAT I NEED.** ECF 97 seeks the benefits, HSA and FSA records. Accenture has confirmed that my coverage was dropped on October 31, 2025 because of a divorce-based qualifying life event reported by the plan participant when no divorce had occurred; that I remained an eligible dependent; and that no COBRA qualifying event occurred. Ms. Ulijasz is the participant. From those custodians I need: who reported that event and what was submitted; every activation, deactivation and lost-or-stolen report on my HSA card, including the one made after my 2025 hospitalization; every election, waiver, termination and change, with dates, for medical, prescription, dental, vision, life, supplemental life, AD&D, critical illness, HSA and FSA coverage; and every beneficiary designation and change, with dates. ECF 97 also seeks the compensation, bank, loan and investment records. From the bank custodians I need the report that my purchase of rehabilitation equipment after spinal surgery was fraud. I will also subpoena the records of the landlord payoff, the payment for the moving truck, and the constables present on April 16 and May 22, 2026.

   b. **HER LEAD OBJECTION IS GONE, AND THE REST ARE ANSWERED.** ECF 111's first ground is L.B.R. 2004-1(b): that Rule 2004 is unavailable because ECF 110 asks the Court to decide whether her accounts and her Accenture compensation and benefit interests "were property of this estate on January 12, 2026" (ECF 111 ¶ 14 at 6). She now asks to withdraw that request (ECF 143 ¶ 6 at 4) and accepts "this Court's determination of the estate's interest in any property" (¶ 7 at 4). That determination requires the records ECF 97 seeks. Her other grounds (the scope of Rule 2004(b), use of the records in the divorce case, the period covered, the Trustee's role, the health-plan records, conference and notice; ECF 111 at 9–16) are answered in ECF 120 and ECF 124 at 2–3. I have asked the Court to overrule ECF 111 and grant ECF 97 now, on the papers. State whether Ms. Ulijasz withdraws ECF 111. If she does not, state each ground she still presses.

5. **TIME.** Ninety minutes for all matters is not agreed, and I do not agree to a cap or a fixed split of time between the parties. The Court set a "final in person, evidentiary hearing" (ECF 129, quoted at ECF 143 ¶ 4 at 3) with one-half day reserved (ECF 139 at 1). Ninety minutes does not allow for Ms. Ulijasz's examination or for the additional witnesses. I am also filing a motion to enforce the automatic stay, for return of my property, and for damages and sanctions under 11 U.S.C. § 362(k). I am asking that the return of my property be heard first (items 1(d) and 8), and the rest with ECF 110. For that setting I ask for a full day. If a full day is not available, I ask for the half day already reserved and a second setting for what remains.

6. **HEALTH & INSURANCE BENEFITS.** This cannot wait for December. After the October 31, 2025 termination in item 4, more than $30,000 in medical billing was denied or clawed back and billed against me; the carrier's portal lists $31,304.19 in denied claims as my share (Nov. 13 Supplement, Decl. ¶ 14). I learned of the termination weeks later, during a hospitalization. Each time coverage was cut off I paid full price in cash for my prescriptions and care. Those bills and the eviction are what brought me into this Court. The report that caused it violated an injunction entered on Ms. Ulijasz's own application: on January 7, 2025 the divorce court made mutual her requested injunction against "[c]anceling, altering, failing to renew or pay premiums on, or in any manner affecting the level of coverage" of any life or health insurance policy insuring either of us (DF-24-18010, Associate Judge's Report of Jan. 7, 2025, granting item 20 of her Dec. 20, 2024 amended application). Accenture's written position now is that

Ms. Ulijasz can claim FSA reimbursement for my eligible expenses incurred through December 31, 2026, and that I can claim only through her. The money I paid out of pocket can be claimed only by her. The life, supplemental life, AD&D and critical illness coverage and my HSA and FSA access have not been restored. The December 17, 2025 order required working coverage and HSA and FSA access within 24 hours, or payment of $20,643.56. I received neither. The history is at ECF 134 at 13 and ECF 122, Ex. R-15 ¶¶ 8B and 9. I am filing a motion to restore my health and insurance benefits and my HSA and FSA access, with a request for an expedited hearing on the Court's earliest date. State whether Ms. Ulijasz opposes an expedited hearing on that motion.

7. **SERVICE DEMAND AND REQUEST FOR ADVANCE NOTICE.**

   a. **WHAT YOU KNEW.** I am self-represented, and not by choice. On November 10 I told you in writing that I have no CM/ECF access and asked you to email me your filings when you filed them; your own certificate quotes that notice (ECF 141 at 12). On November 11 I asked again (Exhibit B). I file on paper. I have no vehicle and no funds (ECF 134 at 2). I surrendered my vehicle (ECF 118, re-filed as ECF 145) because your client cut me off from all marital assets, placed the marital debts on me, and cut off my health care repeatedly. Every filing costs me an overnight delivery fee or a trip to the Clerk's office in Dallas, and keeping up with your filings has cost me hundreds of dollars. You knew all of this on November 12.

   b. **WHAT HAPPENED.** On November 10 at 11:24 a.m. you asked for my positions "by 9:00 a.m. Central Time on Thursday, November 12" and wrote: "I will report any position I receive to the Court." You proposed a response deadline of November 13 at 5:00 p.m. I answered at 8:56 p.m. that night that I would serve any supplement by then, and asked you to email me the filings when filed (Exhibit B).

