# INDEX TO PHOTOGRAPHS, EMAILS AND EXHIBITS

Page numbers are the numbers at the bottom of each page.


**Photographs** Before (April 9, 2026); April 16, 2026; May 22, 2026. See item 8. .......... 19-21

**Emails** Mr. Steele's November 14, 2026 conferral request and the November 13, 2026 emails that preceded it. See item 7(e). .......... 23-26

**Exhibit A** PACER payment confirmation, November 12, 2026, 4:44 p.m. Central. Cited in item 7(c). .......... 27-28

**Exhibit B** Debtor's November 10 and November 11, 2026 emails to Mr. Steele. Cited in items 7(a) and 7(b). .......... 29-31

**Exhibit C** Debtor's Statement of Positions, emailed to Mr. Steele on November 11, 2026 at 12:39 p.m. Central. Cited on page 1 and in item 7(b). .......... 32-35

**Exhibit D** Mr. Steele's November 11, 2026, 1:42 p.m. written commitment to attach the Statement of Positions in full. Cited on page 1 and in item 7(b). .......... 36

**Exhibit E** Mr. Steele's April 23 and May 22, 2026 emails demanding that the Debtor safeguard Ms. Ulijasz's property. Cited in items 7(f) and 8(b). .......... 37-38

**Exhibit F** Declaration of Lynn McKemie, July 3, 2026, with ten photographs. Cited in item 8(d). .......... 39-45

**Exhibit G** San Antonio Police Department dash-camera frames of May 29, 2026; summary of Ms. Ulijasz's police reports, December 2024 through May 2026; and reports SAPD26108224 (May 29, 2026) and SAPD26106749 (May 27, 2026). Cited in item 8(d). .......... 46-51

**Exhibit H** Ms. Ulijasz's Chase statement for the period ending November 27, 2024 (GU000960–61); the parties' text messages of December 12 and 13, 2024; and her American Express statement closing December 26, 2024 (GU000379–80). Cited in item 7(f)(iv). .......... 52-64

# MR. STEELE'S CONFERRAL REQUEST AND THE EMAILS THAT PRECEDED IT

**From:** Jonathan Steele <jsteele@beermannlaw.com>
**Subject: In re McKemie, 26-30161-mvl7: conferral on reset hearing for ECF 110**
**Date:** November 14, 2026 at 6:26:20 PM CST
To: "jmckemie@mckemie.net" <jmckemie@mckemie.net>
Cc: rdafoe <rdafoe@wslawpc.com>, "Sara A. Boucher" <saboucher@beermannlaw.com>, "areya@holderlawpc.com" <areya@holderlawpc.com>, "lmartinez@qslwm.com" <lmartinez@qslwm.com>

Hi Mr. McKemie,

Per the Court's November 13 email, the parties are to confer on the timing of a reset hearing on Ms. Ulijasz's motion for relief from stay (ECF 110) and your pending motions, along with a time estimate.

We are available for an in-person hearing on Tuesday, December 1, Tuesday, December 8, or Friday, December 18. We estimate 90 minutes for all matters.

Please let us know by Wednesday, November 18 which of these dates work for you, or propose alternatives, along with your time estimate, so we can report back to chambers.

Jonathan

Jonathan Steele | Divorce and Family Law Partner
161 N Clark St., Suite 3000 | Chicago, IL 60601
Tel: 312.621.9700 | Fax: 312.621.0909

2275 Half Day Rd., Suite 350 | Bannockburn, IL 60015
Tel: 847.681.9600 | Fax: 847.681.0909
jsteele@beermannlaw.com | www.beermannlaw.com

BEERMANN

---

**From:** Jason McKemie <jason@deaddrop.ai>
**Subject: Re: Case No. 26-30161-mvl7: Debtor's Response with Statement of Position Regarding Movant's Forthcoming Motion to Appear Remotely**
**Date:** November 13, 2026 at 7:24:10 PM CST
To: Richard Dafoe <rdafoe@wslawpc.com>
Cc: "Sara A. Boucher" <saboucher@beermannlaw.com>, Jason McKemie <jmckemie@mckemie.net>, Jason McKemie <jason@callvital.com>, Rosa Gutierrez <rgutierrez@beermannlaw.com>, areya@holderlawpc.com, trustee@holderlawpc.com, ustpregion06.da.ecf@usdoj.gov, mvl_settings@txnb.uscourts.gov, Jonathan Steele JSteele@beermannlaw.com

Mr. Dafoe:

That is not an answer to either question.

I asked for one of two things: the sent email, or proof of mailing.

An outage explains why a message did not arrive. It does not erase a sent-items record, a postage receipt, or a tracking number. If ECF 141, 142 and 143 were emailed to me on November 12, that sent record exists and can be forwarded in under a minute. If they were mailed, the postage record exists. Produce either one.

Second, Mr. Steele's certificates state service "by first-class United States mail." Microsoft does not carry the United States mail. Whatever happened to Exchange Online on November 12 has no bearing on that representation, and it remains unsupported.

Third, you are not the certifying party. Mr. Steele signed those three certificates, and his office is in Illinois, more than 900 miles from yours. Your email nonetheless describes how and when service from his office was accomplished. State the basis for that.

Were you present in his office on November 12?

Did you transmit the filings yourself?

Or are you relaying what someone else told you, and if so, who told you, and what did they say?

A certificate of service is a representation to the Court about what the signer did. It is not substantiated by counsel at a different firm in another state describing events he was not present to observe.

As to the outage itself: Microsoft opened Exchange Online incident EX1550543 at 11:17 a.m. Eastern on November 12 and the broader Microsoft 365 incident MO1550821 that afternoon. Microsoft reported mail DELAYED and queued, not lost, drained the queue, and extended its delivery timeout window. DELAY is precisely my point. I received these three filings on November 13, not November 12. Your email confirms my position rather than answering it.

For the record, other correspondence from your office and from Beermann reached me on the same days without difficulty. The only three transmissions that did not arrive are the three that frame the relief now set for hearing. I am not asking you to explain that. **I am asking you to produce the proof of service that was certified.**

**The date matters.**

**ECF 142 asked the Court to shorten my time to respond.** The certificates on ECF 141, 142 and 143 tell the Court that my time began on November 12. **It began on November 13.**

Nothing I file in response waives this objection, and I reserve the right to seek relief on those certificates, including under Fed. R. Bankr. P. 9011.

So the questions stand:

- The sent email, if sent.
- The postage or tracking record, and who mailed it, when, and from where, if mailed.
- If neither was done on November 12, say so.

Jason Emory McKemie
Debtor, pro se
(214) 519-8958

---

**From:** Richard Dafoe <rdafoe@wslawpc.com>
**Subject: RE: Case No. 26-30161-mvl7: Debtor's Response with Statement of Position Regarding Movant's Forthcoming Motion to Appear Remotely**
Date: **November 13, 2026 at 4:47:00 PM CST**
To: Jason McKemie <jason@deaddrop.ai>, "Sara A. Boucher" <saboucher@beermannlaw.com>
Cc: Jason McKemie <jmckemie@mckemie.net>, Jason McKemie <jason@callvital.com>, Rosa Gutierrez <rgutierrez@beermannlaw.com>, "areya@holderlawpc.com" <areya@holderlawpc.com>, "trustee@holderlawpc.com" <trustee@holderlawpc.com>, "ustpregion06.da.ecf@usdoj.gov"

<ustpregion06.da.ecf@usdoj.gov>, "mvl_settings@txnb.uscourts.gov" <mvl_settings@txnb.uscourts.gov>, Jonathan Steele JSteele@beermannlaw.com

On November 12, 2026, there was a widespread outage involving Microsoft products online that intruded on the work lives of offices nationwide Thursday and Friday, including a lack of email access and delays by users and delays in deliveries of emails. That explains why you did not received emails sent by our office on Nov. 12 until Nov. 13.

**Richard G. Dafoe**
Waddell Serafino Geary Rechner Jenevein, P.C.
1717 Main Street, 25TH Floor
Dallas, TX 75201
rdafoe@wslawpc.com
Direct: 214-979-7427
Main: 214-979-7400
Fax: 214-979-7402

---

**From:** Jason McKemie <jason@deaddrop.ai>
**Subject: Re: Case No. 26-30161-mvl7: Debtor's Response with Statement of Position Regarding Movant's Forthcoming Motion to Appear Remotely**
**Date: November 13, 2026 at 3:54:36 PM CST**
To: "Sara A. Boucher" <saboucher@beermannlaw.com>
Cc: Jason McKemie <jmckemie@mckemie.net>, Jason McKemie <jason@callviral.com>, Rosa Gutierrez <rgutierrez@beermannlaw.com>, rdafoe <rdafoe@wslawpc.com>, areya@holderlawpc.com, trustee@holderlawpc.com, ustpregion06.da.ecf@usdoj.gov, mvl_settings@txnb.uscourts.gov, Jonathan Steele JSteele@beermannlaw.com

Mr. Steele, Mr. Dafoe, Ms. Boucher:

On November 11, 2026, Mr. Dafoe emailed me Movant's witness list and exhibit list.

On November 12, 2026, Movant filed ECF 141, 142 and 143. I received no email of those three filings that day. Your first email of them is dated November 13, 2026.

Mr. Steele's certificate of service on each of the three states that I was served on November 12 "by email" and "by first-class United States mail."

Please state by 5:00 p.m. Central today how ECF 141, 142 and 143 were served on me on November 12, 2026:

1) By email? If so, send me the sent email.

2) By mail? If so, send me proof of mailing: the postage or tracking record, and who mailed it, when, and from where.

If neither was done on November 12, say so.

Jason Emory McKemie
Debtor, pro se
(214) 519-8958

---

**From:** "Sara A. Boucher" <saboucher@beermannlaw.com>
**Subject: RE: Case No. 26-30161-mvl7: Debtor's Response with Statement of Position Regarding Movant's Forthcoming Motion to Appear Remotely**
**Date:** November 13, 2026 at 9:45:03 AM CST
To: Jason McKemie <jmckemie@mckemie.net>, Jason McKemie <jason@callvital.com>
Cc: Rosa Gutierrez <rgutierrez@beermannlaw.com>, rdafoe <rdafoe@wslawpc.com>, "areya@holderlawpc.com" <areya@holderlawpc.com>, "trustee@holderlawpc.com" <trustee@holderlawpc.com>, "ustpregion06.da.ecf@usdoj.gov" <ustpregion06.da.ecf@usdoj.gov>, "mvl_settings@txnb.uscourts.gov" <mvl_settings@txnb.uscourts.gov>, Jonathan Steele jsteele@beermannlaw.com

Mr. McKemie:

Attached please find the following:

1) Movant Gwendolyn Ulijasz's Motion for Leave to Give Any Testimony at the NOvember 18, 2016 Hearing by Webex Videoconference.

2) Movant Gwendolyn Ulijasz's Application for Order Shortening Time and Request for Expedited Consideration of Her Webex Motion.

3) Movant Gwenolyn Ulijasz's Response to the Debtor's Motion to Compel her In-Person Appearance and Testimony and to the Debtor's Motion for Expedited Consideration and proposed Order regarding the same.

Should you have any questions or concerns, please do not hesitate to contact our office.

**Sara A. Boucher (she/her)** | Paralegal
161 N Clark St., Suite 3000 | Chicago, IL 60601
Tel: 312.621.9700 | Fax: 312.621.0909

2275 Half Day Rd., Suite 350 | Bannockburn, IL 60015
Tel: 847.681.9600 | Fax: 847.681.0909
saboucher@beermannlaw.com | www.beermannlaw.com

BEERMANN

**CONFIDENTIAL E-MAIL** This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system.

2026-11-12 (GU) Application for...