   **YOU COMMITTED IN WRITING TO ATTACH MY STATEMENT OF POSITIONS IN FULL, AND YOU LEFT IT OUT OF YOUR FILINGS.** On November 11 at 12:39 p.m., more than twenty hours before your deadline, I emailed you my four-page Statement of Positions, with copies to Ms. Boucher, Mr. Dafoe, the Armstrong firm, the Trustee, the United States Trustee and the courtroom deputy (Exhibits B and C). Its first page states that it "replaces the Debtor's email response of November 10, 2026" and asks that it be attached "IN FULL, TO THE WEBEX MOTION AND TO THE RESPONSE TO THE DEBTOR'S MOTION TO COMPEL, AND TO REPORT EACH POSITION BELOW IN THE CERTIFICATE OF CONFERENCE." At 1:42 p.m. you answered in writing: "Thank you for the Statement of Position. Ms. Ulijasz will attach it in full as an exhibit to her WebEx motion and her response to the Motion to Compel, and each certificate of conference will report your positions as stated in it." You stated her positions on items 6 through 10, agreeing to item 6 and to part of item 7, and wrote: "Both filings will be served on you by email when filed" (Exhibit D). You kept none of those commitments. You filed the WebEx motion (ECF 141) at 11:52 a.m., an application to shorten my time to respond (ECF 142) at 12:00 p.m. and the response to my motion to compel (ECF 143) at 12:15 p.m. on November 12, twenty-two hours after you made them. The Statement is not attached to any of them, and none of them mentions it. ECF 141's certificate of conference quotes the November 10 email the Statement replaced, and ECF 142's summarizes it (ECF 141 at 12–13; ECF 142 at 4). That email holds two of my positions, on WebEx testimony and on the schedule. The other fourteen positions in the Statement, and Ms. Ulijasz's own agreements on items 6 and 7, are reported nowhere in your filings. Both certificates tell the Court that you "will advise the Court

promptly of any position received." You had already received my positions and answered them in writing. A certificate that gives the Court a replaced email as my position, and promises to report what you were already holding, has no evidentiary support. Fed. R. Bankr. P. 9011(b)(3). It is not the candor you certified you would show this Court (ECF 108 at 3; item 7(d)). On November 7 you wrote to me: "Please reflect this response and its date in your certificate of conference" (ECF 135, Ex. E at 4). I did, in full (ECF 134 at 28). You omitted what you had promised in writing to attach to the filings on which you asked the Court to shorten my time to respond, and you did not serve those filings on me until the next day. I am including it now, as Exhibit C, so the Court can see it.

**YOU TURNED MY OWN DEADLINE AGAINST ME.**

I offered to serve any supplement by 5:00 p.m. on November 13 in the same November 10 email in which I asked you to email me your filings when you filed them (Exhibit B). In ECF 142 you told the Court that I "will serve any supplement by 5:00 p.m. Central Time on Friday, November 13, 2026" and asked it to "adopt that schedule" (ECF 142 ¶ 3 at 2). You told it that your notice "will be sufficient because the WebEx Motion presents a single procedural question" (¶ 4 at 3). You certified that "the Debtor's stated deadline of 5:00 p.m. Central Time on November 13, 2026 for any supplement allows him to address them" (ECF 142 at 4). You then left my Statement of Positions out of those filings, filed them on November 12 with a request that the Court shorten my time to respond, and withheld service until November 13, the day the deadline ran out. You presented my deadline to the Court as fair notice while you withheld the papers it depended on. Each of those statements is in a paper you signed and certified. The certifications that I "receive the declaration" with your filings and that my deadline "allows him to address them" have no evidentiary support, because you had not served me. Fed. R. Bankr. P. 9011(b)(3).

The three filings were made under Mr. Dafoe's ECF account with certificates signed by you; you are not an ECF filer in this Court (ECF 108 at 3). They changed the relief and the nature of the hearing. The docket set objections to ECF 141 for December 3, 2026; ECF 142 asked the Court to cut that to the next afternoon. Your certificates told the Court that I "receive the declaration" with those filings and that a 5:00 p.m. November 13 deadline "allows him to address them" (ECF 141 at 12–13; ECF 142 at 4). You certified on each filing that I was served on November 12 by email and by first-class mail (ECF 141 at 13; ECF 142 at 5; ECF 143 at 13).

**Between November 11 and 12 Ms. Ulijasz filed five papers. Mr. Dafoe emailed me the two filed on November 11, her witness disclosures and exhibit list (ECF 136, 137), the same day. The three filed on November 12, the ones that changed the relief and the nature of the hearing and asked the Court to shorten my time (ECF 141, 142, 143), were not served on me on November 12, by email or by mail.** Your office's first email of them came from Sara A. Boucher in your Chicago office on November 13 at 9:45:03 a.m. and arrived within two minutes, **7 hours and 15 minutes before the deadline.** Ms. Boucher sent it as a reply to my November 11 email, the one that transmitted the Statement of Positions. Nothing from either firm reached me on November 12 after those filings were made. Served that morning, a response sent by overnight delivery would not have reached the Clerk before Monday, November 16, the day by which you asked the Court to rule (ECF 142 ¶ 3 at 2). My response reached the Clerk on Friday only because of what is described in item 7(c).

c. **WHAT IT TOOK.** Shortly before the Clerk's office closed on November 12, I called and asked whether anything had been filed in my case that day. I was told yes, and that the Clerk could not send me copies. Nothing had come from your office. I was locked out of PACER for unpaid fees. I borrowed money from a friend and at 4:44 p.m. paid PACER $131.10 to reach the docket (Exhibit A). I found the three filings that night, drafted through the night, arranged a way to print the documents, arranged a vehicle I could borrow, and raced to Dallas to deliver my response to the Clerk's office just before it closed on Friday, November 13.