2026-11-12 (GU) Response to...

2026-11-12 (GU) Proposed Ord...

2026-11-12 (GU) Motion for Lea...

# EXHIBIT A

## PACER PAYMENT CONFIRMATION, NOVEMBER 12, 2026, 4:44 P.M. CENTRAL

Email received by the Debtor from the PACER Service Center. Account, tracking, approval and card numbers are redacted.

---

do_not_reply@psc.uscourts.gov
PACER Payment Confirmation
To:
Reply-To:

Your payment has been successfully processed. The details are below.

Account Number: [redacted]
Amount: $131.10
Tracking Id: [redacted]
Approval Code: [redacted]
Masked Number: [redacted]
Date/Time: 11/12/2026 05:44:14 ET

NOTE: Please do not reply to this message. This is an automated message sent from an unmonitored mailbox. If you have questions or comments, please email them to pacer@psc.uscourts.gov or call the PACER Service Center at (800) 676-6856 between 7 AM and 6 PM CT Monday through Friday.

PACER
Public Access to Court Electronic Records

# *Invoice*

Invoice Date: 10/06/2026
Usage From: 07/01/2026 to: 09/30/2026

## Account Summary

| | |
|---|---|
| ***Pages:*** | 320 |
| Rate: | $0.10 |
| Subtotal: | $32.00 |
| ***Audio Files:*** | 0 |
| Rate: | $2.40 |
| Subtotal: | $0.00 |
| ***Current Billed Usage:*** | $32.00 |
| ***Previous Balance:*** | $99.10 |
| Current Balance: | **$131.10** |

***Total Amount Due:*** $131.10

| | |
|---|---|
| **Account #:** | [redacted] |
| **Invoice #:** | [redacted] |
| **Due Date:** | 11/10/2026 |
| **Amount Due:** | $131.10 |

### Contact Us

San Antonio: (210) 301-6440
Toll Free: (800) 676-6856
Hours: 7 am - 6 pm CT M-F
pacer@psc.uscourts.gov

See pacer.uscourts.gov/billing for instructions on disputing charges, FAQs about the billing process, and more.

To view detailed billing transactions, visit the Manage My Account section of the PACER Service Center website at pacer.uscourts.gov.

The PACER Federal Tax ID is: 74-2747938

Questions about the statement? Visit pacer.uscourts.gov/billing.

### REMINDER: Updated Password Requirements

**If your password needs to be updated, you will be prompted when you log in. You can skip the prompt up to three times. After that, your account will be locked until you change your password.**

**Your new password must be 14-45 characters long, may not include your name, username, or email address, and may not repeat the same character three times in a row. Your password must be updated every 180 days. This requirement will help reduce the risk of extended use of compromised passwords.**

**Make sure you know your security questions and answers and have access to the email address associated with your PACER account. If you share an account with teammates, coordinate with them to avoid an account lockout. If you use third-party software with PACER, check whether any updates are needed.**

*Please detach the coupon below and return with your payment.* ***Thank you!***

PACER
Public Access to Court Electronic Records

| Account # | Due Date | Amount Due |
|---|---|---|
| [redacted] | 11/10/2026 | $131.10 |

Do not send cash. Make checks or money orders drawn on a U.S. Bank in U.S. dollars payable to: PACER Service Center. Include your account ID on the check or money order.

*Visit pacer.uscourts.gov for address changes.*

Jason Emory McKemie
539 W Commerce St
2010
Dallas, TX 75208

U.S. Courts: PACER
P.O. Box 5208
Portland, OR 97208-5208

# EXHIBIT B

## DEBTOR'S NOVEMBER 10 AND NOVEMBER 11, 2026 EMAILS TO MR. STEELE

The Debtor's November 11, 2026 email transmitting his Statement of Positions, with his November 10 email and Mr. Steele's November 10 email quoted below it, as sent.

---

**From:** Jason McKemie <jmckemie@mckemie.net>

**Subject:** Re: Case No. 26-30161-mvl7: Debtor's Response with Statement of Position Regarding Movant's Forthcoming Motion to Appear Remotely

**Date:** November 11, 2026 at 12:39:02 PM CST

**To:** Jonathan Steele <JSteele@beermannlaw.com>

**Cc:** saboucher@beermannlaw.com, rgutierrez@beermannlaw.com, rdafoe@wslawpc.com, rebecca@armstronglawtexas.com, terra@armstronglawtexas.com, lauren@armstronglawtexas.com, areya@holderlawpc.com, trustee@holderlawpc.com, ustpregion06.da.ecf@usdoj.gov, mvl_settings@txnb.uscourts.gov

**Attachment: McKemie Statement of Position - Nov 18 Hearing V3.pdf**

Mr. Steele:

Attached is the Debtor's Statement of Positions on the Movant's anticipated WebEx motion and the November 18, 2026 evidentiary hearing on ECF 110 and ECF 97. It responds to your conferral request of November 10, 2026, 11:24 a.m., and replaces my email response of November 10, 2026. Please attach the Statement, in full, to the WebEx motion and to your response to the Debtor's Motion to Compel, and report each position in your certificate of conference. Please state in writing by 9:00 a.m. Central on Thursday, November 12, 2026 whether the Movant AGREES or DOES NOT AGREE to items 6, 7, 8, 9, and 10.

Please serve both filings on me by email when filed. Both sides have asked that the WebEx motion be decided together with the Debtor's Motion to Compel on or before Monday, November 16, 2026. The courtroom deputy is copied for that reason. The ink-signed original of this Statement will follow to the Clerk in Thursday's overnight delivery.

PLEASE ATTACH THE ATTACHED STATEMENT, IN FULL, TO THE FORTHCOMING WEBEX MOTION AND TO THE RESPONSE TO THE DEBTOR'S MOTION TO COMPEL, AND TO REPORT EACH POSITION BELOW IN THE CERTIFICATE OF CONFERENCE.

Jason Emory McKemie, Debtor, pro se
539 W. Commerce St., #2010, Dallas, Texas 75208
(214) 519-8958
jmckemie@mckemie.net

---

On Nov 10, 2026, at 8:56 PM, Jason McKemie <jmckemie@mckemie.net> wrote:

Mr. Steele:

This responds to your email of November 10, 2026, 11:24 a.m.

(a) WebEx motion. **OPPOSED.**

The Debtor opposes any request that Ms. Ulijasz give testimony by WebEx or other remote means at the November 18, 2026 evidentiary hearing. The grounds are stated in the Debtor's Opposition to Movant's Request to Testify by WebEx, with exhibits, which was served on you by email on November 10, 2026 and is in overnight delivery to the Clerk for November 12, 2026. I do not attach it again.

(b) Expedited schedule.

The Debtor **AGREES** that:

- the Debtor's Motion to Compel Movant's In-Person Appearance and Testimony,

- the Debtor's Opposition to Movant's Request to Testify by WebEx at the November 18, 2026 Evidentiary Hearing (served November 10, 2026), and

- the Movant's anticipated (see Motion to Compel ¶¶ 5, 14) and forthcoming motion to testify remotely by WebEx

...should be considered and decided together on or before Monday, November 16, 2026, as the Debtor's Motion for Expedited Consideration has already requested for the Motion to Compel.

The Debtor **DOES NOT AGREE** that a short WebEx hearing is needed and asks for a ruling on the papers before the court.

The Debtor has no CM/ECF access. The Opposition served November 10 is his response to the WebEx motion. If your filing raises matter not addressed there, he will serve a supplement by email on counsel and the courtroom deputy by 5:00 p.m. Central on Friday, November 13, 2026, with the ink-signed original to follow to the Clerk.

Please serve your response to the Motion to Compel and your WebEx motion on me by email when you file them, and **PLEASE INCLUDE THIS RESPONSE IN FULL IN YOUR FORTHCOMING FILING WITH THE COURT.**

Jason Emory McKemie
Debtor, pro se
1139 W. Commerce St., #2010, Dallas, Texas 75208
(214) 519-8958
jmckemie@mckemie.net

---

On Nov 10, 2026, at 11:24 AM, Jonathan Steele <JSteele@beermannlaw.com> wrote:

Mr. McKemie and Ms. Holder Aurzada,

On Thursday, November 12, Ms. Ulijasz will file a response opposing the Debtor's motion to compel her in-person appearance at the November 18 hearing. With it she will file a motion for leave to give by WebEx any testimony the Court permits or requires from her at that hearing.

The WebEx motion will ask the Court to rule in advance that any such testimony may be given by WebEx video under safeguards that include: camera on at all times, showing her face and hands; alone in a private room; sworn by the courtroom deputy; only the parties' designated exhibits in front of her; no off-the-record communication while testifying; available by WebEx until excused; and her counsel present in the courtroom.

She will also ask the Court to shorten notice on the WebEx motion, with any response due Friday, November 13 at 5:00 p.m. Central Time, and to decide it together with the Debtor's motion to compel by Monday, November 16, on the papers or at a short WebEx hearing.

Please let me know by 9:00 a.m. Central Time on Thursday, November 12 your position on (a) the WebEx motion and (b) the expedited schedule. I will report any position I receive to the Court.

Jonathan D. Steele | Divorce and Family Law Partner
161 N. Clark St., Suite 3000 | Chicago, IL 60601
Tel: 312.621.9700 | Fax: 312.621.0909
Mobile: 872.888.6069
2275 Half Day Rd., Suite 350 | Bannockburn, IL 60015
Tel: 847.681.9600 | Fax: 847.681.0909
jsteele@beermannlaw.com | www.beermannlaw.com

CONFIDENTIAL E-MAIL This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system.

[Mr. Steele's signature block and confidentiality notice appear twice in the original email.]

# EXHIBIT C

## DEBTOR'S STATEMENT OF POSITIONS, EMAILED TO MR. STEELE ON NOVEMBER 11, 2026 AT 12:39 P.M. CENTRAL

Mr. Steele received this Statement on November 11, 2026 at 12:39 p.m. At 1:42 p.m. he promised in writing that Ms. Ulijasz would attach it in full to her WebEx motion and to her response to the Motion to Compel. He then filed both without it, asked the Court to shorten my time to respond, and did not serve those filings on me until the next day. I am including it here so the Court can see it. The Statement is reproduced below as sent, in four pages. Mr. Steele's 1:42 p.m. email is Exhibit D.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

In re Jason Emory McKemie, Debtor | Case No. 26-30161-mvl7 | Chapter 7

### DEBTOR'S STATEMENT OF POSITIONS ON MOVANT'S ANTICIPATED WEBEX MOTION AND THE NOVEMBER 18, 2026, EVIDENTIARY HEARING (ECF 110 AND ECF 97)

Provided to Movant's counsel on November 11, 2026, in response to the conferral request of Jonathan D. Steele dated November 10, 2026, 11:24 a.m. This statement replaces the Debtor's email response of November 10, 2026.

**MOVANT'S COUNSEL HAS BEEN ASKED TO ATTACH THIS STATEMENT, IN FULL, TO THE WEBEX MOTION AND TO THE RESPONSE TO THE DEBTOR'S MOTION TO COMPEL, AND TO REPORT EACH POSITION BELOW IN THE CERTIFICATE OF CONFERENCE.**

The Debtor will be in the Dallas courtroom on November 18, 2026, and will cross-examine Gwendolyn Laura Ulijasz in person, as she has been called as an adverse witness in both ECF 110 and ECF 97 set by the court to be heard that day. Movant's predicted Motion for Remote Appearance via WebEx has not yet been served nor filed with the Court at this time. (Prediction: Debtor's Motion to Compel ¶¶ 5, 14). These positions respond to the motion as described by counsel and waive no objection to the motion, declaration, exhibits, proposed order, or schedule as filed. No position is agreed, waived, or resolved except where this statement says **AGREES**.