d. **THE RULE.** Fed. R. Bankr. P. 9014(b)(3) requires service under Fed. R. Civ. P. 5(b). Service by mail is complete on mailing and service by email on sending, but email service "is not effective if the filer or sender learns that it did not reach the person to be served." Fed. R. Civ. P. 5(b)(2)(C), (E); Fed. R. Bankr. P. 9036(d). Your certificates rest on two facts that only your side can prove: that ECF 141, 142 and 143 were emailed to me on November 12, and that they were mailed to me on November 12. Neither has been shown. An email delayed in transit arrives with the date it was sent. No November 12 email of those filings exists in any of my mailboxes; the only one I have was sent on November 13 at 9:45 a.m. Mr. Dafoe wrote on November 13 that I did not receive "emails sent by our office on Nov. 12 until Nov. 13." That admits that no email from your side reached me on November 12. It does not show that anything was sent that day. Either no email was sent on November 12, or one was sent and never reached me, which your side learned on November 13. Under the rule neither is service. I was not served by email on November 12. That leaves the mailing, and no proof of it has been produced after two requests. If service was by mail alone, Fed. R. Bankr. P. 9006(f) adds three days to any time that runs from service, and you asked the Court for a deadline of the next afternoon. Fed. R. Bankr. P. 9011(b)(3) requires evidentiary support for every factual statement in a paper you sign, including a certificate of service and a certificate of conference. L.B.R. 9014-1(b) and 9007-1(e) require a certificate showing the date and mode of service. You certified to this Court that you would comply with *Dondi Properties Corp. v. Commerce Savings & Loan Ass'n*, 121 F.R.D. 284 (N.D. Tex. 1988) (en banc), and with the local rules (ECF 108 at 3). *Dondi* requires "candor" to the Court and conduct "characterized by honesty and fair play." *Id.* at 287–89.

e. **THIRD REQUEST.** I asked for proof of service of ECF 141, 142 and 143, by mail, by email, or both, on November 13 at 3:54 p.m. and again at 7:24 p.m. No one at any of the three firms presently representing Ms. Ulijasz (Beermann LLP; Armstrong Divorce & Family Law; Waddell Serafino Geary Rechner Jenevein, P.C.) has produced either. This is the third request. Produce the following by 5:00 p.m. Central on Monday, November 16, 2026. My motion in item 7(g) asks the Court to order it.

   i. the email your office says it sent me on November 12, in .eml or .msg format, with full headers and attachments;

   ii. the postage, tracking or mailroom record for the first-class mailing each certificate recites, showing who mailed it, when and from where;

   iii. a written statement, signed by Mr. Dafoe under penalty of perjury, of who sent the November 12 email, from which account and at what time; which office Mr. Dafoe means by "our office"; whether Mr. Dafoe was in your Chicago office on November 12; whether he sent

anything from Ms. Boucher's email account; and whether he has personal knowledge of the Microsoft service issues he gave as the reason I did not receive ECF 141, 142 and 143 on November 12;

iv. the email by which the courtroom deputy was notified of ECF 142 on November 12, as ECF 142 ¶ 1 told the Court she would be, with its send time and full recipient list, and every other communication from your side to chambers or the courtroom deputy since November 10 on which I was not copied (Fed. R. Bankr. P. 9003(a));

v. the Court's November 13 email, with its full recipient list; and

vi. if either method of service was not completed on November 12, corrected certificates of service, filed with the Court, stating the actual date and method.

**f. NOT AN ISOLATED INCIDENT.**

i. ECF 134, my Advance Notice of Anticipated Safety-Based Allegations and Motion to Compel Ms. Ulijasz's In-Person Testimony, was not a guess. It rests on a pattern nearly two years old: her counsel withdraws when discovery is due and reappears when it is closing.

a) Donna Tomlinson of Hargrave Family Law withdrew before the January 7, 2025 protective-order hearing, stating on the record that continuing to represent Ms. Ulijasz would violate her ethical oath as an officer of the court (ECF 134 at 9 ¶ 40).

b) On April 29, 2025, with discovery open until June 23, the court signed the order withdrawing Will Cook of Sullivan & Cook. Ms. Ulijasz then had no attorney of record for 55 days and would not declare herself pro se. I served my discovery on May 27, 2025. There was no one to answer it.

c) At 11:08 p.m. on June 23, 2025, the last day of discovery, Ethan Scroggins of the same firm filed a notice of appearance and blanket objections to my requests. About an hour later discovery was declared closed.

d) The case moved to the 302nd District Court. At the October 31, 2025 hearing I told that court the pattern would repeat: when I pressed for the records, her counsel would move to withdraw. On Monday, November 3, 2025, the next business day, Mr. Scroggins filed his motion to withdraw. I objected on November 4 and November 10 and asked that withdrawal wait until the court-ordered financial records were produced (DF-24-18010, pleadings 109 and 111). The court signed the withdrawal order on November 18, 2025 (pleading 113). The records were not produced.

e) You then appeared pro hac vice, sponsored by Armstrong Divorce & Family Law. You are not new to this client. On July 14, 2023, in the Circuit Court of Cook County, Illinois, you represented Ms. Ulijasz in her protective-order case against her former husband, Christopher McNally (Nos. 23 OP 71958 / 23 OP 73364). At that hearing her own witness, Meritt McClayton, was asked by the judge whether Ms. Ulijasz had ever reported being physically hurt by Mr. McNally and answered, "No" (July 14, 2023 Tr. 45), and testified

she had never seen him hit her (Tr. 29). Ms. Ulijasz testified, "I have three security guards here today" (Tr. 81). I hired those guards. The Standard Force Protection Inc. Service Agreement of July 12, 2023 is in my name: two personal protection officers, one armed, for "the client's girlfriend (Gwendolyn Ulijasz) and witness (Meritt McClayton)," for $465 (ECF 135, Ex. C). I paid for them because I believed what she told me about him. Meritt McClayton is the person whose card paid for the All My Sons truck that emptied my home on April 16, 2026, with the instruction that Ms. Ulijasz's name not be associated with the job (ECF 121 at 9). The same attorney, the same client, the same witness and the same allegations, against two husbands in two states.

Six law firms have acted for her in this dispute:

1. Hargrave Family Law (Donna Tomlinson)
2. Sullivan & Cook, LLC (Will Cook; Ethan Scroggins)
3. Armstrong Divorce & Family Law
4. Beermann LLP (you)
5. Waddell Serafino Geary Rechner Jenevein, P.C. (Richard Dafoe)
6. Husch Blackwell (Gregg Sofer), for whom Jetty Partners prepared a report titled "Investigative Due Diligence: Jason E. McKemie," dated February 7, 2025 (DF-24-18010, pleading 219 at 124)

Ms. Ulijasz has never produced a complete, consecutive set of bank-issued statements for any account.