1. **REMOTE OR HYBRID TESTIMONY BY MS. ULIJASZ:** ........................................ OPPOSED

   The hearing is set in person; her own Notice of Final Hearing (served October 7, 2026) says in person. The Debtor is indigent, has had to surrender his vehicle, and is making all necessary arrangements to travel to Dallas to be in the courtroom for these two hearings as set by Judge Larson on Oct 6, 2026; if the Debtor can be there, Movant can be there too. Fed. R. Bankr. P. 9014(d) requires testimony on disputed material facts to be taken as in an adversary proceeding; Fed. R. Civ. P. 43(a), through Rule 9017, allows remote testimony only for good cause in compelling circumstances. The Debtor does not consent and asks that any ruling state the compelling circumstance found.

2. **THE LISTED WEBEX "SAFEGUARDS":** ........................................ OPPOSED

   Camera on, alone in a room, sworn remotely, counsel in the courtroom: none is a compelling circumstance. They are conditions on remote testimony, not a reason for it.

3. **DECLARATION, AFFIDAVIT, OR COUNSEL PROFFER IN PLACE OF HER TESTIMONY:** ........................................ OPPOSED

   Material statements in her ECF 110 declaration are disputed. The Debtor will cross-examine her on them in the courtroom.

4. **EXCUSING HER, OR COUNSEL-ONLY PRESENTATION:** ........................................ OPPOSED

   Counsel's argument is not evidence. The Debtor will call and examine Ms. Ulijasz as an adverse party under Fed. R. Evid. 611(c)(2).

5. **LIMITS ON THE SCOPE OR TIME OF EXAMINATION:** ........................................ OPPOSED

   The hearing is a reserved half day on ECF 110 and ECF 97 together. Examination covers every fact she put in issue: her knowledge of the bankruptcy and the stay; the property removals; the health-coverage, HSA, and FSA actions;

the vehicle; account activity, transfers, and tracing; and credibility. If a question is excluded, the Debtor will state its relevance and make an offer of proof on the record.

6. **OFF-THE-RECORD COMMUNICATION WITH THE WITNESS:**......................................................................................OPPOSED

No communication by any person with Ms. Ulijasz, by any means, while a question is pending, while she is answering, or while cross-examination is in progress, and no discussion of her testimony during any recess until cross-examination is complete.

7. **PRIVATE SECURITY AND OTHER NONPARTIES IN THE COURTROOM:**..................................................................OPPOSED

Fed. R. Evid. 615 applies to any person who is or may be a witness. No security personnel or other nonparty who may testify, or who has given a statement in any matter between the parties, remains in the courtroom during testimony.

Private security at the hearing: OPPOSED, and to be given no weight. Any private security, bodyguards, or escorts accompanying the Movant into a federal courtroom staffed by Court Security Officers and the United States Marshals Service is a charade, not a safety measure (Motion to Compel ¶¶ 48, 53; 28 U.S.C. §§ 151, 566(a)). No court has ever found that the Debtor poses a danger to the Movant. The Movant's protective-order application of December 18, 2024 was predicted by the Debtor in his call to the Dallas Police Department on December 11, 2024, seven days before she filed it; the call log records "caller thinks is being set up by wife" (CAD 24-2241556; Motion ¶ 19, Ex. A). On January 7, 2025, after an evidentiary hearing, the state court found no evidence of family violence and denied that application in full, and awarded the Debtor exclusive possession of the residence and its contents (Motion ¶¶ 19, 35; Debtor's Opposition, Ex. 6). In the Movant's own words the Debtor is "non violent" (Dec. 15, 2024 text, Motion ¶ 32; Opposition, Ex. 7), and on April 16, 2026 she told deputies on body camera "he never hit me" and that she hires private security because her attorney advised against a protective order (Motion ¶ 36, Ex. I). The Debtor has never been charged with, arrested for, or convicted of any violent offense against anyone; police have never been called to any incident of violence involving him; and he has never been ordered to any anger-management program (Motion ¶ 24). Thirty-three declarants have sworn under penalty of perjury that the Debtor is not a violent person, and not one withdrew when the Movant's former counsel contacted them (Motion ¶ 25, Ex. N; Opposition, Ex. 5). The Debtor asks that the presence of any private security, escort, or other personnel accompanying the Movant be given no weight as evidence of any fact, and that Fed. R. Evid. 615 apply to any such person who is or may be a witness, or who has given a statement in any matter between the parties, so that none remains in the courtroom during testimony.

This includes any reference to security during the hearing, whether by requesting a recess to confer with or check on security personnel, by stating on the record that security is present or waiting, or by any other remark that places unverified danger before the Court without evidence. The Debtor asks that no such reference be made in the presence of the Court, that any genuine security concern be raised with the Court Security Officers or the United States Marshals Service outside the presence of the Court, and that any request for a recess state no reason other than that a recess is requested.

8. **SEALING, CLOSING THE COURTROOM, OR REDACTING TESTIMONY:**.................................................................OPPOSED

11 U.S.C. § 107(a) makes the record public. Every word of testimony is on the record and in the Court's official recording, continuously from call to adjournment. No portion sealed, closed, or omitted.

9. **ANY PROTECTIVE ORDER, CONFIDENTIALITY ORDER, ATTORNEYS'-EYES-ONLY DESIGNATION, HIPAA OR GLBA OBJECTION, OR "TRUSTEE ONLY / NOT DISSEMINATED TO DEBTOR" CONDITION ON RECORDS:** ................OPPOSED

The medical records concern the obstruction and wrongful termination of **THE DEBTOR'S OWN MEDICAL COVERAGE**, related benefits, and community funds; and **DOES NOT INCLUDE ANY MEDICAL RECORDS OF MOVANT'S.** The Debtor will review every record produced.

**10. ANY RESTRICTION ON LATER USE OF THE TESTIMONY, RECORDING, TRANSCRIPT, OR ADMITTED EXHIBITS:** ......................................................................................................................................OPPOSED

The Debtor will use them in DF-24-18010 and its appeal; the Justice Court matters including JPC-25-12755-51 and any appeal; Adversary No. 26-03034-mvl; EBSA File No. 202630-18882 and any ERISA action; any criminal or regulatory referral; and any other proceeding. The Debtor does not consent to any order limiting that use.

**11. LIMITS ON THE RULE 2004 REQUEST TO FORM 1 ACCOUNTS, ACCOUNT-BY-ACCOUNT, PETITION DATE ONLY, OR CONDITIONED ON THE DEBTOR FIRST IDENTIFYING THE DESTINATION OF FUNDS:** ....................OPPOSED

Any such limitation makes estate tracing impossible.

**12. DEFERRAL, BIFURCATION, STATUS CONFERENCE, OR CONTINUANCE OF NOVEMBER 18:** ............................OPPOSED

The Debtor asks for separate written rulings on ECF 110, ECF 97, the Motion to Compel, and the WebEx motion.

**13. QUESTIONING THROUGH COUNSEL, STANDBY COUNSEL, OR A NO-DIRECT-QUESTIONING CONDITION:** ......OPPOSED

No court has found the Debtor to be a threat. The protective order Ms. Ulijasz sought was denied and the Debtor was awarded exclusive possession of the residence (Debtor's Opposition, Ex. 6). The Debtor will question her directly, in person.

**14. EX PARTE OR INFORMAL COMMUNICATION TO THE COURT ON SAFETY OR HER ABILITY TO ATTEND:** .......OPPOSED

Any such communication to be disclosed to the Debtor before the Court relies on it.

**15. DECIDING THE WEBEX MOTION BEFORE THE CLERK DOCKETS THE DEBTOR'S PAPER OPPOSITION:** ..........OPPOSED

The Debtor cannot e-file. The Opposition, served by email November 10, 2026, is in overnight delivery to the Clerk for November 12, 2026.

**16. SCHEDULE:**

The Debtor **AGREES** that:

- the **DEBTOR'S MOTION TO COMPEL MOVANT'S IN-PERSON APPEARANCE AND TESTIMONY AND IN OPPOSITION TO ANY REMOTE TESTIMONY OF GWENDOLYN ULIJASZ** (Served and Delivered to the Court on Tuesday, Nov 10, 2026 at 10:23am - UPS 1Z063EE40110728310),
- the **DEBTOR'S OPPOSITION TO ANY REQUEST THAT THE MOVANT APPEAR OR TESTIFY BY WEBEX OR OTHER REMOTE MEANS AT THE NOVEMBER 18, 2026, EVIDENTIARY HEARING ON ECF 110 AND ECF 97** (Filed in support of the Debtor's Motion to Compel Movant's In-Person Appearance and Testimony and in Opposition to Any Remote Testimony of Gwendolyn Ulijasz), with Exhibits 1 through 10 (Served Nov 10, 2026, with Guaranteed Delivery Thursday, Nov 12th by 10:30am due to Federal Holiday – UPS 1z50v1140774225038),
- and the **Movant's**, previously anticipated (see Motion to Compel ¶¶ 5, 14) and forthcoming, **Motion to Appear Remotely by Webex;**

... should **all be considered and decided together** on or before **Monday, November 16, 2026**, as the Debtor's Motion for Expedited Consideration has already requested for the Motion to Compel.

The Debtor **DOES NOT AGREE** that a short WebEx hearing is needed and asks for a ruling on the papers before the court.

The Debtor has no CM/ECF access. The Opposition served November 10 is his response to the WebEx motion. If your filing raises matter not addressed there, he will serve a supplement by email on counsel and the courtroom deputy by 5:00 p.m. Central on Friday, November 13, 2026, with the ink-signed original to follow to the Clerk.

Please serve your response to the Motion to Compel and your WebEx motion on me by email when you file them, and once again, **PLEASE INCLUDE THIS RESPONSE IN FULL IN YOUR FORTHCOMING FILING WITH THE COURT.**

---

Dated: November 11, 2026

Transmitted via email to Movant's counsel of record, the Chapter 7 Trustee, and the Office of the United States Trustee on **November 11, 2026, at (12:40pm) Central** to:

**Counsel for Movant:**

- Jonathan D. Steele, Beermann LLP (jsteele@beermannlaw.com)
- Sara A. Boucher, Beermann LLP (saboucher@beermannlaw.com)
- Rosa Gutierrez, Beermann LLP (rgutierrez@beermannlaw.com)
- Richard C. Dafoe, Waddell Serafino Geary Rechner Jenevein, P.C. (rdafoe@wslawpc.com)
- Rebecca L. Armstrong, Armstrong Divorce & Family Law, PLLC (rebecca@armstronglawtexas.com)
- Terra Aguirre, Armstrong Divorce & Family Law, PLLC (terra@armstronglawtexas.com)
- Lauren Shaw, Armstrong Divorce & Family Law, PLLC (lauren@armstronglawtexas.com)

**Trustee Areya Holder:**

- Areya Holder Aurzada, Chapter 7 Trustee (areya@holderlawpc.com; trustee@holderlawpc.com)
- Office of the United States Trustee (ustpregion06.da.ecf@usdoj.gov)

**And Judge Larson's Courtroom Deputy:**

- Dawn Harden, Courtroom Deputy to the Honorable Michelle V. Larson (mvl_settings@txnb.uscourts.gov)

Respectfully submitted,

Jason McKemie

**Jason Emory McKemie**, Debtor, pro se
539 W. Commerce St., #2010
Dallas, Texas 75208
(214) 519-8958
jmckemie@mckemie.net

# EXHIBIT D

## COUNSEL'S WRITTEN COMMITMENT TO ATTACH MY STATEMENT OF POSITIONS IN FULL (NOVEMBER 11, 2026, 1:42 P.M.), BROKEN THE NEXT DAY IN THE FILINGS THAT ASKED THE COURT TO SHORTEN MY TIME

Mr. Steele's email to me of November 11, 2026 at 1:42 p.m., replying to the email that transmitted my Statement of Positions (Exhibit C). ECF 141, 142 and 143, filed the next day, do not attach the Statement or mention it, and fourteen of its sixteen positions are reported in none of them.