The January 2025 visit to the house followed the same script as the Cook County hearing. On January 2, 2025, she arrived at the marital residence with private security escorts (ECF 134 at 5 ¶ 22(b)). Five days later her sister testified that there were "listening devices throughout the house. I would estimate that there were dozens," and that "the former police officer that was there found that one" in a plant (ECF 134 at 9 ¶ 40). The "former police officer" was the security she had hired. The object in the plant was a soil-moisture sensor, and she is recorded on the home cameras that day explaining to her own guard what it was (ECF 134 at 10 ¶ 41). No listening device was found, because none existed. On January 9, 2025, Jetty Partners LLC invoiced her $24,227.94 for a "Close Protection Escort," a "Due Diligence Investigation" and "Forensic Device Analysis" (ECF 134 at 7). Two days earlier she had testified, "I don't have any more money," and told the state court she came to the hearing by Greyhound bus because she lacked a functional automobile (ECF 122, Ex. R-15 at 20).

ii. **23 MONTHS OF ATTORNEY GAMESMANSHIP.** Those 23 months are how I knew to call the Clerk on Thursday afternoon to find out which documents I had not been served with. They are why, days in advance, I was already arranging transportation to carry an opposition to Dallas on Friday against whatever would be filed and not served on Thursday. They are why I drafted through the night for a filing in a city three hours away, with no transportation, no funds to reach the filings, and no paper or ink to print them.

iii. **YOUR ADMISSION TO THIS CASE.** I was never served with or given notice of your application for admission (ECF 108) either. Its certificate states service on "each attorney of record," not on me. Had I known, I would have objected, as I did in the divorce court on April 2 and April 7, 2026, and I would have told this Court of the volume and extent of the stay violations and of my warning to the divorce court that your involvement would escalate them.

iv. **THIS COURT HAS ALREADY FOUND LACK OF SERVICE ON ME IN THIS CASE.** The landlord obtained relief from the stay at a March 31, 2026, hearing on a motion that was never served on me (ECF 20; ECF 43). On April 16, 2026, this Court found "lack of proper service to the Debtor" and "lack of notice," reinstated the stay, and ordered that enforcement of the writ "cease immediately" and that "no other party shall remove any of the possessions from the premises" (ECF 57 at 3). Ms. Ulijasz manufactured that eviction, and the motion that lifted the stay did not tell the Court how:

**SHE WAS THE SOLE FINANCIAL GUARANTOR.** We are both tenants on the lease, jointly and severally liable for $4,999 a month through October 31, 2025, with a $4,999 deposit whose refund is "payable to all Tenants named in this lease" (ECF 21 at 3, 4, 6, 17). The landlord approved it on her income (ECF 51 at 5 ¶ 56). The rental application reads: "Guarantor - Gwendolyn Ulijasz. . . . Gwendolyn Ulijasz income more than covers all income requirements for this home" (ECF 135, Ex. AF at 39). The lease "may not be changed except by written agreement," allows no early termination for "changes in marital status" or "loss of co-tenants," and makes a tenant who ends it early "responsible for paying until the end of the Contract" (ECF 21 at 15, 17).

**SHE TOLD ME THERE WAS NO MONEY. THERE WAS.** From about August 2024, she told me the household faced a short-term budget crunch because she had to advance business expenses, instructed me to put community and household expenses on my personal credit cards, and promised that the first installment of her $300,000 signing bonus would pay them off in November and that we would immediately resume paying every card in full each month, as we had done since January 2024. In November she told me the bonus had been pushed to mid-December, and she urged me not to take a position at AT&T paying about $250,000 a year. She said she "couldn't stand the thought of us both working W2 jobs," that she wanted us to travel internationally more and to stay together, and that we had come so far and my continued support of her career "would yield far more for our family than the AT&T job ever would" (ECF 122, Ex. R-15 ¶¶ 1A–1B at 18–19). Her own Chase statement for the period ending November 27, 2024 shows $134,199.71 in deposits, including a $106,407.03 Accenture payroll deposit on November 21, and a closing balance of $78,343.72 (Exhibit H at 1–2, GU000960–61). She later testified that Accenture paid her a signing bonus of about $150,000 (ECF 134 at 7 ¶ 29) and omitted the second $150,000 payment. She grossly overpaid her personal credit cards. Her Chase card statement billed $34,857.01 on November 15, 2024 (GU000175). The day after the bonus arrived she paid $37,571.87, more than the entire balance billed, and on December 10, the day of my surgery, another $8,947.35 (GU000181, GU000183; Exhibit H at 2). On December 22 she paid $11,905.09 on her American Express card, four days before that statement closed (Exhibit H at 12). The card statements she produced show the same overpayments in cycle after cycle (DF-24-18010, pleading 122 at 7).

**My cards were never paid.** On December 10, the day of my spinal surgery, she wrote her sister that she had **"already put up a retainer"** with a family lawyer and that she would be fine: "I have plenty of money."

That conversation continued:

Pam: "You need to just cancel that credit card. Is that the only one he has?"

Gwen Ulijasz: "Yeah. I have to wait until I get back tomorrow or he'll go nuts. They all do when I take the cookie jar away."