Jonathan Steele

Re: Case No. 26-30161-mvl7: Debtor's Response with Statement of Position Regarding Movant's Forthcoming Motion to Appear Remotely

To:

Cc:

Mr. McKemie,

Thank you for the Statement of Position. Ms. Ulijasz will attach it in full as an exhibit to her WebEx motion and to her response to the Motion to Compel, and each certificate of conference will report your positions as stated in it. Her positions on items 6 through 10 are:

Item 6: AGREES that no one will communicate with Ms. Ulijasz about the substance of her testimony while a question is pending or during any recess, until her cross-examination is complete. A break that her provider calls for is not a communication about her testimony.

Item 7: AGREES that Rule 615 applies to nonparty witnesses. DOES NOT AGREE to the remainder of item 7.

Item 8: DOES NOT AGREE. Ms. Ulijasz reserves the right to seek sealing or redaction of her medical information under Bankruptcy Rules 9018 and 9037.

Item 9: DOES NOT AGREE.

Item 10: DOES NOT AGREE. Any later use of the record is governed by applicable law and any order of the Court.

Both filings will be served on you by email when filed.

Jonathan D. Steele

**CONFIDENTIAL E-MAIL** This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system.

**Jonathan Steele** | Divorce and Family Law Partner

161 N Clark St., Suite 3000 | Chicago, IL 60601
Tel: 312.621.9700 | Fax: 312.621.0909

2275 Half Day Rd., Suite 350 | Bannockburn, IL 60015
Tel: 847.681.9600 | Fax: 847.681.0909

BEERMANN LLP

**CONFIDENTIAL E-MAIL** This e-mail message is intended only for the named recipient(s) above. It may contain confidential information that is privileged or that constitutes attorney work product. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system.

# EXHIBIT E

## MR. STEELE'S APRIL 23 AND MAY 22, 2026 DEMAND EMAILS FOR PRESERVATION OF PROPERTY

Three emails from Jonathan D. Steele to the Debtor, reproduced in full without signature blocks and confidentiality notices. The third replies to the Debtor's May 22, 2026, 5:07 p.m. email, "Immediate Preservation Demand – Entire Marital Estate and Property Under Petitioner's Custody or Control," which is quoted beneath it in the original.

---

**From:** Jonathan Steele <jsteele@beermannlaw.com>
**Subject:** Ulijasz v. McKemie
**Date:** Thursday, April 23, 2026 at 5:50 PM
Jason,

I'm writing to confirm what the Dallas police and the moving company communicated directly to Gwen on Thursday: after you obtained the stay of eviction through April 30, all of her personal belongings and separate property were unloaded from the moving truck at your direction and left on the lawn at the property.

Because the stay keeps you in possession of the premises, the care and safekeeping of Gwen's property now sitting outside is your responsibility. That includes protection from weather, theft, and any other loss or deterioration while it remains there.

Please confirm in writing by end of day Friday that (1) Gwen's belongings have been moved to a secure, covered location on the property, and (2) you will propose two dates and times before April 30 when she can arrange pickup.

---

**From:** Jonathan Steele <JSteele@beermannlaw.com>
**Subject:** Re: Ulijasz v. McKemie
**Date:** May 22, 2026 at 1:25 PM
Jason,

I am writing again about Gwen's personal property. I am informed that following the latest eviction action, all of her belongings have been placed on the public sidewalk outside the property and are sitting there now.

This is the same conduct addressed in my April 23 email, with greater exposure. The sidewalk is a public way. Her property is now at heightened risk of weather damage, theft, and removal by the City as abandoned.

Whatever the status of the writ, the safekeeping of Gwen's separate property remains your responsibility while it is on or adjacent to a premises you controlled. That includes protection from weather, theft, loss, and deterioration.

If her property is damaged, lost, or removed while it remains where it currently sits, the resulting loss and the now-documented pattern of conduct will be presented to the court.

.

---

**From:** Jonathan Steele <JSteele@beermannlaw.com>
**Subject:** Re: Immediate Preservation Demand – Entire Marital Estate and Property Under Petitioner's Custody or Control
**Date:** May 22, 2026 at 5:18 PM
**To:** Jason McKemie
**Cc:** Terra Aguirre, rgutuerrez@beermannlaw.com, Sara A. Boucher, Lauren Shaw, Rebecca Armstrong

Mr. McKemie,

Received, in triplicate.

A few observations on the record:

1. Your property is on the sidewalk because a writ of possession was executed against you today. Petitioner is not the cause of that, and the catalog of speculative grievances in your correspondence does not change it.

2. Your emails simultaneously claim that Petitioner is paying personnel hundreds of dollars per hour to inventory and control your property, and that Petitioner is allowing your property to be scavenged, destroyed, and discarded. Both cannot be true. Neither is accepted.

3. Self-styled "notices" reciting facts, listing items, and announcing preservation duties do not create those facts, those items, or those duties. Petitioner is in compliance with the orders that actually exist.

4. Further duplicative emails on these subjects will not be answered individually. If there is a discrete, substantive matter to raise in Cause No. DF-24-18010, raise it once, clearly, and I will respond.

Best regards,

# EXHIBIT F

## DECLARATION OF LYNN McKEMIE, JULY 3, 2026, WITH TEN PHOTOGRAPHS

Sworn declaration of the Debtor's mother, filed in DF-24-18010 on July 6, 2026 as Respondent's Exhibit L-1 (pleading 231 at 11–17), reproduced in full in seven pages. Paragraphs 9 and 17 through 24 and the ten photographs on the last two pages show what the Debtor came away with on May 22, 2026. Her date of birth, street address and email address are redacted.

**CAUSE NO. DF-24-18010**

| | | |
|---|---|---|
| IN THE MATTER OF<br>THE MARRIAGE OF<br><br>**GWENDOLYN ULIJASZ-McKEMIE**<br>AND<br>**JASON EMORY McKEMIE** | §<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br>**301**ST JUDICIAL DISTRICT<br><br>DALLAS COUNTY, TEXAS |

**DECLARATION OF LYNN McKEMIE REGARDING JASON McKEMIE'S MINIMAL PROPERTY, MEDICAL AND FINANCIAL COLLAPSE, AND PERSISTENT UNWANTED CONTACT AFTER REPEATED REQUESTS TO STOP**

My name is Lynn McKemie. I was born in **Hearne, Texas**, and my date of birth is [redacted]. My address is [redacted] **Bryan, Texas 77802**. My email address is [redacted] I am over the age of eighteen, of sound mind, and competent to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct, except where expressly stated to be based on information and belief.

1. I am the mother of Jason McKemie.

2. On May 22, 2026, after Jason was forced out of the marital residence by a writ of possession executed that day, Jason came to my home with only a very small amount of personal property.

3. Jason had recently been taken to UT Southwestern by paramedics because of a serious spinal injury. He had been hospitalized for several days and was released against medical advice because he believed he had to try to save basic possessions, medical items, and survival items before the May 22, 2026 writ was executed.

4. After leaving the hospital, Jason went to the marital residence before the May 22, 2026 writ began. When Jason later arrived at my home, he was in significant pain, physically exhausted, disheveled, and medically compromised.

5. I saw Jason arrive. I saw what was in his vehicle. I saw what was unloaded at my home.

6. Jason came to my home with only the property listed below and shown in the attached ten photographs (Exhibit 1).

7. Jason did not arrive with furniture, household furnishings, organized boxes of property, boxes of Gwendolyn Laura Ulijasz's property, valuables belonging to her, or anything resembling a complete property load from the marital residence.

8. Jason arrived with minimal, incomplete, and disorganized property. This was not a planned move. This was not the contents of a household. This was not the removal of another person's property.

9. Jason brought the following property to my home:

    a) Several shoes, including only approximately two matching pairs, with the remaining shoes being single, unmatched shoes;

b) A small Craftsman toolbox with sliding drawers containing miscellaneous tools and parts;

c) A container full of screws or similar small hardware;

d) A box containing an autographed football, VHS tapes of Jason playing drums when he was young, and a multimeter;

e) A couple of vehicle floor mats;

f) A limited amount of clothing, including shirts and jeans;

g) Some socks;

h) Approximately three pairs of underwear;

i) A backpack; and

j) A MacBook Pro with a cracked screen.

10. Jason did not bring any guitar to my home.

11. Jason did not bring any guitar case to my home.

12. Jason did not bring any baptism cross to my home.

13. Jason did not bring any sobriety coins or sobriety medallions to my home.

14. Jason did not bring any wooden box containing sobriety coins or sobriety medallions to my home.

15. I looked through the box, backpack, and other property Jason brought to my home. The guitar, guitar case, baptism cross, sobriety coins, sobriety medallions, and wooden box were not there.

16. Jason did not bring any property to my home that I recognized as belonging to Gwendolyn Laura Ulijasz.

17. Jason arrived with very little. He arrived with almost nothing.

18. The attached ten photographs (Exhibit 1) show all of the possessions Jason brought to my home.

19. Nothing material is omitted from those photographs.

20. The attached ten photographs fairly and accurately show the complete set of property Jason brought to my home and unloaded at my home.

21. Jason did not retain the contents of a home.

22. Jason did not retain the contents of a music studio.

23. Jason did not arrive with meaningful property from the marital residence.

24. What arrived at my home was only the small, incomplete, survival-level set of items shown in the attached ten photographs.

25. I have known Jason his entire life, and music has been one of the central passions of his life for as long as I can remember.

26. I have known Jason as a drummer, musician, DJ, and music producer.

27. Music has never been a casual hobby for Jason. Music is one of the things most tied to who he is.

28. Jason did not bring any music studio equipment to my home.

29. Jason did not bring drums, DJ equipment, studio monitors, recording equipment, keyboards, controllers, production equipment, studio furniture, or any meaningful music-related equipment to my home.

30. Jason arrived without the possessions, tools, and music equipment connected to the work and passion that have defined much of his life.

31. One of the hardest things for me to watch has been seeing Jason without the things he cared about most and without the basic possessions, equipment, and tools he needs to rebuild.

32. My husband, John McKemie, and I have repeatedly requested that Gwendolyn Laura Ulijasz stop sending correspondence, letters, packages, cards, belongings, notes, or any other mailings to our home address.

33. Those requests have been made through Jason, through Jason's former counsel, through the Court, and through counsel.

34. Despite those requests, Gwendolyn Laura Ulijasz has repeatedly sent belongings, correspondence, and notes to our home.

35. We have also received packages from other people that contained belongings, contents, or notes from Gwendolyn Laura Ulijasz.

36. Those contacts have been unwanted and unsettling.

37. Our home address is not a place for Gwendolyn Laura Ulijasz to send property, messages, notes, packages, cards, correspondence, or communications.

38. We do not want anything from Gwendolyn Laura Ulijasz sent to us directly, indirectly, through third parties, or through anyone acting on her behalf.

39. Despite repeated requests to stop, the unwanted mailings, packages, belongings, notes, and third-party deliveries have continued.

40. We have made clear that our home is not a delivery point, message point, or contact point for Gwendolyn Laura Ulijasz, directly or indirectly.

41. We consider the continued contact after repeated requests to stop to be harassing. We ask the Court to order that it stop.