The card her sister meant was in my name. It was my only access to any marital assets after I had been buried in community debt. Those messages appeared on our shared MacBook Pro, where she was still signed in, while I was backing up the home-security cameras (ECF 122, Ex. R-15 ¶ 1C at 19). Two days later she reported as fraud my $5,750 attorney retainer, the $30,000 I transferred on my lawyer's advice for three months of living expenses, and my prescribed rehabilitation chair (ECF 122, Ex. R-15 ¶ 1E at 19). I had told her in writing that the retainer was mine. Her answer: "I had to cancel that and American Airlines as fraud" (Exhibit H at 4). By then she had siphoned her Chase account into accounts she has concealed, down from $78,343.72 on November 27 to $10,442.76, the balance in the screenshot she sent me that day (Exhibit H at 5). Her text on that page says I "drained the joint checking account." In 2024, about $687,092 moved through the household's accounts, and about $652,692 of it, 95 percent, went into her own account, which I could not access (DF-24-18010, pleading 234 at 9–10 ¶ 22). In the statement period ending November 27, 2024 alone, $134,199.71 came into that account. She sent $2,000 of it to the joint account and $1,500 to me (Exhibit H at 2). The joint account is the other account in her screenshot, ending 6893 (DF-24-18010, pleading 057 at 4). She has sworn that it "was funded by transfers from my own accounts" (ECF 110 at 30). I withdrew about $2,000 from it, for food and medication (ECF 122, Ex. R-15 ¶ 1E at 19). Her own screenshot from that exchange shows $2,018.80 in the joint account (Exhibit H at 5). That evening she wrote: "we really have no money jason. My next paycheck is spoken for" (Exhibit H at 7).

**SHE LEFT ME BURDENED WITH A LEASE ON WHICH SHE WAS THE SOLE FINANCIAL GUARANTOR, WITHOUT INCOME, WHILE I WAS RECOVERING FROM SPINAL SURGERY, AFTER REPORTING MY REHABILITATION EQUIPMENT PURCHASE AS FRAUD AND DISABLING MY HEALTH SAVINGS ACCOUNT CARD, FOR A HOME THAT IS 100% REIMBURSED BY HER EMPLOYER.** On December 11 I told Dallas police that false police reports and a protective order were coming (CAD 24-2241556; ECF 134 at 4 ¶ 19). Her police calls about me began three days later (ECF 144, Ex. 9 at 121). On Friday, December 13, at 1:25 p.m., she replaced my retainer with a $5,000 payment, too late for my lawyers to work before the weekend (ECF 122, Ex. R-15 ¶ 1G at 20), and texted me: "I don't have an attorney. I won't have one until Monday maybe Tuesday" (Exhibit H at 11). Her own American Express statement shows $10,195.00 to Hargrave Family Law the next day, a Saturday, and $6,089.68 to Cozy Chic Homestays, LLC, her San Antonio rental, on December 17 (Exhibit H at 12–13, GU000379–80). Hargrave filed her annulment petition at 12:01 p.m. on Monday, December 16 (DF-24-18010, pleading 001 at 1–2). At 9:31 p.m. on December 17 she signed the lease, in her name

alone, on a furnished San Antonio rental at $3,800 a month. The next day she applied for the protective order and cut off my HSA card (ECF 134 at 13). The divorce court denied the protective order in full on January 7, 2025 (ECF 55 at 68). At that hearing she said she could not afford more than the San Antonio rent and told the court: "I don't have any more money" (ECF 122, Ex. R-15 ¶ 2 at 20; ECF 134 at 7 ¶ 29). Her employer reimburses that rent in full, as she told me (ECF 122, Ex. R-15 ¶ 2 at 20). She has produced no reimbursement record, and the bank statements she produced in the divorce show no San Antonio rent payment at all (DF-24-18010, pleading 134 at 8). She has lived rent-free since January 2025 while I was left with the Dallas rent and the costs of the marital estate.

**THE DEBT STAYED WITH ME.** On June 16, 2026, five months into this case, she moved the divorce court to sign her proposed decree (DF-24-18010, pleading 221 at 1). As signed on June 26, 2026, it assigned every card in my name to me alone and ordered me to pay half of three more debts, recited at $75,000, within 30 days, with indemnity (DF-24-18010, pleading 229 at 6–7). That is a violation of the automatic stay, 11 U.S.C. § 362(a)(1), (3) and (6). The divorce court vacated those sections on September 18, 2026 (DF-24-18010, pleading 254).

**THE SECRET RELEASE.** On July 15, 2025 her divorce lawyer, Ethan Scroggins of Sullivan & Cook, sent the landlord's agent two letters. One called my unpaid rent "targeting Gwen's financial health," told the landlord that she "has contacted the police department regarding Jason's behavior," and said there was "sufficient justification for early termination of the lease." The other said the eviction suit "was not properly served on Gwen" and that this was "fatal," offered "Gwen's waiver of the security deposit" for access to the house, asked that she "be fully released from the current eviction suit," and stated that it was "only sent on Gwen's behalf" (ECF 55 at 37–38). The deposit was not hers to give.

Seven days later, on July 22, 2025, she signed a Mutual Release and Private Settlement Agreement with Skweres Properties, LLC that names her "Tenant" and me "co-tenant" (ECF 110 at 45–47). I did not sign it, was not asked, and was not told its terms. Paragraph 1 releases her from "any and all claims" under the lease "For the consideration stated below and other good and valuable consideration." The agreement does not say what the other consideration was. In paragraph 3 she "surrenders any interest she may have in that certain security deposit held under the Lease," and the landlord need not "provide any itemization of deductions." Paragraph 4 dismisses the eviction "only as it pertains to Gwen (continuing against Jason) with prejudice." Paragraph 6 states that "the terms of this Agreement are confidential and not to be publicly disclosed to any other parties."

On that date both tenants were liable for the rent through October 31, 2025: five months, $24,995. The landlord released the tenant who had the income. A $4,999 deposit he already held does not explain that release. The lease "may not be changed except by written agreement" (ECF 21 at 17). I am a tenant on that lease, and I signed nothing. I have charged under oath that the deposit was a bribe, offered to induce the landlord to join a call and hear her further proposal (ECF 122, Ex. R-15 ¶ 2 at 21). What else she paid or promised the landlord has never been disclosed: the landlord's ledger filed in this Court gives no credit for the deposit (ECF 21 at 20), the bank records the landlord produced in the eviction case contain

no more than two pages of any monthly statement and skip whole months, and she has produced nothing. My position is that the July 22 agreement disposed of community property in secret while the divorce was pending, and that the deposit was not all she gave.