42. In December 2024, Jason came out of spinal surgery and was immediately left destitute. I observed the collapse directly.

43. Jason was cut off from marital and financial resources at the exact time he was medically vulnerable, in pain, and supposed to be recovering. This was a financial ambush.

44. Jason did not merely experience ordinary financial stress. Jason was stripped of functional access to the resources he needed for housing, food, prescriptions, medical recovery, legal defense, and basic survival.

45. Jason underwent spinal surgery in December 2024 and was recovering from that surgery when the financial collapse began.

46. I am informed, and I directly observed the consequences, that after Jason's spinal surgery, charges connected to Jason's attorney retainer, a $30,000 transfer made on the advice of counsel, and Jason's spinal-rehabilitation equipment were reversed after being reported as fraud. Whatever the mechanics, I personally observed the result: Jason, recovering from spinal surgery, suddenly had no functional access to marital resources.

47. Jason was forced to defend against protective-order litigation and related proceedings while still recovering from surgery.

48. Jason had major monthly expenses, including expenses he represented to us were approximately $25,000 per month.

49. My husband, John McKemie, and I loaned Jason money because the collapse was immediate, severe, and survival-level.

50. Jason has continued to suffer from serious spinal pain. Jason has continued seeking medical treatment, including additional spine treatment and/or spine surgery.

51. Jason has not received the treatment he has been trying to obtain. Jason has not been able to obtain that treatment because access to the Health Spending Account card and related healthcare resources has been obstructed. I know this is true.

52. I have watched Jason remain in pain. I have watched Jason remain medically compromised. I have watched Jason continue trying to obtain treatment that he has not been able to receive.

53. Jason and Gwendolyn Laura Ulijasz moved in together around the June or July 2023 timeframe.

54. During the relationship, Jason shifted away from W-2 employment and toward pursuing a startup initiative. That shift occurred with Gwendolyn Laura Ulijasz's knowledge and encouragement.

55. Around Thanksgiving 2024, shortly before Gwendolyn Laura Ulijasz left the marital residence in December 2024, Jason and Gwendolyn Laura Ulijasz were discussing the need to replace Jason's vehicle because it was aging and out of warranty.

56. Since Jason's financial collapse, repossession efforts have been directed at Jason's vehicle, including attempts at our home.

57. Jason needs that vehicle for work, medical appointments, court-related obligations, and basic transportation. Losing that vehicle would further endanger Jason's ability to work, obtain medical care, and survive the financial and medical collapse he is already experiencing.

58. My husband, John McKemie, and I are now being forced to file bankruptcy. Jason has also been forced into bankruptcy. Two generations of our family have been financially devastated by the events surrounding this litigation.

59. We loaned Jason approximately $50,000 after he was left destitute, medically vulnerable, cut off from marital and financial resources, and without practical access to basic survival needs, including food and prescriptions. That financial strain is a direct and substantial reason we can no longer avoid bankruptcy.

60. Jason has a history of congestive heart failure and a prior life-threatening cardiac event. I have personally known about Jason's heart condition for years. Symptoms such as chest pain and shortness of breath are serious for Jason.

61. On June 11, 2026, the day of the final trial setting, Jason arrived at our home after attempting to travel to Dallas for court. Jason was unable to safely complete the drive. Jason was unable to purchase gas using a gift card.

62. When Jason arrived, he was in poor physical condition. Jason complained of chest pain. Jason was short of breath. Jason was physically distressed. I was extremely concerned about Jason's medical condition.

63. Jason was not refusing to attend trial. To the contrary, Jason tried desperately to get to court. When he could not safely complete the trip, Jason tried to participate remotely and protect his rights. Jason was medically compromised, physically unable to safely continue the drive, and still attempting to prevent the Court from treating his medical and transportation collapse as a voluntary failure to appear.

64. I was concerned that Jason needed medical care. Jason was focused on getting filings to the Court because he believed the Court would proceed against him if he did not immediately document what was happening.

65. I have never known Jason to intentionally miss court. What I saw on June 11, 2026, was a medical and transportation collapse, not a voluntary failure to appear.

66. Jason was married once before, and that divorce was resolved without contested litigation or the need for attorney-driven conflict.

67. To my knowledge, Jason is non-violent and has no history of violent crimes, domestic violence, or physical violence against Gwendolyn Laura Ulijasz or anyone else. The claims and posture in this case are not consistent with the son I know or with his history before this litigation.

68. I make this declaration to state what Jason brought to my home after the May 22, 2026 writ. I make this declaration to confirm that Jason did not bring any guitar, guitar case, baptism cross, sobriety coins, sobriety medallions, or wooden box containing sobriety coins or medallions to my home. I make this declaration to confirm that Jason did not bring any music studio equipment to my home.

69. I make this declaration to confirm Jason's medical and financial collapse, and that Jason has not received the medical and spine treatment he has been trying to obtain because access to the Health Spending Account card and related healthcare resources has been obstructed.

70. I make this declaration to confirm that we do not consent to continued mailings, packages, notes, property, correspondence, or communications from Gwendolyn Laura Ulijasz to our home address, directly, indirectly, through third parties, or through anyone acting on her behalf.

## DECLARATION UNDER PENALTY OF PERJURY

My name is **Lynn S. McKemie**. My date of birth is [redacted] **1951**, and my address is [redacted] **Bryan, Texas 77802, Brazos County**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in **Brazos County, State of Texas**, on the **3rd** day of **July 2026**.

Lynn McKemie

## IMAGES















# EXHIBIT G

## SAN ANTONIO POLICE DEPARTMENT DASH-CAMERA FRAMES OF MAY 29, 2026, AND REPORTS SAPD26108224 AND SAPD26106749

This page: two frames from the responding officer's dash camera (Axon Fleet 3) on May 29, 2026, showing the red pickup truck at Ms. Ulijasz's San Antonio residence. Next page: a third frame from the same camera, 4:13:05 p.m. After it: a two-page summary of Ms. Ulijasz's police reports; Report SAPD26108224 (May 29, 2026); and Report SAPD26106749 (May 27, 2026). In the reports as the Debtor obtained them, names, home addresses and dates of birth are blacked out; the Debtor has also blacked out the street address of the offense location. From their content, R-1 in both reports is Ms. Ulijasz; the Debtor is SB-1 in the May 29 report and O-1 in the May 27 report.




Above Right: 3:33:20 p.m.

Below: 3:49:22 p.m. Central. The officer's report of the same call, later in this exhibit, records bags of the Debtor's belongings being placed in a pickup truck "to be taken to the dump."



## MS. ULIJASZ CONVERTED FELONY PROPERTY THEFT INTO FRAUD AND DRUG ALLEGATIONS

May 29, 2026, 4:13:05 p.m. Central, seven days after the May 22, 2026 writ. Dash camera of the same San Antonio patrol car (Axon Fleet 3 F X687J74P5). An officer was dispatched to Ms. Ulijasz's residence on a narcotics call. She turned over a silver case and a tracker from my stolen belongings and told the officer they had been "shipped to her residence." They rode in her truck. That is a false report to a peace officer, Tex. Penal Code § 37.08. Forty minutes after this camera recorded bags of my belongings going into a pickup truck "to be taken to the dump," the officer carries what she turned in to the police property room. The report was coded an information report. I have not been arrested or charged on it (SAPD Report SAPD26108224; ECF 144, Ex. 9 at 121).



# MS. ULIJASZ'S FALSE POLICE REPORTS AGAINST ME, DECEMBER 2024 THROUGH MAY 2026

*False report to a peace officer, Tex. Penal Code § 37.08. This is every report and call of hers that appears in the records the Dallas and San Antonio police departments have released to me, with her protective-order application and what she told deputies on April 16, 2026, in date order. Words in quotation marks are quoted from the record cited; the Dallas records are printed in capital letters. A shorter version is filed in this case as ECF 144, Ex. 9 at 121.*

On December 11, 2024, three days before the first call below, I called Dallas police myself. The dispatcher wrote: "caller thinks is being set up by wife" (Dallas PD call 24-2241556; ECF 134 at 4 ¶ 19).

| Date, agency and number | What Ms. Ulijasz told them | What the record shows |
|---|---|---|
| **Dec. 14, 2024**<br>Dallas PD and Dallas Fire-Rescue<br>Call 24-2263829; fire incident 2024352994 | Asked for a welfare check on me. The dispatcher wrote: "welfare check on husband, RP is wife ... has turned off cameras, concerned due to previous suicide attempt on Thursday." | Fire-Rescue: "Male states him and his wife are having a fight. Denies wanting to harm himself or others and states he is fine." Officers "spoke with husband who stated he was okay." Closed: "NP - No Police Action." |
| **Dec. 18, 2024**<br>254th District Court, Dallas County, DF-24-18010<br>Application for protective order, filed by her attorney (pleadings 002 and 006) | Her declaration: she was "in fear of Jason McKemie based on his manic behavior and drug use," and my "mania, stalking, and aggression is escalating" (pleading 002, Ex. A at 12). | January 7, 2025, after a contested hearing: "Petitioner's application for a Final Protective Order is DENIED" (pleading 036). |
| **Dec. 22, 2024**<br>Dallas PD<br>Report 190487-2024; 911 call 24-2313703 | Called 911. Told officers "her husband had violated a protective order"; that cameras in the house were recording her; that I backed up her hard drive "containing her client information" and put "spyware on her computer"; that "a plaque of a middle finger" was hung in her room; and that framed pictures and a baptism plaque were missing. | Her papers were "an amended temporary restraining order." Officers "found no protective order in place," and a family-violence detective confirmed "no protective order was in place." Coded "Miscellaneous Incident Report No Offense." |
| **Dec. 28, 2024**<br>San Antonio PD<br>Report SAPD24277190 (Harassment, Penal Code § 42.07) | Dispatched as "a violation of protective order report." She said she found a tracking device in her car and "believed" I put it there "due to her seeing him with it in his hand at their residence months prior." | Six days earlier Dallas officers had "found no protective order in place." The City of San Antonio later withheld this file as an investigation that did not result in conviction or deferred adjudication, Tex. Gov't Code § 552.108(a)(2) (Tex. Att'y Gen. OR2026-015328, Apr. 16, 2026). |
| **Jan. 4, 2025**<br>San Antonio PD<br>Report SAPD25002158 (Harassment, § 42.07) | "she located another tracking device on her vehicle," an AirTag behind the rear bumper that her own technician removed. She also reported that her dog was sick and that she "believes S1 to be the cause." (I am S1.) | "unknown if S1 manipulated the water in anyway." The assigned detective, after contacting Apple: "none of the information is linked to you. The information goes back to her email and her phone numbers" (Det. Vidal, May 21, 2025; ECF 144, Ex. 10 at 123). |
| **Jan. 15, 2025**<br>San Antonio PD<br>Report SAPD25009850 (Information Report), dispatched "for a burglary" | That on January 4 her back door was "wide open" and her router wires were missing. She "never saw SB2 in the house but believes that it was him." (I am SB2.) | "I inspected the door, and I saw no damage. There were no pry marks or signs of attempted forced entry." She "could not tell me when they went missing or that if they were ever there." |
| **Mar. 1, 2025, 7:46 p.m.**<br>San Antonio PD<br>Report SAPD25041335 (Harassment, § 42.07) | "she found a tracking device in one of her suitcases planted by her husband" and "suspects her husband broke into her residence to plant the tracking device," "through the front door." Asked whether her Ring camera showed me: "no because S1 messed with the wires by the backyard and hacked into the wi-fi." | The officer "noticed a ring door camera by the front door." She had not seen me on it. Her own Apple "Find My" screen of December 16, 2024 lists two tags named "Gwen's Black Lucas Suitcase" (ECF 134 ¶ 38). |