**DEMAND.** A motion is forthcoming seeking every communication from June 1, 2025 to the present between Ms. Ulijasz, or anyone acting for her, and Skweres Properties, LLC, Travis Skweres, Jacqueline Skweres, Claudia Patricia Prieto, or Girling Law, PLLC; every draft of the July 22, 2025 agreement; and a statement signed by Ms. Ulijasz under penalty of perjury of everything of value she or anyone on her behalf paid, gave or promised to any of them, with the date, amount, account and method of each, including the "other good and valuable consideration" recited in paragraph 1.

**SHE DENIED THE LEASE UNDER OATH.** On October 31, 2025 I asked the divorce court to reimburse the rent. She testified that she "was never on th[e] lease" and "had nothing to do with it." When I said I could produce the lease, Mr. Scroggins, who negotiated the release, told the court that a buyout had been executed months earlier. That was the first I heard of it (ECF 51 at 5 ¶¶ 54–60; ECF 134 at 14 ¶ 56). She is a named tenant on the lease and in its signature block (ECF 21 at 3, 19). The landlord's own bank statement shows that she paid the January 2025 rent and its late fee herself: $5,000 by Zelle on January 5, 2025, marked "Jan Rent," and $600 on January 7, 2025, marked "Late Fee for Jan Rent" (landlord's production, JPC-25-12755-51). In this Court she swears the lease is "[t]he one obligation on which both of our names appeared" (ECF 110 at 31 ¶ 12). Her October 31 testimony is aggravated perjury. Tex. Penal Code §§ 37.02, 37.03.

**WHAT THE LANDLORD THEN TOLD THIS COURT.** The landlord's motion, filed January 21, 2026 with a sworn affidavit, calls her the "Co-Debtor," alleges that "the Debtor and Co-Debtor remain in possession," claims $39,992 in unpaid rent from both of us, and certifies service on her at the residence she left in December 2024 (ECF 20 at 2–5; ECF 21 at 2). Six months earlier the same landlord had released her from every claim under the lease and told the Justice Court that she had "previously surrendered possession" (ECF 110 at 45–47, 50). Neither paper mentions the release. That is the motion that was never served on me, and on it the stay was lifted (ECF 43).

**THE DAY BEFORE THE WRIT.** On April 15, 2026 at 11:07 a.m. the landlord's principal, the man who swore that affidavit, emailed her at her Accenture address: "We have the writ of possession and will be moving Jason out tomorrow morning at 9:30am. . . . Do not notify him or give any advanced indication" (ECF 110, Ex. 2-B at 48). I found the constable's final warning late that night (ECF 55 at 8). I drafted through the night, and when the constables came I went to this Court. Within minutes her security and her movers were in my home (item 8).

**MAY 22, 2026.** She did it again, through her lawyers and the people she paid. An attorney from Armstrong Divorce & Family Law was at my home, was told of the automatic stay and the mutual injunctions, and went ahead. You refused in writing the preservation demand that you had twice made of me (item 8(b); Exhibit E).

Everything I need to live, work, provide for myself and litigate, and everything I loved and cared about, was taken or destroyed. She did all of it despite:

a) the January 7, 2025 temporary orders, which denied her protective order and awarded me "the exclusive use and possession of the marital residence"; she had three approved access periods, about sixteen hours in all, and brought five people to the last (DF-24-18010, Associate Judge's Report of Jan. 7, 2025; ECF 134 at 26–27 ¶ 15);

b) the mutual injunctions entered the same day on her own application, which bar "destroying, removing, concealing, encumbering, transferring" the parties' property and "in any other manner alienating any of the property of one or both of the parties . . . whether separate or community property," and the court's denial of her request to bar me from "[e]xcluding Petitioner from the use and enjoyment of the residence" (*id.*, granting items 6 and 11 and denying item 31 of her Dec. 20, 2024 amended application);

c) the Dallas County Standing Orders, which the same ruling kept "in full force and effect";

d) at least three denials by the divorce court of her later requests to return to the property, including on January 20, 2026, after the theft, the destruction of property and the false police narrative that followed her earlier visits;

e) her own concealed nonsuit agreement with the landlord, in which she surrendered "any right to possession" and agreed that she "shall not enter nor make any claim to enter the Premises" until I had vacated or the divorce judge allowed her entry, which that court denied, and then only to "recover her property" (ECF 55 at 11–12; ECF 110, Ex. 2);

f) the automatic stay, 11 U.S.C. § 362(a)(3), which has never been lifted as to her; and

g) this Court's April 16, 2026 order (ECF 57 at 3), which she defied that day: told by the constable to stop and unload, she drove off with my property (ECF 122, Ex. R-15 ¶ 5B at 23).

v. ECF 138, which re-files ECF 121 with my original signature, sets out the rest: the state-court ruling vacating the June 26, 2026 property division entered in violation of the automatic stay, and the stay violations of record.

None of this is a one-off. Each act serves the purpose stated at the top of this response. A one-day deadline with service a day late is how that purpose is carried out on paper.

g. **FORTHCOMING MOTIONS.** Requests and demands to your side have never been met with good faith, and I am not relying on this one. I am filing a motion asking the Court to order every attorney and firm appearing for Ms. Ulijasz (Beermann LLP; Armstrong Divorce & Family Law; Waddell Serafino Geary Rechner Jenevein, P.C.; and any firm added later) to:

i. email me every filing the day it is filed, at jmckemie@mckemie.net, as the Court ordered for its own order in ECF 57;

ii. state in each certificate of service the actual date, time, method and sender;

iii. give me written notice before filing any request to shorten my time or for expedited relief, and state my position in it;

iv. copy me on everything sent to chambers or the courtroom deputy, including your report on this conferral, when it is sent;

v. produce the items in 7(e) and file corrected certificates of service on ECF 141, 142 and 143; and

vi. pay my costs of responding: the $131.10 PACER payment, my overnight delivery fees, and my transportation costs to file in Dallas on November 13.