| Date, agency and number | What Ms. Ulijasz told them | What the record shows |
|---|---|---|
| **Mar. 1, 2025, 8:04 p.m.** San Antonio PD Call SAPD-2025-0288323 | "V1 called police again and stated she found another tracker." | "the second tracker was actually the case to the air tag." The call was closed "CR-Cancel Request for Service" and appended to call SAPD-2025-0287915. |
| **July 23, 2025** Dallas PD Report 104950-2025; call 25-1304338 ("Burg of Bus") | Reported a burglary of her storage unit; the suspect "could be husband Jason McKemie," "very angry ... after leaving court." She said I "talked the office employees at Public Storage into giving him keys to her storage unit" and "took property," "possibly between 5/30/2025 and 6/30/2025." The dispatcher noted she "is armed with a 9mm Glock gun but is not lic to carry." | "RO advised that it was a civil matter due to the property being community property." Coded "Miscellaneous Incident Report No Offense." She "was adv to put it away." |
| **Apr. 16, 2026** Dallas County Constable, Pct. 5 Deputies' body cameras during the writ at my home | "There are seven police reports and a few cases open in San Antonio. He is an identity thief" (Axon Video 3 at 00:01:08). She told a deputy that an unlabeled liquid in my home was ketamine. | Asked "Do you currently have a protective order against him?" she answered "No, because my attorney advised against it," and then: "He never hit me" (ECF 135, Ex. I at 18). The deputy: "It was unlabeled liquid that she said was ketamine. I poured it out" (Axon Video 4 at 00:03:09). It was water for a soldering sponge (ECF 134 ¶ 47). |
| **May 27, 2026** San Antonio PD Report SAPD26106749 (Information Report), dispatched "for a report of a forgery." The report follows. | That I "may have committed fraud": that by calling "her HSA bank" I "was attempting to impersonate her"; that I "found out where she lived and drove to her residence"; and that letters from my doctor were fraudulent. She said she had "initially called the Dallas Police Dept. to make the report." After the officer mentioned that SAPD can take a report "such as a sexual assault," she told him "that she was drugged and raped by O-1 sometime in 2024." (I am O-1.) | "he's listed as an authorized user on the account"; "it didn't appear that he was attempting to defraud the bank"; "there didn't appear to be any evidence of criminal intent." "I asked R-1 if she wished to make a sexual assault report and she stated she didn't wish to make a report on the sexual assault." |
| **May 29, 2026** San Antonio PD Report SAPD26108224 (Information Report), dispatched "for a Narcotic Laws." The report and dash-camera frames are in this exhibit. | A person at her house (O1) and then Ms. Ulijasz (R1) reported that I "was evicted from his residence," that my belongings were abandoned and "were mailed to R1's address," and that she "found a silver case with drug paraphernalia, and a vacuum sealed bag with a green leafy substance." She handed over "a broken 'Tile' tracker" and an AirTag that "began to ring inside one of the bags O1 was placing in a pickup truck to be taken to the dump." (I am SB1.) | She "was frustrated with the lack of progress of her previous reports" and was "going through the items and throwing them away." Two days earlier she had told the same department that I "drove to her residence" and left the bags myself. Coded Information Report. My property was "taken to the property room." |

**RESULT:** I have not been arrested, charged or convicted on any of these reports. On May 21, 2025, San Antonio Police Detective Vidal (badge 2225) told me "the facts are not pointing towards any criminal action" on my end and "it's leading to the fact that these are frivolous cases" (ECF 144, Ex. 10 at 126–127).

**NOT YET RELEASED:** Each San Antonio report above carries the note "Summarized report. More data regarding this report may exist in the RMS." The City of San Antonio has withheld the rest of its files from me and has asked the Texas Attorney General for rulings four times (COSA File Nos. W671378, W760375, W815471/W815494 and W830174/W830185). Its November 5, 2026 letter states: "The requested information is related to a closed criminal investigation. The investigation did not result in a conviction or deferred adjudication."

San Antonio Police Department

## Report # SAPD26108224 - Offense/Incident Report Cover Sheet

| | DISTRICT | END DATE TIME |
|---|---|---|
| May 29, 2026 15:28 | 7220 / 72 / PRUE / Northside ISD (Bexar) / 8 | May 29, 2026 12:55 - 15:28 |

### INCIDENT

INFORMATION REPORT

[redacted] SAN ANTONIO, TX 78230

### INVOLVED PERSONS

| | NAME | HOME ADDRESS | DOB | RACE | SEX |
|---|---|---|---|---|---|
| SB-1 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| R-1 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| O-1 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

### INVOLVED PROPERTY

| | | DESCRIPTION |
|---|---|---|
| Found | Other | SILVER CASE WITH DRUG PARAPHERNALIA INSIDE |
| Found | Narcotics | marijuana |

### NARRATIVE

I was dispatched to the above address for a Narcotic Laws. I arrived on scene and made contact with O1.

O1 stated R1 has been dealing with SB1 since last year (reference SAPD-2025-0288323, SAPD25041335, SAPD24277190, SAPD25002158). O1 stated R1 and SB1 are currently going through separation. O1 reported SB1 was evicted from his residence and told the movers that he did not want the remaining bags of his belongings on the front yard (thus abandoning the property). O1 told me SB1's remaining belongings were mailed to R1's address, and R1 was in the process of going through the items and throwing them away. O1 reported R1 found a silver case with drug paraphernalia, and a vacuum sealed bag with a green leafy substance. O1 showed me the case and with my training and experience I identified the substance to be marijuana. O1 told me R1 wished to turn it over to the police. O1 also told me R1 is concerned that SB1 would contact police and make a claim that there were drugs inside R1's residence.

I later made contact with R1 who was frustrated with the lack of progress of her previous reports (Listed). R1 gave me a broken "Tile" tracker which was in SB1's abandoned belongs that was shipped to her residence. While I was speaking to R1, an "Air Tag" began to ring inside one of the bags O1 was placing in a pickup truck to be taken to the dump. R1 gave me this tracker as well.

SB1's abandoned property was taken to the property room and placed under the listed barcodes. I gave R1 the SAPD case number for her records.

BWC/MVR

Drew Gonzales #0114 May 29, 2026 19:40 (e-signature)

PRINT NAME

Drew Gonzales #0114

BERNARDO TORRES #3209 May 30, 2026 13:59 (e-signature)

PRINT NAME

BERNARDO TORRES #3209

San Antonio Police Department

[redacted]

Pg 1 of 1

San Antonio Police Department

## Report # SAPD26106749 - Offense/Incident Report Cover Sheet

May 27, 2026 20:28

7310 / 73 / PRUE / Northside ISD (Bexar) / 8

May 27, 2026 14:30 - 15:30

### INCIDENT

OFFENSE CODE

INFORMATION REPORT

OFFENSE LOCATION

[redacted] SAN ANTONIO, TX 78230

### INVOLVED PERSONS

| INVOLVEMENT | NAME | HOME ADDRESS | DOB | RACE | SEX |
|---|---|---|---|---|---|
| R-1 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| O-1 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

### NARRATIVE

I was dispatched to the Prue substation for a report of a forgery. I contacted R-1 who stated that she and O-1 are divorcing and she feels he may have committed fraud. R-1 advised me that she moved to San Antonio, from Dallas, Tx, after she and O-1 separated. R-1 showed me transcripts of two phone calls made by O-1 to her HSA bank that rev status. O-1 provided the agent with some of R-1's personal information to verify the account. R-1 said she feels that O-1 was attempting to impersonate her. I stated to R-1 that it didn't appear he attempting to impersonate her and he's listed as an authorized user on the account. It appeared he was attempting to verify the status of his HSA bank card that he's authorized to possess. On the transcript it also revealed an automated phone call O-1 made in an attempt to activate a new card that was issued to him from the same account.

I again stated to R-1 that it didn't appear that he was attempting to defraud the bank. R-1 stated that O-1 found out where she lived and drove to her residence here in San Antonio. R-1 said that O-1 placed several garbage bags of assorted items and papers on her front lawn after claiming the property belonged to her. R-1 said she went through the contents of one of the bags and came across two letters that were apparently written by O-1's doctor that addressed his medical conditions and his need for continued, uninterrupted medical treatment. It was written in one of the lettters that O-1 was having problems refilling his prescription medications. It was revealed in the phone transcripts that O-1's HSA bank card was inactive and a new card was being sent to him. One of the letters was addressed to a court, but it didn't state the name of the court.

R-1 said she noticed what she thought were some inaccuracies between the two letters, such the addresses from the doctor's office was different on each letter and on one of the letters, the doctors fist name was spelled incorrectly. I advised R-1 that those inaccuracies were not enough evidence that the letters were fraudulent. R-1 said she telephoned the doctor's office and spoke with a receptionist. R-1 said she advised the receptionist of her concerns and was told by the receptionist that they don't write such letters. I also advised R-1 that I couldn't conclude that the letters were fraudulent since she never confirmed the validity of the letters with doctor himself. I also stated to R-1 that there was no evidence, as of yet, that the letters were ever presented to the court on O-1's behalf. I stated to R-1 that if the letters were fraudulent, she would not be considered a victim, as there was no evidence that O-1 attempted to defraud her or the court. I advised R-1 that there didn't appear to be any evidence of criminal intent, in this case.

R-1 said that she initially called the Dallas Police Dept. to make the report, but was referred to SAPD since the letters were discovered here in San Antonio. I advised R-1 that in some cases, SAPD could take an initial report for an event that occurred outside SAPD jurisdiction, but reported here, such as a sexual assault. R-1 then proceeded to tell me that she was drugged and raped by O-1 sometime in 2024. I asked R-1 if she wished to make a sexual assault report and she stated she didn't wish to make a report on the sexual assault. I provided R-1 with the report's case number and advised her call police if she discovered any other information that would constitute a crime where she was victimized. DMEA.

MARIO BAKER #2086 May 27, 2026 21:34 (e-signature)

PRINT NAME

MARIO BAKER #2086

PAUL HAMMOND #3112 May 28, 2026 13:43 (e-signature)

PRINT NAME

PAUL HAMMOND #3112

# EXHIBIT H

## HER CHASE STATEMENT, THE TEXT MESSAGES OF DECEMBER 12 AND 13, 2024, AND HER AMERICAN EXPRESS STATEMENT

Thirteen pages, in date order. Pages 1–2: the first two pages of the Chase checking statement for October 26 through November 27, 2024, produced by Ms. Ulijasz in DF-24-18010 as GU000960–61. Pages 3–11: the parties' text messages of December 12 and 13, 2024, from the Debtor's compilation of the thread. Pages 12–13: the transaction pages (pp. 3/7 and 4/7) of her American Express Platinum statement closing December 26, 2024, produced by her as GU000379–80. On the statements, all but the last four digits of each account number are blacked out. The boxes drawn on the American Express pages are the Debtor's own marks.

***Exhibit H, page 1 of 13. Chase statement, October 26 through November 27, 2024 (GU000960).***

CHASE
JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

October 26, 2024 through November 27, 2024
Account Number: [redacted]898

**CUSTOMER SERVICE INFORMATION**

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-888-262-4273 |
| Para Espanol: | 1-888-262-4273 |
| International Calls: | 1-713-262-1679 |

We accept operator relay calls

00222170 DRE 111 212 33324 NNNNNNNNNNN 1 000000000 18 0000
MS GWENDOLYN L ULIJASZ
539 WEST COMMERCE STREET
#2010
DALLAS TX 75208

**Please review our overdraft service options at the end of this statement**

We've included an overview of our overdraft services and fees that are available for personal checking account(s) at the end of this statement.