The motion also asks that I be permitted to file electronically in this case, given the logistical and financial burden of filing on paper against three firms. Fed. R. Bankr. P. 5005(a)(3)(B)(i).

h. **SANCTIONS REQUEST.** The motion asks for sanctions against Ms. Ulijasz and her counsel and for all other relief available against them: relief under 11 U.S.C. § 105(a) and the Court's inherent power, including my costs in item 7(g)(vi); an order on the Court's own initiative under Fed. R. Bankr. P. 9011(c)(3) directing you to show cause why the certificates of service and of conference on ECF 141, 142 and 143 do not violate Rule 9011(b)(3); discipline under L.B.R. 2090-2(b) and 2090-3(c); and revocation of the pro hac vice admission granted in ECF 115. A separate motion for sanctions under Rule 9011(c)(2) will be served on you under Rule 7004 and filed if those certificates are not withdrawn or corrected within 21 days after service.

i. **YOUR RESPONSE TO THIS DEMAND, OR YOUR SILENCE, GOES TO THE COURT.** Shortening my time and then serving me a day late obstructs my ability to be heard. I state this here so the Court knows what it takes for me to be heard in this case. Item 7 is part of my conferral response. Do not remove it from what you send to chambers. This conferral does not waive my service, notice or response-time objections.

8. **RETURN OF MY STOLEN PROPERTY, COMPUTERS AND LITIGATION HARD DRIVES.**



a. **THE THEFT.** On April 16, 2026, three months after my January 12, 2026 petition, Ms. Ulijasz stole my computer and my professional and litigation hard drives from my residence, about seventy terabytes of data (ECF 133 at 4). I left for this Court at about 2:37 p.m. Within two minutes of my departure her hired agents entered through the garage and disabled my fifteen-camera security system. Minutes later Ms. Ulijasz arrived by Uber, with luggage. A camera on a separate account that she did not know about recorded her at about 2:57 p.m. saying that I was at the courthouse and might be back, and then: "I just need to grab more of this evidence." The remaining cameras and the internet went down at about 3:23 p.m. (ECF 122, Ex. R-15 ¶ 5A at 22; ECF 134 at 5 ¶ 22(d), 17 ¶ 71). Her private security carried the computer and drives out. A Dallas County Precinct 5 deputy constable said it on body camera: "Her security guy just left with that computer, did she approve

that?" and "those hard drives" (ECF 135, Ex. I, Axon Video 2 at 00:02:04). This Court directed that the taking stop, and at 6:36 p.m. ordered in writing that "no other party shall remove any of the possessions from the premises" (ECF 57 at 3). When the Court's direction was relayed, the movers stopped. The constable ordered her to stop and unload what she had put in her vehicle. She got in and fled with my property (ECF 121 at 9; ECF 122, Ex. R-15 ¶ 5B at 23). I did not consent. Nothing has been returned.

I came back to my belongings smashed, stuffed into trash bags and mixed with trash and food. My cameras had been ripped from their mounts. I found my MacBook Pro in a discarded pizza box inside a trash bag (ECF 122, Ex. R-15 ¶ 5E at 23; ECF 135, Ex. N at 34 ¶¶ 12–13). She took the rest as well, down to my furniture, family heirlooms, childhood photographs, televisions, monitors, printers, recording-studio equipment, tools, suits and clothing, medications, passport, tax records, trial binders and printer paper (ECF 134 at 26 ¶ 13).

b. **MAY 22, 2026.** She did it again, through her lawyers and the people she paid. She was not there. An attorney from Armstrong Divorce & Family Law was. I told that attorney of the automatic stay, the mutual injunctions and the divorce court's denials of her client's access. She asked whether I had a paper copy. I told her that my printer had been stolen on April 16 and that I was in the middle of an eviction. She answered that she then did not know what I was talking about. A neighbor with a truck had agreed to hold my toolboxes and 3D printer. She ordered them taken back out of the truck and threatened legal action. That is how I lost my tools of trade. Two men Ms. Ulijasz paid $500 an hour each inventoried what I carried out of my own home and nothing that was taken from me. Everything else I owned was loaded into a 26-foot truck with no inventory, and I later tracked my property to her San Antonio rental (ECF 134 at 14 ¶ 57, 26 ¶ 15; ECF 138 at 12 ¶ 18; ECF 122, Ex. R-15 ¶¶ 5H–5J at 24; DF-24-18010, pleading 218 at 8–9 and pleading 231 at 4–5).

**YOUR OWN EMAILS.** You demanded on April 23, and again at 1:25 p.m. on May 22, that I safeguard property you called hers: "Whatever the status of the writ, the safekeeping of Gwen's separate property remains your responsibility." At 5:07 p.m. on May 22 I sent you the same demand for mine: preserve it, inventory it, and tell me where it was taken and who is holding it. At 5:18 p.m. you answered: "Received, in triplicate." "Petitioner is not the cause of that." "Neither is accepted." You gave no inventory, no location and no confirmation that anything would be preserved (Exhibit E; ECF 122, Ex. R-15 ¶ 5I at 24).