Please note, the following overdraft services are not available for certain accounts:

- Standard Overdraft Practice and Chase Debit Card Coverage℠ are not available for Chase High School Checking℠, Chase Secure Checking℠ and Chase First Checking℠.
- Overdraft Protection is not available for Chase Secure Checking℠ and Chase First Checking℠.

If you have questions, please visit **chase.com/overdraft** or call us at the number on this statement. We accept operator relay calls.

**CHECKING SUMMARY** Chase Sapphire Checking

| | AMOUNT |
|---|---|
| **Beginning Balance** | **$14,504.24** |
| Deposits and Additions | 134,199.71 |
| ATM & Debit Card Withdrawals | -500.00 |
| Electronic Withdrawals | -69,835.23 |
| Fees | -25.00 |
| **Ending Balance** | **$78,343.72** |
| Annual Percentage Yield Earned This Period | 0.01% |
| Interest Paid This Period | $0.23 |
| Interest Paid Year-to-Date | $2.30 |

**DEPOSITS AND ADDITIONS**

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 10/28 | Remote Online Deposit 1 | $3,084.16 |
| 10/29 | Mspbna ACH Trnsfr PPD ID: 1391321258 | 0.11 |
| 11/06 | Accenture Llp Payroll PPD ID: 1720542904 | 10,607.36 |
| 11/06 | Accenture Llp Payments PPD ID: 8975729001 | 70.00 |
| 11/12 | Online Transfer From Chk ...6893 Transaction#: 22695263377 | 3,400.00 |
| 11/20 | Payoneer 7362 EDI Paymnt 366184728596456 CCD ID: 1352254039 | 123.79 |
| 11/21 | Accenture Llp Payroll PPD ID: 1720542904 | 106,407.03 |

Page 1 of 4

GU000960

**Exhibit H, page 2 of 13. Chase statement, continued (GU000961).**

CHASE

October 26, 2024 through November 27, 2024
Account Number: [redacted]898

## DEPOSITS AND ADDITIONS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 11/21 | Accenture Llp Payroll PPD ID: 1720542904 | 10,448.03 |
| 11/26 | State of Ill Ilsttaxrfd PPD ID: 1376002057 | 59.00 |
| 11/27 | Interest Payment | 0.23 |
| **Total Deposits and Additions** | | **$134,199.71** |

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 11/25 | ATM Withdrawal 11/23 5220 W Lovers Ln Dallas TX Card 0416 | $500.00 |
| **Total ATM & Debit Card Withdrawals** | | **$500.00** |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 10/28 | 10/27 Online Transfer To Chk ...6893 Transaction#: 22516949333 | $500.00 |
| 10/28 | American Express ACH Pmt W3000 Web ID: 2005032111 | 174.00 |
| 10/31 | Zelle Payment To Travis Jpm99Aqathrj | 5,000.00 |
| 11/04 | 11/04 Payment To Chase Card Ending IN 4005 | 1,000.00 |
| 11/06 | 11/06 Payment To Chase Card Ending IN 4005 | 5,000.00 |
| 11/07 | Amex Epayment ACH Pmt A6336 Web ID: 6133133497 | 683.04 |
| 11/07 | Sofi Bank Pl Pl Pymt T52510340 Web ID: 3452499527 | 2,782.26 |
| 11/12 | Intouch Credit U Ck-Wth PPD ID: 311079474 | 1,161.70 |
| 11/13 | 11/12 Payment To Chase Card Ending IN 4005 | 12,053.39 |
| 11/15 | Zelle Payment To Housekeeperfiras Jpm99AR8Jmo1 | 40.00 |
| 11/18 | American Express ACH Pmt M8164 Web ID: 2005032111 | 15.00 |
| 11/18 | Venmo Payment 1038312877401 Web ID: 3264681992 | 158.00 |
| 11/22 | 11/22 Online Transfer To Chk ...6893 Transaction#: 22796750628 | 1,500.00 |
| 11/22 | 11/22 Payment To Chase Card Ending IN 4005 | 37,571.87 |
| 11/22 | Zelle Payment To Jason Mckemie 22806450937 | 1,500.00 |
| 11/25 | Loan-Aig 8002655054 3610000801410C Web ID: 1132592361 | 695.97 |
| **Total Electronic Withdrawals** | | **$69,835.23** |

## FEES

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 11/27 | Monthly Service Fee | $25.00 |
| **Total Fees** | | **$25.00** |

Did you know you can waive your Chase Sapphire Checking Monthly Service Fee by keeping an average daily balance of at least $75,000 in qualifying linked deposits and investments? During this statement period, your combined average daily balance was $26,181.

Page 2 of 4

GU000961

***Exhibit H, page 3 of 13. Text messages, December 12, 2024.***

I made a commitment to you to be with you and your family for Christmas , and I love them and you very much. I would be heartbroken not to be with you - and also i don't want to pretend things are okay in front of them. Somehow that seems equally heartbreaking and at risk for failure. I don't see a clear right path.

Can you let me know your feelings? I'm not sure how you're viewing the holiday right now , but can you let me know your thoughts - just in brief , and sometime today - so I can plan how much to pack etc.

I fucking hate this. I had to ask. Thank you for any insight on your thoughts.

10:03 5G

Chase Fraud: We declined $30,870.30 with card ending 4005 at PAYPAL *HALCYON1992.

Was this you? Reply YES or NO

If yes, you will not be charged unless the purchase is attempted again. If no, we will close your current card and send you a new one that you should receive in 5 to 7 business days. Msg & data rates may apply.

Chase Fraud: Thank you, we will close your card and send you a new one that you should receive in 5 to 7 business days.

If you recognize all the other charges, you don't need to do anything else.

If you see other charges that aren't yours, please call us using the number on the back of your card.

In a client mtg. The meta was fraud I guess

IMG_6779.PNG
PNG Image · 215 KB

Hi, can you pls tell me in light of the fraud charges if this was you. I assume yes.

Jason , pls pls let me know for certain that the retainer charge $5250 to Webb law was you ?

***Exhibit H, page 4 of 13. Text messages, December 12, 2024.***

Yes. That's was me

Met with an attorney yesterday and I'm following guidance.

Jason we need to talk please. I had to cancel that and American Airlines as fraud. I don't know what is going on.

If you want an attorney ok but I can't have fraud and then you're not answering me on these other charges.

All you had to do is ask me about the American Airlines. That was days ago. I noticed when you left for your trip that I didn't have a ticket to Madison so I got one because we were supposed to be going together. I thought we forgot to get one so I bought one since there was only one ticket left

Well that charge just came through today. So I didn't know.

Yeah, I would appreciate it if you would re-authorize the retainer for the attorney. I do want an attorney and that's the retainer.

Well, I definitely did not do an American Airlines today.

Ok. Thx for letting me know. The visa is cancelled bc of fraud that came through again via apple pay and pay pal. There was like $80k and 3 separate charges pending that we caught and declined.
We have to stay in open communication.

That was when you left and I thought we just didn't get me one yet.

When you told me P over I canceled the ticket

When you told me the trip was over, I canceled the ticket and we got a credit back. You can see that those came yesterday here.

American Airlines — Yesterday >
Trip Cancellation
...American Airlines home] <http://link.i...

American Airlines — Yesterday >
Your Trip Credit
...American Airlines home] <http://link.i...

I wasn't not responding to you. I was tied up talking to an attorney.

The credit back on American is yours and stays in your name. It would be easier if we can talk .

***Exhibit H, page 5 of 13. Text messages, December 12, 2024.***

I just want to know what you want. I would assume from $5k that's a divorce and not a post nup.

I have a half hour meeting starting.

I'm sure I could transfer a credit. Definitely wasn't any intention of trying to get an American Airlines credit.

It covers either potential outcome.

But that is correct that is their divorce retainer

$80,000 was definitely not attempted to be secured. Nothing remotely like that.

We can talk whenever you get a break.

I'm concerned about your health insurance coverage.

I see you drained the joint checking account. Okay. I'm not going to get upset about it. I know you probably got that advice and it would have been the first thing done

I'm concerned about bouncing bills.

I will call you in 2 mins if that is ok.

yeah, let's talk. Whole thing sucks. Just let me know when you can.

12:08

Good afternoon

Accounts

**Bank accounts (2)**

$10,442.76

$2,018.80

**Credit cards (1)**

[redacted]

***Exhibit H, page 6 of 13. Text messages, December 12, 2024.***

$5k we need for rent. $5k I need bc Accenture pulls all my business expenses straight out of my checking account . They do not pay my corp Amex card directly. You can look that policy up a Glassdoor forum or something if you need confirmation or I'll send a screenshot
Also our debt left on Sofi loan that we used for paying the wedding is pulled from my personal checking accoun. $2800 a month.

If you want me to prepay January rent right now , if that would make you feel safer I will do it . You can let me know.

Just focus on your work right now and what you gotta do. We'll figure it out.

Ok. Ok. On the Apple Pay - something is really wrong. Somehow the new chase card had new fraud start immediately. For now can we pls not attach any card to Apple Pay. Idk what is going on there.

Your mom's ring and necklace she gave to me would absolutely go back to you. It is so important to me that they do. I just wanted to let you know that if it comes to that.

There should not be any of those coming through. I don't even have that card in my phone.

Thank you. Just really try to focus on your work right now. I'm just trying to catch my breath.

I will behave this way on all matters no matter what happens. I cannot live with myself if I'm vindictive. I just have to do the next right thing as a person trying to keep integrity.

Please please talk to me jason. Ok ?

I am packing up quickly here in the room and heading out soon.

Ok. Sounds good.

$82 on eBay ? That was the other o wasn't sure

Dominique's gift

Ok thx. That charge already had gone through, so unlike the attorney retainer and the airline ticket. They said that I could call them back and let them know about that one this afternoon. Thank you.

Sure. If you see anything else, just let me know.

Idk if I should pack for two weeks or not? I think yes ? I

***Exhibit H, page 7 of 13. Text messages, December 12, 2024.***

we can talk tomorrow or this weekend.
Or if you have a decision already for Christmas you can let me know.

Sorry for all the texts I'll just shut up now.

I just got this

I'm sorry,I don't know how to answer your question. My heart and mind her in two different places.

I understand. Same.

Gwen, I shouldn't have committed to leave the house today. I'm broken. Physically, mentally, and emotionally. My back is in so much pain. I'm really having a tough time. And I've been told not to leave the house as well.

You are more than welcome to come here, shower, change clothes, get a suitcase together, and whatever else you might need. Katie's here and I know she's dying to see you. But my request would be that you could find a hotel for tonight. I'm really hurting and I just need to lay down and be still and try to relax. I'm about to run over to the CVS because my doctor just called me and some more pain meds.

And you're more than welcome to take Katie if you want to. She's missed you a ton. So I know she'd love a night with you. And if you need me to come grab her tomorrow or something like that to watch her whether it's one week or two weeks, that's totally fine too. I love her and I'd take real good care of her. But she's definitely your dog. So it's whatever you want for her.

I'm sure this sucks to hear after traveling all week. But I am absolutely destroyed, and I'm so wrecked mentally and emotionally. I just need to follow instructions right now. Stuart's even driving by here in a little bit check on me.

I hate doing this. But honestly, I don't have the energy, or even really the ability to get in a car and ride somewhere with my back like this. The only reason I'm driving across the street CVS is for those meds.

I hope you have a safe flight and sorry about this

Ok I understand. I don't know I can manage a hotel jason. I have to work tonight and be packed to leave by noon. I just honestly don't know I can turn myself around fast enough. I will see what I can do. On the hotel - we really have no money jason. My next paycheck is spoken for. It's all just going on a credit card.
Again let me see what I can do.