The April 16 and May 22 takings are theft. Tex. Penal Code § 31.03(a). They are willful violations of the automatic stay, and the April 16 taking violated this Court's order. 11 U.S.C. § 362(a)(3), (k)(1); ECF 57. The drives are evidence in this case and hold my financial records. Taking and withholding them is the concealment and withholding of estate property and of recorded information about a debtor's property and financial affairs in a title 11 case. 18 U.S.C. §§ 152(1), (8), (9) and 1519.

c. **WHAT THEY ARE.** My largest drives are my separate property. They predate the marriage and our meeting. They hold the music I have created over my whole life, decades of my work files, network diagrams, hospital schematics, contact databases, financial records, irreplaceable family photographs I scanned by hand, and 17 months of litigation work and evidence, including what I need to answer ECF 110. They are my work product and my tools of trade. They cannot be replaced

with money. Ms. Ulijasz has held them since April 16 while I answer her motion without my own files.

d. **EVERYTHING I OWNED IS GONE.**

**WHAT MS. ULIJASZ STOLE AND DESTROYED WAS PROPERTY OF THE BANKRUPTCY ESTATE.**

It was the contents of a full 3,200-square-foot home, taken and destroyed by her and the people she hired after my January 12, 2026 petition. That is theft, Tex. Penal Code § 31.03(a), a state jail felony as to my firearms, § 31.03(e)(4)(C); criminal mischief, § 28.03(a)(1); and a violation of the automatic stay, 11 U.S.C. § 362(a)(3). What I came away with fits in my mother's ten photographs: a few shoes, one small toolbox, some clothes, a backpack and a MacBook Pro with a cracked screen (Exhibit F ¶¶ 9, 17–21). This is worse than a fire. After a fire you can go through the ashes and see what you had. She loaded my home into a 26-foot truck with no inventory (ECF 138 at 12 ¶ 18). A week later a San Antonio police officer at her residence recorded that she was going through my belongings and throwing them away, with bags of them going into a pickup truck "to be taken to the dump" (Exhibit G, SAPD Report SAPD26108224, May 29, 2026; DF-24-18010, pleading 231 at 8). She told the police two stories in two days: on May 27 that I drove to San Antonio and left bags on her lawn, and on May 29 that my belongings were shipped to her (Exhibit G; ECF 144, Ex. 9 at 121). They rode in her truck. That is a false report to a peace officer, Tex. Penal Code § 37.08. I am presently inventorying what was in the home. She is to account for all of it and return it, replace it or pay for it. At a minimum, any hearing should be conditional on the prior return of what I need to litigate: my computers and the 70 terabytes of hard drives that hold my litigation evidence, my proof of marital contributions, my life's professional work, all the music I have ever created, and irreplaceable family photographs and videos that took years to archive (ECF 133 at 4; ECF 134 at 26 ¶ 12).

e. **THE DEMAND. MS. ULIJASZ IS TO:**

i. return all of my computers, network attached storage devices, networking equipment, backup power supplies, monitors, printers, paper, ink and toner, binders and every hard drive to me, intact, by 5:00 p.m. Central on Friday, November 20, 2026, at her expense, by a delivery method I confirm in writing;

ii. until they are in my hands, keep them sealed and allow no access to, use, copying, imaging, inspection, testing or review of them or anything on them by herself, her counsel, her security, any expert or vendor, or anyone acting for her, and make no use of anything taken from them;

iii. by 5:00 p.m. Central on Tuesday, November 17, 2026, state in writing where each device and each firearm is, every person who has had possession of it since April 16, 2026, and every access, copy or image made of any device;

iv. by 5:00 p.m. Central on Friday, November 20, 2026, deliver a written inventory of everything else stolen from my residence on April 16 and May 22, 2026, stating where each item is and who holds it, and listing everything she has thrown away, given away, donated, sold or

handed to the police, with the date and the name of whoever hauled it; and return all of it to me at her expense; and

v. replace, or pay me the cost of replacing, every item she does not return intact.

f. **WHAT I AM FILING.** The return of my property is part of my motion to enforce the automatic stay (item 5). The motion asks the Court to hear the return of my computers and drives on an expedited basis, before ECF 110; to order their return; to bar any use of them or their contents; to hold Ms. Ulijasz in civil contempt of the April 16 order; to award actual and punitive damages under 11 U.S.C. § 362(k)(1); and to report these facts to the United States Attorney under 18 U.S.C. § 3057(a). State by November 17 whether she will return them. Her answer, or her silence, goes to the Court. Item 8 is part of my conferral response. Do not remove it from what you send to chambers.

# APRIL 9, 2026


















## APRIL 16, 2026















## MAY 22, 2026 WHEN ARMSTRONG DIVORCE AND FAMILY LAW WAS PRESENT



Emailed Monday, November 17 , 2026:



**Jason Emory McKemie**
Debtor, pro se
539 W. Commerce St., #2010, Dallas, Texas 75208
(214) 519-8958 | jmckemie@mckemie.net

# CERTIFICATE OF SERVICE

I certify that on **November 24, 2026**, a true copy of this Notice and the proposed order was served by email on counsel for Movant Gwendolyn Laura Ulijasz:

- Jonathan D. Steele (jsteele@beermannlaw.com), Beermann LLP (Chicago)
- Sara Boucher (saboucher@beermannlaw.com), Beermann LLP (Chicago)
- Rosa Gutierrez (rgutierrez@beermannlaw.com), Beermann LLP (Chicago)
- Richard G. Dafoe (rdafoe@wslawpc.com), Waddell Serafino Geary Rechner Jenevein, P.C. (Dallas)
- Rebecca L. Armstrong (rebecca@armstronglawtexas.com), Armstrong Divorce & Family Law, PLLC (Dallas)
- Lauren Shaw (lauren@armstronglawtexas.com), Armstrong Divorce & Family Law, PLLC (Dallas)
- Terra Aguirre (terra@armstronglawtexas.com), Armstrong Divorce & Family Law, PLLC (Dallas)

and on:

- Areya Holder Aurzada, Chapter 7 Trustee (areya@holderlawpc.com)
- Office of the United States Trustee (ustpregion06.da.ecf@usdoj.gov)

On the same date a copy was emailed to the courtroom deputy (mvl_settings@txnb.uscourts.gov), and the ink-signed original were mailed on Tuesday, November 24th, 2026, by US Mail to the Clerk, United States Bankruptcy Court, Northern District of Texas, 1100 Commerce Street, Room 1254, Dallas, Texas 75242.

**Jason Emory McKemie**