Hey, just do what you Gotta do and come here when you gotta come here. It will all work out.

***Exhibit H, page 8 of 13. Text messages, December 12, 2024.***

Ok I understand. I don't know I can manage a hotel jason. I have to work tonight and be packed to leave by noon. I just honestly don't know I can turn myself around fast enough. I will see what I can do. On the hotel - we really have no money jason. My next paycheck is spoken for. It's all just going on a credit card.
Again let me see what I can do.

I definitely can sleep on the floor in my office. With a hotel - I won't be done prepping work stuff , printing some materials , until late, and I have a 8am meeting. I understand you can't leave.
I'm really truly sorry you are in pain jason. I am. I won't approach you to talk.

That won't be necessary.

Thank you

It will be OK and you don't have to avoid me or anything. It's not like that. I'm not angry. Definitely not vengeful or anything like that. Actually, I'm pretty embarrassed about the whole thing and...

I'm, I'm just really sorry I made your day so fucked

Ok. Well I will give you a lot of space. I don't mind sleeping on the air mattress. I think I know where it is.
I assume Stuart has some idea about what's going on , yes ? Just want to be aware

Found out I can have you on my healthcare through cobra for 6 months. In case.

That's really kind of you. But don't worry about that right now. Just focus on your work, all that shit will work out.

Stuart knows that we're having a tough time

Ok

I'm just packing for WI up here. Just letting you know. It'll take me another 30-45 mins or so. Then I'll just be working. I'll sleep in my office. It's fine.

I came upstairs to get my pillow & saw that you had gotten yours.

I'm sleeping on the couch. I already have my CPAP down here and I sleep hard anyway.

**Exhibit H, page 9 of 13. Text messages, December 12 and 13, 2024.**

Go on up to bed when you're able to wrap up.

Jason ... I'm really concerned about you sleeping on the couch with your back. I'm up at 6:00am and I don't want to wake you. Pls sleep in the bed. But it's up to you.

I'm sure. It's all yours. Might make your morning faster too.

Send the link and I'll do it in the next 30 mins

Thank you Gwen for agreeing to make this payment today. I don't feel safe or even Informed of various options, including those you've suggested.

I want you to know that it really meant a lot to me yesterday when you were so understanding about everything, and told me that if that's what I needed to feel comfortable; that you would immediately make that payment.

I feel lost, hurt, confused, and financially isolated. I sincerely appreciate you making this payment for a retainer. I just want to get some guidance as well as options, and it's my desire to find something that would work for both of us which provides some avenue for us to work together to heal and regain each other's trust. But also want a retainer made. They can provide assistance and guidance in whatever may be needed, for whatever various come.

Once again, I asked for a reduction of retainer and they dropped it from $5750 down to $5000

Please list my name on the form so they know it's from me.

LawPay
secure.lawpay.com

Please send me a screenshot of the receipt when complete

Also have an email on drafting to cover a number of little details that we have in been able to have time to talk about some various other little things that need to be taken care of. I'll try to get out here shortly.

Despite all of this, I do hope you have a good trip. I hope that you're able to get some rest, get caught up with work, spend time with family, etc.

So what's the plan for you early next week you said that you're going to Madison you were gonna be staying there a week and you were really excited about it but now you're going on Monday to New York for this gala that Ashlee dumped on you.

and by the way, that's gonna really suck. I know you're

**Exhibit H, page 10 of 13. Text messages, December 13, 2024.**

really looking forward to spending time with family. So having to ditch family to go do that he's gonna be kind of a bummer.

I was just curious what you're playing was after that. Are you going back to Madison after that are you cutting Madison short going to New York and then come back here?

Ok. I'm just sitting here a minute. Sick. Give me like 2 mins pls.

Ok. Doing now.

I can relate Gwen. I've been destroyed over this, completely devastated.

Hearing that you told your mother that, really felt like a dagger right in the heart. I am deeply sad and quite literally blowing my eyes out right now.

I just wanted to talk to this attorney and see what options there are and get some guidance. And I'm looking for things with a potentially positive outcomes, but I also want to understand all potential outcome so I'm not caught off guard anymore. It's just tearing me apart to hear these things as a surprise.

Again, just thanks for making the payment. I want to be on this appointment.

Thank you. Have a good trip.

I just don't think you have any idea how bad this hurts for me right now. How sad it makes me. And how much I freaking miss you.

Anyway, travel safe

I was typing a reply but I actually really feel car sick from that ride. I'm going to check my bag and take a few

**Exhibit H, page 11 of 13. Text messages, December 13, 2024.**

minutes.
I don't have an attorney. I won't have one until Monday maybe Tuesday. I can't manage my job and find an attorney. Also my work email is fucked bc apparently Accenture has one of their global servers down. It's been for the last day. So yes I need my Mac. Like 20% of the company is affected which is insane that it's still going on.

Here's proof. I freaking have to ask Ashley for people's cell phone numbers.

I understand that and that's fine. We don't have to have one on the same day.

I did find one, and I have had an initial consultation and then a 30 minute discussion.

Today will supposedly have a little more time to explore Various options, what they look like, what they entail, etc.

The thing I like about him is, he's not someone that appears in any way like motivated to get people divorced. He actually asked a lot of questions regarding options that were geared towards giving the marriage the best shot possible before other options. I'm not making any interpretations of what your thoughts are in that matter, nor am I making decisions on what those things may be.

But for me, and where my heart is at, such an approach feels mature, healthy, and hopeful. And my God I need that so bad right now.

I also want you to know that I'm not meeting with this attorney to be nasty or anything like that. I don't wanna do anything destructive.
The reason I have so hurt right now, it's because I know all too well for the moment parents are involved, especially elderly parents, damage control becomes almost impossible

They never forget it

The irony is is I'm telling my mom this morning how I'm so proud of how hard you're attacking this new job you're telling your dementia mother about our serious problems.–

**Exhibit H, page 12 of 13.**
**American Express Platinum statement closing December 26, 2024, p. 3/7 (GU000379).**

**Platinum Card®**
GWENDOLYN ULIJASZ
Closing Date 12/26/24

p. 3/7

Account Ending [redacted]008

| | |
|---|---|
| **Customer Care & Billing Inquiries** | **1-800-525-3355** |
| International Collect | 1-954-473-2123 |
| Cash Advance at ATMs Inquiries | 1-800-CASH-NOW |
| **Large Print & Braille Statements** | **1-800-525-3355** |

**Hearing Impaired**
Online chat at **americanexpress.com** or use **Relay dial 711** and **1-800-525-3355**

**Website:** americanexpress.com

**Customer Care & Billing Inquiries**
P.O. BOX 981535
EL PASO, TX
79998-1535

**Payments**
PO BOX 6031
CAROL STREAM IL
60197-6031

## Payments and Credits

### Summary

| | Pay In Full | Pay Over Time / Cash Advance ♦ | Total |
|---|---|---|---|
| **Payments** | -$12,532.85 | $0.00 | -$12,532.85 |
| **Credits** | $0.00 | $0.00 | $0.00 |
| **Total Payments and Credits** | **-$12,532.85** | **$0.00** | **-$12,532.85** |

### Detail

*Indicates posting date

| **Payments** | | **Amount** |
|---|---|---|
| 11/28/24* | MOBILE PAYMENT - THANK YOU | -$627.76 |
| 12/22/24* | MOBILE PAYMENT - THANK YOU | -$11,905.09 |

## New Charges

### Summary

| | Pay In Full | Pay Over Time ♦ | Total |
|---|---|---|---|
| **Total New Charges** | **$21,905.09** | **$0.00** | **$21,905.09** |

### Detail

**GWENDOLYN ULIJASZ**
Card Ending [redacted]008

| | | | | Amount |
|---|---|---|---|---|
| 11/27/24 | UBER ONE<br>8005928996 | help.uber.com | CA | $96.00 |
| 12/07/24 | LINKEDINPRE *17966424<br>SUBSCRIPTION | LNKD.IN/BILL | CA | $29.99 |
| 12/12/24 | SPOTIFY<br>8777781161 | NEW YORK | NY | $13.07 |
| 12/12/24 | STARBUCKS STORE 0624<br>FAST FOOD RESTAURANT | SAN ANTONIO | TX | $4.95 |
| 12/13/24 | KWIK TRIP #1205 0001<br>608-253-0050 | BARABOO | WI | $21.14 |
| 12/13/24 | WEBB FAMILY LAW FIRM PC<br>PROFESSIONAL SERVICE | DALLAS | TX | $5,000.00 |
| 12/13/24 | La Madeleine A DFW<br>9800 75261 | Dallas | TX | $27.30 |
| 12/13/24 | MSN 0503A Travelmart<br>10069 53704<br>HARVARD BUSINESS RE<br>ECONOMIST<br>LIFE & STYLE PREMIU<br>RXBAR BLUEBERRY | Madison | WI | $46.19 |

GU000379

Continued on reverse

**Exhibit H, page 13 of 13. American Express Platinum statement, p. 4/7 (GU000380).**

GWENDOLYN ULIJASZ Account Ending [redacted]008 p. 4/7

## Detail Continued

| | | | | Amount |
|---|---|---|---|---|
| 12/14/24 | HARGRAVE FAMILY LAW<br>PROFESSIONAL SERVICE | DALLAS | TX | $10,195.00 |
| 12/15/24 | NIKEPOS_US<br>SPORTS CLOTHING | BEAVERTON | | $381.77 |
| 12/17/24 | PROPAY*Cozy Chic Homestays, LLC 393672<br>underwriting+1706837339@r | 8137630245 | TX | $103.51 |
| 12/17/24 | PROPAY*Cozy Chic Homestays, LLC 393672<br>underwriting+1706837339@r | 8137630245 | TX | $3,921.88 |
| 12/17/24 | PROPAY*Cozy Chic Homestays, LLC 393672<br>underwriting+1706837339@r | 8137630245 | TX | $2,064.29 |

## Fees

| | | Amount |
|---|---|---|
| 12/26/24 | ANNUAL MEMBERSHIP FEE<br>Cover your annual membership fee and other eligible transactions using Membership Rewards points. Visit membershiprewards.com/yourcharges to explore and learn more. | $695.00 |
| **Total Fees for this Period** | | **$695.00** |

## Interest Charged

| | Amount |
|---|---|
| **Total Interest Charged for this Period** | **$0.00** |

**About Trailing Interest**
You may see interest on your next statement even if you pay the new balance in full and on time and make no new charges. This is called "trailing interest". Trailing interest is the interest charged when, for example, you didn't pay your previous balance in full. When that happens, we charge interest from the first day of the billing period until we receive your payment in full. You can avoid paying interest on purchases by paying your balance in full (or if you have a Plan balance, by paying your Adjusted Balance on your billing statement) by the due date each month. Please see the "When we charge interest" sub-section in your Cardmember Agreement for details.

## 2024 Fees and Interest Totals Year-to-Date

| | Amount |
|---|---|
| Total Fees in 2024 | $724.00 |
| Total Interest in 2024 | $0.00 |

## Interest Charge Calculation

Days in Billing Period: 31

Your Annual Percentage Rate (APR) is the annual interest rate on your account.
Variable APRs will not exceed 29.99%.

| | Transactions Dated From | To | Annual Percentage Rate | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|---|---|
| Pay Over Time | 08/01/2020 | | 22.49% (v) | $0.00 | $0.00 |
| Cash Advances | 05/01/2019 | | 29.49% (v) | $0.00 | $0.00 |
| **Total** | | | | | **$0.00** |

(v) Variable Rate

GU000380